UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

In re:                                        Case No: 14-35132-AJC

PZP Investments, Inc.,                        Chapter 11

Debtor.

_____/

## MOTION BY INTERNATIONAL FINANCE BANK
## FOR RELIEF FROM STAY

**Any interested party who fails to file and serve a written response to this motion within 14 days after the date of service stated in this motion shall, pursuant to Local Rule 4001-1(C), be deemed to have consented to the entry of an order granting the relief requested in the motion.**

Filed on the eve of the foreclosure sale, this Chapter 11 proceeding is delaying creditor, International Finance Bank's ("IFB") recovery of substantial indebtedness secured by real property that bears no remaining equity. Moreover, the collateral is severely imperiled in that it is a leasehold interest and as a result of debtor's defaults the Landlord has purported to terminate the tenancy (and which Debtor concedes). Therefore, IFB moves for relief from the automatic stay upon the following grounds:

1.      Jurisdiction of this motion is predicated upon Title 28 U.S.C. §1334, and Title 11 U.S.C. §362. This matter is a core proceeding pursuant to 28 U.S.C. §157(b)(2)(G).

**I. Background**

2.      On November 13, 2014, PZP Investments, Inc. ("Debtor") filed its petition for relief under Chapter 11 of Title 11 of the United States Code.

3.      On December 12, 2014, Debtor filed its Schedules. [DE-21].

## A. Promissory Note 1

4.      On or about October 4, 2004, Debtor executed and delivered a Term Loan Promissory Note ("Note 1") to IFB in the principal amount of One Million Eight Hundred Seventy-Five Thousand ($1,875,000.00) Dollars. A copy of Note 1 is attached and marked Exhibit "A".

5.      As security for Note 1, Debtor granted a Mortgage and Security Agreement in the following legally described property:

> A portion of Tract "D" of "NARANJA LAKES SHOPPING PLAZA", according to the plat thereof as recorded in Plat Book 120, at Page 59, of the Public Records of Miami-Dade County, Florida, Being more particularly described as follows:
>
> Commence at the Westerly corner of said Tract "D", which is a common corner with Tract "A", said common corner being on the Northeasterly Right-of-Way line of Naranja Lakes Boulevard, as shown on the aforementioned plat of "NARANJA LAKES SHOPPING PLAZA"; Thence S. 48' 42'16"E. Along said Northeasterly Right-of-Way line of Naranja Lakes Boulevard for 470.79 feet to a point; Thence run N. 41' 17' 44"E. for a distance of 56.59 feet to the Point of Beginning of the herein described parcel of land; Thence run S. 48' 41 '15"E. for a distance of 54.77 feet to a point of curvature of a circular curve, concave to the South and having for its elements a radius of 25.00 feet and a central angle of 90' 00' 00"; Thence run Southerly, Easterly and Northerly, along the arc of said circular curve, for an arc distance of 39.27 feet to a point of tangency; Thence run N. 41' 18' 45"E. for a distance of 213. 8 feet to a point; Thence run N. 48' 45' 31 "W. for a distance of 79.84 feet to a point; Thence run S. 41' 17' 44" W. for a distance of 238.48 feet to the Point of Beginning. Said describer parcel of land containing 18,901.32 square feet, more or less.

By instrument dated October 4, 2004, and recorded on October 8, 2004, in Official Records Book 22720, at Page 2665, of the Public Records of Miami-Dade County, Florida. A copy of the Mortgage and Security Agreement is attached as Exhibit "B".

6.      As further security and collateral for Note 1, Debtor granted to IFB a Leasehold Mortgage and Security Agreement, dated October 4, 2004, and recorded on October 8, 2004,

in Official Records Book 22720, at Page 2699, of the Public Records of Miami-Dade County,

Florida, in that certain Ground Lease by and between Lordhill Properties Corp., a Delaware

corporation (the "Ground Lessor"), and Debtor in the following legally described real

property:

> A Portion of Tract "D" of Naranja Lakes Shopping Plaza according to the Plat as recorded in Plat Book 120, at Page 59 of the Public Records of Miami-Dade County, Florida, being more particularly described as follows:
> Commence at the South 114 comer of Section 33, Township 56 South, Range 39 East; Thence North 00' 49'13" West, along the East line of the Southeast 114 of said Section 33,790.57 feet to the intersection with the centerline of U.S. Highway No. I (State Road No. 5); Thence, along said centerline of U.S. Highway No. I North 41' 17' 44" East, 1310.85 feet to the intersection with the centerline of Naranja Lakes Boulevard as it appears on the aforementioned plat of Naranja Lakes Shopping Plaza; Thence, South 48' 42' 16" East, along said centerline of Naranja Lakes Shopping Plaza, 58.00 feet; Thence along the Southeasterly right of way line of said U.S. Highway No. I and its Southwesterly projection, North 41' 17' 44" East, 250.00 feet. To the point of beginning of the following described parcel; Thence, continuing along said Southeasterly right of way line of U.S. I, North 41' 17' 44" East, 154.00 Feet; Thence departing from said Southeasterly right of way line of U.S. Highway No. I, South 48' 42' 16" East, a distance of 140.00 feet; Thence North 41' 17' 44" East, a distance of 106.00 feet; Thence North 48' 42' 16" West, a distance of 40.00 feet; Thence North 41' 17 '44" East, a distance of 180.00 feet; Thence South 48' 42' 16" East, a distance of 247.50 feet; Thence South 41' 17' 44" West, a distance of 30.69 feet; Thence South 48' 42' 16" East, a distance of 298.29 feet; Thence South 41' 17' 44" West, a distance of 609.33 feet; Thence North 48' 42' 16" West, a distance of 470.79 feet; Thence North 41' 17' 44" East, a distance of 200.00 feet; Thence North 48' 42' 16" West, a distance of 175.00 feet to the point of beginning; containing 7.721 acres more or less.

A copy of the Leasehold Mortgage and Security Agreement is attached as Exhibit "C".

7.      On June 2, 2009, Debtor executed and delivered to IFB a Loan Modification

Agreement confirming the outstanding principal balance of $1,638,172.49.      The Loan

Modification Agreement was recorded on November 6, 2009, in Official Records Book 27074,

at Page 4139 of the Public Records of Miami-Dade County, Florida. A copy of the Loan Modification Agreement is attached and marked as Exhibit "D".

8.      On October 4, 2009, Debtor executed and delivered to IFB a Renewal Term Loan Note which, inter alia, confirmed the outstanding principal balance of $1,424,221.46, and reflected a change in the maturity date of the Loan, to wit: January 4, 2010.   A copy of the Renewal Term Loan Note is attached as Exhibit "E".

9.      On May 5, 2010, Debtor executed and delivered to IFB an Allonge to Promissory Note, which further extended the maturity date of the Loan until May 20, 2010.   A copy of the Allonge to Promissory Note is attached as Exhibit "F".

10.     On or about June 17, 2010, Debtor executed and delivered to IFB a Renewal and Increase Promissory Note confirming the outstanding principal balance of $1,532,972.25, and extending the maturity date until June 17, 2015.   A true copy of the Renewal and Increase Promissory Note is attached as Exhibit "G".

11.     To further induce IFB to lend monies and extend further credit to Debtor, the Debtor executed and delivered to IFB a Cross Collateral and Cross Default Agreement, recorded on July 1, 2010, in Official Records Book 27338, at Page 4209 of the Public Records of Miami-Dade County, Florida. A copy of the Cross Collateral and Cross Default Agreement, is attached as Exhibit "H".

**B. Note 2**

12.     On or about January 12, 2007, Debtor executed and delivered to IFB a Term Loan Promissory Note in the principal amount of Nine Hundred Thousand ($900,000.00) Dollars ("Note 2").  A copy of Note 2 is attached as Exhibit "I".

## C. State Court Foreclosure

13.     Debtor defaulted under Note 1 and Note 2 by failing to pay the renewal note when due. IFB elected to accelerate the indebtedness under the note.

14.     On June 19, 2012, IFB filed a foreclosure action against Debtor in the Circuit Court of the Eleventh Judicial Circuit, in and for Miami-Dade County, Florida.

15.     On or about April 4, 2013, the Debtor and IFB entered into a Settlement Agreement.

16.     Debtor defaulted under the terms of the Settlement Agreement.

17.     As a consequence, on November 18, 2013, a Final Judgment of Foreclosure was entered against the Debtor in the amount of $2,116,618.16. On April 17, 2014, an Agreed Amended Final Judgment of Foreclosure was entered against Debtor and in favor of IFB in the amount of $2,116,618.16, setting a sale date for June 9, 2014 (the Amended Judgment corrected the legal description of the property). Copies of the Final Judgment of Foreclosure and Agreed Amended Final Judgment of Foreclosure are attached as Exhibits "J" and "K".

18.     The foreclosure sale in question was reset, and the operative sale date was set for November 13, 2014.

19.     Based upon the amount of the final judgment bearing interest at the prevailing legal rate, as of the petition date, Debtor was indebted to IFB in the amount of $2,215,780.27.

## D. IFB's Claim and Debtor's Collateral

20.     Debtor in its schedules, lists IFB's debt as unsecured.

21.     Schedule A lists two interests in real property – which appear to be being operated by Debtor as a single unit – one parcel which the Debtor owns in fee simple, and the other a commercial building situated upon land in which Debtor had a leasehold interest.   As set forth

above, IFB has a secured interest in both real property interests by virtue of the Mortgage and Security Agreement, Leasehold Mortgage and Security Agreement and Cross Collateral and Cross Default Agreement.

22.    Consequently, despite the Debtor's self-serving characterization, IFB's claim is a secured one.

23.    Schedule A of Debtor's Schedules list the value of the fee simple interest at $500,000.00. For purposes of this motion, IFB does not dispute this valuation.

24.    Schedule A of Debtor's Schedules does not concretely list the value of the Leasehold Interest.    The Debtor's Schedules concede that the value of the Building is contingent upon the Lease being in place.    The same Lease that Debtor admits has been terminated by the Lessor. Schedule A further concedes that upon termination of the Lease, the building (and any attendant value), reverts to the Lessor. See Notation in Schedule A under "Commercial Building" "Notes".  By way of information, the highest value that Debtor's schedules ascribes to the Building is $1,000,000.00.  As noted below, since Debtor has relinquished its possessory interest and any claim of title to the Building to the Lessor, this valuation is spurious.

25.    There is an Agreement signed between the Debtor and the Lessor, wherein the Debtor acknowledges that due to its defaults, the Lease was terminated in September 2014, and that whatever interest Debtor had in the land is extinguished.  A copy of the Agreement between Lordhill Properties Corp. and Debtor is attached as Exhibit "L".

26.    Indeed, according to the Agreement, Page 1, "any and all interest of [Debtor] in any buildings or other improvements erected on the Land including the Building (as Defined in the Original Lease and as modified in Section 5 of this Agreement) have been terminated and

title to the Building has vested in Landlord."  Exhibit "L", Page 1, penultimate whereas clause.

27.    Moreover, even without the Agreement, upon termination of the tenancy, the Building which is located on Lessor's land would revert to the Lessor.

28.    While IFB does not dispute that Debtor and the Landlord purport to have entered into an agreement terminating the Leasehold Interest, IFB has previously notified the Landlord that IFB did not receive the required notice of defaults by Debtor, and was therefore not able to step in and cure the Debtor's defaults to preserve IFB's interest in the collateral for its Loan, i.e. the Leasehold Interest.

29.    Given that Debtor concedes in its schedules that the Leasehold Interest has been terminated as to Debtor (although perhaps not as to IFB), Debtor faces a liability of over $2,215,780.27 to IFB, an additional $75,000.00 to secured creditor, Andres Zapata, and unpaid real estate taxes (for 2011, 2012, and 2013) on the real property of over $184,275.22, without only limited assets for repayment of that debt. This totals $2,475,055.49.  2014 real estate taxes which will come due March 31, 2015, are also unpaid and would increase the tax liability by approximately $56,313.79 (for Tax Folios 30-6933-018-0040 and 30-6933-018-0051).  Further, the 2011 Tax Certificate could become an application for Tax Deed in 2015.

30.    Debtor's assets (according to Debtor's own Schedules) would be limited to the fee simple property (approx. $500,000.00) and other assets ($151,000 in furniture and machinery, and $4,890.28 in cash).    The total scheduled value of Debtor's assets are $655,890.28.

31.    It is beyond peradventure that Debtor has no equity available in the real property, as the secured debts significantly exceed the value of the property.

32.    Additionally, at the §341 meeting of the Creditors, the Debtors testified under oath that the monthly gross income of the business is approximately $40,000.00.  The Debtor

further identified the following approximate monthly expenses:

| | | |
|---|---|---|
| • | Payments to Principals | $2,000 |
| • | Lease Payment | $5,000 |
| • | Electricity | $10,000 |
| • | Trash | $1,600 |
| • | Water bill | $1,600 |
| • | Insurance (CGLI & Property) | $2,400 |
| • | Payroll (3 employees) | $4,500 |
| • | Lawn Service | $500 |
| • | Alarm | $100 |
| • | Maintainance | $2000 |
| • | Accountant | $200 |
| | Subtotal | $29,900 |

**33.** This arguably leaves the debtor approximately $10,100 per month. Property taxes divided amongst 12 months equates to $4,692.82 (just for current year, not taking into account 3 years of arrears of approximately $184,275.22). This leaves less than $5,400.00 per month to be applied towards the secured creditor's debt of $2,215,780.27 due to IFB, and $75,000.00 due to Andres Zapata.

**34.** Further, under oath, the Debtor stated that its sole source of revenue is from sub-tenant rental payments, which are not consistent, are often not for the full amount of rent owed, and are not paid on a regular schedule (such as the first of the month).

**35.** IFB submits that under the above scenario, Debtor does not present a viable prospect for reorganization.

**36.** Debtor has not offered or tendered adequate protection to IFB, and given the financial reality set forth above, including the fact that the principal assets in question purports to have been conveyed to Lessor by Agreement, or reverted to the Lessor upon the termination of the Leasehold Interest, IFB submits that it does not have adequate protection under 11 U.S.C. §362.

### The Court Should Terminate the Automatic Stay Under 11 U.S.C. § 362(d)

37. IFB is entitled to relief from the automatic stay pursuant to 11 U.S.C. § 362 (d)(2), because IFB's secured debt consumes all of the equity that Debtor might claim in the real property and this case is not viable for an effective reorganization.

38. Under 11 U.S.C. § 362 (g)(2), it is the Debtor's burden to establish that the collateral is "necessary to an effective reorganization." "What this requires is not merely a showing that if there is conceivably to be an effective reorganization, this property will be needed for it; but that the property is essential for an effective reorganization *that is in prospect*. This means…that there must be 'a reasonable possibility of a successful reorganization within a reasonable time.'" *United Savings Association of Texas v. Timbers of Inwood Forest Associates, Ltd.*, 484 U.S. 365 (1988).

39. Because the Debtor concedes that the Leasehold Interest in the property at issue has been terminated, it logically follows that it cannot play any significant role in the reorganization. Similarly, the other parcel, which is vacant, cannot play any significant role in the reorganization.

40. To determine that there can be an effective reorganization, the debtor must persuade the Court that the operation of the business will generate sufficient income to pay debt service. *In re L & M Properties, Inc.*, 102 B.R. 481, 485 (Bankr. E.D. Va. 1989). In this

case, Debtor's Schedules indicate no cash on hand other than $4,890.28 in two bank accounts (at IFB and Chase). *See Debtor's Schedule B*. On its face, Debtor's bankruptcy petition demonstrates no ability to make any payments to IFB and no reorganization in prospect.

41.     In addition to the reasons set forth in support of relief from the automatic stay pursuant to 11 U.S.C. § 362 (d)(2), IFB believes grounds also exist for stay relief for cause, as set forth in 11 U.S.C. § 362 (d)(1), because IFB submits that this case fits within the parameters of a bad faith filing under the factors set forth in *Phoenix Piccadilly, Ltd. v. Life Ins. Co. of Va. (In re Phoenix Piccadilly, Ltd.)*, 849 F.2d 1393 (11th Cir. 1988) and its progeny. *See also, In re Albany Partners, Ltd.*, 749 F.2d 670 (11th Cir. 1984); *In re Waldron*, 785 F.2d 936 (11th Cir. 1986); and *In re Sar-Manco, Inc.*, 70 B.R. 132, 139 (Bankr. M.D. Fla. 1986)("The issue is whether the Debtor's invocation of the protection afford by Chapter 11 is for the reasons consistent with the congressional intent of rehabilitating and reorganizing businesses or whether it filed for the purpose of delaying and frustration [Creditor] from proceeding with foreclosure sale and realizing on his collateral.").

42.     Specifically, the *Phoenix Piccadilly* factors to be considered include: (a) that the debtor has only one asset, which is real estate, and for which it doesn't hold legal title—thus, that this is a single asset real estate case; (b) there are very few unsecured creditors whose claims are small in comparison to those of the secured creditors; (c) there are few employees of the debtor; (d) there is a foreclosure on the property based upon arrearages on the debt; (e) the debtor's financial problems primarily result from a dispute between the debtor and the secured creditor and can be resolved in the pending state court action; and (f) the timing of the debtor's filing evidences an intent to delay or frustrate the secured creditor's efforts to enforce its rights. *Id.* at 1394-95.

43. Here, all such factors are met. First, Debtor does indeed seem to be a de facto single asset real estate entity, despite not self-identifying as such in its petition. The Debtor only holds title to one vacant parcel, and admittedly does not hold title to the putatively more valuable parcel which it formerly occupied under a Leasehold Interest, and now occupies under the October 1, 2014 Agreement with the Lessor. And Debtor utilizes the two parcels as a single unit, presumably deriving its revenue from such joint operation.

44. In further accord with the *Phoenix Piccadilly* factors, there are very few creditors at all, and IFB is far and away the largest one. Debtor has no employees or wage obligations identified on the Debtor's Schedules (at the Section 341 meeting, Debtor said it has only 3 employees). There was a pending foreclosure action in state court, in which the foreclosure sale was scheduled. The financial problems stem from the dispute between Debtor and IFB, and these could be easily resolved in the pending foreclosure action in state court. The bankruptcy petition was the morning of the scheduled foreclosure sale, evidencing an intent to frustrate or delay IFB's recovery.

45. Moreover, IFB submits that it lacks adequate protection and relief from the automatic stay is also warranted under 11 U.S.C. §362(d)(1).

46. The automatic stay is among the most powerful tools available to debtors. It should not be misused, nor should it become the reason for bankruptcy filings. Indeed, the filing of a bankruptcy petition merely to prevent foreclosure is an abuse of the Bankruptcy Code. *In re Selinsky*, 365 B.R. 260 (Bankr. S.D. Fla. 2007); *see also In re Caprirolo*, 2010 WL 3222056 (Bankr. S.D. Fla. 2010). Debtor is liable to IFB under the final judgment of foreclosure, and the sole purpose of the Chapter 11 filing was to provide Debtor with relief from the scheduled foreclosure sale and to thwart IFB's efforts to realize value from the

property. Thus, relief from stay should be granted in this case.

47.    Once the stay is terminated, the Debtors will have minimal motivation to insure, preserve or protect the collateral. Therefore, IFB requests that the Court waive the 14 day stay period imposed by the order terminating the stay under Fed. R. Bankr. P. 4001(a)(3).

**WHEREFORE**, IFB respectfully requests that this Court enter an order granting stay relief to IFB to proceed with all remedies available relative to the real property and to award such further relief as deemed appropriate.

Dated: December 17, 2014.

## CERTIFICATION OF COUNSEL

I hereby certify that I am admitted to the Bar of the United States District Court for the Southern District of Florida and I am in compliance with the additional qualifications to practice in this court set forth in Local Rule 2090-1(A).

**LAW OFFICE OF JONATHAN A. HELLER, P.A.**
36 N.E. First Street,
Suite 310
Miami, Florida 33132
Telephone No.: (305) 372-5000
Facsimile No.: (305) 372-0052
E-mail Address: jonathan@hellerlaw.com

By:_____

JONATHAN A. HELLER, ESQ.
Florida Bar: 340881

## CERTIFICATE OF SERVICE

I hereby certify that on this 17th day of December, 2014, I manually filed the foregoing motion with the Clerk of the Court. I also certify that the foregoing motion is being served this day on all counsel of record and/or parties identified on the attached Service List, via email and first class U.S. Mail.

**LAW OFFICE OF JONATHAN A. HELLER, P.A.**
36 N.E. First Street,
Suite 310
Miami, Florida 33132
Telephone No.: (305) 372-5000
Facsimile No.: (305) 372-0052
E-mail Address: jonathan@hellerlaw.com

By:_____
   JONATHAN A. HELLER, ESQ.
   Florida Bar: 340881

## SERVICE LIST

*Debtor*
PZP Investments, Inc.
27455 South Dixie Highway
Miami, Florida 33032

*Attorney for Debtor*
Dolores K. Sanchez, Esq.
4701 N. Federal Highway,
Suite 316, Box B-1
Lighthouse Point, Florida 33064.
E-Mail: Dolores@bizhall.net

*U.S. Trustee*
Office of the US Trustee 51 S.W. 1st Ave.
Suite 1204
Miami, FL 33130
E-Mail: USTPRegion21.MM.ECF@usdoj.gov

Benjamin Weinstock, Esq.
1425 Tower, 15th Floor
Uniondale, NY 11556

Lordhill Properties Corp.
135 Jericho Turnpike
Old Westbury, NY 11568

## TERM LOAN PROMISSORY NOTE

US$1,875,000.00

October 4, 2004
Miami, Florida

FOR VALUE RECEIVED, the undersigned, PZP INVESTMENTS, INC., a Florida corporation (herein the "Borrower"), promises to pay to the order of INTERNATIONAL FINANCE BANK, a Florida banking corporation, its successors or assigns (herein the "Lender") at its offices at 888 Brickell Avenue, Miami, Florida 33131, or such other place as the holder hereof may from time to time designate in writing, the sum of ONE MILLION EIGHT HUNDRED SEVENTY FIVE THOUSAND AND 00/100 DOLLARS ($1,875,000.00), together with interest thereon as herein set forth.

1.    **Interest Rate.**   Interest on the principal amount of this Note from time to time outstanding shall be computed from the date hereof until the full amount of principal has been paid at a fixed rate of six and   one-half percent (6.50%) per annum (the "Interest Rate").    All computations of interest shall be based upon a 360-day year of twelve 30-day months, and in the case of any partial month, on the actual number of days elapsed in such month.

2.    **Payment Terms.**   Beginning on the 4th day of November, 2004 and on the same day of each successive calendar month thereafter, Borrower shall pay to Lender combined monthly principal and interest payment installments of $14,083.36 based on a 20-year amortization.   If not sooner paid, the balance of principal and accrued interest shall be due and payable on October 4, 2009 (the "Maturity Date").

3.    **Collateral.**   This Note is made and delivered pursuant to the provisions of , and secured by:   (a) a Mortgage and Security Agreement and a Leasehold Mortgage and Security Agreement executed by Borrower in favor of Lender of even date herewith to be recorded in the Public Records of Miami-Dade County, Florida (herein the "Mortgage") granting Lender a first lien and security interest in certain real property located in Miami-Dade County, Florida as more fully described therein (herein the "Mortgaged Property"); (b) an Assignment of Leases, Rents and Profits executed by Borrower in favor of Lender of even date herewith to be recorded in the Public Records of Miami-Dade County, Florida; (c) a UCC-1 Financing Statement from Borrower, as Debtor, to Lender, as Secured Party, to be filed with the Florida Department of State; (d) a UCC-1 Financing Statement from Borrower, as Debtor, to Lender, as Secured Party, to be   recorded in the Public Records of Miami-Dade County, Florida; (e) a Continuing and Unconditional Personal Guaranty executed by Mario V. Pino and Maria del Carmen Pino, and Oscar Zapata and Consuelo Zapata, of even date herewith, all in favor of Lender (herein collectively referred to as the "Guaranty"); and (f) certain other loan documents and instruments (hereinafter collectively called the "Loan Documents"). All of the foregoing are hereinafter referred to as the "Collateral".

The Collateral shall further secure any other indebtedness or liability of the Borrower to the Lender direct or indirect, absolute or contingent, due or to become due, now existing or hereafter

1





EXHIBIT "A"

arising, including all future advances or loans by the Lender to the Borrower.

4.    **Prepayments.** The outstanding principal balance may be prepaid in whole or in part at any time without premium or penalty.

5.    **Late Charge.** Provided the Lender has not exercised its right to accelerate this Note as hereinbelow provided, in the event any required payment on this Note is not received by Lender within ten (10) days after said payment is due, Borrower shall pay to Lender a late charge equal to five percent (5%) of the payment not so received. The foregoing provision shall not be construed to extend the due date for any amount required to be paid hereunder. The parties agree that any such late charge is not a penalty, it being understood that said charge is fair and reasonable in order to compensate Lender for its damages and administrative expenses resulting from such late payment. Said late charge shall be immediately due and payable and shall be paid by the Borrower without notice or demand by the Lender. The failure by the Lender to collect or require payment of any late charge shall in no way prejudice the right of the Lender to collect or require payment of a late charge in connection with subsequent late payments. Time is of the essence as to each and every of the Borrower's obligations hereunder.

6.    **Application of Payments.** All payments shall be applied first to the Lender's costs of collection as provided elsewhere herein, then to interest, and then to principal. All interest due hereunder shall be computed on the daily outstanding principal balance based on a 360-day year.

7.    **Default.** The occurrence of the following or any of the following shall constitute an "Event of Default" hereunder, and shall entitle Lender, at its option, to exercise any or all of its remedies hereunder:

(a)    the failure of the undersigned to pay principal, interest, or any other amount due under this Note;

(b)    any representation or warranty made by the undersigned or any other endorser hereof, or any guarantor or other party liable hereon (collectively, "Obligor"), under this Note, or any report, certificate, financial statement or other information provided by or on behalf of the undersigned to Lender in connection herewith is false or misleading in any material respect;

(c)    the failure of the undersigned or any other Obligor or any other person to fully perform when due any agreement under this Note;

(d)    the occurrence of a default or event of default under any other loan documents evidencing or securing this Loan;

(e)    the occurrence of a default or event of default under any present or future indebtedness of the undersigned to Lender not evidenced by this Note, or a default or event of default under any guaranty or security document executed by any person in connection therewith. A default

2



under this Note shall constitute a default under any such indebtedness, guaranty or security documents;

        (f)    the liquidation, dissolution or suspension of the business of the undersigned or any other Obligor, or the commencement by the undersigned or any other Obligor of a proceeding in bankruptcy or insolvency; or the consent or acquiescence of the undersigned (or such other Obligor) to such proceeding; the application by the undersigned or any other Obligor for the appointment of a receiver for all or a substantial part of its properties or the consent or acquiescence of the undersigned or such other Obligor to such proceeding; the making by the undersigned or any other Obligor of an assignment for the benefit of creditors; or the inability of the undersigned or any other Obligor or the admission by the undersigned or any other Obligor in writing of its inability to pay its debts as they mature;

        (g)    the commencement of an involuntary proceeding in bankruptcy or insolvency against the undersigned or any other Obligor, the involuntary appointment of a receiver for all or a substantial part of the properties of the undersigned or any other Obligor; or there shall be issued an order for the issuance of a warrant of attachment, execution, distraint or similar process against all or a substantial part of the properties of the undersigned or any other Obligor, and the continuance of any of the foregoing for sixty (60) days without having been vacated, discharged, stayed, bonded or dismissed;

        (h)    the entry of a judgment against the undersigned or any other Obligor in an amount in excess of $75,000.00, if twenty (20) days have elapsed and the judgment has not been vacated, satisfied or dismissed, and the enforcement of the judgment has not been stayed pending appeal;

        (i)    the issuance of a writ of attachment or garnishment against, or the imposition of a lien by operation of law on, any property of the undersigned or any other Obligor, if the amount of the claim or value of the affected property is in excess of $75,000.00, if twenty (20) days have elapsed and the proceeding or lien has not been vacated, satisfied, dismissed or stayed pending appeal;

        (j)    the merger, consolidation or reorganization of the undersigned or any other Obligor, the termination or invalidation of the undersigned's or any other Obligor's corporate existence or rights, or the transfer or disposition of all or a substantial part of its property;

        (k)    the sale, conveyance or pledge of the Mortgaged Property or any interest of Mortgagor therein;

        (l)    the determination by Lender that a material adverse change has occurred in the financial condition of the undersigned or any other Obligor from that in existence on the date hereof, which determination shall be made reasonably and in good faith;

3



The Lender shall have all of the rights and remedies of a creditor and, to the extent applicable, of a secured party under all applicable law. Without limiting the generality of the foregoing, upon the occurrence of any Event of Default hereunder, the entire amount of principal of this Note, and the entire amount then due under any instrument securing this Note, shall, at the option of Lender, without notice, bear interest from such date at the maximum rate of interest permitted by law (the "Default Rate") and Lender may, at its option, declare the entire unpaid principal and accrued interest accelerated and due and payable at once, together with any and all other liabilities and other obligations and indebtedness of Obligor to Lender, whereupon all such obligations, with accrued interest thereon, whether contingent or direct, shall forthwith become due and payable, and shall bear interest at the Default Rate, without presentment, demand, protest, or other notice of any kind from Lender, all of which are hereby waived. In addition, Lender may immediately proceed to do all things as provided by law, in this Note, the Mortgage, or any other documents executed in connection herewith to enforce its rights hereunder and to collect all amounts owing to Lender.

Each of the undersigned and any other Obligor hereby grants to Lender, to secure all indebtedness of the undersigned and any other Obligor, or any of them, to Lender, whether under this Note or otherwise, a continuing lien upon and security interest in any and all monies, securities and other property of the respective party and the proceeds thereof, now or hereafter held or received by or in transit to, Lender from or for such party, and also upon any deposits (general or special) and credits of such party, if any at Lender, at any time existing. Upon the occurrence of any default, Lender is hereby authorized at any time and from time to time, without notice to the undersigned or any other Obligor, to setoff, appropriate, and apply any or all items hereinabove referred to against all indebtedness of the undersigned or any other Obligor owed to Lender, whether hereunder, under the other Loan Documents, or otherwise, whether now existing or hereafter arising. Lender shall be deemed to have exercised such right of setoff and to have made a charge against such items immediately upon the occurrence of such default although made or entered on its books subsequent thereto.

8.   **Usury.**   Nothing herein contained, nor in any instrument or transaction related hereto, shall be construed or so operate as to require Borrower, or any person liable for the payment of the indebtedness evidenced by this Note, to pay interest in an amount or at a rate greater than the highest rate of interest which may lawfully be charged by the holder hereof under applicable law. Should any interest or other charges paid by the Borrower, or any party liable under this Note, result in the computation or earning of interest in excess of the highest rate permitted under applicable law, then any and all such excess shall be and the same is hereby waived by the holder hereof, and all such excess shall be automatically credited against and in reduction of the principal balance, and any portion of said excess which exceeds the principal balance shall be paid by the holder hereof to Borrower and to any party liable under this Note, it being the intent that under no circumstances shall the Borrower, or any party liable for the payment of the loan made hereunder, be required to pay interest in excess of the highest rate permitted under applicable law.

4



9.   **Renewals and Extensions.**   The holder hereof may, without notice and without releasing the liability of any person liable under this Note, grant extensions or renewals hereof from time to time and for any term or terms, add or release one or more such persons to this security in whole or in part. The holder hereof shall not be liable for or prejudiced by failure to collect or for lack of diligence in bringing suit on this Note or any renewal or extension hereof.

10.   **Waivers.**   As to this Note, the Mortgage and any other Loan Documents, Borrower, any endorser, any guarantors, and any persons liable hereunder severally waive all applicable exemption rights, whether under the State Constitution, homestead laws, or otherwise, and also severally waive valuation and appraisement, presentment, protest and demand, notice of protest, demand and dishonor, and nonpayment of this Note, and expressly agree that the Maturity Date of this Note, or any payment hereunder, may be extended from time to time without in any way affecting the liability of Borrower, or any endorser hereof.

11.   **Remedies Cumulative.**   The remedies of Lender as provided herein, or in the Mortgage and any other Loan Documents, shall be cumulative and concurrent, and may be pursued singularly, successively or together, at Lender's sole discretion, and may be exercised as often as occasion therefor shall arise.

12.   **Successors and Assigns.**   This Note shall be binding upon Borrower and its successors and assigns. Lender has the right, at any time, to assign, endorse, transfer and set over to any person, or legal entity, in whole or in part, this Note, the Mortgage and any other Loan Documents and security documents evidencing and/or securing the loan of reference, for such consideration as Lender may deem advisable. Therefore, Borrower, upon Lender's request, made either personally or by mail, shall certify by a writing, duly acknowledged, to Lender, or to any proposed assignee of the Loan Documents, the amount of principal and interest then owing thereunder and whether or not any offsets or defenses exist against said indebtedness, within five (5) days in case the request is made personally, or within ten (10) days after the mailing of such request, in case the request is made by mail.

13.   **Attorney's Fees.**   In the event a default occurs as herein provided, this Note may be placed in the hands of an attorney for collection and, in such event, each Obligor hereby agrees to pay the holder hereof all attorneys' fees and costs incurred by Lender.

14.   **Sales and Use Taxes.**   Obligors agree that any sales and use tax imposed by any governmental authority upon any amounts due under this Note, the Mortgage or any other Loan Documents, shall be the responsibility of Obligors.

15.   **Governing Law and Venue.**   This Note was executed by Borrower and delivered to Lender in the State of Florida. This Note is to be construed and enforced in accordance with the laws of the State of Florida, United States of America, except that the interest to be paid on this Note shall not exceed the highest legal rate applicable in this transaction under Florida or Federal law, whichever is higher. The Borrower hereby waives any pleas of jurisdiction or venue as not

5



being a resident of Miami-Dade County, Florida, and hereby specifically authorizes any action brought upon the enforcement of this Note to be commenced or suit filed in Miami-Dade County, Florida.

15.    Waiver of Trial By Jury.    LENDER AND BORROWER HEREBY KNOWINGLY, IRREVOCABLY, VOLUNTARILY AND INTENTIONALLY WAIVE ANY RIGHT ANY OF THEM MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY ACTION, PROCEEDING OR COUNTERCLAIM BASED ON THIS TERM LOAN PROMISSORY NOTE, OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS TERM LOAN PROMISSORY NOTE, OR ANY LOAN DOCUMENTS, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS WHETHER VERBAL OR WRITTEN OR ACTIONS OF ANY PARTY HERETO OR TO ANY LOAN DOCUMENT. THIS PROVISION IS A MATERIAL INDUCEMENT FOR LENDER AND BORROWER ENTERING INTO THE SUBJECT LOAN TRANSACTION.

IN WITNESS WHEREOF, the undersigned has executed and delivered this Note as of the date and year first above written.

Borrower's Address:

1070 Hunting Lodge Drive
Miami Springs, Florida 33166

BORROWER:
PZP  INVESTMENTS,  INC.,  a Florida corporation

By: _____
Name: _Oscar Zapata._
Title: _President_

6

CFN 2004R0888224
OR Bk 22720 Pgs 2665 - 2698; (34pgs)
RECORDED 10/08/2004 15:32:20
MTG DOC TAX 6,562.50
INTANG TAX 3,750.00
HARVEY RUVIN, CLERK OF COURT
MIAMI-DADE COUNTY, FLORIDA

This Instrument Was Prepared By
Record and Return To:

Pedro P. Saez, Esq.
Saez & Associates
888 Brickell Avenue, 5th Floor
Miami, Florida 33131

## MORTGAGE AND SECURITY AGREEMENT

THIS MORTGAGE AND SECURITY AGREEMENT (the "Mortgage"), made as of the 4th day of October 2004, between **PZP INVESTMENTS INC.**, a Florida corporation (the "Mortgagor"), as mortgagor and debtor, whose principal place of business is 1070 Hunting Lodge Drive, Miami Springs, Florida 33166 and **INTERNATIONAL FINANCE BANK**, a Florida banking corporation (the "Mortgagee"), as mortgagee and secured party, whose address is 888 Brickell Avenue, Miami, Florida 33131.

### ARTICLE I

### DEFINITIONS, HEADINGS, RULES OF CONSTRUCTION AND SECURITY AGREEMENT

1.1 <u>Definitions</u>. As used in this Mortgage and in the exhibits attached hereto, the following terms shall have the following meanings herein specified, such definition to be applicable equally to the singular and plural forms of such terms:

1.1.1 <u>Commitment</u>: The commitment letter from Mortgagee to Mortgagor dated July 8, 2004.

1.1.2 <u>Default Rate</u>: The Default Rate as defined in the Note.

1.1.3 <u>Environmental Law</u>: Any law, enactment, statute, code, ordinance, order, rule, regulation, judgment, decree, writ, injunction, franchise, permit, certificate, license, authorization, or other direction or requirement of any Governmental Authority, as same may be amended from time to time, whether now in existence or established or hereafter enacted, promulgated, adopted, entered or issued, both within and outside the present contemplation of the parties hereto, relating to pollution or protection of the environment, including but not limited to, (a) the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA"), 42 U.S.C. § 9601-9657, (b) the Superfund Amendments and Reauthorization Act of 1986 ("SARA"), Public Law 99-499, 100 Stat. 1613, (c) the Resource Conservation and Recovery Act, 42 U.S.C. § 6901-6987, (d) the Florida Resource Recovery and Management Act, Fla. Stat. § 403.702-403.7893, (e) the Pollutant Spill Prevention and Control Act, Fla. Stat. § 376.011-376.21, (f) any common law of nuisance or trespass, (g) any law, rule or regulation

-1-



EXHIBIT
"B"

relating to emissions, discharges, releases or threatened releases of pollutants, contaminants or chemicals, or industrial, toxic or other Hazardous Substances or waste into the environment (including without limitation, ambient air, surface water, groundwater, land surface or subsurface strata), (h) any law otherwise relating to the manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling of pollutants, contaminants or chemicals or industrial, toxic or other Hazardous Substances or wastes, and (i) any other designations as toxins, pollutants or contaminants by any other Governmental Authority (including, without limitation, the United States Environmental Protection Agency).

               1.1.4   Events of Default:  Those events described in Article VII hereof.

               1.1.5   Fixtures:  All goods now or hereafter incorporated into any structure now or hereafter erected upon or under the Land, in the manner of lumber, bricks, tile, cement, glass, metalwork, elevators, electrical systems, plumbing systems, air conditioning and heating systems, mechanical systems and the like whether or not permanently affixed, which, to the fullest extent permitted by applicable law in effect from time to time, shall be deemed fixtures and a part of the Land.

               1.1.6   Future Advances:  Any loan of money from Mortgagee to Mortgagor made within twenty (20) years from the date hereof.  The total amount of such loan or loans may decrease or increase from time to time, but the total unpaid aggregate balance secured by this Mortgage at any one time shall not exceed an amount equal to ten (10) times the original principal amount of the Loan, plus interest thereon, and any disbursements made for the payment of the Impositions (whether taxes, levies or otherwise), insurance, or other liens on the Mortgaged Property, with interest on such disbursements.  The Mortgagee has no obligation, whatsoever, to make a Future Advance.

               1.1.7   Governmental Authority:  Any (domestic or foreign) federal, state, county, municipal or other governmental department, entity, authority, commission, board, bureau, court, agency or any instrumentality of any of them.

               1.1.8   Governmental Requirement:  Any law, enactment, statute, code, ordinance, order, rule, regulation, judgment, decree, writ, injunction, franchise, permit, certificate, license, authorization, or other direction or requirement of any Governmental Authority now existing or hereafter enacted, adopted, promulgated, entered, or issued applicable to Mortgagee, Mortgagor or the Mortgaged Property, including, without limitation, any Environmental Law.

               1.1.9   Guarantor:  Jointly and severally any and all Persons now or hereafter guarantying the Obligations or any part thereof (collectively referred to as the "Guarantor").

               1.1.10   Guaranty:  Any guaranty of payment, performance or completion executed by any Guarantor in favor of Mortgagee with respect to the Obligations.

               1.1.11   Hazardous Substances:  Any hazardous, toxic or dangerous waste, substance or material including, but not limited to, any elements or compounds which are now or hereafter (a) identified in Section 101(14) of the CERCLA, 42 U.S.C. § 9601(14), and as set forth in 40 C.F.R. § 302, as the same may be amended from time to time, (b) determined to be toxic, a pollutant or contaminant, under any Environmental Law, (c) contained in the list of hazardous substances adopted by the United States Environmental Protection Agency, (d) defined as  "petroleum" and "petroleum products" as defined in Fla. Stat. § 376.301, as same may be amended from time to time, and (e) asbestos, radon, polychlorinated biphenyls and such other elements, compounds, materials, substances or waste which are otherwise dangerous, hazardous, harmful or deleterious to human or animal health or safety, or the environment.

-2-



1.1.12  <u>Impositions</u>: All (a) real estate and personal property taxes and other taxes and assessments, public or private; utility rates and charges including those for water and sewer; all other governmental and non-governmental charges and any interest or costs or penalties with respect to any of the foregoing; and charges for any public improvement, easement or agreement maintained for the benefit of or involving the Mortgaged Property, general and special, ordinary and extraordinary, foreseen and unforeseen, of any kind and nature whatsoever that at any time prior to or after the execution of this Mortgage may be assessed, levied or imposed upon the Mortgaged Property or the Rent or income received therefrom, or any use or occupancy thereof, (b) other taxes, assessments, fees and governmental and non-governmental charges levied, imposed or assessed upon or against Mortgagor or any of its properties and (c) taxes levied or assessed upon this Mortgage, the Note, and the other Obligations, or any of them.

1.1.13  <u>Improvements</u>: All buildings, structures, appurtenances and improvements, including all additions thereto and replacements and extensions thereof, now constructed or hereafter to be constructed under, on or above the Land, which term includes any part thereof.

1.1.14  <u>Junior Mortgage</u>:  Any mortgage permitted by Mortgagee which now or hereafter encumbers all or any portion of the Mortgaged Property and which is junior or subordinate to the lien of this Mortgage, which term shall collectively refer to all such mortgages and the note or notes secured thereby.

1.1.15  <u>Land</u>:  The real property described in <u>Exhibit "A"</u> attached hereto and made a part hereof, together with all rights, privileges, tenements, hereditaments, rights-of-way, easements, appendages, projections, appurtenances, water rights including riparian and littoral rights, streets, ways, alleys, and strips and gores of land now or hereafter in anyway belonging, adjoining, crossing or pertaining to the Land.

1.1.16  <u>Leases</u>:  Any and all leases, subleases, licenses, concessions, or grants of other possessory interests, together with the security therefor, now or hereafter in force, oral or written, covering or affecting the Mortgaged Property or any part thereof.

1.1.17  <u>Loan</u>: $1,875,,000.00 from Mortgagee to Mortgagor,  as evidenced by the Note.

1.1.18  [INTENTIONALLY OMMITED].

1.1.19  <u>Loan Documents</u>:   The Commitment and those items required by the Commitment and any other document or instrument executed, submitted, or to be submitted by Mortgagor or others in connection with the Loan, including but not limited to the: (a) Note, (b) Mortgage, (c) Leasehold Mortgage and Security Agreement; (d) Guaranty, (e) financing statements, (f) security agreements, (g) environmental indemnity agreements, and (h) any other document or instrument required to be executed by Mortgagor pursuant to the Commitment.

1.1.20     <u>Mortgaged Property</u>:  The Land, Improvements, Fixtures, Leases, Rents and Personal Property together with:

(a)  all judgments, awards of damages and settlements hereafter made resulting from condemnation proceedings or the taking of the Mortgaged Property or any part thereof under the power of eminent domain, or by agreement in lieu thereof, or for any damage thereto caused by any governmental action (whether by such taking or otherwise), such as without limitation, any award for change of grade of streets;

(b)  all judgments, awards and settlements hereafter made, and all insurance proceeds hereafter paid for any damage to the Mortgaged Property, and all unearned insurance premiums on any insurance policies maintained by the Mortgagor pursuant to this Mortgage;

-3-



(c)  all awards and refunds hereafter made with respect to any Imposition; and

(d)  the estate, right, title, interest, privilege, claim or demand whatsoever of Mortgagor, now or hereafter, either at law or in equity, in and to the Mortgaged Property.

The term Mortgaged Property includes any part of the foregoing property described as Mortgaged Property, and all proceeds, products, replacements, improvements, betterments, extensions, additions, substitutions, renewals, accessories, and appurtenances thereto and thereof.

1.1.21    Mortgagee:  International Finance Bank, its successors and assigns.

1.1.22    Mortgagor:  PZP Investments, Inc., a Florida corporation.

1.1.23    Note:  The promissory note dated of even date herewith from Mortgagor to Mortgagee, in the amount of $1,875,000.00 and by this reference made a part hereof to the same extent as though set out in full herein, and any other note given to Mortgagee evidencing a Future Advance as any of said notes may from time to time hereafter be modified, amended, extended or renewed.

1.1.24    Obligations:

(a)  Any and all of the indebtedness, liabilities, covenants, promises, agreements, terms, conditions, and other obligations of every nature whatsoever, whether joint or several, direct or indirect, absolute or contingent, liquidated or unliquidated, of Mortgagor and Guarantor, or any of them, to Mortgagee, evidenced by, secured by, under and as set forth in the Note, this Mortgage, the Guaranty, or the other Loan Documents;

(b)  Any and all other indebtedness, liabilities and obligations of every nature whatsoever (whether or not otherwise secured or to be secured) of Mortgagor (whether as maker, endorser, surety, guarantor or otherwise) to Mortgagee or any of Mortgagee's affiliates, whether now existing or hereafter created or arising or now owned or howsoever hereafter acquired by Mortgagee or any of the Mortgagee's affiliates, whether such indebtedness, liabilities and obligations are or will be joint or several, direct or indirect, absolute or contingent, liquidated or unliquidated, matured or unmatured, including, but not limited to, any letter of credit issued by Mortgagee for the account of Mortgagor; together with all expenses, attorneys' fees, paralegals' fees and legal assistants' fees incurred by Mortgagee in the preparation, execution, perfection or enforcement of any document relating to any of the foregoing; and

(c)  Any and all Future Advances.

1.1.25    Partnership:  Any general or limited partnership, joint venture, or other form of partnership, howsoever designated.

1.1.26    Permitted Title Exceptions:  Those matters, if any, described in Schedule B to the title insurance policy insuring Mortgagee's interest in this Mortgage.

1.1.27    Person:  Any individual, corporation, partnership, joint venture, association, joint stock company, trust, unincorporated organization, government, or agency or political subdivision thereof, or any other form of entity.

-4-



1.1.28   <u>Personal Property</u>: All of the following property of Mortgagor whether now owned or existing, or hereafter acquired or arising, whether located in, on, pertaining to, used or intended to be used in connection with or resulting or created from the ownership, development, management, or operation of the Land:

(a) all Improvements (to the extent same are not deemed to be real property) and landscaping;

(b) all Fixtures (to the extent same are not deemed to be real property) and goods to become Fixtures;

(c) all accounts, accounts receivable, other receivables, contract rights, chattel paper, instruments and documents; any other obligations or indebtedness owed to Mortgagor from whatever source arising; all rights of Mortgagor to receive any performance or any payments in money or kind; all guaranties of the foregoing and security therefor; all of the right, title and interest of Mortgagor in and with respect to the goods, services, or other property that gave rise to or that secure any of the foregoing, and all rights of Mortgagor as an unpaid seller of goods and services, including, but not limited to, the rights to stoppage in transit, replevin, reclamation, and resale;

(d) all goods, including without limitation, all machinery, equipment, furniture, furnishings, building supplies and materials, appliances, business machines, tools, aircraft and motor vehicles of every kind and description, and all warranties and guaranties for any of the foregoing;

(e) all inventory, merchandise, raw materials, parts, supplies, work-in-process and finished products intended for sale, of every kind and description, in the custody or possession, actual or constructive, of Mortgagor including such inventory as is temporarily out of the custody or possession of Mortgagor, and any returns upon any accounts and other proceeds resulting from the sale or disposition of any of the foregoing, including, without limitation, raw materials, work-in-process, and finished goods;

(f) all general intangibles, including without limitation, corporate or other business records and books, computer records whether on tape, disc or otherwise stored, blueprints, surveys, architectural or engineering drawings, plans and specifications, trademarks, trade names, goodwill, telephone numbers, licenses, governmental approvals, franchises, permits, payment and performance bonds, tax refund claims, and agreements with utility companies, together with any deposits, prepaid fees and charges paid thereon;

(g) all Leases and Rents (to the extent same are not deemed to be real property);

(h) all judgments, awards of damages and settlements from any condemnation or eminent domain proceedings regarding the Land, the Improvements or any of the Mortgaged Property;

(i) all insurance policies required by this Mortgage, the unearned premiums therefor and all loss proceeds thereof;

(j) all rights of Mortgagor as "developer," "declarant" or "sponsor" under any declaration or other document encumbering the Land or any portion thereof;

(k) all rights to water and sewer connections and transferable development rights and transportation, school, water and road impact fee credits;

(l) all other personal property, including without limitation, management contracts, construction contracts, architectural contracts, service contracts, engineering contracts, advertising

–5–



contracts, contracts for purchase and sale of any of the Mortgaged Property, purchase orders, equipment leases, monies in escrow accounts, reservation agreements, prepaid expenses, deposits and down payments with respect to the sale or rental of any of the Mortgaged Property, options and agreements with respect to additional real property for use or development of the Mortgaged Property, end-loan commitments, abstracts of title, all brochures, advertising materials, condominium documents and prospectuses; and

(m) all proceeds, products, replacements, additions, betterments, extensions, improvements, substitutions, renewals and accessions of any and all of the foregoing.

1.1.29    Rents:   All of the rents, royalties, issues, revenues, income, profits, security deposits and other benefits whether past due, or now or hereafter arising from the Mortgaged Property and the occupancy, use and enjoyment thereof.

1.2  Rules of Construction.  The use of any gender shall include all other genders. The singular shall include the plural and the plural shall include the singular. The word "or" is not exclusive and the use of the word "and" may be conjunctive or disjunctive in the sole and absolute discretion of Mortgagee. The captions of Articles, Sections and Subsections of this Mortgage are for convenient reference only, and shall not affect the construction or interpretation of any of the terms and provisions set forth herein.

1.3  Security Agreement.  This Mortgage constitutes a "Security Agreement" within the meaning of and shall create a security interest under the Uniform Commercial Code-Secured Transactions as adopted by the State of Florida, with respect to the Fixtures, Leases, Rents and Personal Property. A carbon, photographic or other reproduction of this Mortgage or of any financing statement shall be sufficient as a financing statement. The debtor's principal place of business and the secured party's address is set forth in the introduction to this Mortgage.

**ARTICLE II**
**GRANT**

2.1  Grant.  For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and to secure the payment, observance, performance and discharge of the Obligations, Mortgagor does by these presents give, transfer, grant, bargain, sell, alien, remise, release, assign, mortgage, hypothecate, deposit, pledge, set over, confirm, convey and warrant unto Mortgagee all estate, right, title and interest of Mortgagor in and to the Mortgaged Property, whether now owned or held or hereafter acquired by Mortgagor, subject, however, to the Permitted Title Exceptions, to have and to hold the Mortgaged Property unto Mortgagee, its successors and assigns forever.

2.2  Condition of Grant.  Subject to the provisions of this Mortgage, the condition of these presents is such that if Mortgagor shall pay, observe, perform and discharge the Obligations, or cause same to be paid, observed, performed and discharged in strict accordance with the terms thereof, then this Mortgage and the estates, interests, rights and assignments granted hereby shall be null and void, but otherwise shall remain in full force and effect.

2.3  Subrogation.  The Mortgagee is hereby subrogated to the claims and liens of all parties whose claims or liens are fully or partially discharged or paid with the proceeds of the indebtedness secured by this Mortgage notwithstanding that such claims or liens may have been cancelled and satisfied of record.

-6-

## ARTICLE III

### ASSIGNMENT OF LEASES AND RENTS

3.1 <u>Assignment</u>. The Mortgagor does hereby absolutely and unconditionally assign and transfer to Mortgagee all of Mortgagor's estate, right, title and interest in and to the Leases and Rents, to have and to hold the Leases and Rents unto Mortgagee, its successors and assigns forever. From time to time, upon request of Mortgagee, Mortgagor shall give further evidence of this assignment to Mortgagee by executing and delivering to Mortgagee specific assignments of the Leases and Rents, in form and content approved by Mortgagee. All such specific assignments shall be of the same dignity and priority as this Mortgage. From time to time, upon request of Mortgagee, Mortgagor shall also execute and deliver to Mortgagee any notification to tenants or other document reasonably required by Mortgagee.

3.2 <u>Payment of Rents to Mortgagor, as Trustee, Until Default</u>. So long as no Event of Default has occurred, Mortgagor may, as trustee for the use and benefit of Mortgagee, collect, receive and accept the Rents as they become due and payable (but in no event for more than two (2) months in advance); provided, however, that if the Rents exceed the payments due under the Note, the Mortgagor may use such excess, first, for the operation and benefit of the Mortgaged Property and, second, for the general benefit of the Mortgagor. Upon the occurrence of an Event of Default Mortgagee may, at its option, remove the Mortgagor as trustee for the collection of the Rents and appoint any other person including, but not limited to, itself as a substitute trustee to collect, receive, accept and use all such Rents in payment of the Obligations, in such order as Mortgagee shall elect in its sole and absolute discretion, whether or not Mortgagee takes possession of the Mortgaged Property. Mortgagor hereby directs each of the respective tenants under the Leases, and any rental agent, to pay to Mortgagee all such Rents, as may now be due or shall hereafter become due, upon demand for payment thereof by Mortgagee without any obligation on the part of any such tenant or rental agent to determine whether or not an Event of Default has in fact occurred. Upon an Event of Default, the permission hereby given to Mortgagor to collect, receive and accept such Rents as trustee shall terminate and such permission shall not be reinstated upon a cure of the Event of Default without Mortgagee's specific written consent. Exercise of Mortgagee's rights under this Section, and the application of any such Rents to the Obligations, shall not cure or waive any default or notice of default hereunder or invalidate any act done pursuant hereto, but shall be cumulative and in addition to all other rights and remedies of Mortgagee.

3.3 <u>Performance Under Leases</u>. Mortgagor covenants that it shall, at its sole cost and expense, (a) duly and punctually perform and discharge, or cause to be performed and discharged, all of the obligations and undertakings of Mortgagor or its agents under the Leases, (b) use its best efforts to enforce or secure, or cause to be enforced or secured, the performance of each and every obligation and undertaking of the respective tenants under the Leases, (c) promptly notify Mortgagee if Mortgagor receives any notice from a tenant claiming that Mortgagor is in default under a Lease and (d) appear in and defend any action or proceeding arising under or in any manner connected with the Leases.

3.4 <u>Leases In Good Standing</u>. All Leases are in full force and effect, and there are no defaults thereunder or any defenses or offsets thereto on the part of any tenant.

3.5 <u>Provisions of Leases and Approval of Tenants</u>. All Leases shall be inferior and subordinate to the lien of this Mortgage and the terms of each Lease shall so expressly provide. Mortgagor covenants that all Leases hereafter entered into by Mortgagor shall be in form and substance satisfactory to Mortgagee. Further, the Mortgagee specifically reserves the right to approve all proposed tenants, and any assignee or sublessee of any existing tenant.

3.6 <u>Termination or Modification</u>. Mortgagor covenants that it shall not, without the prior express written consent of Mortgagee, enter into a Lease, or modify, terminate, extend, amend, or consent to the cancellation or surrender of any Lease, or permit any tenant under any Lease to assign or sublet its rights thereunder.

-7-



3.7 <u>Delivery of Executed Leases and Monthly Status Reports</u>. Mortgagor covenants that it shall furnish Mortgagee with executed copies of all Leases within ten (10) days after the execution thereof, and a monthly status report on all leasing activities, together with such other related information as may be reasonably required by Mortgagee.

3.8 <u>No Obligation of Mortgagee</u>. This Assignment shall not be deemed or construed to constitute Mortgagee as a mortgagee in possession of the Mortgaged Property nor shall it obligate Mortgagee to take any action or to incur expenses or perform or discharge any obligation, duty or liability of Mortgagor under any Lease.

3.9 <u>Cumulative Remedies</u>. Each and every right, remedy and power granted to Mortgagee by this Article shall be cumulative and in addition to every other right, remedy and power given by the Loan Documents and now or hereafter existing in equity, at law, or by virtue of statute or otherwise. The failure of Mortgagee to avail itself of any of its rights, remedies and powers shall not be construed or deemed to be a waiver thereof.

3.10 <u>Notification of Mortgagee's Rights</u>. Mortgagee shall have the right, but not the obligation, at any time and from time to time, to notify any tenant under any Lease of the rights of Mortgagee as provided in this Article III and Mortgagor, upon demand from Mortgagee, shall confirm to such tenant the existence of such rights.

3.11 <u>Management and Leasing</u>.

3.11.1 The Mortgagor covenants that the Mortgaged Property shall be managed by the Mortgagor or by a management company which shall have been approved in writing by the Mortgagee and pursuant to a management agreement which shall have been approved in writing by the Mortgagee prior to the execution thereof. If, in the judgment of Mortgagee, the Mortgaged Property is not being properly managed, then Mortgagee may require Mortgagor to employ a qualified property manager approved by Mortgagee.

3.11.2 During any period of time in which the Mortgaged Property (or any portion thereof) is leased or utilized as a rental property, if Mortgagee shall determine, in the exercise of Mortgagee's sole discretion, that Mortgagor has failed to proceed with reasonable diligence in the leasing of the rental space contained in or on the Mortgaged Property, Mortgagee may, at its option, require Mortgagor to employ a reputable real estate leasing organization to lease such rental space. The selection of such company by Mortgagor shall be subject to the prior written approval of Mortgagee.

3.11.3 In the event Mortgagor shall fail to select a company approved by Mortgagee within twenty (20) days after Mortgagee shall request Mortgagor to do so pursuant to Subsections (3.11.1) or (3.11.2) above, such failure shall constitute an Event of Default under this Mortgage.

3.12 <u>Leasing Commission</u>. Mortgagor covenants that every agreement to pay leasing commissions with respect to the leasing of space in the Mortgaged Property, or any part thereof, are and shall be subject, subordinate and inferior to the right of Mortgagee, so that in the event Mortgagee acquires title to the Mortgaged Property either at a foreclosure sale or by other means, Mortgagee will be exonerated and discharged from all liabilities for the payment of any such commissions or compensations.

3.13 <u>Attorney-in-Fact</u>. To further effectuate Mortgagee's rights under this Article III, Mortgagor hereby constitutes and irrevocably appoints Mortgagee its true and lawful attorney-in-fact, which appointment is coupled with an interest, with full power of substitution, and empowers said attorney or attorneys in the name of Mortgagor, but at the option of said attorney-in-fact, to (a) collect and receive the Rents and to issue receipts therefor, (b) to make, enter into, extend, modify, amend, terminate, consent to the cancellation or surrender of any Lease, or permit any tenant to assign or sublet its rights thereunder, (c) to execute, acknowledge and deliver any and all instruments and documents that Mortgagee may deem necessary or proper to implement its rights as provided in

–8–



this Article III, and (d) to perform and discharge any and all obligations and undertakings of Mortgagor under any Lease.

3.14 Other Assignments. Mortgagor shall not further assign or transfer the Leases or Rents except in favor of Mortgagee as provided in this Article III, and shall not create or permit to be created or to remain, any mortgage, pledge, lien, encumbrance, claim, or charge on the Leases or Rents. Any transaction prohibited under this Section shall be null and void.

## ARTICLE IV

### REPRESENTATIONS AND WARRANTIES

4.1 Representations and Warranties. Mortgagor hereby represents and warrants to Mortgagee that:

4.1.1 Organization, Corporate Power, Partnership Power, Etc. Mortgagor (a) if a corporation, (i) is duly organized, validly existing and in good standing under the laws of the state or country of its incorporation, (ii) has the corporate power and authority to own its properties and to carry on its business as now being conducted, and all of its issued and outstanding stock is fully paid and nonassessable, there are no outstanding rights or options to acquire any additional stock, and its stock has not been pledged or encumbered in any manner whatsoever, (iii) is qualified to do business in the State of Florida, (iv) is in compliance with all Governmental Requirements, and (v) has not amended or modified its articles or certificate of incorporation or its bylaws except as previously disclosed in writing to Mortgagee prior to the execution hereof, (b) if a Partnership, (i) is duly organized, validly existing and in good standing under the laws of the state or country of its creation, (ii) has partnership power and authority to own its properties and to carry on its business as now being conducted, (iii) is qualified to do business in the State of Florida, (iv) is in compliance with all Governmental Requirements, and (v) has not amended or modified its certificate of partnership or partnership agreement except as previously disclosed in writing to Mortgagee prior to the execution hereof, or (c) if a limited liability company (i) is duly organized, validly existing and in good standing under the laws of the state or country of its creation, (ii) has power and authority to own its properties and to carry on its business as now being conducted, (iii) is qualified to do business in the State of Florida, (iv) is in compliance with all Governmental Requirements, and (v) has not amended or modified its articles of organization or operating agreement except as previously disclosed in writing to Mortgagee prior to the execution hereof.

4.1.2 Validity of Loan Documents. (a) The execution, delivery and performance by Mortgagor of the Loan Documents, and the borrowing evidenced by the Note, (i) are within the powers and purposes of Mortgagor, (ii) have been duly authorized by all requisite action of Mortgagor, (iii) do not require the approval of any Governmental Authority, and (iv) will not violate any Governmental Requirement, the articles of incorporation and bylaws or the partnership agreement of Mortgagor or any indenture, agreement or other instrument to which Mortgagor is a party or by which it or any of its property is bound, or be in conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any such indenture, agreement or other instrument, or result in the creation or imposition of any lien, charge or encumbrance of any nature whatsoever upon any of its property or assets, except as contemplated by the provisions of the Loan Documents; and (b) the Loan Documents, constitute the legal, valid and binding obligations of Mortgagor and other obligors named therein, if any, in accordance with their respective terms.

4.1.3 Financial Statements. All balance sheets, statements of profit and loss, and other financial data that have been given to Mortgagee with respect to the Mortgagor and the Guarantor, (a) are complete and correct in all material respects, (b) accurately present the financial condition of said parties as of the dates, and the results of its or their operations, for the periods for which the same have been furnished, and (c) have been prepared in accordance with generally accepted accounting principles consistently followed throughout the periods covered thereby; all balance sheets disclose all known liabilities, direct and contingent, as of their respective dates;

-9-



and there has been no change in the condition of the Mortgagor or the Guarantor, financial or otherwise, since the date of the most recent financial statements given to Mortgagee with respect to said parties, other than changes in the ordinary course of business, none of which changes has been materially adverse.

        4.1.4   Other Agreements. Mortgagor is not a party to any agreement or instrument materially and adversely affecting it or its present or proposed businesses, properties or assets, operation or condition, financial or otherwise, and Mortgagor is not in default in the performance, observance or fulfillment of any of the material obligations, covenants or conditions set forth in any agreement or instrument to which it is a party.

        4.1.5   Other Information. . All other information, including reports, financial statements, certificates, papers, data and otherwise, given and to be given to Mortgagee with respect (a) to Mortgagor or any Guarantor, (b) to the Loan and (c) to others obligated under the terms of the Loan Documents, are true, accurate and correct in all material respects and complete.

        4.1.6   Title. Mortgagor is indefeasibly seized of and has and will have good and marketable fee simple title to the Land and Improvements free and clear of any and all mortgages, liens, encumbrances, claims, charges, equities, covenants, conditions, restrictions, easements, rights-of-way and all other matters affecting the Land and Improvements, whether or not of record, except for the Permitted Title Exceptions. Mortgagor has and will have good, absolute and marketable title to the Fixtures and Personal Property all free and clear of any and all liens, charges, encumbrances, security interests and adverse claims whatsoever, except those in favor of Mortgagee. Mortgagor will preserve its title to the Mortgaged Property and will forever warrant and defend the same to Mortgagee and will forever warrant and defend the validity and priority of the lien of this Mortgage against the claims of all persons and parties whomsoever.

        4.1.7   No Violations. No Governmental Requirement (including, but not limited to, 21 U.S.C. § 811 and 881, and 18 U.S.C. § 1961), and no covenant, condition, restriction, easement or similar matter affecting the Land or Improvements has been violated, and Mortgagor has not received any notice of violation from any Governmental Authority or any other person with respect to any of the foregoing matters.

        4.1.8   Taxes. Mortgagor has filed all federal, state, county and municipal income tax returns required to have been filed by it, and has paid all taxes that have become due pursuant to such returns, pursuant to any assessments received by it or pursuant to law, and Mortgagor does not know of any basis for additional assessment with respect to such taxes or additional taxes. The Land is assessed separately from all other adjacent land for the purposes of real estate taxes and there is no intended public improvements which may involve any charge being levied or assessed, or which may result in the creation of any lien upon the Mortgaged Property.

        4.1.9   Litigation. There are no judgments outstanding against Mortgagor and there is no action, suit, proceeding, or investigation now pending (or to the best of Mortgagor's knowledge after diligent inquiry, threatened) against, involving or affecting Mortgagor or the Mortgaged Property, or any part thereof, at law, in equity or before any Governmental Authority that if adversely determined as to the Mortgaged Property or as to Mortgagor would result in a material adverse change in the business or financial condition of the Mortgagor or Mortgagor's operation and ownership of the Mortgaged Property, nor is there any basis for such action, suit, proceeding or investigation.

        4.1.10   Utilities. There is available to the Land and Improvements through public or private easements or rights-of-way abutting or crossing the Land (which would inure to the benefit of Mortgagee in case of enforcement of this Mortgage) a water supply and a sanitary sewer service approved by all health and other authorities having jurisdiction, and electric, gas (if applicable) and telephone service, all of sufficient capacity to serve the needs of the Land and Improvements according to their intended purpose.

-10-



4.1.11   Condition of Mortgaged Property. The Mortgaged Property or any part thereof, now existing, is not damaged or injured as a result of any fire, explosion, accident, flood or other casualty. The Improvements, if any, as of the date of this Mortgage, are free of any defects in material, structure and construction and do not violate any Governmental Requirements. There is no existing, proposed or contemplated plan to modify or realign any street or highway or any existing, proposed or contemplated eminent domain proceeding that would result in the taking of all or any part of the Mortgaged Property or that would adversely affect the use or the operation of the Mortgaged Property.

4.1.12   Zoning. The Land is zoned so as to permit the Land and Improvements to be used for their intended purpose.

4.1.13   No Default. No default or Event of Default exists under any of the Loan Documents; and no event has occurred and is continuing which, with notice or the lapse of time, or both, would constitute a default under any provision thereof.

4.1.14   Fictitious Name Statute. Mortgagor, if applicable, has duly complied with all of the requirements of the Florida Fictitious Name Statute.

4.1.15   Junior Mortgage. No Junior Mortgage, if any, existing as of the date hereof requires the consent of any of the holders thereof to the Loan, the execution and delivery of the Loan Documents, or to any transaction contemplated under the Loan Documents. All Junior Mortgages existing as of the date hereof, if any, are in good standing, all principal, interest and other payments due thereunder have been paid in accordance with the terms thereof, there is no default thereunder and no event has occurred which with due notice or the lapse of time, or both, would constitute a default thereunder.

4.1.16   Environmental Contamination/Hazardous Substances. Mortgagor and the Mortgaged Property are in full compliance with all Environmental Laws, and there are no civil, criminal or administrative actions, suits, demands, claims, hearings, notices or demand letters, notices of violation, investigations, or proceedings pending or threatened against the Mortgagor or the Mortgaged Property relating in any way to any Environmental Law or any agreement, plan, order, decree, judgment, injunction, notice or demand letter issued, entered, promulgated or approved under any Environmental Law. There have never been nor are there currently any Hazardous Substances located on, in, or under the Mortgaged Property or used in connection therewith, and neither Mortgagor nor any other person has ever used the Mortgaged Property for the manufacture, processing, distribution, use, transport, handling, treatment, storage, disposal, emission, discharge or release of any Hazardous Substance. No notice or advice has been received by Mortgagor of any condition or state of facts that would be contributing to a claim of pollution or any other damage to the environment by reason of the conduct of any business on the Mortgaged Property or operation of the Mortgaged Property, whether past or present.

4.1.17   Representations and Warranties in Other Loan Documents. All of the representations and warranties contained in the other Loan Documents are true and correct.

4.1.18   USA Patriot Act. Mortgagor warrants and represents to Mortgagee neither the Mortgagor nor any affiliate thereof, is identified in any list of known or suspected terrorists published by any United States government agency, (individually, as each such list may be amended or supplemented from time to time, referred to as a "Blocked Persons List") including, without limitation, (i) the annex to Executive Order 13224 issued on October 23, 2001 by the President of the United States and (ii) the Specially Designated Nationals List published by the United States Office of Foreign Assets Control.

4.2   Reliance on Representations. The Mortgagor acknowledges that the Mortgagee has relied upon the Mortgagor's representations, has made no independent investigation of the truth thereof, is not charged with any knowledge contrary thereto that may be received by an examination of the public records in Tallahassee, Florida

-11-



and wherein the Land is located, or that may have been received by any officer, director, agent, employee or shareholder of Mortgagee.

## ARTICLE V

## AFFIRMATIVE COVENANTS

5.1 <u>Payment and Performance</u>. Mortgagor shall promptly pay and punctually perform, or shall cause to be promptly paid and punctually performed, all of the Obligations as and when due and payable.

5.2 <u>Existence</u>. Mortgagor shall preserve and keep in full force and effect its existence, rights, franchises, trade names and qualification to transact business in the State of Florida.

5.3 <u>Compliance With Laws</u>. Mortgagor shall promptly and faithfully comply with, conform to and obey all Governmental Requirements and the rules and regulations now existing or hereafter adopted by every Board of Fire Underwriters having jurisdiction, or similar body exercising similar functions, that may be applicable to Mortgagor or to the Mortgaged Property or to the use or manner of use, occupancy, possession, operation, maintenance, alteration, repair or reconstruction of the Mortgaged Property, whether or not such Governmental Requirement or rule or regulation shall necessitate structural changes or improvements or interfere with the use or enjoyment of the Mortgaged Property.

5.4 <u>Impositions</u>.

5.4.1    Mortgagor shall pay all Impositions on the Mortgaged Property and all taxes levied or assessed upon this Mortgage, the Note and the Obligations, or any of them. In the event of the passage, after the date of this Mortgage, of any law (i) making it illegal for the Mortgagor to pay the whole or any part of the Impositions, or charges or liens herein required to be paid by Mortgagor, or (ii) rendering the payment by Mortgagor of any and all taxes levied or assessed upon this Mortgage, the Note, or the Obligations or the interest in the Mortgaged Property represented by this Mortgage unlawful, or (iii) rendering the covenants for the payment of the matters set forth in Subparts (i) and (ii) of this Subsection by Mortgagor legally inoperative, the Mortgagor shall pay, upon demand, the entire unpaid Obligations notwithstanding anything in the Note, this Mortgage, or the other Loan Documents to the contrary.

5.4.2    Mortgagor shall pay all ad valorem taxes on the Mortgaged Property on or before December 1st of each year in which they become a lien on the Mortgaged Property, and shall deliver to Mortgagee tax receipts evidencing said payment on or before December 31st of each year. Mortgagor shall also deliver to Mortgagee receipts evidencing the payment of all other Impositions within thirty (30) days after same become due and payable or before same shall become delinquent, whichever is sooner.

5.5 <u>Insurance</u>.

5.5.1    The Mortgagor shall obtain, maintain and keep in full force and effect during the term of this Mortgage, with all premiums paid thereon, and without notice or demand, the following insurance with respect to the Mortgaged Property:

(a) [INTENTIONALLY OMITTED]

(b) All-Risk (Special) Hazard Insurance ("All-Risk Hazard Insurance") reflecting coverage in such amounts as Mortgagee may require, but in no event less than 100% of the full replacement cost of the Mortgaged Property that includes: (A) a mortgage endorsement naming the Mortgagee as mortgagee, which endorsement shall provide that the mortgagee's coverage will not be invalidated by a foreclosure or the acquisition of the Mortgaged Property by a deed in lieu thereof, a change in ownership of the Mortgaged

–12–



Property, a more hazardous use of the Mortgaged Property or a loss caused by the neglect of the owner of the Mortgaged Property, provided that the mortgagee pays any premium demanded should the owner of the Mortgaged Property fail to do so; the aforesaid mortgage endorsement (which creates a separate agreement between the insurance company and the mortgagee) shall also specifically cover and apply to that portion of the Mortgaged Property constituting Personal Property; (B) a replacement cost endorsement, (C) a stipulated value/agreed amount endorsement, (D) boiler explosion coverage, if applicable, (E) sprinkler leakage coverage, if applicable, (F) vandalism and malicious mischief coverage, and (G) flood insurance, during any time that the Mortgaged Property is in a designated flood plain area. Such policy shall provide that any and all loss payments thereunder be payable to Mortgagee alone and not jointly with Mortgagor. In addition, consequential and resulting losses from an insured peril shall also be covered;

(c) General Comprehensive Public Liability Insurance ("Liability Insurance") against claims for bodily injury, death and property damage, occurring in, on, or about the Mortgaged Property, in such amounts as may be required by Mortgagee, but in no event less than $2,000,000.00 per occurrence for bodily injury and property damage. Such policy shall include an additional insured endorsement naming the Mortgagee. The Mortgagor's general contractor (if applicable) shall also carry the aforesaid insurance coverage;

(d) Workers' Compensation Insurance ("Workers' Compensation") in the statutory amount, naming the Mortgagor as owner of the Mortgaged Property; and

(e) Insurance in such amounts and against such other casualties and contingencies as may from time to time be required by Mortgagee ("Other Insurance").

5.5.2    All policies of insurance required hereunder shall: (i) be written by carriers which are licensed or authorized to transact business in the State of Florida, and are rated "A" or higher, Class X or higher, according to the latest published Best's Key Rating Guide and which shall be otherwise acceptable to Mortgagee in all other respects, (ii) provide that the Mortgagee shall receive thirty (30) days' prior written notice from the insurer before a cancellation, modification, material change or non-renewal of the policy becomes effective, (iii) be written with a deductible of not more than $5,000.00 and for such amounts as are sufficient to prevent the Mortgagor from becoming a co-insurer thereunder, and (iv) be otherwise satisfactory to Mortgagee.

5.5.3    Mortgagor shall not, without the prior written consent of Mortgagee, take out separate insurance concurrent in form or contributing with regard to any insurance coverage required by this Mortgage.

5.5.4    At all times during the term of this Mortgage, Mortgagor shall have delivered to Mortgagee the original (or a certified copy) of all policies of insurance required hereby, together with receipts or other evidence that the premiums therefor have been paid.

5.5.5    Not less than thirty (30) days prior to the expiration date of any insurance policy, Mortgagor shall deliver to Mortgagee the original (or certified copy), or the original certificate, as applicable, of each renewal policy, together with receipts or other evidence that the premiums therefor have been paid.

5.5.6    The delivery of any insurance policy and any renewals thereof, shall constitute an assignment thereof to Mortgagee, and Mortgagor hereby grants to Mortgagee a security interest in all such policies, in all proceeds thereof and in all unearned premiums therefor.

5.6    Tax and Insurance Escrow. Supplementing the provisions of Sections 5.4 and 5.5 hereof, and if required by Mortgagee, Mortgagor shall pay to Mortgagee on the payment date of installments of interest as provided in the Note, together with and in addition to such installments of interest, an installment of the Impositions and insurance premiums for such insurance as is required hereunder, next due on the Mortgaged Property in an

–13–



amount sufficient, as estimated by Mortgagee, to accumulate the sum required to pay such Impositions and insurance, as applicable, thirty (30) days prior to the due date thereof. Amounts held hereunder shall not be, nor be deemed to be, trust funds, but may be commingled with the general funds of Mortgagee, and no interest shall be payable with respect thereto. Upon demand of Mortgagee, Mortgagor shall deliver to Mortgagee, within ten (10) days after such demand, such additional money as is necessary to make up any deficiencies in the amounts necessary to enable Mortgagee to pay such Impositions and insurance premiums when due. In case of an Event of Default, Mortgagee may apply any amount under this Section remaining to Mortgagor's credit to the reduction of the Obligations, at such times and in such manner as Mortgagee shall determine.

5.7  Repair.  Mortgagor shall keep the Mortgaged Property in good order and condition and make all necessary or appropriate repairs and replacements thereof and betterments and improvements thereto, ordinary and extraordinary, foreseen and unforeseen, and use its best efforts to prevent any act that might impair the value or usefulness of the Mortgaged Property.

5.8  Restoration Following Casualty.

5.8.1  If all or any part of the Mortgaged Property shall be damaged or destroyed by a casualty covered by insurance under Section 5.5, Mortgagor shall immediately give written notice thereof to Mortgagee and the appropriate insurer, and Mortgagee is authorized and empowered (but not obligated or required) to make proof of loss and to settle, adjust or compromise any claims for loss, damage or destruction under any policies of insurance required under this Mortgage. All proceeds of insurance, as provided in Section 5.5, shall be paid to Mortgagee and shall be applied first to the payment of all costs and expenses (including, without limitation, reasonable attorneys' fees and expenses) incurred by Mortgagee in obtaining such proceeds, and second, at the option of Mortgagee, either to the payment of the Obligations whether or not due, in such order as Mortgagee may elect, or to the restoration, repair, or replacement of the Mortgaged Property. If Mortgagee elects to apply the insurance proceeds to the restoration, repair or replacement of the Mortgaged Property, such proceeds shall be disbursed to Mortgagor as work progresses pursuant to a construction and disbursing agreement in form and content satisfactory to Mortgagee in its sole discretion, and Mortgagor shall promptly and diligently, regardless of whether there shall be sufficient insurance proceeds therefor, restore, repair and rebuild the Mortgaged Property to the equivalent of its condition immediately prior to the casualty. During the period of restoration and repair, Mortgagor shall continue to duly and promptly pay, perform, observe and comply with all of the Obligations. The election by Mortgagee to apply the insurance proceeds to the restoration, repair or replacement of the Mortgaged Property shall not affect the lien of this Mortgage or affect or reduce the Obligations.

5.8.2  If all or any of the Mortgaged Property shall be damaged or destroyed by a casualty not covered by insurance under Section 5.5, or, if so covered, the insurer fails or refuses to pay the claim within thirty (30) days following the filing thereof, Mortgagor shall immediately give written notice thereof to Mortgagee, and Mortgagor shall promptly and diligently, at Mortgagor's sole cost and expense, restore, repair and rebuild the Mortgaged Property to the equivalent of its condition immediately prior to the casualty. During the period of restoration and repair, Mortgagor shall continue to duly and promptly pay, perform, observe and comply with all of the Obligations.

5.8.3  If any work required to be performed under Subsections (a) or (b) above, or both, shall involve an estimated expenditure of more than $15,000.00, no such work shall be undertaken until plans and specifications therefor, prepared by an architect satisfactory to Mortgagee, have been submitted to and approved by Mortgagee.

5.8.4  Condemnation.

5.8.5  Mortgagor shall immediately notify Mortgagee upon obtaining any knowledge of the institution of any proceedings for the condemnation of the Mortgaged Property or any part thereof.

-14-



5.8.6    If all or any part of the Mortgaged Property shall be damaged or taken through condemnation (which term when used in this Mortgage shall include any damage or taking by any Governmental Authority and any transfer by private sale in lieu thereof, either temporarily or permanently), Mortgagee at its option may declare all of the unpaid Obligations to be immediately due and payable, and upon ten (10) days written notice from Mortgagee to Mortgagor all such Obligations shall immediately become due and payable as fully and to the same effect as if such date were the date originally specified for the final payment or maturity thereof. The Mortgagee shall be entitled to all compensation, awards and other payments resulting from such condemnation and is hereby authorized, at its option, to commence, appear in and prosecute, in its own or in Mortgagor's name, any action or proceeding relating to any condemnation, and to settle or compromise any claim in connection therewith. All such compensation, awards, damages, claims, rights of action and proceeds and the right thereto are hereby assigned by Mortgagor to Mortgagee and shall, be applied first to the payment of all costs and expenses (including, without limitation, reasonable attorneys' fees and expenses) incurred by Mortgagee in connection with any action or proceeding under this Section, and second, at the option of Mortgagee, either to the payment of the Obligations whether or not due, in such order as Mortgagee may elect, or to the restoration, repair or alteration of the Mortgaged Property. If Mortgagee elects to apply the condemnation awards to the restoration, repair or alteration of the Mortgaged Property, such awards shall be disbursed to Mortgagor as work progresses pursuant to a construction and disbursing agreement in form and content satisfactory to Mortgagee in its sole discretion, and Mortgagor shall promptly and diligently, regardless of whether there shall be sufficient condemnation awards therefor, restore, repair and alter the Mortgaged Property in a manner satisfactory to Mortgagee. During the period of restoration, repair and alteration, the Mortgagor shall continue to duly and promptly pay, perform, observe and comply with all of the Obligations. The election by Mortgagee to apply the condemnation awards to the restoration, repair or alteration of the Mortgaged Property shall not affect the lien of this Mortgage or affect or reduce the Obligations. If any restoration, repair or alteration of the Mortgaged Property shall involve an estimated expenditure of more than $10,000.00, same shall not be commenced until plans and specifications therefor, prepared by an architect satisfactory to Mortgagee, have been submitted to and approved by Mortgagee.

5.9  Inspection.  Mortgagor shall permit Mortgagee and its agents to inspect the Mortgaged Property at any time during normal business hours and at all other reasonable times.

5.10  Contest of Tax Assessments, Etc.  After prior written notice to Mortgagee, Mortgagor, at its own expense, may contest by appropriate legal proceedings, promptly initiated and conducted in good faith and with due diligence, the amount, validity or application, in whole or in part, of (a) any of the Governmental Requirements referred to in Section 5.3, or (b) any Imposition; provided that: (i) in the case of any unpaid Imposition, such proceedings shall suspend the collection thereof from Mortgagor and from the Mortgaged Property, (ii) the Mortgaged Property or any part thereof will not be in danger of being sold, forfeited, terminated, cancelled or lost, (iii) the use of the Mortgaged Property or any part thereof for its present or future intended purpose or purposes will not be interrupted, lost or terminated, (iv) Mortgagor shall have set aside adequate reserves with respect thereto, and (v) Mortgagor shall have furnished such security as may be required in the proceedings or as may be reasonably requested by Mortgagee.

5.11 Expenses.

5.11.1    Mortgagor shall pay all costs and expenses in connection with the Loan and the preparation, execution, and delivery of the Loan Documents including, but not limited to, fees and disbursements of counsel appointed by Mortgagee, and all recording costs and expenses, documentary stamp tax and intangible tax on the entire amount of funds disbursed under the Loan, and other taxes, surveys, appraisals, premiums for policies of title and other insurance and all other fees, costs and expenses, if any, set forth in the Commitment, the Loan Agreement, or otherwise connected with the Loan transaction.

-15-



5.11.2   Mortgagor shall pay or reimburse Mortgagee for all costs, charges, expenses, and reasonable attorneys' fees paid or incurred by Mortgagee pursuant to this Mortgage including but not limited to those costs, charges, expenses and fees paid or incurred for the payment of the Impositions, insurance, completion of construction, repairs, or in any action, proceeding or dispute of any kind in which Mortgagee is a party because of any Obligation not being duly and promptly performed or being violated, including, but not limited to, the foreclosure or other enforcement of this Mortgage, any condemnation or eminent domain action involving the Mortgaged Property or any part thereof, any action to protect the security hereof, or any proceeding in probate, reorganization, bankruptcy, or forfeiture in rem. All such amounts paid or incurred by Mortgagee, together with interest thereon at the Default Rate from the date incurred by Mortgagee, shall be secured by this Mortgage and shall be due and payable by Mortgagor immediately, whether or not there be notice or demand therefor.

5.11.3   Any reference in this Mortgage to attorneys' or counsels' fees paid or incurred by Mortgagee shall be deemed to include paralegals' fees and legal assistants' fees. Moreover, wherever provision is made herein for payment of attorneys' fees or counsels' fees or expenses incurred by the Mortgagee, said provision shall include, but not be limited to, such fees or expenses incurred in any and all judicial, bankruptcy, reorganization, administrative, or other proceedings, including appellate proceedings, whether such fees or expenses arise before proceedings are commenced or after entry of a final judgment.

5.12   Performance of the Commitment. The Obligations of the Mortgagor under the Commitment shall survive the execution and delivery of this Mortgage and Mortgagor shall timely comply with, abide by and perform all the Obligations of the Commitment on its part to be complied with, abided by and performed.

5.13   Preservation of Agreements. Mortgagor shall preserve and keep in full force and effect all agreements, approvals, permits and licenses necessary for the development, use and operation of the Mortgaged Property for its intended purpose or purposes.

5.14   Books and Records. The Mortgagor shall keep and maintain, at all times, full, true and accurate books of accounts and records, adequate to correctly reflect the results of the operation of the Mortgaged Property. The Mortgagor shall have the right to examine such books and records and to make such copies or extracts therefrom as the Mortgagee shall require.

5.15   Estoppel Affidavits. Mortgagor, within ten (10) days after written request from Mortgagee, shall furnish a written statement, duly acknowledged, setting forth the unpaid principal balance of, and interest on, the Obligations secured by this Mortgage, and whether or not any off-sets or defenses exist thereto.

5.16   Indemnification.

5.16.1   Mortgagor shall at its own expense, and does hereby agree to, protect, indemnify, reimburse, defend and hold harmless Mortgagee and its directors, officers, agents, employees attorneys, successors and assigns from and against any and all liabilities (including strict liability), losses, suits, proceedings, settlements, judgments, orders, penalties, fines, liens, assessments, claims, demands, damages, injuries, obligations, costs, disbursements, expenses or fees, of any kind or nature (including attorneys' fees and expenses paid or incurred in connection therewith) arising out of or by reason of (a) an incorrect legal description of the Land; (i) any action, or inaction of Mortgagee in connection with the Note, this Mortgage, the other Loan Documents or the Mortgaged Property; (ii) the construction of any Improvements; (iii) the use and operation of the Mortgaged Property; (iv) any acts or omissions of Mortgagor or any other Person at, on or about the Mortgaged Property regarding the contamination of air, soil, surface waters or groundwaters over, on or under the Mortgaged Property; (v) the presence, whether past, present or future, of any Hazardous Substances on, in or under the Mortgaged Property; or (vi) any past, present or future events, conditions, circumstances, activities, practices, incidents, actions or plans involving the manufacture, processing, distribution, use, transport, handling, treatment, storage, disposal, cleanup, emission, discharge, seepage, spillage, leakage, release or threatened release of any Hazardous Substance on, in,

–16–



under or from the Mortgaged Property, in connection with Mortgagor's operations on the Mortgaged Property, or otherwise; all of the foregoing regardless of whether within the control of Mortgagee.

5.16.2 The indemnifications of this Section shall survive the full payment and performance of the Obligations and the satisfaction of this Mortgage.

5.17 <u>Mortgagor to Furnish Financial Statements</u>. Mortgagor shall annually, until all the Obligations have been fully paid and performed, furnish Mortgagee with audited financial statements of Mortgagor and each Guarantor, prepared by a certified public accountant satisfactory to Mortgagee, all in such detail as Mortgagee may reasonably require. Such statements shall be furnished not later than ninety (90) days after the end of Mortgagor's fiscal year. Mortgagor shall also furnish Mortgagee with copies of all income tax returns of Mortgagor and each Guarantor simultaneously with the delivery of same to any Governmental Authority. Failure to furnish such statements shall be an Event of Default under Article VII of this Mortgage.

5.18 <u>Mortgagor to Furnish Financial Statements of the Mortgaged Property</u>. Mortgagor shall annually, until all the Obligations have been fully paid and performed, furnish Mortgagee with statements of earnings for the Mortgaged Property for each fiscal year of Mortgagor in such detail as Mortgagee may reasonably require, showing gross income and detailed operating expenses of and a balance sheet for the operation of the Mortgaged Property including where applicable the annual rent roll, (together with a schedule showing the name of each tenant, the space occupied and the Lease expiration date), other income and sales volume of tenants where Leases provide for payment of rentals based on percentages of volume of business done. All such financial statements shall be accompanied by an unqualified opinion of independent certified public accountants, satisfactory to Mortgagee, who shall certify that they have examined such statements in accordance with generally accepted auditing standards and that such statements are correct. Each such statement shall be for and cover a whole fiscal year. Such statements shall be furnished not later than ninety (90) days after the end of Mortgagor's fiscal year. Failure to furnish such statements shall be an Event of Default under Article VII of this Mortgage.

5.19 <u>Further Assurances</u>. Mortgagor, at its sole expense, upon the request of Mortgagee, shall execute, acknowledge and deliver such further instruments and do such further acts as may, in the opinion of the Mortgagee, be necessary, desirable, or proper to carry out more effectively the purpose of this Mortgage and to subject to the lien hereof any property intended by the terms hereof to be covered hereby, including, without limitation, any proceeds, renewals, additions, substitutions, replacements, products, betterments, accessions and appurtenances thereto and thereof.

5.20 <u>Junior Mortgage(s) and Rights of Mortgagee</u>.

5.20.1 Mortgagor shall, with respect to any Junior Mortgage, (i) promptly observe and perform all of the covenants and conditions contained in the Junior Mortgage, (ii) duly and promptly make all payments required by the terms of the Junior Mortgage, (iii) promptly notify Mortgagee in writing upon receipt by Mortgagor of any notice that Mortgagor is in default under the Junior Mortgage or that an event has occurred which with due notice or the lapse of time, or both, would constitute a default under the Junior Mortgage, and to promptly cause a copy of each such notice given by the holder thereof to be delivered to Mortgagee, and (iv) from time to time upon demand of Mortgagee submit evidence to Mortgagee that Mortgagor has maintained and is maintaining the Junior Mortgage in good standing. Upon receipt by Mortgagee of any such aforesaid notice, Mortgagee may rely thereon even though the existence of such default or the nature thereof may be questioned or denied by Mortgagor or by any party on behalf of Mortgagor.

5.20.2 If Mortgagor fails to make any payment required under the Junior Mortgage as and when due, or fails to perform any condition, covenant, or term of the Junior Mortgage, then Mortgagee may on behalf of Mortgagor, but without obligation to do so, and without notice to and demand upon Mortgagor, and without releasing Mortgagor from any Obligation and without waiving any Event of Default hereunder, take any

-17-



action Mortgagee deems necessary or desirable to prevent or cure any such default by Mortgagor, including, but without limitation, the right to pay any and all payments of principal and interest, insurance premiums, taxes and assessments and other sums due or to become due under the Junior Mortgage. Mortgagor hereby expressly grants to Mortgagee and agrees that Mortgagee and its agents shall have the absolute and immediate right to enter upon the Land and the Improvements or any part thereof to such extent and as often as Mortgagee in its sole discretion deems necessary or desirable in order to prevent or cure any such default by Mortgagor. All payments and all costs and expenses incurred by Mortgagee in connection with any such prevention or cure (including, without limitation, reasonable attorneys' fees and expenses), together with interest thereon at the Default Rate from the date incurred by Mortgagee, shall be secured by this Mortgage and shall be due and payable by Mortgagor immediately, whether or not there be notice, demand, an attempt to collect same, or suit pending.

      5.20.3    Nothing in this Section shall in any manner be construed as consent by Mortgagee to the further encumbering or mortgaging of the Mortgaged Property.

      5.21 Financing Statements.    Mortgagor shall execute and deliver to Mortgagee, in form and substance satisfactory to Mortgagee, such financing statements, continuation statements, and such further assurances as Mortgagee may from time to time consider reasonably necessary to create, perfect, preserve and maintain in full force and effect Mortgagee's lien upon the Fixtures, Leases, Rents and Personal Property; and, Mortgagee, at the expense of Mortgagor, may cause such statements and assurances to be recorded and rerecorded, filed and re-filed, in the name of Mortgagor, and Mortgagor hereby constitutes and irrevocably appoints Mortgagee its true and lawful attorney-in-fact, which appointment is coupled with an interest, with full power of substitution, and empowers said attorney or attorneys in the name of Mortgagor, but at the option of said attorney-in-fact, to execute and file any and all financing statements.

      5.22 Withholding Taxes.

      5.22.1    If under any applicable law or regulation or the interpretation thereof by any Governmental Authority charged with the administration thereof, Mortgagor shall be required to make any withholding or deduction from any payment of the Obligations (whether of principal, interest or otherwise) to be made by or on behalf of Mortgagor to Mortgagee for or in respect of any present or future taxes, levies, imposts, duties, charges, or fees of any nature (excepting only Mortgagee's income taxes of the United States of America and its political subdivisions), the amount due to Mortgagee from Mortgagor in respect of such payment shall be increased to the extent necessary to ensure that after making such withholding or deduction and any witholdings or deductions required to be made in respect to any such increase, Mortgagee shall receive an amount equal to the amount which Mortgagee would have received had no such withholding or deduction been required to be made. In the event of any such withholding or deduction, Mortgagor shall deliver to Mortgagee forthwith after receipt thereof the official receipt or other official documentation evidencing the payment of the amount so withheld or deducted.

      5.22.2    If Mortgagor shall fail to make any withholding or deduction so required to be made, Mortgagee reserves the right to make payment thereof to the appropriate Governmental Authority.  If Mortgagee makes such payment under any applicable law or regulation or if as a result of the interpretation thereof by any Governmental Authority charged with the administration thereof in respect of any such payment, whether of principal, interest or otherwise made or to be made by Mortgagor, Mortgagee shall be required to pay any tax, levy, impost, duty, charge or fee of any nature (excepting only Mortgagee's income taxes of the United States of America and its political subdivisions), Mortgagor shall and does hereby indemnify Mortgagee against and shall forthwith upon demand of Mortgagee pay to Mortgagee the amount of such payment, together with any interest, penalties, and expenses in connection therewith, and interest thereon at the Default Rate; and in the event any of the aforesaid amounts, interest, penalties or expenses shall be subject to withholding or deduction, the amount thereof shall be increased to the extent necessary to ensure that after making such withholding or deduction and any withholdings or deductions in respect of any such increase, Mortgagee shall receive an amount equal to the amount which Mortgagee would have received had no such withholding or deduction been required to be made.

-18-



5.22.3   Any increased amount required to be paid by Mortgagor in accordance with the provisions of this Section shall have the same character as the amount in respect of which such increased amount is determined, but shall not (i) if characterized as principal, be applied in reduction of the principal amount outstanding under the Obligations or (ii) if characterized as interest, be applied in reduction of accrued, unpaid interest under the Obligations.

5.23 <u>Hazardous Substances</u>.

5.23.1   Mortgagor shall immediately notify Mortgagee orally and in writing if Mortgagor (a) becomes aware of the presence of any Hazardous Substance or other environmental problem or liability on, in, under, released from or associated with the Mortgaged Property, or (i) receives any complaint, order, citation, notice or other written or oral communication (collectively an "Environmental Complaint") regarding air emissions, water discharges or any other environmental, health or safety matter affecting the Mortgaged Property or any part thereof, or the presence of any Hazardous Substance on, in, under, released from or associated with the Mortgaged Property, or any past, present or future events, conditions, circumstances, activities, practices, incidents, actions or plans involving the manufacture, processing, distribution, use, transport, handling, treatment, storage, disposal, cleanup, emission, discharge, seepage, spillage, leakage, release or threatened release of any Hazardous Substance on, under or from the Mortgaged Property. Mortgagor shall forthwith transmit to Mortgagee copies of any Environmental Complaint.

5.23.2   Mortgagor shall, at its own cost and expense, take any action necessary or advisable for the cleanup of any Hazardous Substance on, in, under, released from or associated with the Mortgaged Property, including any removal, containment or remedial actions in accordance with all applicable Environmental Laws, and shall pay or cause to be paid all cleanup, administrative, enforcement and other costs, expenses or fines which may be asserted against Mortgagor, Mortgagee, the Mortgaged Property, or any other Person in connection therewith.

5.23.3   Mortgagee shall have the right but not the obligation, and without any limitation of Mortgagee's other rights under this Mortgage, to enter onto the Mortgaged Property or to take any action as it deems necessary or advisable to cleanup, remove, resolve or minimize the impact of, or otherwise deal with, any Hazardous Substance or any Environmental Complaint following receipt of any notice from any Person or Governmental Authority asserting the existence of any Hazardous Substance or an Environmental Complaint pertaining to the Mortgaged Property or any part thereof which, if true, could result in an order, suit or other action against Mortgagor or Mortgagee which, in the sole opinion of Mortgagee, could jeopardize Mortgagee's security under this Mortgage. All costs and expenses incurred by Mortgagee in the exercise of any such rights shall be secured by this Mortgage and shall be payable by Mortgagor upon demand.

5.23.4   Mortgagor shall, within thirty (30) days of Mortgagee's written request, cause to be prepared an environmental audit of the Mortgaged Property (but not more frequently than annually unless an Environmental Complaint is then outstanding) and, if required by Mortgagee, an environmental risk assessment of the Mortgaged Property including Hazardous Substances waste management practices and Hazardous Substances waste disposal sites thereon. All environmental audits and environmental risk assessments shall be at Mortgagor's expense, shall be performed and prepared by an environmental consultant satisfactory to Mortgagee, and shall otherwise be in form and substance satisfactory to Mortgagee. Should Mortgagor fail to provide such environmental audit or environmental risk assessment within said thirty (30) day period, Mortgagee shall have the right, but not the obligation, to retain an environmental consultant to perform and prepare same. All costs and expenses incurred by Mortgagee in the exercise of such rights shall be secured by this Mortgage and shall be payable by Mortgagor upon demand or charged to Mortgagor's loan balance at the discretion of Mortgagee.

5.24 <u>Financial Reports, Etc.</u>   Mortgagor shall, at Mortgagor's sole cost and expense, provide Mortgagee with any financial statements, financial reports, appraisals or other documentation with respect to

-19-



Mortgagor or the Mortgaged Property which may be required from time to time by any Governmental Authority having regulatory authority over Mortgagee. Such information shall be provided by Mortgagor within thirty (30) days after written request from Mortgagee.

5.25 <u>Title Reports</u>. Mortgagor shall annually, at Mortgagor's sole cost and expense, within thirty (30) days after payment of all ad valorem taxes on the Mortgaged Property, obtain and deliver to Mortgagee, a title insurance endorsement to the title policy insuring this Mortgage.

5.26 <u>Reappraisal of Mortgaged Property</u>. Mortgagor acknowledges that Mortgagee was induced to enter into the subject Loan transaction based upon a specific loan-to-value ratio (the "Original Loan-to-Value Ratio"). The Original Loan-to-Value Ratio was based upon the appraised value (the "Original Appraised Value") of the Mortgaged Property set forth in the appraisal Mortgagor submitted to Mortgagee prior to the closing of the subject Loan transaction. If Mortgagee at any time believes, in its discretion, that the appraised value of the Mortgaged Property has declined, or if Mortgagee is required, under any applicable Governmental Requirement, to obtain further appraisals hereafter, Mortgagee may obtain a then current appraisal (the "Reappraisal") of the Mortgaged Property. Each Reappraisal shall be at Mortgagor's expense, shall be performed and prepared by an appraiser certified or licensed under the State of Florida and acceptable to Mortgagee, which Reappraisal shall meet all appraisal standards prescribed by all Governmental Authorities regulating Mortgagee, and shall otherwise be in form and substance satisfactory to Mortgagee. If the Reappraisal reflects that the appraised value of the Mortgaged Property has decreased from the Original Appraised Value and if such decrease results in a loan-to-value ratio which is higher than the Original Loan-to-Value Ratio, Mortgagor shall within ten (10) days of Mortgagee's written request make a principal payment (the "Prepayment") under the Note in an amount sufficient to maintain the Original Loan-to-Value Ratio. Such Prepayment shall not entitle Mortgagor to a release of any of the Mortgaged Property.

5.27 <u>Performance of Loan Documents</u>. Mortgagor shall duly and punctually perform all covenants, terms and agreements expressed as binding upon it under all of the Loan Documents.

5.28 <u>Performance of Other Agreements</u>. Mortgagor shall duly and punctually perform all covenants, terms and agreements expressed as binding upon it under any Permitted Title Exception, or any other agreement of any nature whatsoever binding upon it with respect to the Mortgaged Property.

5.29 [INTENTIONALLY OMITTED]

5.30 <u>USA Patriot Act</u>.

5.30.1 Mortgagor hereby represents and warrants to, and covenants with, Mortgagee that as of the date hereof and until such time as the Obligations shall be paid in full:

(i) None of the entities comprising Mortgagor or Guarantor or any of their respective direct or indirect constituents or affiliates, any of their respective officers or directors (including officers or directors of any such constituents or affiliates), and, to Mortgagor's knowledge, any of their respective brokers, investors or other agents acting or benefiting in any capacity in connection with the Loan, is a Prohibited Person (as defined below);

(ii) None of the entities comprising Mortgagor, Guarantor or any of their respective direct or indirect constituents or affiliates, any of their respective officers or directors (including officers or directors of any such constituents or affiliates) (A) to Mortgagor's knowledge, has conducted or will conduct any business or has engaged or will engage in any transaction or dealing with any Prohibited Person, including making or receiving any contribution of funds, goods or services to or for the benefit of any Prohibited Person, (B) to Mortgagor's knowledge, has dealt or will deal in, or otherwise has engaged or will engage in any transaction relating to, any property or interests in property blocked pursuant to the Executive Order (as defined

-20-



below); or (C) has engaged or will engage in or has conspired or will conspire to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the requirements or prohibitions set forth in the Executive Order or the PATRIOT Act (as defined below);

(iii) To Mortgagor's knowledge, none of the brokers, investors or other agents for any entity comprising Mortgagor, Guarantor or any indemnitor or principal under the Loan Documents acting in any capacity in connection with the Loan (A) has conducted or will conduct any business or has engaged or will engage in any transaction or dealing with any Prohibited Person, including making or receiving any contribution of funds, goods or services to or for the benefit of any Prohibited Person, (B) has dealt or will deal in, or otherwise has engaged or will engage in any transaction relating to, any property or interests in property blocked pursuant to the Executive Order; or (C) has engaged or will engage in or has conspired or will conspire to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the requirements or prohibitions set forth in the Executive Order or the PATRIOT Act;

(iv) Mortgagor covenants and agrees to deliver to Mortgagee any certification or other evidence requested from time to time by Mortgagee, confirming Mortgagor's compliance with this Section;

(v) Mortgagor represents and warrants that to its knowledge Mortgagor, Guarantor, and and all of their respective affiliates (including any officers and directors of any of the foregoing) are in full compliance with all applicable orders, rules and regulations issued by, and recommendations of, the U.S. Department of the Treasury and OFAC (as defined below) pursuant to IEEPA (as defined below), the PATRIOT Act, other legal requirements relating to money laundering or terrorism and any executive orders related thereto;

(vi) At all times throughout the term of the Loan, Mortgagor, Guarantor, and all of their respective affiliates (including any officers and directors of any of the foregoing) shall be in full compliance with all applicable orders, rules and regulations issued by, and recommendations of, the U.S. Department of the Treasury and OFAC pursuant to IEEPA, the PATRIOT Act, other legal requirements relating to money laundering or terrorism and any executive orders related thereto;

(vii) Mortgagor covenants that it will adopt appropriate policies, procedures and internal controls to be fully compliant with any additional laws, rules or regulations relating to money laundering and/or terrorism, including the PATRIOT Act, to which it may become subject;

(viii) Mortgagor does not believe, and has no reason to believe, that any of its investors is a "Prohibited Foreign Shell Bank" (as defined in the PATRIOT Act), or is named on any available lists of known or suspected terrorists, terrorist organizations or of other sanctioned persons issued by the United States government and/or the government(s) of any jurisdiction(s) in which Mortgagor is doing business;

(ix) Mortgagor does not believe, and has no reason to believe, that the person or entity from whom Mortgagor acquired the Mortgaged Property is a Prohibited Foreign Shell Bank, or is named on any available lists of known or suspected terrorists, terrorist organizations or of other sanctioned persons issued by the United States government and/or the government(s) of any jurisdiction(s) in which Mortgagor is doing business;

(x) Mortgagor will advise Mortgagee immediately of any material change that would affect the representations, covenants and warranties provided in this Section.

5.30.2 For purposes hereof, "IEEPA" means the International Emergency Economic Power Act, 50 U.S.C. §1701 et. seq. "OFAC" means the U.S. Department of Treasury's Office of Foreign Asset

-21-



Control. "PATRIOT Act" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Public Law 107-56) (The USA PATRIOT Act). "Prohibited Person" means any Person: (a) listed in the Annex to, or is otherwise subject to the provisions of, the Executive Order No. 13224 on Terrorist Financing, effective October 24, 2001, and relating to Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism (the "Executive Order"); (b) that is owned or controlled by, or acting for or on behalf of, any person or entity that is listed in the Annex to, or is otherwise subject to the provisions of the Executive Order; (c) with whom Mortgagee is prohibited from dealing or otherwise engaging in any transaction by any terrorism or money laundering legal requirements, including the PATRIOT Act and the Executive Order; (d) that commits, threatens or conspires to commit or supports "terrorism" as defined in the Executive Order; (e) that is named as a "specifically designated national (SDN)" on the most current list published by the U.S. Treasury Department Office of Foreign Assets Control at its official website, http://www.treas.gov.ofac/t11sdn.pdf or at any replacement website or other replacement official publication of such list or is named on any other U.S. or foreign government or regulatory list issued post-09/11/01; (f) that is covered by IEEPA, OFAC or any other law, regulation or executive order relating to the imposition of economic sanctions against any country, region or individual pursuant to United States law or United Nations resolution; or (g) that is an affiliate (including any principal, officer, immediate family member or close associate) of a person or entity described in one or more of clauses (a) – (f) of this definition of Prohibited Person.

## ARTICLE VI

### NEGATIVE COVENANTS

6.1 <u>Use Violations, Etc.</u> Mortgagor shall not use the Mortgaged Property or allow the same to be used or occupied for any unlawful purpose or in violation of any Governmental Requirement or restrictive covenant covering, affecting or applying to the ownership, use or occupancy thereof, commit or permit or suffer any act to be done or any condition to exist on the Mortgaged Property or any article to be brought thereon that may be dangerous, or that may in any way increase any ordinary fire or other hazard, unless safeguarded as required by law, or that may, in law, constitute a nuisance, public or private.

6.2 <u>Care of the Mortgaged Property</u>.

6.2.1 Mortgagor shall not commit or permit any waste, impairment, or deterioration of the Mortgaged Property, or (except as may be provided for in the Loan Agreement) perform any clearing, grading, filling or excavation of the Mortgaged Property, or make or permit to be made to the Mortgaged Property any alterations or additions that would have the effect of materially diminishing the value thereof (in Mortgagee's sole opinion) or take or permit any action that will in any way increase any ordinary fire or other hazard arising out of the construction or operation thereof.

6.2.2 Mortgagor shall not, without the prior written consent of Mortgagee, remove, demolish or substantially alter, or permit the removal, demolishment or substantial alteration of, any Improvements on the Land. In the event such consent is given and if any work to be performed shall involve an estimated expenditure of more than $10,000.00, no such work shall be undertaken until plans and specifications therefor, prepared by an architect satisfactory to Mortgagee, shall have been submitted to and approved by Mortgagee.

6.2.3 Mortgagor shall not permit any of the Fixtures or Personal Property to be demolished or to be removed from the Land, without the prior written consent of Mortgagee. In the event such consent is given, the Mortgagee may require that said Fixture or Personal Property be replaced by an article of equal suitability and value, owned by Mortgagor free and clear of any vendor's lien, chattel mortgage, or security interest of any kind, except such as may be approved in writing by Mortgagee, and that such replacement article be encumbered by the lien of this Mortgage. Notwithstanding the foregoing, the Mortgagor may remove or demolish any Fixture or Personal Property without first obtaining the Mortgagee's prior written consent provided (a) the value

-22-



of such article does not exceed in value at the time of disposition thereof $1,000.00 for any single item, or a total of $15,000.00 in any one year for all such items and (i) that said article is replaced and subject to the lien of this Mortgage as aforesaid.

6.3 <u>Other Liens and Mortgages</u>.

6.3.1    Mortgagor shall not, without the prior written consent of Mortgagee, create or permit to be created or to remain, any mortgage, pledge, construction lien or other lien, conditional sale or other title retention agreement, encumbrance, claim, or charge on (whether prior or subordinate to the lien of this Mortgage or the other Loan Documents) the Mortgaged Property or income therefrom, other than this Mortgage, the other Loan Documents and the Permitted Title Exceptions. Any transaction prohibited under this Section shall be null and void.

6.3.2    Mortgagor shall not, without the prior written consent of Mortgagee, (a) enter into any agreement either oral or in writing, whereby any permitted Junior Mortgage is modified or amended in any manner whatsoever, (i) permit the release of any guarantor or modification of any guaranty affecting any permitted Junior Mortgage, or (ii) incur any additional indebtedness secured thereby.

6.3.3    Mortgagor shall not directly or indirectly, take, acquire, or permit to be taken or acquired by any other party, any interest whatsoever in any permitted Junior Mortgage without the prior written consent of Mortgagee.

6.4 <u>Transfer of Mortgaged Property</u>. Except as may otherwise be expressly permitted in the Loan Agreement (if any) executed in connection with this Mortgage, Mortgagor shall not sell, convey, or transfer or permit to be sold, conveyed or transferred any interest in the Mortgaged Property or any part thereof. A contract to deed or agreement for deed, or an assignment, pledge, or encumbrance of a beneficial interest in any land trust, or a lease for all or substantially all of the Land or Improvements shall constitute a transfer prohibited by the provisions of this Section and shall be null and void.

6.5 <u>Change in Ownership of Mortgagor</u>. Mortgagor shall not, without the prior written consent of Mortgagee, do or permit any other Person to do any of the following:

6.5.1    (a) transfer any membership interest of any member whose interest, directly or indirectly, in the Mortgagor is 5% or more as of the date hereof, (b) transfer, directly or indirectly, in the aggregate a 25% or more interest in the Mortgagor, or (c) admit to Mortgagor any new member; or

6.5.2    if Mortgagor owns the Mortgaged Property as trustee, resign as trustee or permit the appointment of a successor trustee.

Any transfer described in Subsection 6.5.1 above shall be deemed to have occurred where such purported transfer shall be a direct transfer, sale, or conveyance by a stockholder or partner, the result of an encumbrance or pledge of such stock or Partnership interest, or the result of action by any Person against such stockholder or partner.

6.6 <u>Loans to Stockholders, Members or Partners</u>. Mortgagor shall not make loans directly or indirectly to any Guarantor and if Mortgagor is a corporation, limited liability company or Partnership, Mortgagor shall not make loans directly or indirectly to any stockholder, member, partner, corporate affiliate, or any related party of Mortgagor.

6.7 <u>Mortgagor's Articles of Incorporation/Organization and Partnership Agreement</u>. Mortgagor, if (i) a corporation or a Partnership, shall not, without the prior written consent of Mortgagee, materially amend or modify its articles or certificate of incorporation or bylaws or its certificate of Partnership or Partnership agreement,

-23-



or (ii) if a limited liability company, shall not, without the prior written consent of Mortgagee, materially amend or modify its articles or organization or operating agreement.

      6.8 <u>Transfer of Other Assets</u>. Mortgagor shall not, directly or indirectly, sell, convey, or transfer or permit to be sold, conveyed, or transferred any of its assets to any Person to which Mortgagor is related or connected. The term "assets" as used in this Section does not include the Mortgaged Property, the sale, conveyance, or transfer of which is prohibited as provided in Section 6.4 hereof.

      6.9 <u>Environmental Contamination/Hazardous Substances</u>. Mortgagor and the Mortgaged Property shall at all times remain in full compliance with all Environmental Laws. Mortgagor shall not, nor permit any other person to manufacture, process, distribute, use, transport, handle, treat, store, dispose, emit, discharge, leak, spill or release any Hazardous Substance on, in, under or from the Mortgaged Property.

## ARTICLE VII

### EVENTS OF DEFAULT

      7.1 <u>Events of Default</u>. An "Event of Default", as used in this Mortgage, shall occur at any time or from time to time:

      7.1.1 <u>Failure to Pay</u>. If any Obligation or any installment thereof is not paid as and when due and payable;

      7.1.2 <u>Failure to Perform</u>. If any Obligation other than an Obligation requiring the payment of money or the occurrence of an event described in Subsections 7.1.3 through 7.1.15, inclusive, below is not duly and promptly performed or is violated and such non-performance or violation is not curable, or if curable continues for a period of ten (10) days after written notice thereof from Mortgagee to Mortgagor, provided, however, if such non-performance or violation may not reasonably be cured within such ten (10) day period, an Event of Default shall not be deemed to have occurred so long as same shall be diligently and continuously endeavored to be cured. Notwithstanding the foregoing, it shall be an Event of Default if such non-performance or violation has not been cured within sixty (60) days after notice thereof;

      7.1.3 <u>False Representation</u>. If any representation or warranty made in any Loan Document by or on behalf of Mortgagor or any Guarantor is at any time false, misleading, or breached;

      7.1.4 <u>Judgment</u>. If a final judgment for the payment of money is rendered against Mortgagor or any Guarantor, and the same remains unsatisfied except for such period of time as execution on the judgment is effectively stayed;

      7.1.5 <u>Voluntary Bankruptcy, Etc</u>. If Mortgagor or any Guarantor (a) is voluntarily adjudicated a bankrupt or insolvent, (b) seeks or consents to the appointment of a receiver or trustee for itself or for all or any part of its property, (c) files a petition seeking relief, including reorganization, arrangement or similar relief, under the present Bankruptcy Code or other similar present or future applicable laws of the United States or any state or any other competent jurisdiction, (d) makes a general assignment for the benefit of creditors or (e) admits in writing its inability to pay its debts as they mature;

      7.1.6 <u>Involuntary Bankruptcy, Etc</u>. If a receiver or trustee is appointed for Mortgagor or any Guarantor or for all or any part of their respective properties without their respective consents and such appointment is not vacated within sixty (60) days, or if a petition is filed against Mortgagor or any Guarantor seeking relief, including reorganization, arrangement or similar relief, under the present Bankruptcy Code or other

–24–



similar present or future applicable laws of the United States or any state or other competent jurisdiction, and such petition is not dismissed within sixty (60) days after the filing thereof;

7.1.7 <u>Dissolution</u>. If Mortgagor or any Guarantor voluntarily or involuntarily dissolves or liquidates;

7.1.8 <u>Financial Condition</u>. If a material adverse change has occurred, at any time or times subsequent to the date hereof, in the financial condition, results of operations, operations, business, properties, or prospects of Mortgagor, its subsidiaries, parent or affiliates, or any Guarantor, or any endorser, co-maker, surety or guarantor of the Obligations, such as, by way of illustration and not limitation, a downturn in financial performance, the loss of key customers, the loss of critical licenses, management exodus, or a labor strike;

7.1.9 <u>Death or Incompetency</u>. If any Guarantor, Mortgagor or any general partner of Mortgagor, if Mortgagor is a limited partnership, or any partner of Mortgagor, if Mortgagor is a general partnership, dies or is declared incompetent;

7.1.10 <u>Default by Guarantor</u>. If any Guarantor fails to duly pay or perform any covenant, term, provision, or condition of the Guaranty, or fails to duly pay or perform any and all indebtedness, liabilities and obligations (whether joint or several, direct or indirect, absolute or contingent, liquidated or unliquidated, matured or unmatured) of any Guarantor to Mortgagee or to any of Mortgagee's affiliates, whether now existing or hereafter created or arising or now owned or howsoever hereafter acquired by Mortgagee or by any of Mortgagee's affiliates;

7.1.11 <u>Default Under Loan Documents</u>. If any default occurs under any of the other Loan Documents or if any obligation of Mortgagor under any of the other Loan Documents is not fully performed;

7.1.12 <u>Foreclosure of Other Liens</u>. If the holder of any mortgage or other lien on the Mortgaged Property, whether a Permitted Title Exception or not (without hereby implying Mortgagee's consent to any such mortgage or other lien) institutes foreclosure or other proceedings for the enforcement of any of its remedies thereunder;

7.1.13 <u>Notice Limiting Future Advances</u>. If Mortgagor, pursuant to Florida Statutes 697.04(1)(b) as amended from time to time, files for record a notice limiting the maximum amount which may be secured by this Mortgage;

7.1.14 <u>Default Under Junior Mortgage</u>. If any default or any event of default occurs under any permitted Junior Mortgage, whether or not foreclosure or other proceedings have been instituted thereunder;

7.1.15 <u>Termination of Guaranty</u>. If any Guarantor delivers to Mortgagee any notice purporting to limit or terminate any Guaranty; or

7.1.16 <u>Other Events of Default</u>. If a general partner of Mortgagor, if Mortgagor is a limited partnership, or any partner of Mortgagor, if Mortgagor is a general partnership, is the subject of any occurrence described in Subsections 7.1.4 through 7.1.8, inclusive, of this Article.

-25-



## ARTICLE VIII

## RIGHTS AND REMEDIES

8.1 <u>Remedies</u>. If an Event of Default shall have occurred, Mortgagee may, at its option, exercise any, some or all of the following remedies, concurrently or consecutively:

8.1.1    <u>Acceleration</u>. Mortgagee may declare all of the unpaid Obligations, together with all accrued interest thereon, to be due and payable without notice or demand which are hereby expressly waived, and upon such declaration all such Obligations shall immediately become due and payable as fully and to the same effect as if the date of such declaration were the date originally specified for the full payment or maturity thereof.

8.1.2    <u>Mortgagee's Right to Enter and Take Possession, Operate and Apply Income</u>.

(a)    Mortgagee may demand that Mortgagor surrender the actual possession of the Mortgaged Property and upon such demand, Mortgagor shall forthwith surrender same to Mortgagee and, to the extent permitted by law, Mortgagee itself, or by such officers or agents as it may appoint, may enter and take possession of all of the Mortgaged Property and may exclude Mortgagor and its agents and employees wholly therefrom.

(b)    If Mortgagor shall for any reason fail to surrender or deliver the Mortgaged Property or any part thereof after Mortgagee's demand, Mortgagee may obtain a judgment or order conferring on Mortgagee the right to immediate possession or requiring the Mortgagor to deliver immediate possession to Mortgagee, to the entry of which judgment or decree the Mortgagor hereby specifically consents.

(c)    Mortgagee may from time to time: (iii) continue and complete construction of, hold, store, use, operate, manage and control the Mortgaged Property and conduct the business thereof; (iv) make all reasonably necessary maintenance, repairs, renewals, replacements, additions, betterments and improvements thereto and thereon and purchase or otherwise acquire additional Fixtures and Personal Property; (v) insure or keep the Mortgaged Property insured; (vi) exercise all the rights and powers of the Mortgagor in its name or otherwise with respect to the same; and (vii) enter into agreements with others (including, without limitation, new Leases or amendments, extensions, or cancellations to existing Leases) all as Mortgagee from time to time may determine in its sole discretion. Mortgagor hereby constitutes and irrevocably appoints Mortgagee its true and lawful attorney-in-fact, which appointment is coupled with an interest, with full power of substitution, and empowers said attorney or attorneys in the name of Mortgagor, but at the option of said attorney-in-fact, to do any and all acts and execute any and all agreements that Mortgagee may deem necessary or proper to implement and perform any and all of the foregoing.

(d)    The Mortgagee may, with or without taking possession of the Mortgaged Property as hereinabove provided, collect and receive all the Rents therefrom, including those past due as well as those accruing thereafter, and shall apply the monies so received first, to the payment of all costs and expenses (including, without limitation, reasonable attorneys' fees and expenses) incurred by Mortgagee and its agents in connection with the collection of same, whether or not in possession of the Mortgaged Property, and second, in such order as Mortgagee may elect, to the payment of the Obligations.

8.1.3    <u>Proceedings To Recover Sums Due</u>.

(a)    If any installment or part of any Obligation shall fail to be paid when due, Mortgagee shall be entitled to sue for and to recover judgment against the Mortgagor for the amount so due and

–26–



unpaid together with all costs and expenses (including, without limitation, reasonable attorneys' fees and expenses) incurred by Mortgagee in connection with such proceeding, together with interest thereon at the Default Rate from the date incurred by Mortgagee. All such costs and expenses shall be secured by this Mortgage and shall be due and payable by Mortgagor immediately.

(b) If Mortgagor shall fail to pay upon the Mortgagee's demand, after acceleration as provided in Subsection 8.1.1, all of the unpaid Obligations, together with all accrued interest thereon, Mortgagee shall be entitled to sue for and to recover judgment against the Mortgagor for the entire amount so due and unpaid together with all costs and expenses (including, without limitation, reasonable attorneys' fees and expenses) incurred by Mortgagee in connection with such proceeding, together with interest thereon at the Default Rate from the date incurred by Mortgagee. All such costs and expenses shall be secured by this Mortgage and shall be payable by Mortgagor immediately. Mortgagee's right under this Subsection may be exercised by Mortgagee either before, after or during the pendency of any proceedings for the enforcement of this Mortgage, including appellate proceedings.

(c) No recovery of any judgment as provided in Subsections (a) and (b) above and no attachment or levy of any execution upon any of the Mortgaged Property or any other property shall in any way affect the lien of this Mortgage upon the Mortgaged Property or any part thereof, or any lien, rights, powers, or remedies of Mortgagee hereunder, but such lien, rights, powers and remedies shall continue unimpaired as before.

(d) In accordance with Section 55.03(1), Florida Statutes (2003), Mortgagor hereby expressly further agrees that the Default Rate shall be applicable to interest accruing on any judgment entered with respect to the indebtedness evidenced or secured hereby or by any of the other Loan Documents.

8.1.4   Foreclosure.

(a) Mortgagee may institute proceedings for the partial or complete foreclosure of this Mortgage and Mortgagee may, pursuant to any final judgment of foreclosure, sell the Mortgaged Property as an entirety or in separate lots, units, or parcels.

(b) In case of a foreclosure sale of all or any part of the Mortgaged Property, the proceeds of sale shall be applied in accordance with Section 8.8 hereof, and the Mortgagee shall be entitled to seek a deficiency judgment against the Mortgagor to enforce payment of any and all Obligations then remaining due and unpaid, together with interest thereon, and to recover a judgment against the Mortgagor therefor. In accordance with Section 55.03(1), Florida Statutes (2003), Mortgagor hereby expressly further agrees that the Default Rate shall be applicable to interest accruing on any judgment entered with respect to the indebtedness evidenced or secured hereby or by any of the other Loan Documents.

(c) The Mortgagee is authorized to foreclose this Mortgage subject to the rights of any tenants of the Mortgaged Property, or Mortgagee may elect which tenants Mortgagee desires to name as parties defendant in such foreclosure and failure to make any such tenants parties defendant to any such foreclosure proceedings and to foreclose their rights will not be, nor be asserted by the Mortgagor to be, a defense to any proceedings instituted by the Mortgagee to collect the unpaid Obligations or to collect any deficiency remaining unpaid after the foreclosure sale of the Mortgaged Property.

8.1.5   Receiver. Mortgagee may apply to any court of competent jurisdiction to have a receiver appointed to enter upon and take possession of the Mortgaged Property, collect the Rents therefrom and apply the same as the court may direct, such receiver to have all of the rights and powers permitted under the laws of the State of Florida. The right of the appointment of such receiver shall be a matter of strict right without regard to the value or the occupancy of the Mortgaged Property or the solvency or insolvency of Mortgagor. The expenses,

–27–



including receiver's fees, attorneys' fees, costs and agent's commission incurred pursuant to the powers herein contained, together with interest thereon at the Default Rate, shall be secured hereby and shall be due and payable by Mortgagor immediately without notice or demand.  Notwithstanding the appointment of any receiver or other custodian, Mortgagee shall be entitled as pledgee to the possession and control of any cash or deposits at the time held by, payable, or deliverable under the terms of this Mortgage to the Mortgagee, and the Mortgagee shall have the right to offset the unpaid Obligations against any such cash or deposits in such order as Mortgagee may elect.

        8.1.6    Remedies as to Personal Property. Mortgagee may exercise any or all of its rights and remedies under the Uniform Commercial Code-Secured Transactions as adopted by the State of Florida or other applicable law as well as all other rights and remedies possessed by Mortgagee, all of which shall be cumulative. Mortgagee is hereby authorized and empowered to enter the Mortgaged Property or other place where the Personal Property may be located without legal process, and to take possession of the Personal Property without notice or demand, which hereby are waived to the maximum extent permitted by the laws of the State of Florida. Upon demand by Mortgagee, Mortgagor shall make the Personal Property available to Mortgagee at a place reasonably convenient to Mortgagee. Mortgagee may sell at one or more public or private sales and for such price as Mortgagee may deem commercially reasonable, any and all of the Personal Property secured by this Mortgage, and any other security or property held by Mortgagee and Mortgagee may be the purchaser of any or all of the Personal Property.

        8.1.7    Other. Mortgagee may institute and maintain any suits and proceedings as the Mortgagee may deem advisable (a) to prevent any impairment of the Mortgaged Property by any acts which may be unlawful or in violation of this Mortgage, (bvii to preserve or protect its interest in the Mortgaged Property, and (c) to restrain the enforcement of or compliance with any Governmental Requirement that may be unconstitutional or otherwise invalid, if the enforcement of or compliance with such Governmental Requirement might impair the security hereunder or be prejudicial to the Mortgagee's interest.

        8.2  Remedies Cumulative and Concurrent. No right, power or remedy of Mortgagee as provided in the Note, this Mortgage, the Guaranty, or the other Loan Documents is intended to be exclusive of any other right, power, or remedy of Mortgagee, but each and every such right, power and remedy shall be cumulative and concurrent and in addition to any other right, power or remedy available to Mortgagee now or hereafter existing at law or in equity and may be pursued separately, successively or together against Mortgagor, any Guarantor, or any endorser, co-maker, surety or guarantor of the Obligations, or the Mortgaged Property or any part thereof, or any one or more of them, at the sole discretion of Mortgagee. The failure of Mortgagee to exercise any such right, power or remedy shall in no event be construed as a waiver or release thereof.

        8.3  Waiver, Delay or Omission. No waiver of any Event of Default hereunder shall extend to or affect any subsequent or any other Event of Default then existing, or impair any rights, powers or remedies consequent thereon, and no delay or omission of Mortgagee to exercise any right, power or remedy shall be construed to waive any such Event of Default or to constitute acquiescence therein.

        8.4  Credit of Mortgagee. To the maximum extent permitted by the laws of the State of Florida, upon any sale made under or by virtue of this Article, Mortgagee may bid for and acquire the Mortgaged Property, or any part thereof, and in lieu of paying cash therefor may apply to the purchase price, any portion of or all of the unpaid Obligations in such order as Mortgagee may elect.

        8.5  Sale. Any sale or sales made under or by virtue of this Article shall operate to divest all the estate, right, title, interest, claim and demand whatsoever at law or in equity, of the Mortgagor and all Persons, except tenants pursuant to Leases approved by Mortgagee, claiming by, through or under Mortgagor in and to the properties and rights so sold, whether sold to Mortgagee or to others.

-28-



8.6 <u>Proofs of Claim</u>. In the case of any receivership, insolvency, bankruptcy, reorganization, arrangement, adjustment, composition, seizure of the Mortgaged Property by any Governmental Authority, or other judicial proceedings affecting the Mortgagor, any Guarantor, any endorser, co-maker, surety, or guarantor of the Obligations, or any of their respective properties, the Mortgagee, to the extent permitted by law, shall be entitled to file such proofs of claim and other documents as may be necessary or advisable in order to have its claim allowed in such proceedings for the entire unpaid Obligations at the date of the institution of such proceedings, and for any additional amounts which may become due and payable after such date.

8.7 <u>Waiver of Redemption, Notice, Marshalling, Etc.</u> Mortgagor hereby waives and releases, for itself and anyone claiming through, by, or under it, to the maximum extent permitted by the laws of the State of Florida:

(a) all benefit that might accrue to Mortgagor by virtue of any present or future law exempting the Mortgaged Property, or any part of the proceeds arising from any sale thereof, from attachment, levy or sale on execution, or providing for any appraisement, valuation, stay of execution, exemption from civil process, redemption or extension of time for payment,

(b) unless specifically required herein, all notices of default, or Mortgagee's actual exercise of any option or remedy under the Loan Documents, or otherwise, and

(c) any right to have the Mortgaged Property marshalled.

8.8 <u>Application of Proceeds</u>. The proceeds of any sale of all or any portion of the Mortgaged Property shall be applied by Mortgagee first, to the payment of receiver's fees and expenses, if any, and to the payment of all costs and expenses (including, without limitation, reasonable attorneys' fees and expenses) incurred by Mortgagee, together with interest thereon at the Default Rate from the date so incurred, in connection with any entry, action or proceeding under this Article and, second, in such order as Mortgagee may elect, to the payment of the Obligations. Mortgagor shall be and remain liable to Mortgagee for any difference between the net proceeds of sale and the amount of the Obligations until all of the Obligations have been paid in full.

8.9 <u>Discontinuance of Proceedings</u>. If Mortgagee shall have proceeded to enforce any right under any Loan Document and such proceedings shall have been discontinued or abandoned for any reason, then except as may be provided in any written agreement between Mortgagor and Mortgagee providing for the discontinuance or abandonment of such proceedings, Mortgagor and Mortgagee shall be restored to their former positions and the rights, remedies and powers of Mortgagee shall continue as if no such proceedings had been instituted.

8.10 <u>Mortgagee's Actions</u>. Mortgagee may, at any time without notice to any Person and without consideration, do or refrain from doing any or all of the following actions, and neither the Mortgagor, any Guarantor, any endorser, co-maker, surety or guarantor of the Obligations, nor any other Person (hereinafter in this Section collectively referred to as the "Obligor") now or hereafter liable for the payment and performance of the Obligations shall be relieved from the payment and performance thereof, unless specifically released in writing by Mortgagee: (a) renew, extend or modify the terms of the Note, this Mortgage, the Guaranty and the other Loan Documents, or any of them; (b) forbear or extend the time for the payment or performance of any or all of the Obligations; (c) apply payments by any Obligor to the reduction of the unpaid Obligations in such manner, in such amounts, and at such times and in such order and priority as Mortgagee may see fit; (d) release any Obligor; (e) substitute or release in whole or in part the Mortgaged Property or any other collateral or any portion thereof now or hereafter held as security for the Obligations without affecting, disturbing or impairing in any manner whatsoever the validity and priority of the lien of this Mortgage upon the Mortgaged Property which is not released or substituted, or the validity and priority of any security interest of the Mortgagee in such other collateral which is not released or substituted; (f) subordinate the lien of this Mortgage or the lien of any other security interest in any other

-29-

collateral now or hereafter held as security for the Obligations; (g) join in the execution of a plat or replat of the Land; (h) join in and consent to the filing of a declaration of condominium or declaration of restrictive covenants regarding all or any part of the Land; (i) consent to the granting of any easement on the Land; and (j) generally deal with any Obligor or any other party as Mortgagee may see fit.

## ARTICLE IX

### MORTGAGEE'S PERFORMANCE

9.1 <u>Governmental Regulation of Mortgagee</u>. Mortgagee is subject to various Governmental Authorities and the laws, rules and regulations enacted, adopted and promulgated by them. To the extent that Mortgagee's authority to perform its obligations (if any) under this Mortgage, now or hereafter, may be limited or regulated by such Governmental Authorities, Mortgagee is hereby excused from such performance.

9.2 <u>Mortgagee's Failure to Perform</u>. If Mortgagee fails to perform its obligations (if any) under this Mortgage (except to the extent excused therefrom as provided in Section 9.1 above), Mortgagor shall notify Mortgagee in writing (the "Notice") within thirty (30) days after Mortgagor's obtaining knowledge of such failure. Each such Notice shall describe in detail the act or event constituting the non-performance by Mortgagee. Mortgagee shall have thirty (30) days after its receipt of the Notice to cure any such failure to perform, unless such cure can not be accomplished using reasonable efforts within said thirty (30) day period, in which case Mortgagee shall have such additional time as may be necessary, using reasonable efforts, to cure such non-performance (the "Mortgagee Cure Period").

9.3 <u>Mortgagor's Rights and Remedies</u>. The giving of the Notice and the expiration of the Mortgagee Cure Period shall be conditions precedent to any right of the Mortgagor to bring an action against Mortgagee. Mortgagor hereby expressly agrees that its sole remedy against Mortgagee in any such action shall be that of specific performance.

## ARTICLE X

### MISCELLANEOUS

10.1 <u>Maximum Rate of Interest</u>. Nothing contained herein, in the Note, in the Commitment, or in any other Loan Document or in any instrument or transaction related thereto, shall be construed or so operate as to require the Mortgagor or any person liable for the payment of the Loan made pursuant to the Note, or liable for the payment of any Obligations, to pay interest, or any charge in the nature of interest, in an amount or at a rate which exceeds the maximum rate of interest allowed by applicable law, as amended from time to time. Should any interest or other charges in the nature of interest received by Mortgagee or paid by the Mortgagor or any parties liable for the payment of the Loan made pursuant to the Note, or liable for the payment of any Obligations, exceed the maximum rate of interest allowed by applicable law, as amended from time to time, then such excess sum shall be credited against the principal balance of the Note or the balance of the other Obligations, as applicable, unless the Mortgagor or such other parties liable for such payments, as applicable, shall notify the Mortgagee, in writing, that the Mortgagor or such other party elects to have such excess sum returned to it forthwith, it being the intent of the parties hereto that under no circumstances shall the Mortgagor or any parties liable for any of the aforesaid payments be required to pay interest in excess of the maximum rate of interest allowed by applicable law, as amended from time to time. The Mortgagee may, in determining the maximum rate of interest allowed under applicable law, as amended from time to time, take advantage of any state or federal law, rule or regulation in effect from time to time which may govern the maximum rate of interest which may be reserved, charged or taken.

–30–



10.2 <u>Continuing Agreement</u>. This Mortgage and all of the Mortgagor's representations, warranties and covenants herein, Mortgagee's security interest in the Mortgaged Property and all of the rights, powers and remedies of Mortgagee hereunder shall continue in full force and effect until all of the Obligations have been paid and performed in full; until Mortgagee has no further obligation to make any advances under the Loan; and until Mortgagee, upon the request of the Mortgagor, has executed a satisfaction of mortgage. Furthermore, if for any reason no Obligations are owing, notwithstanding such occurrence, this Mortgage shall remain valid and in full force and effect as to subsequent Obligations, so long as Mortgagee has not executed a satisfaction of mortgage; provided, however, that the indemnifications set forth in Article V of this Mortgage shall survive the satisfaction of this Mortgage.

10.3 <u>Survival of Warranties and Covenants</u>. The warranties, representations, covenants and agreements set forth in this Mortgage shall survive the making of the Loan and the execution and delivery of the Note, and shall continue in full force and effect until all of the Obligations shall have been paid and performed in full.

10.4 <u>No Representation By Mortgagee</u>. By accepting or approving anything required to be observed, performed or fulfilled, or to be given to Mortgagee, pursuant to this Mortgage, the Commitment, or the other Loan Documents, including, but not limited to, any officer's certificate, balance sheet, statement, survey or appraisal, Mortgagee shall not be deemed to have warranted or represented the sufficiency, legality, effectiveness or legal effect of the same, or of any term, provision or condition thereof, and such acceptance or approval thereof shall not be or constitute any warranty or representation with respect thereto by Mortgagee.

10.5 <u>Notice</u>. All notices, demands, requests and other communications required under this Mortgage may be given orally (either in person or by telephone if confirmed in writing within three (3) days thereafter), in writing delivered by hand, telecopy or mail and shall be conclusively deemed to have been received if delivered or attempted to be delivered by hand, telecopy or United States first class mail, return receipt requested, postage prepaid, addressed to the party for whom it is intended at its address set forth in the introduction to this Mortgage, as applicable. Any party may designate a change of address by written notice to the other party, received by such other party at least ten (10) days before such change of address is to become effective.

10.6 <u>Mortgagee's Right to Pay and Perform</u>. If Mortgagor shall fail to duly pay or perform any of the Obligations required by this Mortgage, then at any time thereafter without notice to or demand upon Mortgagor, and without waiving or releasing any right, remedy, or power of Mortgagee, and without releasing any of the Obligations or any Event of Default, Mortgagee may pay or perform such Obligation for the account of and at the expense of Mortgagor, and shall have the right to enter and to authorize others to enter upon the Mortgaged Property for such purpose and to take all such action thereon and with respect to the Mortgaged Property as may be necessary or appropriate for such purpose. All payments made and all costs and expenses (including, without limitation, reasonable attorneys' fees and expenses) incurred by Mortgagee, together with interest thereon at the Default Rate from the date incurred by Mortgagee shall be secured by this Mortgage and shall be due and payable by Mortgagor immediately, whether or not there be notice, demand, an attempt to collect same, or suit pending.

10.7 <u>Covenants Running With the Land</u>. All covenants contained in this Mortgage shall be binding on the Mortgagor and shall run with the Land.

10.8 <u>Successors and Assigns</u>. All of the terms of this Mortgage shall apply to and be binding upon, and inure to the benefit of, the heirs, devisees, personal representatives, successors and assigns of Mortgagor and Mortgagee, respectively, and all persons claiming under or through them.

10.9 <u>Invalidity</u>.

10.9.1   If any one or more of the provisions contained in this Mortgage is declared or

-31-



found by a court of competent jurisdiction to be invalid, illegal, or unenforceable, such provision or portion thereof shall be deemed stricken and severed and the remaining provisions hereof shall continue in full force and effect.

           10.9.2    If any one or more of the Obligations is declared or found by a court of competent jurisdiction to be invalid, illegal, or unenforceable, the validity, legality and enforceability of the remaining Obligations shall continue in full force and effect.

           10.10    Modification.  No agreement unless in writing and signed by an authorized officer of Mortgagee and no course of dealing between the parties hereto shall be effective to change, waive, terminate, modify, discharge, or release in whole or in part any provision of this Mortgage.  No waiver of any rights or powers of Mortgagee or consent by it shall be valid unless in writing signed by an authorized officer of Mortgagee and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

           10.11    Applicable Law.  This Mortgage shall be construed, interpreted, enforced and governed by and in accordance with the laws of the State of Florida (excluding the principles thereof governing conflicts of law), and federal law, in the event federal law permits a higher rate of interest than Florida law.

           10.12    Strict Performance.  It is specifically agreed that time is of the essence as to all matters provided for in this Mortgage and that no waiver of any Obligation hereunder or secured hereby shall at any time thereafter be held to be a waiver of the Obligations.

           10.13    Joint and Several Liability.  If more than one Person executes this Mortgage, each is and shall be jointly and severally liable hereunder; and if Mortgagor is a general partnership, then all partners in Mortgagor (and if Mortgagor is a limited partnership, then all general partners in Mortgagor) shall be jointly and severally liable hereunder, notwithstanding any contrary provision in the partnership laws of the State of Florida.

           10.14    WAIVER OF TRIAL BY JURY.  MORTGAGOR AND MORTGAGEE (BY ACCEPTANCE OF THIS INSTRUMENT) HEREBY KNOWINGLY, IRREVOCABLY, VOLUNTARILY AND INTENTIONALLY WAIVE ANY RIGHT EITHER MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY ACTION, PROCEEDING OR COUNTERCLAIM BASED ON THIS MORTGAGE, OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS MORTGAGE, THE NOTE, OR ANY OTHER LOAN DOCUMENT, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF ANY PARTY HERETO OR TO ANY LOAN DOCUMENT. THIS PROVISION IS A MATERIAL INDUCEMENT FOR MORTGAGOR AND MORTGAGEE ENTERING INTO THE SUBJECT LOAN TRANSACTION.

           IN WITNESS WHEREOF, Mortgagor has executed this instrument as of the day and year first above written.

Signed, sealed and delivered
in the presence of:

Print Name: _____

Print Name: _____

**MORTGAGOR:**

PZP INVESTMENTS, INC., a Florida corporation

By: _____
Name: _Oscar Zapata._
Title: _President._

[ SEAL]

-32-

STATE OF FLORIDA              )
                              )SS:
COUNTY OF MIAMI-DADE          )

    The foregoing instrument was subscribed and acknowledged before me, this 4th day of October, 2004 by _OSCAR ZAPATA_ as President of PZP INVESTMENTS,, INC., a Florida corporation, on behalf of said corporation. He/She is personally known to me or has produced _FL DRIVER'S LICENSE_ as identification and ( ) did ( ) did not take an oath.

> **JUDITH M. PERAZA**
> MY COMMISSION # DD 337709
> EXPIRES: July 14, 2008
> Bonded Thru Budget Notary Services

NOTARY PUBLIC, State of Florida

Printed Name of Notary
My Commission Expires:_____
Commission No.:_____

-33-

## Exhibit A

## LEGAL DESCRIPTION

A portion of Tract "D"of "NARANJA LAKES SHOPPING PLAZA", according to the plat thereof as recorded in Plat Book 120, at Page 59, of the Public Records of Miami-Dade County, Florida, Being more particularly described as follows:

Commence at the Westerly corner of said Tract "D", which is a common corner with Tract "A", said common corner being on the Northeasterly Right-of-Way line of Naranja Lakes Boulevard, as shown on the aforementioned plat of "NARANJA LAKES SHOPPING PLAZA"; Thence S. 48° 42'16"E. Along said Northeasterly Right-of-Way line of Naranja Lakes Boulevard for 470.79 feet to a point; Thence run N. 41° 17' 44"E. for a distance of 56.59 feet to the Point of Beginning of the herein described parcel of land; Thence run S. 48° 41'15"E. for a distance of 54.77 feet to a point of curvature of a circular curve, concave to the South and having for its elements a radius of 25.00 feet and a central angle of 90° 00' 00"; Thence run Southerly, Easterly and Northerly, along the arc of said circular curve, for an arc distance of 39.27 feet to a point of tangency; Thence run N. 41° 18' 45"E. for a distance of 213.58 feet to a point; Thence run N. 48° 45' 31"W. for a distance of 79.84 feet to a point; Thence run S. 41° 17' 44" W. for a distance of 238.48 feet to the Point of Beginning. Said describer parcel of land containing 18,901.32 square feet, more or less.

CFN 2004R0888225
OR Bk 22720 Pgs 2699 - 2722; (24pgs)
RECORDED 10/08/2004 15:32:20
HARVEY RUVIN, CLERK OF COURT
MIAMI-DADE COUNTY, FLORIDA

**THIS INSTRUMENT PREPARED BY & RETURN TO:**

Pedro P. Saez, Esquire
SAEZ & ASSOCIATES.
888 Brickell Avenue
5ᵗʰ Floor
Miami, Florida 33131

SPACE RESERVED FOR CLERK OF COURT

## LEASEHOLD MORTGAGE
## AND SECURITY AGREEMENT

THIS LEASEHOLD MORTGAGE AND SECURITY AGREEMENT (hereinafter the "Mortgage"), made as of the _____ day of October, 2004, between PZP INVESTMENTS, INC., a Florida corporation (the "Mortgagor"), as mortgagor and debtor, whose principal place of business is 1070 Hunting Lodge Drive, Miami Springs, Florida 33166 and INTERNATIONAL FINANCE BANK, a Florida banking corporation (the "Mortgagee"), as mortgagee and secured party, whose address is 888 Brickell Avenue, Miami, Florida 33131.

### ARTICLE I
### DEFINITIONS, HEADINGS, RULES OF
### CONSTRUCTION AND SECURITY AGREEMENT

1.1    Definitions.  As used in this Mortgage and in the exhibits attached hereto, the following terms shall have the following meanings herein specified, such definition to be applicable to the singular and plural forms of such terms.

(a)    Borrower:    PZP Investments, Inc., a Florida corporation

(b)    Collateral Reserve Account:  An account to be established by Mortgagor with Mortgagee's own funds and maintained with Mortgagee until Mortgagor shall satisfy all conditions set forth in the Commitment for the release thereof, but in no event less than one (1) year, in an amount not less than the greater of (i) the equivalent of six (6) months of principal, interest, real property taxes, insurance premiums and Rents due under the Ground Lease; or (ii) $150,000.00.

(c)    Construction Reserve Account: An account to be established by Mortgagor with Mortgagee's own funds and maintained with Mortgagee during the progress of construction of any initial Improvements to the Mortgaged Property required to prepare the Mortgaged Property for Mortgagor's intended use in an amount not less than $384,000.00 which account shall be available to Mortgagor for the payment of all fees and costs relating to such construction.

(d)    Commitment: That certain Loan Commitment Letter dated July 8, 2004 issued and approved by Mortgagor and Mortgagee, together with any amendments thereto.

(e)    Default Rate:    The Default Rate as defined in the Note.

(f)    Environmental Law: Any law, enactment, statute, code, ordinance, order, rule, regulation, judgment, decree, writ, injunction, franchise, permit, certificate, license, authorization, or other direction or requirement of any Governmental Authority, as same may be amended from time to time, whether now in existence or established or hereafter enacted, promulgated, adopted, entered or issued, both within and outside the present contemplation of the parties hereto, relating to pollution or protection of the environment, including but not limited to, (i) the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA"), 42 U.S.C. §§9601-9657, (ii) the Superfund Amendments and Reauthorization Act of 1986 ("SARA"), Public Law 99-499, 100 Stat. 1613, (iii) the Resource Conservation and Recovery Act, 42 U.S.C. §§ 6901-6987, (iv) the Florida Resource Recovery and Management Act, Fla. Stat. §§ 403.702 - 403.7893, (v) the Pollutant Spill Prevention and Control Act, Fla. Stat. §§ 376.011 -376.21, (viii) any common law of nuisance or trespass, (viii) any law, rule, or regulation relating to emissions, discharges, releases or threatened releases of pollutants, contaminants or chemicals, or industrial, toxins or other Hazardous Substances or waste into the environment (including without limitation, ambient air, surface water, groundwater, land surface or subsurface strata), (ix) any law otherwise relating to the manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling of pollutants, contaminants or chemicals or industrial, toxic or other Hazardous Substances or wastes, and (x) any other designations as toxins, pollutants or contaminants by any other Governmental Authority (including, without limitation, the United States Environmental Protection Agency).

(g)    Estate for Years:  A prepaid estate in the Land held by Mortgagor expiring October 1, 2008.

(h)    Events of Default: Those events described in Article VII hereof.

1



EXHIBIT
"C"

(i) <u>Fixtures</u>:  All property and equipment now owned or hereafter acquired by Mortgagor and now or hereafter located under, on, or above the Land, whether or not permanently affixed, which, to the fullest extent permitted by applicable law in effect from time to time, shall be deemed fixtures and a part of the Land.

(j) <u>Future Advances</u>. Any loan of money from Mortgagee to Mortgagor made within twenty (20) years from the date hereof.  The total amount of such loan or loans may increase or decrease from time to time, but the total unpaid aggregate balance secured by this Mortgage at any one time shall not exceed $2,000,000.00, plus interest thereon, and any disbursements made for the payment of the Impositions (whether taxes, levies or otherwise), insurance or other liens on the Mortgaged Property, with interest on such disbursements.  The Mortgagee has no obligation whatsoever to make any Future Advances.

(k) <u>Governmental Authority</u>:  Any (domestic or foreign) federal, state, county, municipal or other governmental department, entity, authority, commission, board, bureau, court, agency or any instrumentality of any of them.

(l) <u>Governmental Requirement</u>:  Any law, enactment, statute, code, ordinance, order, rule, regulation, judgment, decree, writ, injunction, franchise permit, certificate, license, authorization, or other direction or requirement of any Governmental Authority now existing or hereafter enacted, adopted, promulgated, entered, or issued applicable to Mortgagee, the Mortgagor, the Land, the Improvements, or any of the Mortgaged Property including, without limitation, any Environmental Law.

(m) <u>Ground Lease</u>:  That certain Lease by and between Lordhill Properties Corp., a Delaware corporation, as Landlord and Lordhill Naranja Lakes Limited Partnership, a Florida limited partnership, as Tenant, dated October 11, 2002, and recorded December 14, 2002, in Official Records Book 20874, at Page 1921, of the Public Records of Miami-Dade County, Florida, and all amendments, extensions, renewals and modifications thereto.

(n) <u>Guarantor</u>:  Jointly and severally any and all Persons now or hereafter guaranteeing the Obligations or any part thereof (collectively referred to as the "Guarantor").

(o) <u>Guaranty</u>:  Any guaranty of payment, performance or completion executed by any Guarantor in favor of Mortgagee with respect to the Obligations.

(p) <u>Hazardous Substances</u>:  Any hazardous, toxic or dangerous waste, substance or material including, but not limited to, any elements or compounds which are now or hereafter (i) identified in Section 101(14) of the CERCLA, 42 U.S.C. §9601(14), and as set forth in 40 C.F.R. §302, as the same may be amended from time to time, (ii) determined to be toxic, a pollutant or contaminant, under any Environmental Law, (iii) contained in the list of hazardous substances adopted by the United States Environmental Protection Agency, (iv) defined as "petroleum" and "petroleum products" as defined in Fla. Stat. §376.301, as same may be amended from time to time, and (v) asbestos and asbestos-containing materials, radon, polychlorinated biphenyls, lead, materials containing lead-based paint, radioactive materials, flammables, explosives and such other elements, compounds, materials, substances or waste which are otherwise dangerous, hazardous, harmful or deleterious to human or animal health or safety, or the environment.

(q) <u>Impositions</u>:  All (i) real estate and personal property taxes and other taxes and assessments, public or private; utility rates and charges including those for water and sewer; all other governmental and non-governmental charges and any interest or costs or penalties with respect to any of the foregoing; and charges for any public improvement, easement or agreement maintained for the benefit of, or involving, the Land, the Improvements or any of the Mortgaged Property, general and special, ordinary and extraordinary, foreseen and unforeseen, of any kind and nature whatsoever that at any time prior to, or after, the execution of this Mortgage may be assessed, levied or imposed upon the Land, the Improvements of any of the Mortgaged Property or the Rent or income received therefrom, or any use or occupancy thereof, (ii) other taxes, assessments, fees and governmental and non-governmental charges levied, imposed or assessed upon or against Mortgagor or any of its properties and (iii) taxes levied or assessed upon this Mortgage, the Note, and the other Obligations, or any of them.

(r) <u>Improvements</u>:  All buildings, structures, appurtenances and improvements, including all additions thereto and replacements and extensions thereof, now constructed or hereafter to be constructed under, on or above the Land, which term includes any part thereof.

(s) <u>Junior Mortgage</u>:  Any mortgage permitted by Mortgagee which now or hereafter encumbers all or any portion of the Mortgaged Property and which is junior or subordinate to the lien of this Mortgage, which term shall collectively refer to all such mortgages and the note or notes secured thereby.

(t) <u>Land</u>:  The real property described in Exhibit "A" attached hereto and made a part hereof, together with all rights, privileges, tenements, hereditaments, rights-of-way, easements, appendages, projection, appurtenances, water rights, including riparian and littoral rights, streets, ways, alleys, and strips and gores of land now or hereafter in anyway belonging, adjoining, crossing or pertaining to the Land.

(u) <u>Leasehold Estate</u>:  The leasehold estate held by Mortgagor in the Land effective October 2, 2008 created by, arising under and by virtue of the Ground Lease which includes, but is not limited to, all Improvements and Fixtures now or hereafter erected thereon or affixed thereto and any and all rights and privileges appurtenant thereto.

2



(v)     Lessee: PZP Investments, Inc., a Florida corporation.

(w)     Lessor: Lordhill Properties Corp., a Delaware corporation.

(x)     Loan: The principal amount of $1,875,000.00, as evidenced by the Note.

(y)     Loan Agreement: N/A

(z)     Loan Documents: The Commitment and those items required by the Commitment and any other document or instrument executed, submitted, or to be submitted by Mortgagor or others in connection with the Loan, including but not limited to, the: (i) Note; (ii) Mortgage; (iii) assignments of subleases and rents; (iv) Guaranty, (v) Loan Agreement (if applicable); (vi) security agreements; (vii) financing statements and all amendments and continuations thereof; (viii) environmental indemnity agreement; and any other document or instrument defined as "Loan Documents" in the Loan Commitment.

(aa)     Mortgaged Property: The Estate for Years, the Leasehold Estate, Ground Lease, Improvements, Fixtures, Subleases, Rents and Personal Property together with:

> (i)     all judgments, awards of damages and settlements hereafter made resulting from condemnation proceedings or the taking of the Land, the Improvements or any of the Mortgaged Property or any part thereof under the power of eminent domain, or by agreement in lieu thereof, or for any damage thereto caused by any governmental action (whether by such taking or otherwise), such as without limitation, any award for change of grade of streets;
>
> (ii)     all judgments, awards and settlements hereafter made, and all insurance proceeds hereafter paid for any damage to the Land, the Improvements of any of the Mortgaged Property, and all unearned insurance premiums on any insurance policies maintained by the Mortgagor pursuant to this Mortgage;
>
> (iii)     all awards and refunds hereafter made with respect to any Imposition;
>
> (iv)     the estate, right, title, interest, privilege, claim or demand whatsoever of Mortgagor, now or hereafter, either at law or in equity, in and to the Mortgaged Property;
>
> (v)     all rights and benefits of every nature whatsoever derived or to be derived by the Mortgagor under or by virtue of the Ground Lease, including, without limitation, the right to exercise options, to give consents, and to receive monies payable to the Lessee thereunder.
>
> (vi)     any extension, renewal or modification, as permitted by Mortgagee, of the Leasehold Estate created by the Ground Lease;
>
> (vii)     all right, title and interest that Mortgagor may hereafter acquire in the Land whether by exercising the Purchase Option or otherwise; and
>
> (viii)     all right, title and interest of the Mortgagor in and to all and singular tenements, hereditament, easements, rights, privileges and appurtenances of the Leasehold Estate at any time belonging or in any way appertaining thereto.

The term Mortgaged Property includes any part of the foregoing property described as Mortgaged Property, and all proceeds, products, replacements, improvements, betterments, extensions, additions, substitutions, renewals, accessories, and appurtenances thereto and thereof.

(bb)     Mortgagee: International Finance Bank, a Florida banking corporation, its successors and assigns.

(cc)     Mortgagor: PZP Investments, Inc., a Florida corporation.

(dd)     Note: The Term Loan Note executed by Borrower in favor of Mortgagee in the original principal amount of $1,875,000.00 of even date herewith, as the same may from time to time hereafter be modified, amended, extended or renewed.

(ee)     Obligations:

> (i)     Any and all of the indebtedness, liabilities, covenants, promises, agreements, terms, conditions, and other obligations of every nature whatsoever, whether joint or several, direct or indirect, absolute or contingent, liquidated or unliquidated, of Mortgagor and Guarantor, or any of them, to Mortgagee, evidenced by, secured by, under and as set forth in the Note, this Mortgage, the Guaranty or the other Loan

3

Documents; and

(ii)    any and all Future Advances.

(ff)    Partnership: Any general or limited partnership, joint venture, or other form of partnership, howsoever designated.

(gg)    Permitted Title Exceptions: Those matters, if any, described in Schedule B to the title insurance policy insuring Mortgagee's interest in this Mortgage.

(hh)    Person. Any individual, corporation, partnership, joint venture, association, joint stock company, trust, unincorporated organization, government, or agency or political subdivision thereof, or any other form of entity.

(ii)    Personal Property. All of the following property of Mortgagor whether now owned or existing, or hereafter acquired or arising, whether located in, on, pertaining to, used or intended to be used in connection with or resulting or created from Mortgagor's Estate for Years or the Leasehold Estate in, or Mortgagor's development, management, or operation of the Land:

(i)    all Improvements (to the extent same are not deemed to be real property) and landscaping;

(ii)    all Fixtures (to the extent same are not deemed to be real property) and goods to become Fixtures;

(iii)    all accounts, accounts receivable, other receivables, contract rights, chattel paper, instruments and documents; any other obligations or indebtedness owed to Mortgagor from whatever source arising; all rights of Mortgagor to receive any performance of any payments in money or kind; all guaranties of the foregoing and security therefor; all of the right, title and interest of Mortgagor in and with respect to the goods, services, or other property that gave rise to or that secure any of the foregoing, and all rights of Mortgagor as an unpaid seller of goods and services, including, but not limited to, the rights to stoppage in transit, replevin, reclamation, and resale;

(iv)    all goods, including without limitation, all machinery, equipment, furniture, furnishings, building supplies and materials, appliances, business machines, tools, aircraft and motor vehicles of every kind and description, and all warranties and guaranties for any of the foregoing;

(v)    all inventory, merchandise, raw materials, parts, supplies, work-in-process and finished products intended for sale, of every kind and description, in the custody or possession, actual or constructive, of Mortgagor including such inventory as is temporarily out of the custody or possession of Mortgagor, and any returns upon any accounts and other proceeds resulting from the sale or disposition of any of the foregoing, including, without limitation, raw materials, work-in-process, and finished goods;

(vi)    all general intangibles, including without limitation, corporate or other business records and books, computer records whether on tape, disc or otherwise stored, blueprints, surveys, architectural or engineering drawings, plans and specifications, trademarks, trade names, goodwill, telephone numbers, licenses, governmental approvals, franchises, permits, payment and performance bonds, tax refund claims, and agreements with utility companies, together with any deposits, prepaid fees and charges paid thereon;

(vii)    all Subleases and Rents (to the extent same are not deemed to be real property);

(ix)    all insurance policies required by this Mortgage, the unearned premiums therefor and all loss proceeds thereof;

(x)    all awards and refunds hereafter with respect to any Imposition;

(xi)    all other personal property, including without limitation, management contracts, construction contracts, architectural contracts, service contracts, engineering contracts, advertising contracts, contracts for purchase and sale of any of the Mortgaged Property, purchase orders, equipment leases, monies in escrow accounts, reservation agreements, prepaid expenses, deposits and down payments with respect to the sale or rental of any of the Mortgaged Property, options and

4



agreements with respect to additional real property for use or development of the Mortgaged Property, end-loan commitments, abstracts of title, all brochures, advertising materials, condominium documents and prospectuses; and

(xii) all proceeds, products, replacements, additions, betterment, extensions, improvements, substitutions, renewals and accessions of any and all of the foregoing.

(jj) <u>Rents</u>: All of the rents, royalties, issues, revenues, income, profits, security deposits and other benefits whether past due, or now or hereafter arising from the Mortgaged Property and the occupancy, use and enjoyment thereof.

(kk) <u>Subleases</u>: Any and all leases (other than the Ground Lease), subleases, licenses, concessions, or grants of other possessory interests, together with the security therefor, now or hereafter in force, oral or written, covering or affecting the Mortgaged Property or any part thereof.

1.2 <u>Headings</u>. The Article headings and the Section and Subsection titles hereof are inserted for convenience of reference only, and shall in no way alter or modify the text or substance of such Articles, Sections and Subsections.

1.3 <u>Rules of Construction</u>. The use of any gender shall include all other genders. The singular shall include the plural and the plural shall include the singular. The word "or" is not exclusive and the use of the word "and" may be conjunctive or disjunctive in the sole and absolute discretion of Mortgagee. The captions of Articles, Sections and Subsections of this Mortgage are for convenience reference only, and shall not affect the construction or interpretation of any of the terms and provisions set forth herein.

1.4 <u>Security Agreement</u>. This Mortgage constitutes a "Security Agreement" within the meaning of and shall create a security interest under the Uniform Commercial Code-Secured Transactions as adopted by the State of Florida, with respect to the Fixtures, Subleases, Rents and Personal Property. A carbon, photographic or other reproduction of this Mortgage or of any financing statement shall be sufficient as a financing statement. The debtor's principal place of business and the secured party's address is set forth in the introduction to this Mortgage.

**ARTICLE II**
**GRANT**

2.1 <u>Grant</u>. For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and to secure the payment, observance, performance and discharge of the Obligations, Mortgagor does by these presents give, transfer, grant, bargain, sell alien, remise, release, assign, mortgage, hypothecate, deposit, pledge, set over, confirm, convey and warrant unto Mortgagee all estate, right, title and interest of Mortgagor in and to the Mortgaged Property, whether now owned or held or hereafter acquired by Mortgagor, subject, however, to the Permitted Title Exceptions, to have and to hold the Mortgaged Property unto Mortgagee, its successors and assigns forever.

2.2 <u>Condition of Grant</u>. Subject to the provisions of this Mortgage, the condition of these presents is such that if Mortgagor shall pay, observe, perform and discharge the Obligations, or cause same to be paid, observed, performed and discharged in strict accordance with the terms thereof, then this Mortgage and the estates, interests, rights and assignments granted hereby shall be null and void, but otherwise remain in full force and effect.

2.3 <u>Subrogation</u>. The Mortgagee is hereby subrogated to the claims and liens of all parties whose claims or liens are fully or partially discharged or paid with the proceeds of the indebtedness secured by this Mortgage notwithstanding that such claims or liens may have been canceled and satisfied of record.

**ARTICLE III**
**ASSIGNMENT OF SUBLEASES AND RENTS**

3.1 <u>Assignment</u>. The Mortgagor does hereby absolutely and unconditionally assign and transfer to Mortgagee all of Mortgagor's estate, right, title and interest in and to the Subleases and Rents, to have and to hold the Subleases and Rents unto Mortgagee, its successors and assigns forever. From time to time, upon request of Mortgagee, Mortgagor shall give further evidence of this assignment to Mortgagee by executing and delivering to Mortgagee specific assignments of the Subleases and Rents, in form and content approved by Mortgagee. All such specific assignments shall be of the same dignity and priority as this Mortgage. From time to time, upon request of Mortgagee, Mortgagor shall also execute and deliver to Mortgagee any notification to subtenants or other document reasonably required by Mortgagee.

3.2 <u>Payment of Rents to Mortgagor, as Trustee, Until Default</u>. So long as no Event of Default exists and is continuing, Mortgagor may, as trustee for the use and benefit of Mortgagee, collect, receive and accept the Rents as they become due and payable (but in no event for more than (2) months in advance); provided, however, that if the Rents exceed the payments due under the Notes, the Mortgagor may use such excess, first, for the operation and benefit of the Mortgaged Property and, second, for the general benefit of the Mortgagor. Upon the occurrence of an Event of Default, and as long as the Event of Default continues, Mortgagee may, at its option, remove the Mortgagor as trustee for the collection of the Rents and appoint any other person including, but not limited to, itself as a substitute trustee

5



to collect, receive, accept and use all such Rents in payment of the Obligations, in such order as Mortgagee shall elect in its sole and absolute discretion, whether or not Mortgagee takes possession of the Mortgaged Property. Mortgagor hereby directs each of the respective subtenants under the Subleases, and any rental agent, to pay to Mortgagee all such Rents, as may now be due or shall hereafter become due, upon demand for payment thereof by Mortgagee without any obligation on the part of any such subtenant or rental agent to determine whether or not an Event of Default has in fact occurred. Upon an Event of Default, the permission hereby given to Mortgagor to collect, receive and accept such Rents as trustee shall terminate and such permission shall not be reinstated upon a cure of the Event of Default without Mortgagee's specific written consent. Exercise of Mortgagee's rights under this Section, and the application of any such Rents to the Obligations, shall not cure or waive any default or notice of default hereunder or invalidate any act done pursuant hereto, but shall be cumulative and in addition to all other rights and remedies of Mortgagee.

3.3    Performance Under Subleases. Mortgagor covenants that it shall, at its sole cost and expense, (a) duly and punctually perform and discharge, or cause to be performed and discharged, all of the obligations and undertakings of Mortgagor, as sublessor, under the Subleases, (b) use its best efforts to enforce or secure, or cause to be enforced or secured, the performance of each and every obligation and undertaking of the respective subtenants under the Subleases, (c) promptly notify Mortgagee if Mortgagor receives any notice from a subtenant claiming that Mortgagor is in default under a Sublease and (d) appear in and defend any action or proceeding arising under or in any manner connected with the Subleases.

3.4    Provisions of Subleases and Approval of Subtenants. All Subleases shall be inferior and subordinate to the lien of this Mortgage and the terms of each Sublease shall so expressly provide. Mortgagor covenants that all Subleases hereafter entered into by Mortgagor shall be in form and substance satisfactory to Mortgagee. Further, the Mortgagee specifically reserves the right to approve all proposed subtenants, and any assignee or sublessee of any existing subtenant.

3.5    Termination or Modification. Mortgagor covenants that it shall not, without the prior express written consent of Mortgagee, enter into a Sublease, or modify, terminate, extend, amend, or consent to the cancellation or surrender of any Sublease, or permit any subtenant under any Sublease to assign or sublet its rights thereunder.

3.6    No Obligation of Mortgagee. This Assignment shall not be deemed or construed to constitute Mortgagee as a mortgagee in possession of the Mortgaged Property nor shall it obligate Mortgagee to take any action or to incur expenses or perform or discharge any obligation, duty or liability of Mortgagor under any Sublease.

3.7    Cumulative Remedies. Each and every right, remedy and power granted to Mortgagee by this Article shall be cumulative and in addition to every other right, remedy and power given by the Loan Documents and now or hereafter existing in equity, at law, or by virtue of statute or otherwise. The failure of Mortgagee to avail itself of any of its rights, remedies and powers shall not be construed or deemed to be a waiver thereof.

3.8    Notification of Mortgagee's Rights. Mortgagee shall have the right, but not the obligation, at any time and from time to time, to notify any subtenant under any Sublease of the rights of Mortgagee as provided in this Article III and Mortgagor, upon demand from Mortgagee, shall confirm to such subtenant the existence of such rights.

3.9    Attorney-in-Fact. To further effectuate Mortgagee's rights under this Article III, upon the occurrence of an Event of Default, Mortgagor hereby constitutes and irrevocably appoints Mortgagee its true and lawful attorney-in-fact, which appointment is coupled with an interest, with full power of substitution, and empowers said attorney or attorneys in the name of Mortgagor, but at the option of said attorney-in-fact, to (i) collect and receive the Rents and to issue receipts therefor, (ii) to make, enter into, extend, modify, amend, terminate, consent to the cancellation or surrender of any Sublease, or permit any subtenant to assign or sublet its rights thereunder, (iii) to execute, acknowledge and deliver any and all instruments and documents that Mortgagee may deem necessary or proper to implement its rights as provided in this Article III, and (iv) to perform and discharge any and all obligations and undertakings of Mortgagor under any Sublease.

3.10    Other Assignments. Mortgagor shall not further assign or transfer the Subleases or Rents except in favor of Mortgagee as provided in this Article III, and shall not create or permit to be created or to remain, any mortgage, pledge, lien, encumbrance, claim, or charge on the Subleases or Rents. Any transaction prohibited under this Section shall be null and void.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES

4.1    Representations and Warranties. Mortgagor hereby represents and warrants to Mortgagee that:

(a)    Organization, Corporate Power, Partnership Power, Etc. Mortgagor (i) is duly organized, validly existing and in good standing under the laws of the state or country of its incorporation, (ii) has the corporate power and authority to own its properties and to carry on its business as now being conducted, all of its issued and outstanding stock is fully paid and nonassessable, there are no outstanding rights or options to acquire any additional stock, and its stock has not been pledged or encumbered in any manner whatsoever, (iii) is qualified to do business in the State of Florida, (iv) is in compliance with all Governmental Requirements, and (v) has not amended or modified its articles or certificate of incorporation or its bylaws except as previously disclosed in writing to Mortgagee prior to the execution hereof.

6



(b)    Validity of Loan Documents. (i) The execution, delivery and performance by Mortgagor of the Ground Lease and the Loan Documents, and the borrowing evidenced by the Notes, (a) are within the powers and purposes of Mortgagor, (b) have been duly authorized by all requisite action of Mortgagor, (c) do not require the approval of any Governmental Authority, and (d) will not violate any Governmental Requirement, the articles of incorporation and bylaws or the partnership agreement of Mortgagor or any indenture, agreement or other instrument to which Mortgagor is a party or by which it or any of its property is bound, or be in conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any such indenture, agreement or other instrument, or result in the creation or imposition of any lien, charge or encumbrance of any nature whatsoever upon any of its property or assets, except as contemplated by the provisions of the Loan Documents; and (ii) the Ground Lease and Loan Documents, constitute the legal, valid and binding obligations of Mortgagor and other obligors named therein, if any, in accordance with their respective terms.

(c)    Financial Statements. All balance sheets, statements of profit and loss, and other financial data that have been given to Mortgagee with respect to the Mortgagor and the Guarantor, (i) are complete and correct in all material respects, (ii) accurately present the financial condition of said parties as of the dates, and the results of its or their operations, for the periods for which the same have been furnished, and (iii) have been prepared in accordance with generally accepted accounting principles consistently followed through the periods covered thereby; all balance sheets disclose of all known liabilities, direct and contingent, as of their respective dates; and there has been no change in the condition of the Mortgagor or the Guarantor, financial or otherwise, since the date of the most recent financial statements given to Mortgagee with respect to said parties, other than changes in the ordinary course of business, none of which changes has been materially adverse.

(d)    Other Agreements. Mortgagor is not a party to any agreement or instrument materially and adversely affecting any of the Mortgaged Property, Mortgagor, or Mortgagor's present or proposed businesses, properties or assets, operation or condition, financial or otherwise, and Mortgagor is not in default in the performance, observance or fulfillment of any of the material obligations, covenants or conditions set forth in any agreement or instrument to which it is a party.

(e)    Other Information. All other information, including reports, financial statements, certificates, papers, data and otherwise, given and to be given to Mortgagee with respect (i) to Mortgagor or any Guarantor, (ii) to the Ground Lease, (iii) to the Loan and (iv) to others obligated under the terms of the Loan Documents, are true, accurate and correct in all material respects and complete.

(f)    Title. Mortgagor is the sole owner and holder of the entire lessee's interest in the Ground Lease and of the Leasehold Estate created thereby and Mortgagor has and will have good, absolute and marketable leasehold title to the Land and Improvements free and clear of any and all mortgages, liens, encumbrances, claims, charges, equities, covenants, conditions, restrictions, easements, rights-of-way and all other matters affecting the Land and Improvements and Mortgagor's Leasehold Estate therein, whether or not of record, except for the Permitted Title Exceptions. Mortgagor has and will have good, absolute and marketable title to the Fixtures and Personal Property all free and clear of any and all liens, charges, encumbrances, security interests and adverse claims whatsoever, except those in favor of Mortgagee. Mortgagor will forever warrant and defend the validity and priority of the lien of this Mortgage against the claims of all persons and parties whomsoever.

(g)    No Violations. No Governmental Requirement (including, but not limited to, 21 U.S.C. §§ 811 and 881, and 18 U.S.C. §1961), and no covenant, condition, restriction, easement or similar matter affecting the Land, the Improvements or any of the Mortgaged Property have been violated, and Mortgagor has not received any notice of violation from any Governmental Authority or any other person with respect to any of the foregoing matters.

(h)    Ground Lease. The fully executed copy of the Ground Lease delivered to Mortgagee by Mortgagor is a true, correct and complete copy of the Ground Lease. The Ground Lease is in full force and effect, in good standing, and is unmodified as of the date hereof. All rents (including additional rents and other charges) reserved in the Ground Lease have been paid to the extent that they were payable prior to the date hereof. There is no existing default under the Ground Lease or in the performance of any of the terms, covenants, conditions or warranties thereof by Mortgagor or by Lessor, and no event has occurred which with due notice or the lapse of time, or both, would constitute a default thereunder. The Lessor has consented to Mortgagor's execution and delivery of this Mortgage.

(i)    Taxes. Mortgagor has filed all federal, state, county and municipal income tax returns required to have been filed by it, and has paid all taxes that have become due pursuant to such returns, pursuant to any assessments received by it or pursuant to law, and Mortgagor does not know of any basis for additional assessment with respect to such taxes or additional taxes. The Land is assessed separately from all other adjacent land for the purposes of real estate taxes and there is no intended public improvements which may involve any charge being levied or assessed, or which may result in the creation of any lien upon the Land, the Improvements or any of the Mortgaged Property.

(j)    Litigation. There are no judgments outstanding against Mortgagor and there is no action, suit, proceeding, or investigation now pending (or to the best of Mortgagor's knowledge after diligent inquiry, threatened) against, involving or affecting Mortgagor or the Mortgaged Property, or any part thereof, at law, in equity or before any Governmental Authority that if adversely determined as to the Mortgaged Property or as to Mortgagor would result in a material adverse change in the business or financial condition of the Mortgagor or Mortgagor's operation and ownership of the Mortgaged Property, nor is there any basis for such action, suit, proceeding or

7



investigation.

(k)    Utilities.    There is available to the Land and Improvements through public or private easements or rights-of-way abutting or crossing the Land (which would inure to the benefit of Mortgagee in case of enforcement of this Mortgage) a water supply and a sanitary sewer service approved by all health and other authorities having jurisdiction, and electric, gas (if applicable) and telephone service, all of sufficient capacity to serve the needs of the Land and Improvements according to their intended purpose.

(l)    Condition of Mortgaged Property.    Neither the Land, the Improvements nor any of the Mortgaged Property or any part thereof, now existing, is damaged or injured as a result of any fire, explosion, accident, flood or other casualty. The Improvements, as of the date of this Mortgage, are free of any defects in material, structure and construction and do not violate any Governmental Requirements. There is no existing, proposed or contemplated plan to modify or realign any street or highway or any existing, proposed or contemplated eminent domain proceeding that would result in the taking of all or any part of the Land, the Improvements or any of the Mortgaged Property, or that would adversely affect the use or the operation of the Land, the Improvements or any of the Mortgaged Property.

(m)    Zoning.    The Land is zoned so as to permit the Land and Improvements to be used for their intended purpose.

(n)    No Default.    No default or Event of Default exists under any of the Loan Documents; and no event has occurred and is continuing which, with notice or the lapse of time, or both, would constitute a default under any provision thereof.

(o)    Fictitious Name Statute.    Mortgagor, if applicable, has duly complied with all of the requirements of the Florida Fictitious Name Statute.

(p)    Junior Mortgage.    No Junior Mortgage, if any, existing as of the date hereof requires the consent of any of the holders thereof to the Loan, the execution and delivery of the Loan Documents, or to any transaction contemplated under the Loan Documents. All Junior Mortgages existing as of the date hereof, if any, are in good standing, all principal, interest and other payments due thereunder have been paid in accordance with the terms thereof, there is no default thereunder and no event has occurred which with due notice or the lapse of time, or both, would constitute a default thereunder.

(q)    Environmental Contamination/Hazardous Substances.    Mortgagor and the Mortgaged Property are in full compliance with all Environmental Laws, and there are no civil, criminal or administrative actions, suits, demands, claims, hearings, notices or demand letters, notices of violation, investigations, or proceedings pending or threatened against the Mortgagor or the Land, the Improvements or the Mortgaged Property relating in any way to any Environmental Law or any agreement, plan, order, decree, judgment, injunction, notice or demand letter issued, entered, promulgated or approved under any Environmental Law. There have never been nor are there currently any Hazardous Substances located on, in, or under the Mortgaged Property or used in connection therewith, and neither Mortgagor nor any other person has ever used the Land, the Improvements or the Mortgaged Property for the manufacture, processing, distribution, use, transport, handling, treatment, storage, disposal, emission, discharge or release of any Hazardous Substance. No notice or advice has been received by Mortgagor of any condition or state of facts that would be contributing to a claim of pollution or any other damage to the environment by reason of the conduct of any business on the Land, the Improvements or any of the other Mortgaged Property or the operation thereof, whether past or present.

(r)    Representations and Warranties in Other Loan Documents.    All of the representations and warranties contained in the other Loan Documents are true and correct.

4.2    Reliance on Representations.    The Mortgagee acknowledges that the Mortgagee has relied upon the Mortgagor's representations, has made no independent investigation of the truth thereof, is not charged with any knowledge contrary thereto that may be received by an examination of the public records in Tallahassee, Florida and wherein the Land is located, or that may have been received by any officer, director, agent, employee or shareholder of Mortgagee.

## ARTICLE V
### AFFIRMATIVE COVENANTS

5.1    Payment and Performance.    Mortgagor shall promptly pay and punctually perform, or shall cause to be promptly paid and punctually performed, all of the Obligations as and when due and payable.

5.2    Existence.    Mortgagor shall preserve and keep in full force and effect its existence, rights, franchises, trade names and qualification to transact business in the State of Florida.

5.3    Compliance With Laws.    Mortgagor shall promptly and faithfully comply with, conform to and obey all Governmental Requirements and the rules and regulations now existing or hereafter adopted by every Board of Fire Underwriters having jurisdiction, or similar body exercising similar functions, that may be applicable to Mortgagor, the Land, the Improvements, or any of the Mortgaged Property or to the use or manner of use, occupancy, possession,

8



operation, maintenance, alteration, repair or reconstruction of the Land, the Improvements or any of the Mortgaged Property, whether or not such Governmental Requirement or rule or regulation shall necessitate structural changes or improvements or interfere with the use or enjoyment of the Land, the Improvements or any of the Mortgaged Property.

5.4     Impositions.     Mortgagor shall pay all Impositions on the Land, the Improvements and the other Mortgaged Property and all taxes levied or assessed upon this Mortgage, the Notes and the Obligations, or any of them.

5.5     Insurance.

(a)     The Mortgagor shall obtain, maintain and keep in full force and effect during the term of this Mortgage, with all premiums paid thereon, and without notice or demand, the following insurance with respect to the Land, the Improvements and the other Mortgaged Property:

(i)     During construction of the Improvements, Builder's All-Risk, Completed Value, Non-Reporting Form Insurance ("Builder's Risk Insurance") reflecting coverage in such amounts as Mortgagee may reasonably require, but in no event less than 100% of the full replacement cost of the Mortgaged Property that includes: (a) a mortgage endorsement naming the Mortgagee as mortgagee, which endorsement shall provide that the mortgagee's coverage will not be invalidated by a foreclosure or the acquisition of the Mortgaged Property by a deed in lieu thereof, a change in ownership of the Land, the Improvements or any of the Mortgaged Property, provided that the Mortgagee pays any premium demanded should the Mortgagor or Lessor fail to do so; the aforesaid mortgage endorsement (which creates a separate agreement between the insurance company and the Mortgagee) shall also specifically cover and apply to that portion of the Mortgaged Property constituting Personal Property; (b) a replacement cost endorsement; (c) a stipulated value/agreed amount endorsement; (d) flood insurance, if the Land is in a designated flood plain area; (e) collapse and earthquake coverage; and (f) vandalism and malicious mischief coverage. Such policy shall provide that any and all loss payments thereunder be payable to Mortgagee alone and not jointly with Mortgagor. Such policy shall also cover all Mortgaged Property whether on the Land, stored off the Land, or in transit and the transit coverage shall equal or exceed the largest single shipment;

(ii)     Upon completion of construction of the Improvements, All-Risk (Special) Hazard Insurance ("All-Risk Hazard Insurance") reflecting coverage in such amounts as Mortgagee may require, but in no event less than 100% of the full replacement cost of the Mortgaged Property that includes: (a) a mortgage endorsement naming the Mortgagee as mortgagee, which endorsement shall provide that the mortgagee's coverage will not be invalidated by a foreclosure or the acquisition of the Mortgaged Property by a deed in lieu thereof, a change in ownership of the Land, the Improvements or any of the Mortgaged Property, provided that the mortgagee pays any premium demanded should the Mortgagor or Lessor fail to do so; the aforesaid mortgage endorsement (which creates a separate agreement between the insurance company and the mortgagee) shall also specifically cover and apply to that portion of the Mortgaged Property constituting Personal Property; (b) a replacement cost endorsement; (c) boiler explosion coverage, if applicable; (d) sprinkler leakage coverage, if applicable; (e) vandalism and malicious mischief coverage; (f) twelve (12) months rent loss and business interruption coverage; and (g) flood insurance, if the Land is in a designated flood plain area. Such policy shall provide that any and all loss payments thereunder be payable to Mortgagee alone and not jointly with Mortgagor;

(iii)     General Comprehensive Public Liability Insurance ("Liability Insurance") against claims for bodily injury, death and property damage, occurring in, on or about the Land, the Improvements or any of the Mortgaged Property, in such amounts as may be required by Mortgagee, but in no event less than $1,000,000 per occurrence for bodily injury and property damage. Such policy shall include an additional insured endorsement naming the Mortgagee. The Mortgagor's general contractor (if applicable) shall also carry the aforesaid insurance coverage;

(iv)     Worker's Compensation Insurance ("Workers' Compensation") in the statutory amount, naming the Mortgagor as owner of the Mortgaged Property; and

(v)     Insurance in such amounts and against such other casualties and contingencies as required under the Ground Lease and as may from time to time be required by Mortgagee ("Other Insurance").

(b)     All policies of insurance required hereunder shall: (i) be written by carriers which are licensed or authorized to transact business in the State of Florida, and are rated "A" or higher, Class XII or higher,

9



according to the latest published Best's Key Rating Guide and which shall be otherwise acceptable to Mortgagee in all other respects; (ii) provide that the Mortgagee shall receive thirty (30) days' prior written notice from the insurer before a cancellation, modification, material change or non-renewal of the policy becomes effective; (iii) be written with a deductible of not more than $1,000 and for such amounts as are sufficient to prevent the Mortgagor from becoming a co-insurer thereunder; and (iv) be otherwise satisfactory to Mortgagee.

(c)     Mortgagor shall not, without the prior written consent of Mortgagee, take out separate insurance concurrent in form or contributing with regard to any insurance coverage required by this Mortgage.

(d)     At all times during the term of this Mortgage, Mortgagor shall have delivered to Mortgagee the original (a certified copy or certificate of insurance) of all policies of insurance required hereby, together with receipts or other evidence that the premiums therefor have been paid.

(e)     The delivery of any insurance policy and any renewals thereof, shall constitute an assignment thereof to Mortgagee, and Mortgagor hereby grants to Mortgagee a security interest in all such policies, in all proceeds thereof and in all unearned premiums therefor.

5.6     Tax and Insurance Escrow.     Supplementing the provisions of Sections 5.4 and 5.5 hereof, Mortgagor shall pay to Mortgagee on the payment date of installments of interest as provided in the Notes, together with and in addition to such installments of interest, an installment of the Impositions and insurance premiums for such insurance as is required hereunder, next due on the Mortgaged Property, in an amount sufficient, as estimated by Mortgagee, to accumulate the sum required to pay such Impositions and insurance, as applicable, thirty (30) days prior to the due date thereof. Amounts held hereunder shall not be, nor be deemed to be, trust funds, but may be commingled with the general funds of Mortgagee, and no interest shall be payable with respect thereto. Upon demand of Mortgagee, Mortgagor shall deliver to Mortgagee, within ten (10) days after such demand, such additional money as is necessary to make up any deficiencies in the amounts necessary to enable Mortgagee to pay such Impositions and insurance premiums when due. In case of an Event of Default, Mortgagee may apply any amount under this Section remaining to Mortgagor's credit to the reduction of the Obligations, at such times and in such manner as Mortgagee shall determine.

5.7     Repair. Mortgagor shall keep the Land, the Improvements and the other Mortgaged Property in good order and condition and make all necessary or appropriate repairs and replacements thereof and betterment and improvements thereto, ordinary and extraordinary, foreseen and unforeseen, and use its best efforts to prevent any act that might impair the value or usefulness of the Land, the Improvements or any of the Mortgaged Property.

5.8     Restoration Following Casualty.

(a)     If all or any part of the Mortgaged Property shall be damaged or destroyed by a casualty covered by insurance under Section 5.5, Mortgagor shall immediately give written notice thereof to Mortgagee and the appropriate insurer. Mortgagee is authorized and empowered (but not obligated or required) to make proof of loss and to settle, adjust or compromise any claims for loss, damage or destruction under any policies of insurance required under this Mortgage; provided, however, that Mortgagee shall not make such proof of loss and settle, adjust or compromise such claim so long as: (i) no Event of Default exists, and no condition exists which but for notice would constitute an Event of Default; and (ii) Mortgagor shall forthwith make such proof of loss and diligently prosecute the payment of such claim and the settlement, adjustment or compromise thereof and, at Mortgagee's request, retain legal counsel (acceptable to Mortgagee) to represent Mortgagor in connection with such prosecution, settlement, adjustment or compromise. All proceeds of insurance, as provided in Section 5.5, shall be paid to Mortgagee and shall be applied first to the payment of all costs and expenses (including, without limitation, reasonable attorneys' fees and expenses) incurred by Mortgagee in obtaining such proceeds, and second, at the option of Mortgagee, either to the payment of the Obligations whether or not due, in such order as Mortgagee may elect, or to the restoration, repair, or replacement of the Mortgaged Property. If Mortgagee elects to apply the insurance proceeds to the restoration, repair or replacement of the Mortgaged Property, such proceeds shall be disbursed to Mortgagor as work progresses pursuant to a construction and disbursing agreement in form and content satisfactory to Mortgagee in its sole discretion, and Mortgagor shall promptly and diligently, regardless of whether there shall be sufficient insurance proceeds therefor, restore, repair and rebuild the Mortgaged Property to the equivalent of its condition immediately prior to the casualty. During the period of restoration and repair, Mortgagor shall continue to duly and promptly pay, perform, observe and comply with all of the Obligations. The election by Mortgagee to apply the insurance proceeds to the restoration, repair or replacement of the Mortgaged Property shall not affect the lien of this Mortgage or affect or reduce the Obligations.

(b)     Notwithstanding the provisions of Subsection 5.8(a) to the contrary, if a portion of the Mortgaged Property shall be damaged or destroyed by a casualty covered by insurance under Section 5.5 then, provided that no Event of Default exists and no condition exists which but for notice would constitute an Event of Default, the proceeds of insurance received by Mortgagee with respect to such casualty, after deducting therefrom all of the Mortgagee's costs and expenses reasonably incurred by Mortgagee in connection with obtaining such proceeds, shall be disbursed to Mortgagor, as work progresses, and Mortgagor shall promptly and diligently, regardless of whether there shall be sufficient insurance proceeds therefor, restore, repair and rebuild the Mortgaged Property to the equivalent of its condition immediately prior to the casualty.

(c)     If all or any of the Mortgaged Property shall be damaged or destroyed by a casualty not covered by insurance under Section 5.5, or, if so covered, the insurer fails or refuses to pay the claim within thirty (30) days following the filing thereof, Mortgagor shall immediately give written notice thereof to Mortgagee, and Mortgagor

10



shall promptly and diligently, at Mortgagor's sole cost and expense, restore, repair and rebuild the Mortgaged Property to the equivalent of its condition immediately prior to the casualty. During the period of restoration and repair, Mortgagor shall continue to duly and promptly pay, perform, observe and comply with all of the Obligations.

(d)  If any work required to be performed under Subsections (a), (b) and (c) above, or any of them, shall involve an estimated expenditure of more than $75,000.00, no such work shall be undertaken until plans and specifications therefor, prepared by an architect satisfactory to Mortgagee, have been submitted to Mortgagee, which plans and specifications shall provide, at a minimum, for the Mortgaged Property to be restored or rebuilt to the equivalent of its condition immediately prior to the casualty. Upon completion of such restoration work, Mortgagee reserves the right to cause the Mortgaged Property to be inspected, at Mortgagor's sole cost and expense (not to exceed $1,000.00), by an engineer to be selected by Mortgagee to verify that the work has been completed in accordance with the plans and specifications submitted to Mortgagee.

5.9  Condemnation.

(a)  Mortgagor shall immediately notify Mortgagee upon obtaining any knowledge of the institution of any proceedings for the condemnation of the Mortgaged Property or any part thereof.

(b)  If all or any part of the Mortgaged Property shall be damaged or taken through condemnation (which term when used in this Mortgage shall include any damage or taking by any Governmental Authority and any transfer by private sale in lieu thereof, either temporarily or permanently), Mortgagee at its option may declare all of the unpaid Obligations to be immediately due and payable, and upon ten (10) days' written notice from Mortgagee to Mortgagor all such Obligations shall immediately become due and payable as fully and to the same effect as if such date were the date originally specified for the final payment or maturity thereof. The Mortgagee shall be entitled to all compensation, awards and other payments resulting from such condemnation, and is hereby authorized, at its option, to commence, appear in and prosecute, in its own or in Mortgagor's name, any action or proceeding relating to any condemnation, and to settle or compromise any claim in connection therewith; provided, however, that Mortgagee shall not commence or prosecute such action or proceeding or settle or compromise such claim so long as: (i) no Event of Default exists, and no condition exists which but for notice would constitute an Event of Default; and (ii) Mortgagor shall retain legal counsel, acceptable to Mortgagee, to represent Mortgagor in connection with such condemnation and shall timely commence and diligently prosecute any action, proceeding, settlement and compromise in connection therewith. All such compensation, awards, damages, claims, rights of action and proceeds and the right thereto are hereby assigned by Mortgagor to Mortgagee and shall be applied first to the payment of all costs and expenses (including, without limitation, reasonable attorneys' fees and expenses) incurred by Mortgagee in connection with any action or proceeding under this Section 5.9, and second, at the option of Mortgagee, either to the payment of the Obligations whether or not due, in such order as Mortgagee may elect, or to the restoration, repair or alteration of the Mortgaged Property. If Mortgagee elects to apply the condemnation awards to the restoration, repair or alteration of the Mortgaged Property, such awards shall be disbursed to Mortgagor as work progresses pursuant to a construction and disbursing agreement in form and content satisfactory to Mortgagee in its sole discretion, and Mortgagor shall promptly and diligently, regardless of whether there shall be sufficient condemnation awards therefor, restore, repair and alter the Mortgaged Property in a manner satisfactory to Mortgagee. During the period of restoration, repair and alteration, the Mortgagor shall continue to duly and promptly pay, perform, observe and comply with all of the Obligations. The election by Mortgagee to apply the condemnation awards to the restoration, repair or alteration of the Mortgaged Property shall not affect the lien of this Mortgage or affect or reduce the Obligations. If any restoration, repair or alteration of the Mortgaged Property shall involve an estimated expenditure of more than $10,000.00, same shall not be commenced until plans and specifications therefor, prepared by an architect satisfactory to Mortgagee, have been submitted to and approved by Mortgagee.

(c)  Notwithstanding the provisions of Subsection 5.9(b) to the contrary, if a "de minimis" (as hereinafter defined) portion of the Mortgaged Property is taken or damaged through condemnation and if in Mortgagee's judgment such portion may be restored, repaired or altered to a condition as near as possible to its condition immediately prior to such taking or damage and without impairment of Mortgagee's security or the value of the Mortgaged Property for its intended purpose, then, provided that no Event of Default exists and no condition exists which but for notice would constitute an Event of Default, the condemnation awards received by and expenses incurred by Mortgagee in connection with such condemnation action or proceeding, shall be disbursed to Mortgagor pursuant to the Loan Agreement, as work progresses, and Mortgagor shall promptly and diligently, regardless of whether there be sufficient condemnation awards therefor, restore, repair and alter such portion of the Mortgaged Property in a manner satisfactory to Mortgagee. The term "de minimis" for the purposes of this Subsection 5.9(c) means a portion, as determined by Mortgagee in its sole discretion, which does not adversely affect the actual use of the Improvements.

5.10  Inspection.    Mortgagor shall permit Mortgagee and its agents to inspect the Land, Improvements and the other Mortgaged Property at any time during normal business hours and at all other reasonable times.

5.11  Contest of Tax Assessments, Etc.    After prior written notice to Mortgagee, Mortgagor, at its own expense, may contest by appropriate legal proceedings, promptly initiated and conducted in good faith and with due diligence, the amount, validity or application, in whole or in part, of (a) any of the Governmental Requirements referred to in Section 5.3, or (b) any Imposition; provided that: (i) in the case of any unpaid Imposition, such proceedings shall suspend the collection thereof from Mortgagor, the Lessor, the Land, the Improvements and the other Mortgaged Property, (ii) the Land, the Improvements and the other Mortgaged Property or any part thereof will not be in danger

11



· of being sold, forfeited, terminated, canceled or lost, (iii) the use of the Land, the Improvements and the other Mortgaged Property or any part thereof for its present or future intended purpose or purposes will not be interrupted, lost or terminated, (iv) Mortgagor shall have set aside adequate reserves with respect thereto, and (v) Mortgagor shall have furnished such security as may be required in the proceedings or as may be reasonably requested by Mortgagee.

    5.12    <u>Expenses</u>.

    (a)    Mortgagor shall pay all costs and expenses in connection with the Loan and the preparation, execution, and delivery of the Loan Documents including, but not limited to, fees and disbursements of counsel appointed by Mortgagee, and all recording costs and expenses, documentary stamp tax and intangible tax on the entire amount of funds disbursed under the Loan, and other taxes, surveys, appraisals, premiums for policies of title and other insurance and all other fees, costs and expenses, if any, set forth in the Commitment, the Loan Agreement, or otherwise connected with the Loan transaction.

    (b)    Mortgagor shall pay or reimburse Mortgagee for all costs, charges, expenses, and reasonable attorneys' fees paid or incurred by Mortgagee pursuant to this Mortgage, including but not limited to, those costs, charges, expenses and fees paid or incurred for the payment of the Impositions, insurance, completion of construction, repairs, or in any action, proceeding or dispute of any kind in which Mortgagee is a party because of any Obligation not being duly and promptly performed or being violated, including, but not limited to, the foreclosure or other enforcement of this Mortgage, any condemnation or eminent domain action involving the Land, the Improvements or any of the Mortgaged Property or any part thereof, any action to protect the security hereof, or any proceeding in probate, reorganization, bankruptcy, or forfeiture in rem. All such amounts paid or incurred by Mortgagee, together with interest thereon at the Default Rate from the date incurred by Mortgagee, shall be secured by this Mortgage and shall be due and payable by Mortgagor immediately, whether or not there be notice or demand therefor.

    (c)    Any reference in this Mortgage to attorneys' or counsels' fees paid or incurred by Mortgagee shall be deemed to include paralegals' fees and legal assistants' fees. Moreover, wherever provision is made herein for payment of attorneys' or counsels' fees or expenses incurred by the Mortgagee, said provision shall include, but not be limited to, such fees or expenses incurred in any and all judicial, bankruptcy, reorganization, administrative, or other proceedings, including appellate proceedings, whether such fees or expenses arise before proceedings are commenced or after entry of a final judgment.

    5.13    <u>Performance of the Commitment</u>.    The Obligations of the Mortgagor under the Commitment shall survive the execution and delivery of this Mortgage and Mortgagor shall timely comply with, abide by and perform all the Obligations of the Commitment on its part to be complied with, abided by and performed, including but not limited to, the following:

    (a)    Mortgagor shall, during the term of the Loan, in addition to the Collateral Reserve Account and the Construction Reserve Account, maintain with Mortgagee all of its operating accounts with respect to the Mortgaged Property, including without limitation, all security deposit accounts and property management accounts;

    (b)    Mortgagor shall, prior to the funding of the Loan, establish the Collateral Reserve Account with Mortgagee with Mortgagor's own funds and not out of the proceeds of the Loan, which Collateral Reserve Account shall be maintained until Mortgagor shall have complied with all conditions set forth in the Commitment for the release thereof but in no event less than one (1) year from the loan closing date;

    (c)    Mortgagor shall, prior to the funding of the Loan, establish the Construction Reserve Account with Mortgagee with Mortgagor's own funds and not out of the proceeds of the Loan, for the payment of all fees and costs of construction of the initial Improvements to the Mortgaged Property; and

    (d)    Following the release of the Collateral Reserve Account, Mortgagee shall, at all times during the term of the Loan, maintain a Debt Service Coverage ratio (defined as available Net Income divided by Loan Debt Service) of 1.25x or better.

    5.14    <u>Preservation of Agreements</u>.    Mortgagor shall preserve and keep in full force and effect, or cause to be preserved and kept in full force and effect, all agreements, approvals, permits and licenses necessary for the development, use and operation of the Land, the Improvements and the other Mortgaged Property for its intended purpose or purposes.

    5.15    <u>Books and Records</u>.    The Mortgagor shall keep and maintain, at all times, full, true and accurate books of accounts and records, adequate to correctly reflect the results of the operation of the Mortgaged Property.

    5.16    <u>Estoppel Affidavits</u>.    Mortgagor, within (10) days after written request from Mortgagee, shall furnish a written statement, duly acknowledged, setting forth the unpaid principal balance of, and interest on, the Obligations secured by this Mortgage, and whether or not any off-sets or defenses exist thereto.

    5.17    <u>Indemnification</u>.

    (a)    Mortgagor shall at its own expense, and does hereby agree to, protect, indemnify, reimburse, defend and hold harmless Mortgagee and its directors, officers, agents, employees, attorneys, successors and assigns

12



from and against any and all liabilities (including strict liability), losses, suits, proceedings, settlements, judgments, orders, penalties, fines, liens, assessments, claims, demands, damages, injuries, obligations, costs, disbursements, expenses or fees, or any kind or nature (including attorneys' fees and expenses paid or incurred in connection therewith) arising out of or by reason of (i) an incorrect legal description of the Land; (ii) any action, or inaction of Mortgagee in connection with the Notes, this Mortgage, the other Loan Documents or the Mortgaged Property; (iii) the construction of any Improvements; (iv) the Improvements; (v) the use and operation of the Mortgaged Property (vi) any acts or omissions of Mortgagor or any other Person at, on or about the Land, the Improvements or the other Mortgaged Property regarding the contamination of air, soil, surface waters or groundwater over, on or under the Land; (vii) the presence, whether past, present or future, of any Hazardous Substances on, in, or under the Land; or (viii) any past, present or future events, conditions, circumstances, activities, practices, incidents, actions or plans involving the manufacture, processing, distribution, use, transport, handling, treatment, storage, disposal, cleanup, emission, discharge, seepage, spillage, leakage, release or threatened release of any Hazardous Substance on, in, under or from the Land, in connection with Mortgagor's operations on the Land, the Improvements or the other Mortgaged Property, or otherwise; all of the foregoing regardless of whether within the control or Mortgagee.

        (b)      The indemnification of this Section 5.17 shall survive the full payment and performance of the Obligations and the satisfaction of this Mortgage.

      5.18    <u>Mortgagor to Furnish Financial Statements.</u>  Mortgagor shall annually, until all the Obligations have been fully paid and performed, furnish Mortgagee with financial statements of Mortgagor prepared by a certified public accountant satisfactory to Mortgagee, in accordance with Generally Accepted Accounting Principles all in such detail as Mortgagee may reasonably require. In addition, Mortgagor shall annually, until all the Obligations have been fully paid and performed, furnish Mortgagee or cause to be furnished to Mortgagee financial statements of each Guarantor in such detail as Mortgagee may reasonably require certified by the applicable Guarantor as being true, correct and complete. Such statements shall be furnished not later than ninety (90) days after the end of Mortgagor's fiscal year. Failure to furnish such statements shall be an Event of Default under Article VII of this Mortgage.

      5.19    <u>Mortgagor to Furnish Financial Statements of the Mortgaged Property.</u> Mortgagor shall annually, until all the Obligations have been fully paid and performed, furnish Mortgagee with statements of earnings for the Mortgaged Property for each fiscal year of Mortgagor in such detail as Mortgagee may reasonably require, showing gross income and detailed operating expenses of and a balance sheet for the operation of the Mortgaged Property including where applicable the annual rent roll, (together with a schedule showing the name of each subtenant, the space occupied and the Sublease expiration date), other income and sales volume of subtenants where Subleases provide for payment of rentals based on percentages of volume of business done. Each such statement shall be for and cover a whole fiscal year. Such statements shall be furnished not later than sixty (60) days after the end of Mortgagor's fiscal year. Failure to furnish such statements shall be an Event of Default under Article VII of this Mortgage.

      5.20    <u>Further Assurances.</u>    Mortgagor, at its sole expense, upon the request of Mortgagee, shall execute, acknowledge and deliver such further instruments and do such further acts as may, in the opinion of the Mortgagee, be necessary, desirable, or proper to carry out more effectively the purpose of this Mortgage and to subject to the lien hereof any property intended by the terms hereof to be covered hereby, including, without limitation, any proceeds, renewals, additions, substitutions, replacements, products, betterment, accessions and appurtenances thereto and thereof.

      5.21    <u>Junior Mortgage(s) and Rights of Mortgagee.</u>

        (a)      Mortgagor shall, with respect to any Junior Mortgage, (i) promptly observe and perform all of the covenants and conditions contained in the Junior Mortgage, (ii) duly and promptly make all payments required by the terms of the Junior Mortgage, (iii) promptly notify Mortgagee in writing upon receipt by Mortgagor of any notice that Mortgagor is in default under the Junior Mortgage or that an event has occurred which with due notice or the lapse of time, or both, would constitute a default under the Junior Mortgage, and to promptly cause a copy of each such notice given by the holder thereof to be delivered to Mortgagee, and (iv) from time to time upon demand of Mortgagee submit evidence to Mortgagee that Mortgagor has maintained and is maintaining the Junior Mortgage in good standing.

        (b)      If Mortgagor fails to make any payment required under the Junior Mortgage as and when due, or fails to perform any covenant, condition or term of the Junior Mortgage, then Mortgagee may on behalf of Mortgagor, but without obligation to do so, and without notice to and demand upon Mortgagor, and without releasing Mortgagor from any Obligation and without waiving any Event of Default hereunder, take any action Mortgagee deems necessary or desirable to prevent or cure any such default by Mortgagor, including but without limitation, the right to pay any and all payments of principal and interest, insurance premiums, taxes and assessments and other sums due or to become due under the Junior Mortgage. Mortgagor hereby expressly grants to Mortgagee and agrees that Mortgagee and its agents shall have the absolute and immediate right to enter upon the Land and the Improvements or any part thereof to such extent and as often as Mortgagee in its sole discretion deems necessary or desirable in order to prevent or cure any such default by Mortgagor. All payments and all costs and expenses incurred by Mortgagee in connection with any such prevention or cure (including, without limitation, reasonable attorney's fees and expenses), together with interest thereon at the Default Rate from the date paid by Mortgagee, shall be secured by this Mortgage and shall be due and payable by Mortgagor immediately, whether or not there be notice, demand, an attempt to collect same, or suit pending.

        (c)      Nothing in this Section 5.21 shall in any manner be construed as a consent by Mortgagee to the further encumbering or mortgaging of the Mortgaged Property.

13



5.22      Financing Statements.      Mortgagor shall execute and deliver to Mortgagee, in form and substance satisfactory to Mortgagee, such financing statements, continuation statements, and such further assurances as Mortgagee may from time to time consider reasonably necessary to create, perfect, preserve and maintain in full force and effect Mortgagee's lien upon the Fixtures, Subleases, Rents and Personal Property; Mortgagor, at the expense of Mortgagor, may cause such statements and assurances to be recorded and rerecorded, filed and re-filed, in the name of Mortgagor, and Mortgagor hereby constitutes and irrevocably appoints Mortgagee its true and lawful attorney-in-fact, which appointment is coupled with an interest, with full power of substitution, and empowers said attorney or attorneys in the name of Mortgagor, but at the option of said attorney-in-fact, to execute and file any and all financing statements.

5.23      Withholding Taxes.

(a)      If under any applicable law or regulation or the interpretation thereof by any Governmental Authority charged with the administration thereof, Mortgagor shall be required to make any withholding or deduction from any payment of the Obligations (whether of principal, interest or otherwise) to be made by or on behalf of Mortgagor to Mortgagee for or in respect of any present or future taxes, levies, imposts, duties, charges, or fees or any nature (excepting only Mortgagee's income taxes of the United States of America and its political subdivisions), the amount due to Mortgagee from Mortgagor in respect of such payment shall be increased to the extent necessary to ensure that after making such withholding or deduction and any withholdings or deductions required to be made in respect to any such increase, Mortgagee shall receive an amount equal to the amount which Mortgagee would have received had no such withholding or deduction been required to be made.  In the event of any such withholding or deduction, Mortgagor shall deliver to Mortgagee forthwith after receipt thereof the official receipt or other official documentation evidencing the payment of the amount so withheld or deducted.

(b)      If Mortgagor shall fail to make any withholding or deduction so required to be made, Mortgagee reserves the right to make payment thereof to the appropriate Governmental Authority.  If Mortgagee makes such payment under any applicable law or regulation or if as a result of the interpretation thereof by any Governmental Authority charged with the administration thereof in respect of any such payment, whether of principal, interest or otherwise made or to be made by Mortgagor, Mortgagee shall be required to pay any tax, levy, impost, duty, charge or fee of any nature (excepting only Mortgagee's income taxes of the United States of America and its political subdivisions), Mortgagor shall and does hereby indemnify Mortgagee against and shall forthwith upon demand of Mortgagee pay to Mortgagee the amount of such payment, together with any interest, penalties, and expenses in connection therewith, and interest thereon at the Default Rate; and in the event any of the aforesaid amounts, interest, penalties or expenses shall be subject to withholding or deduction and any withholdings or deductions in respect of any such increase, Mortgagee shall receive an amount equal to the amount which Mortgagee would have received had no such withholding or deduction been required to be made.

(c)      Any increased amount required to be paid by Mortgagor in accordance with the provisions of this Section 5.23 shall have the same character as the amount in respect of which such increased amount is determined, but shall not (i) if characterized as principal, be applied in reduction of the principal amount outstanding under the Obligations or (ii) if characterized as interest, be applied in reduction of accrued, unpaid interest under the Obligations.

5.24      Hazardous Substances.

(a)      Mortgagor shall immediately notify Mortgagee orally and in writing if Mortgagor (i) becomes aware of the presence of any Hazardous Substance or other environmental problem or liability on, in, under, released from or associated with the Land, the Improvements or the Mortgaged Property, or (ii) received any complaint, order, citation, notice or other written or oral communication (collectively an "Environmental Complaint") regarding air emissions, water discharges or any other environmental, health or safety mater affecting the Land, the Improvements, or the other Mortgaged Property or any part thereof, or the presence of any Hazardous Substance on,in, under, released from or associated with the Land, the Improvements or the other Mortgaged Property, or any past, present or future events, conditions, circumstances, activities, practices, incidents, actions or plans involving the manufacture, processing, distribution, use, transport, handling, treatment, storage, disposal, cleanup, emission, discharge, seepage, spillage, leakage, release or threatened release of any Hazardous Substance on, under or from the Land, the Improvements or the other Mortgaged Property.  Mortgagor shall forthwith transmit to Mortgagee copies of any Environmental Complaint.

(b)      Mortgagor shall, at its own cost and expense, take any action necessary or advisable for the cleanup of any Hazardous Substance on, in, under, released from or associated with the Land, the Improvements or the other Mortgaged Property, including any removal, containment or remedial actions in accordance with all applicable Environmental Laws, and shall pay or cause to be paid all cleanup, administrative, enforcement and other costs, expenses or fines which may be asserted against Mortgagor, Mortgagee, the Land, have the right but not the obligation, and without any limitation of Mortgagee's other rights under this Mortgage to enter onto the Land and the Improvements or to take any action as it deems necessary or advisable to cleanup, remove, resolve or minimize the impact of, or otherwise deal with, any Hazardous Substance or any Environmental Complaint following receipt of any notice from any Person or Governmental Authority asserting the existence of any Hazardous Substance or an Environmental Complaint pertaining to the Land, the Improvements or any of the Mortgaged Property or any part thereof which, if true, could result in an order, suit or other action against Mortgagor or Mortgagee which, in the sole opinion of Mortgagee, could jeopardize Mortgagee's security under this Mortgage.  All costs and expenses incurred by Mortgagee in the exercise of any such rights shall be secured by this Mortgage and shall be payable by Mortgagor upon demand.

14



(c)    If required by any Governmental Authority, Mortgagee shall have the right to require Mortgagor to periodically perform an environmental audit of the Land, the Improvements and the other Mortgaged Property (but not more frequently than annually unless an Environmental Complaint is then outstanding) and, if deemed necessary by Mortgage, an environmental risk assessment of the Land, the Improvements and the other Mortgaged Property including Hazardous Substances waste management practices and Hazardous Substances waste disposal sites thereon. All environmental audits and environmental risk assessments shall be at Mortgagor's expense, shall be performed and prepared by an environmental consultant to perform and prepare same. All costs and expenses incurred by Mortgagee in the exercise of such rights shall be secured by this Mortgage and shall be payable by Mortgagor upon demand or charged to Mortgagor's loan balance at the discretion of Mortgagee.

5.25    Financial Reports, Etc.    Mortgagor shall, at Mortgagor's sole cost and expense, provide Mortgagee with any financial statements, financial reports, appraisals or other documentation with respect to Mortgagor, the Land, the Improvements or the other Mortgaged Property which may be required from time to time by any Governmental Authority having regulatory authority over Mortgagee. Such information shall be provided by Mortgagor within thirty (30) days after written request from Mortgagee.

5.26    Performance of Loan Documents.    Mortgagor shall duly and punctually perform all covenants, terms and agreements expressed as binding upon it under all of the Loan Documents.

5.27    Performance of Other Agreements.    Mortgagor shall duly and punctually perform all covenants, terms and agreements expressed as binding upon it under any Permitted Title Exception, or any other agreement of any nature whatsoever binding upon it with respect to the Land, the Improvements or any of the Mortgaged Property.

5.28    Loan Agreement.    [INTENTIONALLY OMITTED]

5.29    Ground Lease.

(a)    Mortgagor shall (i) duly and punctually observe, perform and discharge, or cause to be observed, performed and discharged, all of the obligations and undertakings of Mortgagor or its agents under the Ground Lease and will do all things necessary to keep unimpaired its right in and to the Leasehold Estate created by the Ground Lease; (ii) use its best efforts to enforce or secure, or cause to be enforced or secured, the due and punctual performance of each and every obligation and undertaking of the Lessor under the Ground Lease; (iii) deliver to Mortgagee promptly upon receipt thereof by Mortgagor, a copy of any notice that Mortgagor is in default (the "Default Notice") under the Ground Lease or that an event has occurred which with due notice or the lapse of time, or both, would constitute a default under the Ground Lease; (iv) shall deliver to Mortgagee, promptly upon receipt thereof by Mortgagor, copies of all other notices, certificates, requests, demands and other instruments furnished or deliver to or by Mortgagor under the Ground Lease in any way relating to the Ground Lease or Mortgagor's interest therein; and (v) from time to time upon demand of Mortgagee submit evidence to Mortgagee that Mortgagor has maintained and is maintaining the Ground Lease in good standing.

(b)    If Mortgagor fails to observe, perform, or discharge any obligation or undertaking of Mortgagor under the Ground Lease, then Mortgagee may on behalf of Mortgagor, but without obligation to do so, and without notice to and demand upon Mortgagor, and without releasing Mortgagor from any Obligation and without waiving any Event of Default hereunder, take any action Mortgagee deems necessary or desirable to prevent or cure any such default by Mortgagor, including, but without limitation, the right to pay any and all rental payments, insurance premiums, taxes and assessments and other sums due or to become due under the Ground Lease. Mortgagor hereby expressly grants to Mortgagee and agrees that Mortgagee and its agents shall have the absolute and immediate right to enter upon the Land and the Improvements or any part thereof to such extent and as often as Mortgagee in its sole discretion deems necessary or desirable in order to prevent or cure any such default by Mortgagor. All payments and all costs and expenses incurred by Mortgagee in connection with any such prevention or cure (including, without limitation, reasonable attorneys' fees and expenses), together with interest thereon at the Default Rate from the date paid Mortgagee, shall be secured by this Mortgage and shall be due and payable by Mortgagor immediately, Mortgagor hereby constitutes and irrevocably appoints Mortgagee its true and lawful attorney-in-fact, which appointment is coupled with an interest, with full power of substitution, and empowers said attorney or attorneys in the name of Mortgagor, but at the option of said attorney-in-fact, which appointment is coupled with interest, with full power of substitute, and empowers said attorney or attorneys in the name of Mortgagor, but at the option of said attorney-in-fact, to perform and discharge any and all obligations and undertakings of Mortgage under the Ground Lease.

### ARTICLE VI
### NEGATIVE COVENANTS

6.1    Use Violations, Etc.    Mortgagor shall not use the Land, the Improvements or any of the Mortgaged Property or allow the same to be used or occupied for any unlawful purpose or in violation of any Governmental Requirement or restrictive covenant covering, affecting or applying to the ownership, use or occupancy thereof, commit or permit or suffer any act to be done or any condition to exist on the Land, the Improvements or any of the Mortgaged Property or any article to be brought thereon that may be dangerous, or that may in any way increase any ordinary fire or other hazard, unless safeguarded as required by law, or that may, in law, constitute a nuisance, public or private.

6.2    Care of the Mortgaged Property.

15



(a)     Mortgagor shall not commit or permit any waste, impairment, or deterioration of the Land, the Improvements or any of the Mortgaged Property, or perform any clearing, grading, filling or excavation thereof, or make or permit to be made any alterations or additions thereto that would have the effect of materially diminishing the value thereof (in Mortgagee's sole opinion) or take or permit any action that will in any way increase any ordinary fire or other hazard arising out of the construction or operation thereof.

(b)     Mortgagor shall not, without the prior written consent of Mortgagee, remove, demolish or substantially alter, or permit the removal, demolishment or substantial alteration of, any Improvements on the Land. In the event such consent is given and if any work to be performed shall involve an estimated expenditure of more than $10,000.00, no such work shall be undertaken until plans and specifications therefor, prepared by an architect satisfactory to Mortgagee, shall have been submitted to and approved by Mortgagee.

(c)     Mortgagor shall not permit any of the Fixtures or Personal Property to be demolished or to be removed from the Land and Improvements without the prior written consent of Mortgagee which approval shall not be unreasonably withheld or delayed. In the event such consent is given, the Mortgagee may require that said Fixtures or Personal Property be replaced by an article of equal suitability and value, owned by Mortgagor free and clear of any vendor's lien, chattel mortgage, or security interest of any kind, except such as may be approved in writing by Mortgagee, and that such replacement article be encumbered by the lien of this Mortgage. Notwithstanding the foregoing, the Mortgagor may remove or demolish any Fixture or Personal Property without first obtaining the Mortgagee's prior written consent provided: (i) the value of such article does not exceed in value at the time of disposition thereof $1,000.00 for any single item, or a total of $15,000.00 in any one year for all such items; and (ii) that said article is replaced and subject to the lien of this Mortgage as aforesaid.

6.3     <u>Other Liens and Mortgages.</u>

(a)     Mortgagor shall not, without the prior written consent of Mortgagee, create or permit to be created or to remain, any mortgage, pledge, construction lien or other lien, conditional sale or other title retention agreement, encumbrance, claim, or charge on (whether prior or subordinate to the lien of this Mortgage or the other Loan Documents) the Mortgaged Property or income therefrom, other than this Mortgage, the other Loan Documents and the Permitted Title Exceptions. Any transaction prohibited under this Section shall be null and void.

(b)     Mortgagor shall not, without the prior written consent of Mortgagee, (i) enter into any agreement either oral or in writing, whereby any permitted Junior Mortgage is modified or amended in any manner whatsoever, (ii) permit the release of any guarantor or modification of any guaranty affecting any permitted Junior Mortgage, or (iii) incur any additional indebtedness secured thereby.

(c)     Mortgagor shall not directly or indirectly, take, acquire, or permit to be taken or acquired by any other party, any interest whatsoever in any permitted Junior Mortgage without the prior written consent of Mortgagee.

6.4     <u>Transfer of Mortgaged Property.</u>     Except for Subleases, Mortgagor shall not sell, convey, or transfer or permit to be sold, conveyed or transferred any interest in the Mortgaged Property or any part thereof. A contract to deed or agreement for deed, or an assignment, pledge, or encumbrance of a beneficial interest in any land rust, or a lease for all or substantially all of the Land or Improvements shall constitute a transfer prohibited by the provisions of this Section and shall be null and void.

6.5     <u>Change in Ownership of Mortgagor.</u>     Mortgagor shall not, without the prior written consent of Mortgagee, do or permit any other Person to transfer, directly or indirectly, the issued and outstanding stock in Mortgagor or its corporate general partner(s) as of the date hereof, or issue any additional stock of Mortgagor, or its corporate general partner(s) after the date hereof such that the Guarantors shall not own at least 50.1% of the Borrower's stock. Any transfer described above shall be deemed to have occurred where such purported transfer shall be: (i) a direct transfer, sale, or conveyance by a stockholder; (ii) the result of an encumbrance or pledge of such stock; or (iii) the result of action by any Person against such stockholder.

6.6     <u>Loans to Stockholders or Partners.</u>     Mortgagor shall not make loans directly or indirectly to any Guarantor and, if Mortgagor is a corporation or Partnership, Mortgagor shall not make loans directly or indirectly to any stockholder, partner, corporate affiliate, or to any party directly or indirectly related to Mortgagor.

6.7     <u>Mortgagor's Certificate of Incorporation and Partnership Agreement.</u>     Mortgagor, if a corporation or a Partnership, shall not, without the prior written consent of Mortgagee, materially amend or modify its Articles or Certificate of Incorporation or bylaws or its Certificate of Partnership or Partnership Agreement.

6.8     <u>Transfer of Other Assets.</u>     Mortgagor shall not, directly or indirectly, sell, convey, or transfer or permit to be sold, conveyed, or transferred any of its assets to any Person to which Mortgagor is related or connected. The term "assets" as used in this Section does not include the Mortgaged Property, the sale, conveyance, or transfer of which is prohibited as provided in Section 6.4 hereof.

6.9     <u>Environmental Contamination/Hazardous Substances.</u>     Mortgagor, the Land, the Improvements and the Mortgaged Property shall at all times remain in full compliance with all Environmental Laws. Mortgagor shall not, nor permit any other person to manufacture, process, distribute, use, transport, handle, treat, store, dispose, emit,

16



discharge, leak, spill or release any Hazardous Substance on, in, under or from the Land, the Improvements or the Mortgaged Property.

6.10    Ground Lease. Mortgagor shall not (a) amend, modify, extend, or in any way alter the terms of the Ground Lease or cancel, terminate, or surrender the Ground Lease; and Mortgagor does hereby expressly release, relinquish and surrender unto Mortgagee all of the Mortgagor's right, power and authority to amend, modify, extend or alter any of the terms or provisions of the Ground Lease or to cancel, terminate or surrender the Ground Lease, and any attempt on the part of Mortgagor to exercise any such right without the prior written consent of Mortgagee shall be null and void ab initio and shall be of no force and effect; (b) waive, condone, or in any way release or discharge the Lessor from duly and punctually performing any of Lessor's obligations or undertakings under the Ground Lease; or (c) do or permit anything to be done, the doing of which, or refrain from doing anything, the omission of which, will impair or tend to impair the security of this Mortgage or will be grounds for terminating or declaring a forfeiture of the Ground Lease.

### ARTICLE VII
### EVENTS OF DEFAULT

7.1    Events of Default. An "Event of Default", as used in this Mortgage, shall occur at any time or from time to time.

(a)    Failure to Pay. If any Obligation or any installment thereof is not paid within ten (10) days following the due date thereof;

(b)    Failure to Perform. If any Obligation [other than an Obligation requiring the payment of money or the occurrence of an event described in Subsections 7.1(c) through 7.1(o), inclusive, below] is not duly and promptly performed or is violated and such non-performance or violation is not curable, or if curable continues for a period of twenty (20) days after written notice thereof from Mortgagee to Mortgagor; provided, however, if such non-performance or violation may not reasonably be cured within such twenty (20) day period, an Event of Default shall not be deemed to have occurred so long as same shall be diligently and continuously endeavored to be cured. Notwithstanding the foregoing, it shall be an Event of Default if such non-performance or violation has not been cured within sixty (60) days after notice thereof;

(c)    False Representation. If any representation or warranty made in any Loan Document by or on behalf of Mortgagor or any Guarantor is at any time false, misleading, or breached;

(d)    Judgment. If a final judgment for the payment of money is rendered against Mortgagor or any Guarantor in excess of $75,000.00, and the same remains unsatisfied except for such period of time as execution on the judgment is effectively stayed;

(e)    Voluntary Bankruptcy, Etc. If Mortgagor or any Guarantor (i) is voluntarily adjudicated a bankrupt or insolvent; (ii) seeks or consents to the appointment of a receiver or trustee for itself or for all or any part of its property; (iii) files a petition seeking relief, including reorganization, arrangement or similar relief, under the present Bankruptcy Code or other similar present or future applicable laws of the United States or any state or any other competent jurisdiction; (iv) makes a general assignment for the benefit of creditors; or (v) admits in writing its inability to pay its debts as they mature;

(f)    Involuntary Bankruptcy, Etc. If a receiver or trustee is appointed for Mortgagor or any Guarantor or for all or any part of their respective properties without their respective consents and such appointment is not vacated within sixty (60) days, or if a petition is filed against Mortgagor or any Guarantor seeking relief, including reorganization, arrangement or similar relief, under the present Bankruptcy Code or other similar present or future applicable laws of the United States or any state or other competent jurisdiction, and such petition is not dismissed within sixty (60) days after the filing thereof;

(g)    Dissolution. If Mortgagor voluntarily or involuntarily dissolves (except for administrative dissolution resulting from Mortgagor's failure to timely file the annual Uniform Business Report) or liquidates;

(h)    Financial Condition. If a material adverse change has occurred, at any time or times subsequent to the date hereof, in the financial condition, results of operations, operations, business, properties, or prospects of Mortgagor, its subsidiaries, parent or affiliates;

(i)    Death or Incompetency. If either of OSCAR ZAPATA or MARIO PINO (sometimes referred to individually as a "Key Guarantor" or collectively the "Key Guarantors"); or any general partner of Mortgagor, if Mortgagor is a limited partnership; or any partner of Mortgagor, if Mortgagor is a general partnership, dies or is declared incompetent; provided, however, that for a period of one hundred twenty (120) days following the death or incapacity of one, but not both, of the Key Guarantors, Mortgagor shall have an opportunity to provide Mortgagee with such assurances, or to comply with such requirements, as Mortgagee may reasonably demand for the protection of its interest in the Mortgaged Property and to insure the continued repayment of the Loan secured hereby, including but not limited to, a reduction of the principal balance of the Loan, delivery of additional collateral, or substitution of another guarantor agreeable to Mortgagee, in Mortgagee's sole and absolute discretion.

17



(j)      Default by Guarantor.  If any Guarantor fails to duly pay or perform any covenant, term, provision, or condition of the Guaranty;

(k)      Default Under Loan Documents.  If any default occurs under any of the other Loan Documents or if any obligation of Mortgagor under any of the other Loan Documents is not fully performed.

(l)      Foreclosure of Other Liens.  If the holder of any mortgage or other lien on the Mortgaged Property, whether a Permitted Title Exception or not (without hereby implying Mortgagee's consent to any such mortgage or other lien) institutes foreclosure or other proceedings for the enforcement of any of its remedies thereunder;

(m)      Default Under Junior Mortgage.  If any default or any event of default occurs under any permitted Junior Mortgage, whether or not foreclosure or other proceedings have been instituted thereunder;

(n)      Ground Lease.  If any default or event of default occurs under the Ground Lease, which default is not cured within any applicable grace period, or if Mortgagor fails to give Mortgagee notice within five (5) business days of any default under the Ground Lease, or if Mortgagor fails to furnish to Mortgagee within five (5) business days any and all information which Mortgagee may reasonably request concerning the performance by Mortgagor of its obligations and undertakings under the Ground Lease, or if Mortgagor fails to permit Mortgagee or Mortgagee's agents at all reasonable times to investigate or examine Mortgagor's performance under the Ground Lease, or if Mortgagor fails to permit Mortgagee from curing any default of Mortgagor under the Ground Lease;

(o)      Cross Default.  The occurrence of an Event of Default hereunder shall constitute an event of default under each and every other loan or extension of credit (collectively the "Other Loans") by Mortgagee, or by any of Mortgagee's affiliates, to Mortgagor, whether any or all of such Other Loans now exist or are hereafter created or arise or are now owned or are hereafter acquired by Mortgagee or by any of Mortgagee's affiliates, and the occurrence of an event of default under any instrument or document evidencing or securing any such Other Loan shall constitute an Event of Default hereunder.

## ARTICLE VIII
## RIGHTS AND REMEDIES

8.1      Remedies.  If an Event of Default shall have occurred, Mortgagee may, at its option, exercise any, some or all of the following remedies, concurrently or consecutively:

(a)      Acceleration.  Mortgagee may declare all of the unpaid Obligations, together with all accrued interest thereon, to be due and payable and upon such declaration all such Obligations shall immediately become due and payable as fully and to the same effect as if the date of such declaration were the date originally specified for the full payment or maturity thereof.

(b)      Mortgagee's Right to Enter and Take Possession, Operate and Apply Income.

(i)      Mortgagee may demand that Mortgagor surrender the actual possession of the Mortgaged Property and upon such demand, Mortgagor shall forthwith surrender same to Mortgagee and, to the extent permitted by law, Mortgagee itself, or by such officers or agents as it may appoint, may enter and take possession of all of the Mortgaged Property and may exclude Mortgagor and its agents and employees wholly therefrom.

(ii)      If Mortgagor shall for any reason fail to surrender or deliver the Mortgaged Property or any part thereof after Mortgagee's demand, Mortgagee may obtain a judgment or order conferring on Mortgagee the right to immediate possession or requiring the Mortgagor to deliver immediate possession to Mortgagee, to the entry of which judgment or decree the Mortgagor hereby specifically consents.

(iii)      Mortgagee may from time to time: (a) continue and complete construction of, hold, store, use, operate, manage and control the Mortgaged Property and conduct the business thereof, (b) make all reasonably necessary maintenance, repairs, renewals, replacements, additions, betterments and improvements thereto and thereon and purchase or otherwise acquire additional Fixtures and Personal Property; (c) insure or keep the Mortgaged Property insured; (d) exercise all the rights and powers of the Mortgagor in its name or otherwise with respect to the same; and (e) enter into agreements with others (including, without limitation, a new ground lease, new Subleases or amendments, extensions, or cancellations to existing Subleases) all as Mortgagee from time to time may determine in its sole discretion. Mortgagor hereby constitutes and irrevocably appoints Mortgagee its true and lawful attorney-in-fact, which appointment is coupled with an interest, with full power of substitution, and empowers said attorney or attorneys in the name of Mortgagor, but at the option of said attorney-in-fact, to do any and all acts and execute any and all agreements that Mortgagee may deem necessary or proper to implement and perform any and all of the foregoing.

(iv)      The Mortgagee may, with or without taking possession of the Mortgaged Property as hereinabove provided, collect and receive all the Rents therefrom, including those past due as well as those accruing thereafter, and shall apply the monies so received first, to the payment of all costs and expenses (including, without limitation, reasonable attorneys' fees and expenses) incurred by Mortgagee and its agents in connection with the collection of same, whether or not in possession of the Mortgaged Property, and second, in such order as Mortgagee

18



may elect, to the payment of the Obligations.

  (c) <u>Proceedings To Recover Sums Due</u>.

    (i) If any installment or part of any Obligation shall fail to be paid when due, Mortgagee shall be entitled to sue for and to recover judgment against the Mortgagor for the amount so due and unpaid together with all costs and expenses (including, without limitation, reasonable attorneys' fees and expenses) paid by Mortgagee in connection with such proceeding, together with interest thereon at the Default Rate from the date incurred by Mortgagee. All such costs and expenses shall be secured by this Mortgage and shall be due and payable by Mortgagor immediately.

    (ii) If Mortgagor shall fail to pay, upon the Mortgagee's demand, after acceleration as provided in Subsection 8.1(a), all of the unpaid Obligations, together with all accrued interest thereon, Mortgagee shall be entitled to sue for and to recover judgment against the Mortgagor for the entire amount so due and unpaid together with all costs and expenses (including, without limitation, reasonable attorneys' fees and expenses) paid by Mortgagee. All such costs and expenses shall be secured by this Mortgage and shall be payable by Mortgagor immediately. Mortgagee's right under this Subsection 8.1(c)(ii) may be exercised by Mortgagee either before, after or during the pendency of any proceedings for the enforcement of this Mortgage, including appellate proceedings.

    (iii) No recovery of any judgment as provided in Subsections 8.1(c)(i) and 8.1(c)(ii) above and no attachment or levy of any execution upon any of the Mortgaged Property or any other property shall in any way affect the lien of this Mortgage upon the Mortgaged Property or any part thereof, or any lien, rights, powers, or remedies of Mortgagee hereunder, but such lien, rights, powers and remedies shall continue unimpaired as before.

  (d) <u>Foreclosure</u>.

    (i) Mortgagee may institute proceedings for the partial or complete foreclosure of this Mortgage and Mortgagee may, pursuant to any final judgment of foreclosure, sell the Mortgaged Property as an entirety or in separate lots, units, or parcels.

    (ii) In case of a foreclosure sale of all or any part of the Mortgaged Property, the proceeds of sale shall be applied in accordance with Section 8.8 hereof, and the Mortgagee shall be entitled to seek a deficiency judgment against the Mortgagor to enforce payment of any and all Obligations then remaining due and unpaid, together with interest thereon, and to recover a judgment against the Mortgagor therefor.

    (iii) The Mortgagee is authorized to foreclose this Mortgage subject to the rights of any subtenants of the Mortgaged Property, or Mortgagee may elect which subtenants Mortgagee desires to name as parties defendant in such foreclosure and failure to make any such subtenants parties defendant to any such foreclosure proceedings and to foreclose their rights will not be, nor be asserted by the Mortgagor to be, a defense to any proceedings instituted by the Mortgagee to collect the unpaid Obligations or to collect any deficiency remaining unpaid after the foreclosure sale of the Mortgaged Property.

  (e) <u>Receiver</u>. Mortgagee may apply to any court of competent jurisdiction to have a receiver appointed to enter upon and take possession of the Mortgaged Property, collect the Rents therefrom and apply the same as the court may direct, such receiver to have all of the rights and powers permitted under the laws of the State of Florida. The right of appointment of such receiver shall be a matter of strict right without regard to the value or the occupancy of the Mortgaged Property or the solvency or insolvency of Mortgagor. The expenses, including receiver's fees, attorneys' fees, costs and agent's commission incurred pursuant to the powers herein contained, together with interest thereon at the Default Rate, shall be secured hereby and shall be due and payable by Mortgagor immediately without notice or demand. Notwithstanding the appointment of any receiver or other custodian, Mortgagee shall be entitled as pledgee to the possession and control of any cash or deposits at the time held by, payable, or deliverable under the terms of this Mortgage to the Mortgagee, and the Mortgagee shall have the right to offset the unpaid Obligations against any such cash or deposits in such order as Mortgagee may elect.

  (f) <u>Remedies as to Personal Property</u>. Mortgagee may exercise any or all of its rights and remedies under the Uniform Commercial Code-Secured Transactions as adopted by the State of Florida or other applicable law as well as all other rights and remedies possessed by Mortgagee, all of which shall be cumulative. Mortgagee is hereby authorized and empowered to enter the Land and Improvements or other place where the Personal Property may be located without legal process, and to take possession of the Personal Property without notice or demand, which hereby are waived to the maximum extent permitted by the laws of the State of Florida. Upon demand by Mortgagee, Mortgagor shall make the Personal Property available to Mortgagee at a place reasonably convenient to Mortgagee. Mortgagee may sell at one or more public or private sales and for such price as Mortgagee may deem commercially reasonable, any and all of the Personal Property secured by this Mortgage, and any other security or property held by Mortgagee and Mortgagee may be the purchaser of any or all of the Personal Property.

  (g) <u>Other</u>. Mortgagee may institute and maintain any suits and proceedings as the Mortgagee may deem advisable: (i) to prevent any impairment of the Mortgaged Property by any acts which may be unlawful or in violation of this Mortgage; (ii) to preserve or protect its interest in the Mortgaged Property; and (iii) to restrain the enforcement of, or compliance with, any Governmental Requirement that may be unconstitutional or otherwise invalid, if the enforcement of, or compliance with, such Governmental Requirement might impair the security hereunder or be

19



prejudicial to the Mortgagee's interest.

8.2     Remedies Cumulative and Concurrent.     No right, power or remedy of Mortgagee as provided in the Notes, this Mortgage, the Guaranty, or the other Loan Documents is intended to be exclusive of any other right, power, or remedy of Mortgagee, but each and every such right, power and remedy shall be cumulative and concurrent and in addition to any other right, power or remedy available to Mortgagee now or hereafter existing at law or in equity and may be pursued separately, successively or together against Mortgagor, any Guarantor, or any endorser, co-maker, surety or guarantor of the Obligations, or the Mortgaged Property or any part thereof, or any one or more of them, at the sole discretion of Mortgagee.    The failure of Mortgagee to exercise any such right, power or remedy shall in no event be construed as a waiver or release thereof.

8.3     Waiver, Delay or Omission.     No waiver of any Event of Default hereunder shall extend to or affect any subsequent or any other Event of Default then existing, or impair any rights, powers or remedies consequent thereon, and no delay or omission of Mortgagee to exercise any right, power or remedy shall be construed to waive any such Event of Default or to constitute acquiescence therein.

8.4     Credit of Mortgagee.     To the maximum extent permitted by the laws of the State of Florida, upon any sale made under or by virtue of this Article, Mortgagee may bid for and acquire the Mortgaged Property, or any part thereof, and in lieu of paying cash therefor may apply to the purchase price, any portion of or all of the unpaid Obligations in such order as Mortgagee may elect.

8.5     Sale.     Any sale or sales made under or by virtue of this Article shall operate to divest all the estate, right, title. interest, claim and demand whatsoever at law or in equity, of the Mortgagor and all Persons, except subtenants pursuant to Subleases approved by Mortgagee, claiming by, through or under Mortgagor in and to the properties and rights so sold, whether sold to Mortgagee or to others.

8.6     Proofs of Claim.     In the case of any receivership, insolvency, bankruptcy, reorganization, arrangement, adjustment, composition, seizure of the Mortgaged Property by any Governmental Authority, or other judicial proceedings affecting the Mortgagor, any Guarantor, any endorser, co-maker, surety, or guarantor of the Obligations, or any of their respective properties, the Mortgagee, to the extent permitted by law, shall be entitled to file such proofs of claim and other documents as may be necessary or advisable in order to have its claim allowed in such proceedings for the entire unpaid Obligations at the date of the institution of such proceedings, and for any additional amounts which may become due and payable after such date.

8.7     Waiver of Redemption, Notice, Marshalling, Etc.   Mortgagor hereby waives and releases, for itself and anyone claiming through, by, or under it, to the maximum extent permitted by the laws of the State of Florida:

(a)     all benefits that might accrue to Mortgagor by virtue of any present or future law exempting the Mortgaged Property, or any part of the proceeds arising from any sale thereof, from attachment, levy or sale on execution, or providing for any appraisement, valuation, stay of execution, exemption from civil process, redemption or extension of time for payment; and

(b)     any right to have the Mortgaged Property marshalled.

8.8     Application of Proceeds.   The proceeds of any sale of all or any portion of the Mortgaged Property shall be applied by Mortgagee first, to the payment of receiver's fees and expenses, if any, and to the payment of all costs and expenses (including, without limitation, reasonable attorneys' fees and expenses) incurred by Mortgagee, together with interest thereon at the Default Rate from the date so paid, in connection with any entry, action or proceeding under this Article and, second, in such order as Mortgagee may elect, to the payment of the Obligations.  Mortgagor shall be and remain liable to Mortgagee for any difference between the net proceeds of sale and the amount of the Obligations until all of the Obligations have been paid in full.

8.9     Discontinuance of Proceedings.   If Mortgagee shall have proceeded to enforce any right under any Loan Document and such proceedings shall have been discontinued or abandoned for any reason, then except as may be provided in any written agreement between Mortgagor and Mortgagee providing for the discontinuance or abandonment of such proceedings, Mortgagor and Mortgagee shall be restored to their former positions and the rights, remedies and powers of Mortgagee shall continue as if no such proceedings had been instituted.

8.10     Mortgagee's Actions.   Mortgagee may, at any time without notice to any Person and without consideration, do, or refrain from doing, any or all of the following actions, and neither the Mortgagor, any Guarantor, any endorser, co-maker, surety or guarantor of the Obligations, nor any other Person (hereinafter in this Section 8.10 collectively referred to as the "Obligor") now or hereafter liable for the payment and performance of the Obligations shall be relieved from the payment and performance thereof, unless specifically released in writing by Mortgagee: (a) renew, extend or modify the terms of the Notes, this Mortgage, the Guaranty and the other Loan Documents, or any of them; (b) forbear or extend the time for payment or performance of any or all of the Obligations; (c) apply payments by any Obligor to the reduction of the unpaid Obligations in such manner, in such amounts, and at such times and in such order and priority as Mortgagee may see fit; (d) release any Obligor; (e) substitute or release in whole or in part the Mortgaged Property or any other collateral or any portion thereof now or hereafter held as security for the Obligations without affecting, disturbing or impairing in any manner whatsoever the validity and priority of the lien of this Mortgage upon the Mortgaged Property which is not released or substituted, or the validity and priority of any

20



security interest of the Mortgagee in such other collateral which is not released or substituted; (f) subordinate the lien of this Mortgage or the lien of any other security interest in any other collateral now or hereafter held as security for the Obligations; (g) join in the execution of a plat or re-plat of the Land; (h) join in and consent to the filing of a declaration of condominium or declaration of restrictive covenants regarding all or any part of the Land; (i) consent to the granting of any easement on the Land; and (j) generally deal with any Obligor or any other party as Mortgagee may see fit.

## ARTICLE IX
## MORTGAGEE'S PERFORMANCE

9.1     Governmental Regulation of Mortgagee. Mortgagee is subject to various Governmental Authorities and the laws, rules and regulations enacted, adopted and promulgated by them. To the extent that Mortgagee's authority to preform its obligations (if any) under this Mortgage, now or hereafter, may be limited or regulated by such Governmental Authorities, Mortgagee is hereby excused from such performance.

9.2     Mortgagee's Failure to Perform. If Mortgagee fails to perform its obligations (if any) under this Mortgage (except to the extent excused therefrom as provided in Section 9.1 above), Mortgagor shall notify Mortgagee in writing (the "Notice") forthwith upon Mortgagor's obtaining knowledge of such failure. Each such Notice shall describe in detail the act or event constituting the non-performance by Mortgagee. Mortgagee shall have thirty (30) days after its receipt of the Notice to cure any such failure to perform, unless such cure cannot be accomplished using reasonable efforts within said thirty (30) day period, in which case Mortgagee shall have such additional time as may be necessary, using reasonable efforts, to cure such non-performance (the "Mortgagee Cure Period").

9.3     Mortgagor's Rights and Remedies. The giving of the Notice and the expiration of the Mortgage Cure Period shall be conditions precedent to any right of the Mortgagor to bring an action against Mortgagee.

## ARTICLE X
## MISCELLANEOUS

10.1     Maximum Rate of Interest. Nothing contained herein, in the Notes, in the Commitment, or in any other Loan Document or in any instrument or transaction related thereto, shall be construed or so operate as to require the Mortgagor or any person liable for the payment of the Loan made pursuant to the Notes, or liable for the payment of any Obligations, to pay interest, or any charge in the nature of interest, in an amount or at a rate which exceeds the maximum rate of interest allowed by applicable law, as amended from time to time. Should any interest or other charges in the nature of interest received by Mortgagee, or paid by the Mortgagor, or any parties liable for the payment of the Loan made pursuant to the Notes, or liable for the payment of any Obligations, exceed the maximum rate of interest allowed by applicable law, as amended from time to time, then such excess sum shall be credited against the principal balance of the Notes or the balance of the other Obligations, as applicable, unless the Mortgagor or such other parties liable for such payments, as applicable, shall notify the Mortgagee, in writing, that the Mortgagor or such other party elects to have such excess sum returned to it forthwith, it being the intent of the parties hereto that under no circumstances shall the Mortgagor or any parties liable for any of the aforesaid payments be required to pay interest in excess of the maximum rate of interest allowed by applicable law, as amended from time to time. The Mortgagee may, in determining the maximum rate of interest allowed under applicable law, take advantage of any state or federal law, rule or regulation in effect from time to time, which may govern the maximum rate of interest which may be reserved, charged or taken under the Notes.

10.2     Continuing Agreement. This Mortgage and all of the Mortgagor's representations, warranties and covenants herein, Mortgagee's security interest in the Mortgaged Property and all of the rights, powers and remedies of Mortgagee hereunder shall continue in full force and effect until all of the Obligations have been paid and performed in full; until Mortgagee has no further obligation to make any advances under the Loan. Furthermore, if for any reason no Obligations are owing, notwithstanding such occurrence, this Mortgage shall remain valid and in full force and effect as to subsequent Obligations, so long as Mortgagee has not executed a satisfaction of mortgage.

10.3     Survival of Warranties and Covenants. The warranties, representations, covenants and agreements set forth in this Mortgage shall survive the making of the Loan and the execution and delivery of the Notes, and shall continue in full force and effect until all of the Obligations shall have been paid and performed in full.

10.4     No Representation By Mortgagee. By accepting or approving anything required to be observed, performed or fulfilled, or to be given to Mortgagee, pursuant to this Mortgage, the Commitment, or the other Loan Documents, including, but not limited to, any officer's certificate, balance sheet, statement, survey or appraisal. Mortgagee shall not be deemed to have warranted or represented the sufficiency, legality, effectiveness or legal effect of the same, or of any term, provision or condition thereof, and such acceptance or approval thereof shall not be or constitute any warranty or representation with respect thereto by Mortgagee.

10.5     Notice. All notices, demands, requests and other communications required under this Mortgage may be given orally (either in person or by telephone if confirmed in writing within three (3) days thereafter), by facsimile,

21



or in writing delivered by hand or mail and shall be conclusively deemed to have been received if delivered or attempted to be delivered by United States first class mail, return receipt requested, postage prepaid, addressed to the party for whom it is intended at its address set forth in the introduction to this Mortgage. Any party may designate a change of address by written notice to the other party, received by such other party at least ten (10) days before such change of address is to become effective.

10.6     Mortgagee's Right to Pay and Perform.  If Mortgagor shall fail to duly pay or perform any of the Obligations required by this Mortgage, then at any time thereafter without notice to or demand upon Mortgagor, and without waiving or releasing any right, remedy, or power of Mortgagee, and without releasing any of the Obligations or any Event of Default, Mortgagee may pay or perform such Obligation for the account of and at the expense of Mortgagor, and shall have the right to enter and to authorize others to enter upon the Land and the Improvements for such purpose and to take all such action thereon and with respect to the Mortgaged Property as may be necessary or appropriate for such purpose. All payments made and all costs and expenses (including, without limitation, reasonable attorneys' fees and expenses) incurred by Mortgagee, together with interest thereon at the Default Rate from the date paid by Mortgagee shall be secured by this Mortgage and shall be due and payable by Mortgagor immediately, whether or not there be notice, demand, an attempt to collect same, or suit pending.

10.7     Covenants Running With the Land.  All covenants contained in this Mortgage shall be binding on the Mortgagor and shall run with the Leasehold Estate.

10.8     Successors and Assigns.  All the terms of this Mortgage shall apply to and be binding upon, and inure to the benefit of, the heirs, devisees, personal representatives, successors and assigns of Mortgagor and Mortgagee, respectively, and all persons claiming under or through them.

10.9     Invalidity.

(a)  If any one or more of the provisions contained in this Mortgage is declared or found by a court of competent jurisdiction to be invalid, illegal, or unenforceable, such provision or portion thereof shall be deemed stricken and severed and the remaining provisions hereof shall continue in full force and effect.

(b)     If any one or more of the Obligations is declared or found by a court of competent jurisdiction to be invalid, illegal, or unenforceable, the validity, legality and enforceability of the remaining Obligations shall continue in full force and effect.

10.10     Modification.  No agreement unless in writing and signed by an authorized officer of Mortgagee and no course of dealing between the parties hereto shall be effective to change, waive, terminate, modify, discharge, or release in whole or in party any provision of this Mortgage. No waiver of any rights or powers of Mortgagee or consent by it shall be valid unless in writing signed by an authorized officer of Mortgagee and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

10.11     Applicable Law.  This Mortgage shall be construed, interpreted, enforced and governed by and in accordance with the laws of the State of Florida (excluding the principles thereof governing conflicts of law), and federal law, in the event federal law permits a higher rate of interest than Florida law.

10.12     Strict Performance.  It is specifically agreed that time is of the essence as to all matters provided for in this Mortgage and that no waiver of any Obligation hereunder or secured hereby shall at any time thereafter be held to be a waiver of the Obligations.

10.13     Joint and Several Liability.  If more than one Person executes this Mortgage, each is and shall be jointly and severally liable hereunder; and if Mortgagor is a general partnership, then all partners in Mortgagor (and if Mortgagor is a limited partnership, then all general partners in Mortgagor) shall be jointly and severally liable hereunder, notwithstanding any contrary provision in the partnership laws of the State of Florida.

10.14     No-Merger.  So long as this Mortgage is in existence, the Lessor's fee simple interest in the Land and Improvements and the Mortgagor's Leasehold Estate therein shall not merge, but shall remain separate and distinct, notwithstanding the acquisition of both estates by Lessor, or by Mortgagor, or by Mortgagee, or by any other Person.

10.15     Waiver of Trial by Jury.  **MORTGAGEE AND MORTGAGOR HEREBY KNOWINGLY, IRREVOCABLY, VOLUNTARILY AND INTENTIONALLY WAIVE ANY RIGHT EITHER MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY ACTION, PROCEEDING OR COUNTERCLAIM BASED ON THIS MORTGAGE, OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS MORTGAGE, THE NOTES, OR ANY OTHER LOAN DOCUMENT, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF ANY PARTY HERETO OR TO ANY LOAN DOCUMENT. THIS PROVISION IS A MATERIAL INDUCEMENT FOR MORTGAGEE AND MORTGAGOR ENTERING INTO THE SUBJECT LOAN TRANSACTION.**

22



IN WITNESS WHEREOF, Mortgagor has executed this instrument as of the day and year first above written.

Signed, sealed and delivered
in the presence of:

**MORTGAGOR:**
PZP INVESTMENTS, INC., a Florida corporation

Witness Signature
PEDRO    P.    SAEZ
Printed Name of Witness

By:
Name: Oscar Zapato
Its:    President

Witness Signature
JUDITH M. PERAZA
Printed Name of Witness

Attest:
Name: MARIO   V.   PINO
Its:    Secretary

STATE OF FLORIDA        )
                        )ss:
COUNTY OF MIAMI-DADE    )

The foregoing instrument was sworn to, subscribed and acknowledged before me this 4th day of October, 2004, by OSCAR ZAPATA and MARIO V. PINO, as President and Secretary, respectively of PZP INVESTMENTS, INC., a Florida corporation on behalf of the corporation, who are personally known to me or have produced FLORIDA DRIVER'S LICENSE as identification and who ( ) did X ) did not take an oath.

JUDITH M. PERAZA
MY COMMISSION # DD 237709
EXPIRES: July 14, 2008
Bonded Thru Budget Notary Services

NOTARY PUBLIC, State of Florida
JUDITH   M.   PERAZA .
Printed Name of Notary
My Commission Expires:_____
Commission No.:_____

23

**Exhibit A**

## LEGAL DESCRIPTION

A Portion of Tract "D" of Naranja Lakes Shopping Plaza according to the Plat as recorded in Plat Book 120, at Page 59 of the Public Records of Miami-Dade County, Florida, being more particularly described as follows:

Commence at the South 1/4 corner of Section 33, Township 56 South, Range 39 East; Thence North 00° 49'13" West, along the East line of the Southeast 1/4 of said Section 33,790.57 feet to the intersection with the centerline of U.S. Highway No. 1 (State Road No. 5); Thence, along said centerline of U.S. Highway No. 1 North 41° 17' 44" East, 1310.85 feet to the intersection with the centerline of Naranja Lakes Boulevard as it appears on the aforementioned plat of Naranja Lakes Shopping Plaza; Thence, South 48° 42' 16" East, along said centerline of Naranja Lakes Shopping Plaza, 58.00 feet; Thence along the Southeasterly right of way line of said U.S. Highway No. 1 and its Southwesterly projection, North 41° 17' 44" East, 250.00 feet. To the point of beginning of the following described parcel; Thence, continuing along said Southeasterly right of way line of U.S. 1, North 41° 17' 44" East, 154.00 Feet; Thence departing from said Southeasterly right of way line of U.S. Highway No. 1, South 48° 42' 16" East, a distance of 140.00 feet; Thence North 41° 17' 44" East, a distance of 106.00 feet; Thence North 48° 42' 16" West, a distance of 40.00 feet; Thence North 41° 17 '44" East, a distance of 180.00 feet; Thence South 48° 42' 16" East, a distance of 247.50 feet; Thence South 41° 17' 44" West, a distance of 30.69 feet; Thence South 48° 42' 16" East, a distance of 298.29 feet; Thence South 41° 17' 44" West, a distance of 609.33 feet; Thence North 48° 42' 16" West, a distance of 470.79 feet; Thence North 41° 17' 44" East, a distance of 200.00 feet; Thence North 48° 42' 16" West, a distance of 175.00 feet to the point of beginning; containing 7.721 acres more or less.

International Finance Bank
PO Box 441900
Miami, Fl 33144

THIS INSTRUMENT PREPARED BY
AND RETURN TO:
Pedro P. Saez, Esq.
Saez & Associates
777 Brickell Avenue, Suite 1110
Miami, Florida 33131

CFN 2009 30, OR BK 5970 PAGE 193,
Recorded 06/19/2009 at 01:51 PM. Scott Ellis, Clerk of
Courts, Brevard County
# Pgs 4

SPACE ABOVE THIS LINE FOR RECORDING DATA

THIS LOAN MODIFICATION IS BEING
RE-RECORDED IN THE CORRECT
COUNTY, (MIAMI-DADE)

**LOAN MODIFICATION AGREEMENT**

THIS LOAN MODIFICATION AGREEMENT is made and entered into as of the _____ day of _____, 2009, by and among PZP INVESTMENTS, INC., a Florida corporation (hereinafter referred to as the "Borrower"); MARIO V. PINO, MARIA DEL CARMEN PINO, OSCAR ZAPATA and CONSUELO ZAPATA, individually (herein collectively referred to as the "Guarantors"); and INTERNATIONAL FINANCE BANK, a Florida banking corporation (herein referred to as "Mortgagee").

**RECITALS:**

A.    Mortgagor executed and delivered to Mortgagee that certain Term Loan Promissory Note dated as of October 4, 2004 (the "Note") in the original principal sum of ONE MILLION EIGHT HUNDRED SEVENTY FIVE THOUSAND AND NO/100 DOLLARS ($1,875,000.00);

B.    The Note is secured by that certain Mortgage and Security Agreement executed by Mortgagor in favor of Mortgagee dated October 4, 2004 and recorded in O. R. Book 22720, at Page 2665 (the "Fee Simple Mortgage"), and a Leasehold Mortgage and Security Agreement executed by Mortgagor in favor of Mortgagee dated October 4, 2004 and recorded in Official Records Book 22720, at Page 2699 (the "Leasehold Mortgage") , both of the Public Records of Miami-Dade County, Florida;

C.    At the request of Mortgagor, Mortgagee has agreed to modify the Note to provide for monthly payments of interest only effective as of the monthly payment due May 4, 2009 until maturity subject to the terms and conditions of this Agreement;

D.    The Guarantors have executed and delivered a Guaranty in favor of Mortgagee dated October 4, 2004 and join herein to consent to the modification of the Original Note;

NOW, THEREFORE, in consideration of the premises and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Borrower, Guarantor and Mortgagee agree as follows:

1.    Recitals. All of the statements contained in the above recitals are true and correct and are incorporated herein by reference.

2.    Representations of Borrower and Guarantors.  Borrower and Guarantors acknowledge, as of the date of execution of this Agreement, as follows:

A.    That Borrower is currently indebted to Mortgagee in the principal amount of ONE MILLION SIX HUNDRED THIRTY EIGHT THOUSAND ONE HUNDRED SEVENTY TWO AND 00/100 DOLLARS ($1,638,172.49);

B.    That the Fee Simple Mortgage and the Leasehold Mortgage constitute valid first mortgage liens and security interests on the Mortgaged Property as therein described free and clear of all liens and encumbrances;

C.    That they have no claims or defenses against Mortgagee that could give rise to any defense, offset or counterclaim in connection with the payment of the Note or the enforcement of the Guaranty, the Fee Simple Mortgage or the Leasehold Mortgage, as amended hereby, or against the Mortgagee; and

D.    That the outstanding principal balance of the Note is the absolute and unconditional obligation of Borrower and that the Guaranty, the Fee Simple Mortgage, the Leasehold Mortgage and all other Loan Documents executed by Borrower, Mortgagor and/or the Guarantors, as the case may be, in

1


EXHIBIT "D"

connection therewith are legally valid and binding, fully enforceable in accordance with the terms thereof and remain in full force and effect.

E.    During the past 90 days, there have been no improvements, alterations or repairs to the Property or any structures thereon for which the costs thereof remain unpaid, nor are there any pending violations of any federal, state or local laws pertaining to any construction or use of the Property;

F.    Borrower has no claims for reimbursement of any sums heretofore paid to the Mortgagee, whether by way of interest payments, or for any other matter whatsoever in any way arising from or growing out of the Note;

G.    Borrower waives and relinquishes any such claims, set-offs, counterclaims or defenses whatsoever which it may now have under the Loan Documents;

H.    Borrower further releases and relieves Mortgagee from any claims of, liabilities or obligations whatsoever to, Borrower in any way arising from or growing out of the Loan and/or any actions of Mortgagee arising through the date of this Agreement;

I.    Borrower is duly organized, validly existing and in good standing under the laws of the State of Florida;

J.    The execution, delivery and performance of this Agreement have been duly authorized by all requisite action and do not require the consent, license or other authorization of any other person (including shareholders of the Borrower and governmental authorities);

K.    The execution, delivery and performance of this Agreement will not result in a breach or default under the Borrower's Articles of Incorporation or any other agreement or contract to which Borrower or the Guarantor is a party or by which any of their respective properties are bound and will not result in the creation or imposition of any lien or encumbrance on any assets of the Borrower or Guarantor, except for the lien of the Fee Simple Mortgage and the Leasehold Mortgage;

L.    This Agreement constitutes a valid and legally binding obligation of the Borrower and Guarantor, enforceable in accordance with its terms, except as the enforcement of remedies may be limited by applicable bankruptcy, reorganization, insolvency or similar laws and moratorium laws from time to time in effect;

M.    There is no litigation or governmental proceeding pending or threatened against the Borrower or Guarantor, or any of the properties pledged as collateral for this loan;

N.    The financial statements of the Borrower and Guarantors dated _____ have been prepared in accordance with generally accepted accounting principles, are true and correct, and fairly present the financial condition and results of operations of the Borrower and Guarantors, as the case may be, as of the date thereof, and reflect all known liabilities of such parties, absolute or contingent;

O.    There has been no material adverse change in the Borrower's and Guarantor's financial condition as shown in the financial statements referred to in Paragraph N. above from the date thereof to the present date;

P.    Borrower and Guarantors have good title to all their assets, free of all liens, encumbrances and restrictions, except those reflected in the financial statements referred to in Paragraph N. above; and

Q.    No event has occurred which would, upon the giving of notice or lapse of time or both, constitute a breach, default or violation of any law, regulation, order or agreement applicable to the Borrower or Guarantors, or any of their assets.

3.    <u>Modification of Loan</u>.  Effective with the monthly payment due May 4, 2009 until the Maturity Date of the Note, Borrower shall pay to Mortgagee monthly payments of interest only at the rates therein provided and all monthly principal payments otherwise due on May 4, June 4, July 4, August 4 and September 4, 2009 shall be deferred until the Maturity Date on which date the outstanding balance of principal shall become due and payable.

4.    Mortgagor agrees that all of the terms, covenants and conditions of the Mortgage, except as

2

modified herein, shall remain in full force and effect, and are hereby ratified, confirmed and approved in all respects as of the date hereof, and are incorporated herein by reference.

    5.    <u>Conditions Precedent</u>.    The modification of the Loan shall be subject to the following conditions:

    A.    Borrower shall pay to Mortgagee at closing the following:

        I.    A servicing fee in the amount of $500.00;

        II.    A principal reduction payment in the amount of $200,000.00 to be applied to the outstanding principal of the Note; and

        III.    All legal fees and expenses relating to the modification of the Loan as set forth in the Loan Modification Worksheet.

    B.    Lender shall waive all late fees accrued as of May 11, 2009 in connection with the Note.

    6.    The parties confirm that this Agreement is not and shall not constitute or be deemed a novation of the Fee Simple Mortgage or the Leasehold Mortgage or any other documents evidencing the collateral for the Loan or the Note, all of which shall remain valid first liens on the Mortgaged Property and any other property encumbered by either, as of the original date of recording or filing of any such documents.

    7.    No waiver by Mortgagee of any of its rights hereunder nor any performance by Mortgagee shall act as a waiver of any rights of Mortgagee to demand performance by Borrower. Furthermore, no delay or omission on the part of Mortgagee in the exercise of any of its rights or remedies shall operate as a waiver thereof, and no single or partial exercise by Mortgagee of any of its rights or remedies shall preclude any other or further exercise thereof.

    8.    This Agreement and the performance hereunder and all suits and special proceedings hereunder shall be construed in accordance with the laws of the State of Florida.

    9.    No waiver or modification of this Agreement, nor of any covenant, condition or limitation contained herein, shall be valid unless in writing duly executed by all parties to this Agreement.

    10.    The parties hereto confirm that this Agreement contains their complete understanding concerning this transaction, and this Agreement supersedes all other agreements between the parties on this matter.

    **IN WITNESS WHEREOF**, the parties have signed and sealed this Agreement on the date set forth above.

Signed, sealed and delivered
in the presence of

_____
Witness Signature

_____
Printed Name of Witness

_____
Witness Signature

_____
Printed Name of Witness

_____
Witness Signature
MARIA M. FENDLER

"MORTGAGOR":
PZP INVESTMENTS, INC., a Florida corporation

By: _____
Name: _____
Title: _____
Address:  1070 Hunting Lodge Drive
         Miami Springs, FL 33166

"GUARANTORS":

_____
MARIO V. PINO

_____
MARIA DEL CARMEN PINO

3

Printed Name of Witness

Witness Signature

Printed Name of Witness

Witness Signature

MARIA M. POMUET

Printed Name of Witness

OSCAR ZAPATA

CONSUELO ZAPATA

"MORTGAGEE":
INTERNATIONAL FINANCE BANK, a Florida
banking corporation

By:
Name: William Gonzalez
Title: V. P.

Witness Signature

Printed Name of Witness

Witness Signature

Printed Name of Witness

STATE OF FLORIDA          )
                          )ss:
COUNTY OF MIAMI-DADE      )

The foregoing instrument was sworn to, subscribed and acknowledged before me this ___ day of ___ 2009, by Oscar Zapata, individually and as President of PZP INVESTMENTS, INC., a Florida corporation, and by CONSUELO ZAPATA, MARIO V. PINO and MARIA DEL CARMEN PINO, individually; who is/are personally known to me or has/have produced _____ as identification and he/she/they ( ) did ( ) did not take an oath.

MARIO A. LAMAH
MY COMMISSION # DD 707169
EXPIRES: September 17, 2011
Bonded Thru Budget Notary Services

NOTARY PUBLIC, State of Florida

Printed Name of Notary
My Commission Expires: _____
Commission No.: _____

STATE OF FLORIDA          )
                          )ss:
COUNTY OF MIAMI-DADE      )

The foregoing instrument was sworn to, subscribed and acknowledged before me, this ___ day of May, 2009 by William Gonzalez, as Vice President of INTERNATIONAL FINANCE BANK, a Florida banking corporation, on behalf of said corporation. He/She is personally known to me or has produced _____ as identification and he/she ( ) did ( ) did not take an oath.

NOTARY PUBLIC, State of Florida
SUSANA VEGA
Printed Name of Notary
My Commission Expires: _____
Commission No.: _____

400901
INTERNATIONAL FINANCE BANK
P O BOX 441900

MIAMI FL 33144

Notary Public State of Florida
Susana Vega
My Commission DD617036
Expires 12/11/2010

4

**NOTE TO TAX EXAMINER:** THIS IS A RENEWAL OF THAT CERTAIN PROMISSORY NOTE DATED OCTOBER 4, 2004 IN THE ORIGINAL PRINCIPAL AMOUNT OF $1,875,000.00 EXECUTED BY BORROWER IN FAVOR OF BANK (THE "ORIGINAL NOTE"). THE ORIGINAL NOTE MATURED ON OCTOBER 4, 2009 WITH AN UNPAID PRINCIPAL BALANCE OF $1,424,221.47. ACCORDINGLY, THE PRINCIPAL AMOUNT OF THIS RENEWAL NOTE REPRESENTS THE UNPAID PRINCIPAL BALANCE OUTSTANDING AS OF THE MATURITY DATE OF THE ORIGINAL NOTE.

<u>RENEWAL TERM LOAN NOTE</u>

US$1,424,221.47

As of October 4, 2009
Miami, Florida

FOR VALUE RECEIVED, the undersigned, PZP INVESTMENTS, INC., a Florida corporation (the "Borrower"), promises to pay to the order of INTERNATIONAL FINANCE BANK, a Florida banking corporation, or its successors or assigns (hereinafter the "Lender") at its offices located at 801 Brickell Avenue, Suite 2400, Miami, Florida 33131, or at such other place as the holder hereof may from time to time designate in writing, the principal sum of ONE MILLION FOUR HUNDRED TWENTY FOUR THOUSAND TWO HUNDRED TWENTY ONE AND 47/100 DOLLARS ($1,424,221.47), together with interest thereon as hereinafter set forth.

1.    <u>Interest Rate</u>.    Interest on the principal amount of this Note from time to time outstanding shall be computed from the date hereof until the full amount of principal has been paid at a fixed rate of six and one-half percent (6.50%) per annum (the "Interest Rate"). All computations of interest shall be based upon a 360-day year of twelve 30-day months, and in the case of any partial month, on the actual number of days elapsed in such month.

2.    <u>Payment Terms</u>.    Accrued interest on the principal amount of this Note, at the rate of interest hereinabove set forth, shall be due and payable monthly commencing November 4, 2009, without set-off or deduction, and continuing on the same day of each calendar month thereafter until the Maturity Date. If not sooner paid, the balance of principal and accrued interest shall be due and payable on January 4, 2010 (the "Maturity Date").

3.    <u>Collateral</u>.    This Note is made and delivered pursuant to the provisions of, and secured by: (a) a Mortgage and Security Agreement dated October 4, 2004 and recorded in O. R. Book 22720, at Page 2665, and a Leasehold Mortgage and Security Agreement dated October 4, 2004 and recorded in O.R. Book 22720, at Page 2699, both of the Public Records of Miami-Dade County, Florida, as amended by Loan Modification Agreement dated June 2, 2009 and recorded _____, 2009 in Official Records Book____, at Page_____, of the Public Records of Miami-Dade County, Florida, and further amended by Loan and Mortgage Modification Agreement of even date herewith to be recorded in the Public Records of Miami-Dade County, Florida (herein collectively referred to as the "Mortgage") granting Lender a first lien and security interest in certain real property located in Miami-Dade County, Florida as more fully described therein (herein the "Mortgaged Property"); (b) an Assignment of Leases, Rents and Profits executed by Borrower in favor of Lender dated October 4, 2004 and recorded in O. R. Book 22720, at Page 2728, of the Public Records of Miami-Dade County, Florida; (c) a UCC-1 Financing Statement recorded October

1




OCT-29-2009 09:11    FROM:P2S INVESTMENT    3052471611    TO:3056488848    P.6

8, 2004 in O.R. Book 22720, at Page 2723, of the Public Records of Miami-Dade County, Florida; (d) a UCC-1 Financing Statement filed October 14, 2004 with the Florida Secured Transaction Registry under file # 200408075579; (e)  a Continuing and Unconditional Personal Guaranty executed by Mario V. Pino and Maria del Carmen Pino, and Oscar Zapata and Consuelo Zapata, of even date herewith, all in favor of Lender (herein collectively referred to as the "Guaranty"); and (f) certain other loan documents and instruments (hereinafter collectively called the "Loan Documents"). All of the foregoing are hereinafter referred to as the "Collateral".

The Collateral shall further secure any other indebtedness or liability of the Borrower to the Lender direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising, including all future advances or loans by the Lender to the Borrower.

4.    **Prepayments.**  The outstanding principal balance may be prepaid in whole or in part at any time without premium or penalty.

5.    **Late Charge.**  Provided the Lender has not exercised its right to accelerate this Note as hereinbelow provided, in the event any required payment on this Note is not received by Lender within ten (10) days after said payment is due, Borrower shall pay to Lender a late charge equal to five percent (5%) of the payment not so received.  The foregoing provision shall not be construed to extend the due date for any amount required to be paid hereunder.  The parties agree that any such late charge is not a penalty, it being understood that said charge is fair and reasonable in order to compensate Lender for its damages and administrative expenses resulting from such late payment. Said late charge shall be immediately due and payable and shall be paid by the Borrower without notice or demand by the Lender.  The failure by the Lender to collect or require payment of any late charge shall in no way prejudice the right of the Lender to collect or require payment of a late charge in connection with subsequent late payments.  Time is of the essence as to each and every of the Borrower's obligations hereunder.

6.    **Application of Payments.**  All payments shall be applied first to the Lender's costs of collection as provided elsewhere herein, then to interest, and then to principal.  All interest due hereunder shall be computed on the daily outstanding principal balance based on a 360-day year.

7.    **Default.**  The occurrence of the following or any of the following shall constitute an "Event of Default" hereunder, and shall entitle Lender, at its option, to exercise any or all of its remedies hereunder:

(a)    the failure of the undersigned to pay principal, interest, or any other amount due under this Note;

(b)    any representation or warranty made by the undersigned or any other endorser hereof, or any guarantor or other party liable hereon (collectively, "Obligor"), under this Note, or any report, certificate, financial statement or other information provided by or on behalf of the undersigned to Lender in connection herewith is false or misleading in any material respect;

2

(c)     the failure of the undersigned or any other Obligor or any other person to fully perform when due any agreement under this Note;

(d)     the occurrence of a default or event of default under any other loan documents evidencing or securing this Loan;

(e)     the occurrence of a default or event of default under any present or future indebtedness of the undersigned to Lender not evidenced by this Note, or a default or event of default under any guaranty or security document executed by any person in connection therewith. A default under this Note shall constitute a default under any such indebtedness, guaranty or security documents;

(f)     the liquidation, dissolution or suspension of the business of the undersigned or any other Obligor, or the commencement by the undersigned or any other Obligor of a proceeding in bankruptcy or insolvency; or the consent or acquiescence of the undersigned (or such other Obligor) to such proceeding; the application by the undersigned or any other Obligor for the appointment of a receiver for all or a substantial part of its properties or the consent or acquiescence of the undersigned or such other Obligor to such proceeding; the making by the undersigned or any other Obligor of an assignment for the benefit of creditors; or the inability of the undersigned or any other Obligor or the admission by the undersigned or any other Obligor in writing of its inability to pay its debts as they mature;

(g)     the commencement of an involuntary proceeding in bankruptcy or insolvency against the undersigned or any other Obligor, the involuntary appointment of a receiver for all or a substantial part of the properties of the undersigned or any other Obligor; or there shall be issued an order for the issuance of a warrant of attachment, execution, distraint or similar process against all or a substantial part of the properties of the undersigned or any other Obligor, and the continuance of any of the foregoing for sixty (60) days without having been vacated, discharged, stayed, bonded or dismissed;

(h)     the entry of a judgment against the undersigned or any other Obligor in an amount in excess of $75,000.00, if twenty (20) days have elapsed and the judgment has not been vacated, satisfied or dismissed, and the enforcement of the judgment has not been stayed pending appeal;

(i)     the issuance of a writ of attachment or garnishment against, or the imposition of a lien by operation of law on, any property of the undersigned or any other Obligor, if the amount of the claim or value of the affected property is in excess of $75,000.00, if twenty (20) days have elapsed and the proceeding or lien has not been vacated, satisfied, dismissed or stayed pending appeal;

(j)     the merger, consolidation or reorganization of the undersigned or any other Obligor, the termination or invalidation of the undersigned's or any other Obligor's corporate

3

existence or rights, or the transfer or disposition of all or a substantial part of its property;

        (k)     the sale, conveyance or pledge of the Mortgaged Property or any interest of Mortgagor therein;

        (l)     the determination by Lender that a material adverse change has occurred in the financial condition of the undersigned or any other Obligor from that in existence on the date hereof, which determination shall be made reasonably and in good faith;

The Lender shall have all of the rights and remedies of a creditor and, to the extent applicable, of a secured party under all applicable law. Without limiting the generality of the foregoing, upon the occurrence of any Event of Default hereunder, the entire amount of principal of this Note, and the entire amount then due under any instrument securing this Note, shall, at the option of Lender, without notice, bear interest from such date at the maximum rate of interest permitted by law (the "Default Rate") and Lender may, at its option, declare the entire unpaid principal and accrued interest accelerated and due and payable at once, together with any and all other liabilities and other obligations and indebtedness of Obligor to Lender, whereupon all such obligations, with accrued interest thereon, whether contingent or direct, shall forthwith become due and payable, and shall bear interest at the Default Rate, without presentment, demand, protest, or other notice of any kind from Lender, all of which are hereby waived. In addition, Lender may immediately proceed to do all things as provided by law, in this Note, the Mortgage, or any other documents executed in connection herewith to enforce its rights hereunder and to collect all amounts owing to Lender.

Each of the undersigned and any other Obligor hereby grants to Lender, to secure all indebtedness of the undersigned and any other Obligor, or any of them, to Lender, whether under this Note or otherwise, a continuing lien upon and security interest in any and all monies, securities and other property of the respective party and the proceeds thereof, now or hereafter held or received by or in transit to, Lender from or for such party, and also upon any deposits (general or special) and credits of such party, if any at Lender, at any time existing. Upon the occurrence of any default, Lender is hereby authorized at any time and from time to time, without notice to the undersigned or any other Obligor, to setoff, appropriate, and apply any or all items hereinabove referred to against all indebtedness of the undersigned or any other Obligor owed to Lender, whether hereunder, under the other Loan Documents, or otherwise, whether now existing or hereafter arising. Lender shall be deemed to have exercised such right of setoff and to have made a charge against such items immediately upon the occurrence of such default although made or entered on its books subsequent thereto.

        3.    **Usury.**     Nothing herein contained, nor in any instrument or transaction related hereto, shall be construed or so operate as to require Borrower, or any person liable for the payment of the indebtedness evidenced by this Note, to pay interest in an amount or at a rate greater than the highest rate of interest which may lawfully be charged by the holder hereof under applicable law.

4

OCT-30-2009 02:14   FROM:P2F INC^TMENT    3058471611    3056469846    P.9

Should any interest or other charges paid by the Borrower, or any party liable under this Note, result in the computation or earning of interest in excess of the highest rate permitted under applicable law, then any and all such excess shall be and the same is hereby waived by the holder hereof, and all such excess shall be automatically credited against and in reduction of the principal balance, and any portion of said excess which exceeds the principal balance shall be paid by the holder hereof to Borrower and to any party liable under this Note, it being the intent that under no circumstances shall the Borrower, or any party liable for the payment of the loan made hereunder, be required to pay interest in excess of the highest rate permitted under applicable law.

9.    **Renewals and Extensions.**    The holder hereof may, without notice and without releasing the liability of any person liable under this Note, grant extensions or renewals hereof from time to time and for any term or terms, add or release one or more such persons to this security in whole or in part. The holder hereof shall not be liable for or prejudiced by failure to collect or for lack of diligence in bringing suit on this Note or any renewal or extension hereof.

10.    **Waivers.**    As to this Note, the Mortgage and any other Loan Documents, Borrower, any endorser, any guarantors, and any persons otherwise liable hereunder severally waive all applicable exemption rights, whether under the State Constitution, homestead laws, or otherwise, and also severally waive valuation and appraisement, presentment, protest and demand, notice of protest, demand and dishonor, and nonpayment of this Note, and expressly agree that the Maturity Date of this Note, or any payment hereunder, may be extended from time to time without in any way affecting the liability of Borrower, or any endorser hereof.

11.    **Remedies Cumulative.**    The remedies of Lender as provided herein, or in the Mortgage and any other Loan Documents, shall be cumulative and concurrent, and may be pursued singularly, successively or together, at Lender's sole discretion, and may be exercised as often as occasion therefor shall arise.

12.    **Successors and Assigns.**    This Note shall be binding upon Borrower and its successors and assigns. Lender has the right, at any time, to assign, endorse, transfer and set over to any person, or legal entity, in whole or in part, this Note, the Mortgage and any other Loan Documents and security documents evidencing and/or securing the loan of reference, for such consideration as Lender may deem advisable. Therefore, Borrower, upon Lender's request, made either personally or by mail, shall certify by a writing, duly acknowledged, to Lender, or to any proposed assignee of the Loan Documents, the amount of principal and interest then owing thereunder and whether or not any offsets or defenses exist against said indebtedness, within five (5) days in case the request is made personally, or within ten (10) days after the mailing of such request, in case the request is made by mail.

13.    **Attorney's Fees.**    In the event a default occurs as herein provided, this Note may be placed in the hands of an attorney for collection and, in such event, each Obligor hereby agrees to pay the holder hereof all attorneys' fees and costs incurred by Lender.

14.    **Sales and Use Taxes.**    Obligors agree that any sales and use tax imposed by any governmental authority upon any amounts due under this Note, the Mortgage or any other Loan Documents, shall be the responsibility of Obligors.

15.    **Governing Law and Venue.**    This Note was executed by Borrower and delivered to Lender in the State of Florida. This Note is to be construed and enforced in accordance with the laws of the State of Florida, United States of America, except that the interest to be paid on this Note shall not exceed the highest legal rate applicable in this transaction under Florida or Federal law, whichever is higher. The Borrower hereby waives any pleas of jurisdiction or venue as not being a resident of Miami-Dade County, Florida, and hereby specifically authorizes any action brought upon the enforcement of this Note to be commenced or suit filed in Miami-Dade County, Florida.

16.    **Waiver of Trial By Jury.**    **LENDER AND BORROWER HEREBY KNOWINGLY, IRREVOCABLY, VOLUNTARILY AND INTENTIONALLY WAIVE ANY RIGHT ANY OF THEM MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY ACTION, PROCEEDING OR COUNTERCLAIM BASED ON THIS RENEWAL TERM LOAN PROMISSORY NOTE, OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS RENEWAL TERM LOAN PROMISSORY NOTE, OR ANY LOAN DOCUMENTS, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS WHETHER VERBAL OR WRITTEN OR ACTIONS OF ANY PARTY HERETO OR TO ANY LOAN DOCUMENT. THIS PROVISION IS A MATERIAL INDUCEMENT FOR LENDER AND BORROWER ENTERING INTO THE SUBJECT LOAN TRANSACTION.**

IN WITNESS WHEREOF, the undersigned has executed and delivered this Renewal Term Loan Note as of the date and year first above written.

Borrower's Address:

1070 Hunting Lodge Drive
Miami Springs, Florida 33166

**BORROWER:**
PZP INVESTMENTS, INC., a Florida corporation

By: _____
Name: _OSCAR ZAPATA_
Title: _PRESIDENT_

6

Prepared By and Return To:
CARLOS GARCIA, P.A.
4100 S.W. 57th Avenue
South Miami, Florida 33155

**Effective date:**
**JANUARY 4, 2010**

THIS IS A MODIFICATION OF A LOAN PREVIOUSLY EXTENDED BY THE BANK TO THE BORROWER THAT WAS ORIGINALLY EVIDENCED BY THAT CERTAIN PROMISSORY NOTE DATED OCTOBER 4, 2004 IN THE ORIGINAL PRINCIPAL SUM OF ONE MILLION EIGHT HUNDRED SEVENTY FIVE THOUSAND AND 00/100 DOLLARS ($1,875,000.00) AND THAT CERTAIN RENEWAL PROMISSORY NOTE DATED OCTOBER 4, 2009 IN THE PRINCIPAL SUM OF ONE MILLION FOUR HUNDRED TWENTY FOUR THOUSAND TWO HUNDRED TWENTY ONE AND 47/100 DOLLARS ($1424,221.47) AS MODIFIED BY THAT CERTAIN LOAN MODIFICATION AGREEMENT DATED JUNE 2, 2009, AND RECORDED ON NOVEMBER 11, 2009, IN OFFICIAL RECORDS BOOK 27074 AT PAGES 4139-4142 OF THE PUBLIC RECORDS OF MIAMI-DADE COUNTY, FLORIDA.. THERE HAS BEEN NO CHANGE IN THE ORIGINAL OBLIGORS AND NO ADDITIONAL FUNDS ARE BEING LOANED. ACCORDINGLY, NO DOCUMENTARY STAMP TAXES ARE DUE AND PAYABLE ON THE PROMISSORY NOTE.  DOCUMENTARY STAMP TAXES WERE PAID ON THE MORTGAGE AND SECURITY AGREEMENT DATED OCTOBER 4, 2004 AND RECORDED ON OCTOBER 8, 2004 IN OFFICIAL RECORDS BOOK 22720 AT PAGES 2665-26698 OF THE PUBLIC RECORDS OF MIAMI-DADE COUNTY, FLORIDA. IN ACCORDANCE TO FLORIDA STATUTES SECTION 201.08 DOCUMENTARY STAMP TAXES INCIDENT TO THE PROMISSORY NOTE WERE AFFIXED TO THE ORIGINAL MORTGAGE.

### ALLONGE TO PROMISSORY NOTE

This ALLONGE is made this ⟍ day of May, 2010 to that certain Renewal Promissory Note dated October 4, 2009 executed by PZP INVESTMENTS, INC., a Florida corporation as Borrower in favor of INTERNATIONAL FINANCE BANK as Lender.

### WITNESSETH

The Borrower did on October 4, 2004, make, execute and deliver to the Lender a Promissory Note in the original principal amount of ONE MILLION EIGHT HUNDRED SEVENTY FIVE THOUSAND AND 00/100 DOLLARS ($1,875,000.00).  Thereafter, the Borrower did execute, on or about October 4, 2009 a Renewal Promissory Note in the principal sum of ONE MILLION FOUR HUNDRED TWENTY FOUR THOUSAND TWO HUNDRED TWENTY ONE AND 47/100 DOLLARS ($1,424,221.47) which notes were secured by a Mortgage and Security Agreement dated October 4, 2004 and recorded on October 8, 2004, in Official Records Book 22720 at Pages 2665-26698, a Collateral Assignment of Leases and Rentals dated October 4, 2004 and recorded on October 8, 2004 in Official Records Book 22720 at Pages 2728-2731 and a UCC-1 Financing Statement recorded on October 8, 2004, in Official Records Book 22720 at Pages 2723-2727 and as modified by that certain Loan Modification Agreement dated June 2, 2009 and recorded on November 6, 2009 in Official Records Book 27074 at Pages 4139-4142 of the Public Records of Miami-Dade County, Florida.    As of the date of the execution of this document, the principal balance due under the Note is ONE MILLION FOUR HUNDRED THIRTY TWO THOUSAND NINE HUNDRED SEVENTY TWO AND 00/100 DOLLARS ($1,432,972.00).

The MAKER and Lender agree to modify the Promissory Note as follows:

The maturity date of the Note is hereby extended to May ⟋20̸ 2010.

Except as herein modified and changed all of the terms, covenants, conditions and agreements contained in said Promissory Note shall remain the same.


EXHIBIT
"F"

Witnesses:

Print Name _Lawrence H. Alvata_

Print Name

Witnesses:

Print Name

Print Name

BORROWER:

**PZP INVESTMENTS, INC.**
a Florida corporation

By: _____
Oscar Zapata, President

LENDER

**INTERNATIONAL FINANCE BANK**, a Florida
banking corporation.

By: _____
Manuel Alvarez, Senior Vice President

## RENEWAL AND INCREASE PROMISSORY NOTE

$1,532,972.25                       MIAMI, FLORIDA
                                           June 17, 2010

The undersigned, and if more than one, each of them jointly and severally (hereinafter jointly called MAKER), promises to pay to the order of **INTERNATIONAL FINANCE BANK**, a Florida banking corporation (hereinafter, together with any holder hereof, called the BANK or HOLDER), at its office located at 3663 S.W. 8th Street, Miami, Florida 33135 or at such other place as BANK may from time to time designate, the principal sum of **ONE MILLION FIVE HUNDRED THIRTY TWO THOUSAND NINE HUNDRED SEVENTY TWO AND 25/100 DOLLARS ($1,532,972.25)**. The principal sum of **ONE MILLION FIVE HUNDRED THIRTY TWO THOUSAND NINE HUNDRED SEVENTY TWO AND 25/100 DOLLARS ($1,532,972.25)** shall be paid as follows:

1.      The principal and interest hereunder shall be repaid in FIFTY NINE (59) consecutive monthly payments beginning on JULY 17, 2010 and ONE (1) final Balloon payment due on JUNE 17, 2015. The MAKER shall make monthly payments of interest only during the first six months of the loan. Thereafter and commencing with the payment due in month SEVEN (7) the MAKER shall make payments of principal and interest in the amount of TEN THOUSAND NINE HUNDRED THIRTY FIVE AND FORTY NINE/100 DOLLARS ($10,935.49). The payments due under the terms of this Note shall be calculated based on a Twenty-five (25) year amortization schedule.

2.      The interest rate charged shall be 7.0% per annum and shall remain fixed at this rate for the term of the loan.

3.      On JUNE 17, 2015 all accrued and unpaid interest hereunder, together with the then outstanding principal balance hereunder, in addition to any accrued interest and other charges under the Note shall be due and payable in one final Balloon payment, unless renewed as provided for in this Note. THIS NOTE MAY BE PREPAID IN WHOLE OR PART WITHOUT PENALTY.

4.      MAKER agrees to maintain a depository relationship at BANK.

5.      A late charge shall be assessed for any payment which is overdue for a period of ten (10) days in the amount of five percent (5%) of the amount overdue.

6.      All payments shall be applied first to accrued interest and then to principal. Interest will be computed and charged on the basis of a 360/actual days. In no event shall interest be due at a rate in excess of the highest lawful rate in effect from time to time. It is not the intention of the parties hereto to make any agreement which shall be violative of the laws of the state of Florida or the United States of America relating to usury. In no event shall MAKER pay, nor shall BANK accept or charge, any interest which, together with any other charges upon the principal, or any portion thereof, howsoever computed, after taking into account any requirement for commitment and facility fees (if applicable), shall exceed the maximum lawful rate of interest allowable under the laws of the State of Florida or the United States of America, from time to time, whichever is higher or unlimited. Without limiting the generality of the foregoing, and notwithstanding any oral or written agreement, no deposit of funds shall be required in connection with the loan evidenced by this Note in an amount which will, when deducted from the principal amount outstanding hereunder, cause the rate of interest hereunder to exceed the highest rate permitted by applicable law. Should any provision hereof, or of any other documentation at any time entered into by and between the parties hereto, be construed to require the payment of interest which, together with any other charges upon the principal or any portion thereof, after taking into account any requirement for commitment and facilities fees (if applicable), shall exceed such maximum lawful rate of interest, then any such excess shall be applied against the then remaining outstanding principal balance hereunder. This Note, with interest, is secured by all collateral more particularly set forth in certain Mortgage and

1



Security Agreement dated October 4, 2004 and recorded on October 8, 2004 in Official Records Book 22720, at Pages 2665-2698, a Leasehold Mortgage and Security Agreement dated October 4, 2004 and recorded on October 8, 2004 in Official records Book 22720 at Pages 2699-2722, a Collateral Assignment of Leases and Rentals dated October 4, 2004 and recorded on October 8, 2004 in Official Records Book 22720 at Pages 2728-2731, a UCC-1 Financing Statement recorded on October 8, 2004 in Official Records Book 22720 at Pages 2723-2727, a Cross Collaterization and Cross Default Agreement dated October 4, 2004 and recorded on October 8, 2004 in Official records Book 22720 at Pages 2732-2739, , a Cross Collaterization and Cross Default Agreement dated January 12, 2007 and recorded on February 7, 2007 in Official records Book 25347 at pages 0752-757,   a Loan Modification Agreement dated June 2, 2009 and recorded on November 6, 2009 in Official Records Book 27074 at pages 4139-4142, all of the Public Records of Miami-Dade County, Florida. The Note is further secured by that certain Mortgage Modification Agreement, Assignment of Leases, Rents, and Profits, and Assignment of Intangibles, of even date herewith, executed and delivered by MAKER in favor of BANK. This Note is subject to the terms and a condition contained therein, and is further subject to the terms and conditions of any other loan documentation executed in connection therewith, and a default under any of the foregoing shall constitute a default hereunder, and shall entitle BANK to exercise any and all of its rights and remedies as provided for herein.

Whether or not specific property is described above as additional security for the payment of this Note, any renewals, extensions or modifications hereof, and any other liabilities of MAKER to BANK, however or whenever created, MAKER hereby pledges to BANK any and all property of MAKER, now or hereafter delivered to, left in, or coming into the possession, control or custody of BANK, whether expressly as collateral security or for any other purpose (including cash, stock and other dividends, and all rights to subscribe for securities incident to, declared, or granted in connection with such property), and property described in collateral receipts or other documents signed or furnished by the MAKER, and any and all replacements of any of the foregoing, whether or not in the possession of BANK. All such property, and all other property securing MAKER's liabilities to the BANK, will hereafter be referred to as the "Collateral". The Collateral shall also serve as security for all other liabilities (primary, secondary, direct, contingent, sole, joint or several), due or to become due or which may be hereafter contracted or acquired, of each MAKER (including each MAKER and any other person) to BANK, whether such liabilities arise in the ordinary course of business or not. The BANK may continue to hold any Collateral deposited hereunder after the payment of this Note if at the time of the payment and discharge hereof any of the parties liable for the payment hereof shall be then directly or contingently liable to the BANK as maker, endorser, surety or guarantor of any other note, draft, bill of exchange, or other instrument, or otherwise, and the BANK may thereafter exercise its rights with respect to the Collateral granted herein even though this Note shall have been surrendered to the MAKER.

It is jointly and severally covenanted and agreed with the BANK by each MAKER of this Note that:

1.      Additions to, releases, reductions or exchanges of, or substitutions for the Collateral, payments on account of the loan evidenced by this Note or increases of the same, or other loans made partially or wholly upon the Collateral, may from time to time be made without affecting the provisions of this Note or liabilities of any MAKER hereof. BANK shall exercise reasonable care in the custody and preservation of the Collateral and shall be deemed to have exercised reasonable care if it takes such action for that purpose as MAKER shall reasonably request in writing, but no omission to comply with any request of MAKER shall of itself be deemed a failure to exercise reasonable care. Without limiting the generality of the foregoing, the BANK shall have no responsibility for ascertaining any maturities, calls, exchanges, offers, tenders or similar matters relating to any of the Collateral, nor for informing the undersigned with respect to any thereof. BANK shall not be bound to take any steps necessary to preserve any rights in the Collateral against prior parties, and MAKER shall take all necessary steps for such purposes. BANK or its nominee need not collect dividends or interest on, or principal of, any Collateral or give any notice with respect to it.

2.      BANK is hereby given a lien upon and a security interest in all property pledged of each MAKER now, or at any time hereafter, in the possession of BANK in any capacity whatsoever,

including but not limited to any balance or share of any deposit, trust or agency account, as security for the payment of this Note, and a similar lien upon the security interest in all such property as it has with respect to the Collateral pledged by the MAKER.

3.    BANK shall have, but shall not be limited to, the following rights, each of which may be exercised at any time whether or not this Note is due: (a) to pledge or transfer this Note and the Collateral, whereupon BANK shall be relieved of all duties and responsibilities and relieved from any and all liability with respect to any Collateral so pledged or transferred, and any pledgee or transferee shall for all purposes stand in the place of BANK hereunder and have all the rights of BANK hereunder; (b) to transfer the whole or any part of the pledged Collateral into the name of itself or its nominee; (c) to notify the obligors on any Collateral to make payment to BANK of any amounts due, or to become due, on any Collateral and to hold same as additional Collateral and, upon an occurrence of an Event of Default, apply it to the principal or interest hereof, or to any liabilities secured hereby; (d) to demand, sue for, collect, or make any compromise or settlement it deems desirable with reference to the Collateral; and, (e) to take possession or control of any proceeds of the Collateral.

4.    The parties agree that the MAKER shall maintain an Operating Account at BANK.

5.    If the Collateral shall at any time become unsatisfactory to BANK, to the extent that the BANK reasonably believes that the value of the collateral has been impaired, or upon the happening of any of the following events, each of which shall constitute a default hereunder, and if not cured within 30 days notice, other than a default due to nonpayment, (hereinafter referred to as an "Event of Default"), all liabilities of each MAKER to BANK, whether or not evidenced by this Note, shall thereupon or thereafter, at the option of BANK, without notice or demand, become due and payable: (a) failure of any MAKER to pay in full, when due, any liability whatsoever to BANK including any installment of principal, interest or other sums due hereunder; (b) the death of any MAKER; (c) MAKER shall (i) have an order for relief entered with respect to it under the Federal Bankruptcy Code; (ii) not pay, or admit in writing its inability to pay its debts generally as they become due; (iii) make an assignment for the benefit of creditors; (iv) apply for, seek, consent to, or acquiesce in the appointment of a receiver, custodian, trustee, examiner, liquidator or similar official, for it, or any substantial part of its property; (v) institute any proceeding seeking an order for relief under the Federal Bankruptcy Code or seeking to adjudicate it a bankrupt or insolvent, or seeking dissolution, winding up, liquidation, reorganization, arrangement, adjustment or composition of it, or its debts, under any law relating to bankruptcy, insolvency or reorganization or relief of debtors, or fail to file an answer, or other pleading, denying the material allegations of any such proceeding filed against it; (vi) be "insolvent" as such term is defined in the Federal Bankruptcy Code; (vii) have concealed, removed, or permitted to be concealed or removed, any part of its properties or assets, with intent to hinder, delay or defraud its creditors, or any of them, or made or suffered a transfer of any of its property which may be fraudulent under any bankruptcy, fraudulent conveyance or similar law; or shall have made any transfer of its property to or for the benefit of a creditor at a time when other creditors similarly situated have not been paid; (viii) take any corporate action to authorize or effect any of the foregoing actions set forth in this subsection, or (ix) fail to contest in good faith any appointment or proceeding described in subsection (d); (d) without the application, approval or consent of the MAKER, a receiver, trustee, examiner, liquidator or similar official shall be appointed for any MAKER or any part of its property, or a proceeding described in subsection (c)(v) shall be instituted against the MAKER; (e) the entry of a money judgment against any MAKER if not cured as described above or if not bonded; (f) the issuing of any attachments or garnishment or the filing of any lien against any property of any MAKER if not cured as described above; (g) the taking of possession of any substantial part of the property of any MAKER at the instance of any governmental authority; (h) the dissolution, merger, consolidation or reorganization of any MAKER; (i) the determination by BANK that a material adverse change has occurred in the financial condition of any MAKER from the conditions set forth in the most recent financial statement of such MAKER heretofore furnished to BANK, or from the condition of such MAKER as heretofore most recently disclosed to BANK in any manner; or that any warranty, representation, certificate or statement of any MAKER (whether contained in this Note or not) pertaining to or in connection with this Note, or the loan evidenced by this Note, is not true; (j) the further granting by any MAKER of a security interest in any of the Collateral without the prior written consent of BANK; (k) failure to do all things necessary to preserve and maintain the value and collectibility of the Collateral, including, but

3

not limited to, the payment of taxes and premiums on policies of insurance on the respective due date without benefit of the grace period; (l) failure of the MAKER, after request by BANK, to furnish financial information, annual rent rolls, or to permit inspection of the MAKER's books and records; and, (m) failure of the MAKER to maintain, at all times during the term of this loan, an operating account with BANK; (n) the sale or disposition of any part of the collateral without the express written consent of the BANK except that a sale of any of the individual units being held as collateral, as set forth in the Mortgage securing this Note, shall not be considered an event of default provided the conditions set forth in the Mortgage are complied with and MAKER makes a payment to obtain a partial release of the Mortgage; in addition, upon the sale of a particular unit, any partial release payment shall be considered a principal reduction and the payment shall serve to re amortize the loan taking into consideration the new principal, thereby reducing the amount of any subsequent payments; (o) the occurrence of any events otherwise described in this Note as a default under this Note.

6.      Upon the occurrence of an Event of Default, BANK shall have all the remedies of a creditor, mortgagee and secured party under the Uniform Commercial Code as adopted by the State of Florida, and without limiting the generality of the foregoing, BANK shall have the right, at its option, and without notice or demand, to (a) declare the entire amount of this Note remaining unpaid, and all other liabilities of any MAKER, or any of such liabilities selected by BANK, immediately due and payable, less any unearned interest or other charges and any rebates required by law; (b) setoff against this Note all money owed by BANK in any capacity to each, or any, MAKER, whether or not due; and, (c) to setoff against all other liabilities of each MAKER to BANK all money owed by BANK in any capacity to each, or any, MAKER.  MAKER agrees that if any installment of principal or interest is not made within ten (10) days of its due date, the BANK shall also have the right to charge and collect from MAKER a late charge equal to five percent (5%) of the amount of such payment.  BANK shall have the right to charge and collect interest at the Default Rate (as hereinafter defined) on the principal balance of this Note from the date of the occurrence of an Event of Default or maturity (whether by acceleration, at stated maturity or otherwise), as the case may be, and continue until the Event of Default is cured or this Note is fully repaid.  Failure to exercise any of said options shall not constitute a waiver of the subsequent right to exercise any such option.  Failure to collect, or a waiver of, delinquent interest at the Default Rate or late charges shall not constitute a waiver of any subsequent right to collect such delinquent interest at the Default Rate and late charges.  The "Default Rate" shall mean the highest lawful rate of interest allowable under the laws of the state of Florida or the United States of America, whichever is higher, or unlimited.

7.      Unless the Collateral is perishable, or threatens to decline speedily in value, or is of a type customarily sold on a recognized market, BANK will give each MAKER, reasonable notice of the time and place of any public sale thereof, or of the time after which a private sale will be held.  The requirement of reasonable notice shall be met if such notice is mailed, postage prepaid, to each MAKER at the address shown on the records of the BANK at least ninety (90) days prior to the time of the sale.  Upon disposition of any Collateral after the occurrence of any default hereunder, each MAKER shall be and remain liable for any deficiency, and BANK shall account to MAKER for any surplus, but BANK shall have the right to apply all or any part of such surplus (or to hold the same as a reserve) against any and all other liabilities of each or any MAKER to BANK.

8.      No delay or omission on the part of BANK in exercising any right hereunder shall operate as a waiver of such right or of any right under this Note.  No waiver, modification, supplement or change, in whole or in part, of any provision of this Note shall be binding on BANK unless in a writing signed by an authorized BANK officer and then only to the extent specifically set forth therein.  Presentment, demand, protest and notice of dishonor are hereby waived by each and every MAKER.  Each MAKER jointly and severally, promises and agrees to pay all costs of collection of this Note including reasonable attorneys' fees and costs if the BANK proceeds to collect this Note through the services of an attorney at law or by legal action, plus costs incurred in enforcing this Note and recovery of all amounts owing by MAKER to BANK, whether or not suit is instituted, plus reasonable attorney's fees incurred in trial, appellate or bankruptcy proceedings.  Each MAKER hereby expressly waives any statutory right to receive attorney's fees in any cause of action or other litigation based in whole or in part, directly or indirectly, upon this Note.

4

9.    Each MAKER hereby expressly consents to any and all extensions and renewals, in whole or in part, and all delays in time or payment or other performance which the BANK may grant or permit at any time, and from time to time, without limitation, and without any notice to, or further consent of, any MAKER. To this end, each MAKER gives the BANK full authority, without notice of consent, in its sole discretion, to do any or all of the following things: (a) grant time, waivers and other indulgences in respect hereto; (b) vary, exchange, release or discharge, wholly or partially, or delay in or abstain from perfecting and enforcing any Collateral which the BANK now has or acquires after the date hereof; (c) accept partial payments from any MAKER; (d) release or discharge, wholly or partially, any MAKER or any other party obligated in any manner with respect hereto; and, (e) make a settlement with one or more MAKER for less than the aggregate amount of this Note and thereafter release such MAKER from liability hereunder without releasing any other MAKER. No action or inaction by BANK shall discharge any party liable for the payment hereof, and the liability of all such parties shall continue until actual payment is received by the BANK. Without limiting the generality of the foregoing, the release or discharge of any MAKER or any other party obligated in any manner with respect hereto, shall not discharge any other MAKER, and the release or impairment of Collateral, the taking of a renewal note for part or all of the indebtedness hereunder, or a change in the interest rate shall not discharge any MAKER. Each MAKER further waives any defense to enforcement of this Note because of BANK's failure to preserve, perfect or continue perfection of any security interest now or hereafter held by BANK, or BANK's failure to claim or make any claim in any insolvency proceeding involving any MAKER or any other party obligated in any manner with respect hereto.

10.    All payments of principal and interest on this Note are payable in lawful money of the United States of America in immediately available funds without deduction for, or on account of, any present or future taxes, duties or other charges levied or imposed on this Note, the proceeds, MAKER or BANK by any government, or any instrumentality, authority or political subdivision thereof. MAKER shall receive immediate credit on payments received during BANK's normal business hours if made in immediately available funds; otherwise, said payments shall be credited after clearance though normal banking channels. If any payment required to be made pursuant to this Note is not received within ten (10) days of the due date, BANK shall have the right, at its election, to charge any of MAKER's accounts at the BANK with the amount of such payment subject to availability of collected balances. MAKER agrees, upon the request of BANK, to pay all such taxes, duties and other charges in addition to principal and interest on this Note, including all documentary stamp taxes and intangible taxes as are, from time to time, payable or assessed on this Note, but exclusive of United States income taxes and Florida income taxes.

11.    The BANK's rights hereunder, and under any other security agreement or other writing, or under applicable law shall be cumulative.

12.    MAKER shall furnish BANK with such financial information of MAKER as BANK may from time to time reasonably request, and shall permit reasonable inspection of MAKER'S books and records during MAKER's regular business hours, as provided for in the Loan Commitment Letter dated April 28, 2010.

13.    This Note shall be governed and construed in accordance with the laws of the State of Florida without giving effect to principles of conflict of laws, regardless of the citizenship, residence, location or domicile of any MAKER of this Note. Whenever possible, each provision of this Note shall be interpreted in such a manner as to be effective and valid under applicable law, but if any provision of this Note shall be prohibited by, or invalid under, applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Note.

14.    MAKER hereby waives any plea of jurisdiction or venue as not being residents of the county within the State of Florida where suit is instituted, and hereby specifically authorize any action brought upon the enforcement of this Note by BANK to be instituted and prosecuted in either the Circuit Court of any County, in the State of Florida, or any United States District Court situated in the State of Florida, at the election of BANK.

5

15.    All nouns and pronouns contained in this instrument shall mean and include the plural as well as the singular, and the masculine, feminine, and neuter gender whenever and wherever the context so admits or requires.

16.    THE MONEY MAKER HAS RECEIVED IN EXCHANGE FOR THIS NOTE WILL BE USED FOR A BUSINESS OR COMMERCIAL PURPOSE.

17.    MAKER HEREBY, AND BANK BY ITS ACCEPTANCE HEREOF, DOES KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THE RIGHT EITHER MAY HAVE TO A TRIAL BY JURY IN RESPECT TO ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS NOTE AND ANY AGREEMENT CONTEMPLATED TO BE EXECUTED IN CONJUNCTION HEREWITH, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF EITHER PARTY.  THIS PROVISION IS A MATERIAL INDUCEMENT FOR THE BANK MAKING THE LOAN OR EXTENSION OF CREDIT EVIDENCED BY THIS NOTE.    .

18.    MAKER agrees it will fully perform, comply with and abide by each and every one of the terms, covenants and agreements contained and set forth in the certain Commitment letter dated April 28, 2010 by and between the parties hereto, together with any further modifications or amendments thereof, relating to this Mortgage loan, executed copies of which are in the possession of the Mortgagors and Mortgagee. The Commitment Letter will survive the closing of this transaction. Any default under or breach by Mortgagors of said  Commitment and amendments thereto, if any, or other loan documents shall, at the option of the Lender, be an Event of Default under the terms of this Note .

19.    MAKER ACKNOWLEDGES THAT, IN ADDITION TO THIS LOAN, MAKER HAS OR IN THE FUTURE MAY HAVE OTHER LOAN OBLIGATIONS AND FACILITIES GRANTED BY THE BANK, WHETHER AS BORROWER, GUARANTOR, OWNER OF A BORROWING ENTITY OR IN ANY OTHER CAPACITY AND AGREES IT WILL FULLY PERFORM, COMPLY WITH AND ABIDE BY EACH AND EVERY ONE OF THE TERMS, COVENANTS, AGREEMENTS AND OBLIGATIONS OF SAID FACILITIES. MAKER AGREES THAT A DEFAULT UNDER ANOTHER LOAN FACILITY GRANTED BY BANK, WHETHER COLLATERIZED BY A MORTGAGE OR NOT, SHALL BE CONSIDERED A DEFAULT UNDER THE SUBJECT MORTGAGE LOAN.


MAKER:

PZP INVESTMENTS, INC.
a Florida corporation

By:
Oscar Zapata, President

6

Thence North 48° 42' 16" West, a distance of 40.00 feet; Thence North 41° 17 '44" East, a distance of 180.00 feet; Thence South 48° 42' 16" East, a distance of 247.50 feet; Thence South 41° 17' 44" West, a distance of 30.69 feet; Thence South 48° 42' 16" East, a distance of 298.29 feet; Thence South 41° 17' 44" West, a distance of 609.33 feet; Thence North 48° 42' 16" West, a distance of 470.79 feet; Thence North 41° 17' 44" East, a distance of 200.00 feet; Thence North 48° 42' 16" West, a distance of 175.00 feet to the Point of Beginning.

      B.    The LENDER had previously made a loan to the BORROWER in original principal sum of NINE HUNDRED THOUSAND AND 00/100 DOLLARS ($900,000.00), which sum is evidenced by a Promissory Note (the "Note" or "Notes") and other loan documents from BORROWER to LENDER dated January 12, 2007 secured by a mortgage on the following described real property located in Miami-Dade County, Florida.

PARCEL I

Commence at the Southeast corner of Tract A; thence South 48 degrees 42 minutes 16 seconds East along the Northeast right-of-way line of Naranja Lakes Blvd., a distance of 513.24 feet to the POINT OF BEGINNING; thence North 41degrees 17 minutes 44 seconds East, a distance of 120.00 feet; thence North 81 degrees 17 minutes 44 seconds East, a distance of 140.00 feet; thence North 41 degrees 17 minutes 44 seconds East, a distance of 347.69 feet; thence South 77 degrees 27 minutes 28 seconds East, a distance of 116.95 feet; thence South 12 degrees 32 minutes 32 seconds West, a distance of 690.00 feet to a point on a curve to the right having a radius of 1180.00 feet; thence from a radial bearing of South 28 degrees 04 minutes 35 seconds West, continue along the arc of said curve to the right, having a central angle of 13 degrees 13 minutes 09 seconds, a distance of 272.25 feet to the Point of Tangency; thence North 48 degrees 42 minutes 16 seconds West, a distance of 100.00 feet; thence North 46 degrees 51 minutes 07 seconds West, a distance of 154.68 feet to the POINT OF BEGINNING (the last three described courses being the Northeast right-of-way of Naranja Lakes Boulevard).

      The LENDER has agreed, in its sole and absolute discretion, to make the loan described in paragraph A above on the condition that the BORROWER and GUARANTORS agree to the conditions of this agreement, in addition to the conditions contained in the Loan Documents.

      NOW, THEREFORE, in consideration of the covenants contained herein and in the Loan documents, the parties agree as follows:

      THE PROPERTY DESCRIBED IN PARAGRAPH A ABOVE SHALL STAND AS SECURITY AND SHALL COLLATERIZE THE OBLIGATION DESCRIBED IN PARAGRAPH B AS WELL AS THE OBLIGATION DESCRIBED IN PARAGRAPH A AND ANY DEFAULT WITH RESPECT TO THE PAYMENT OF THE OBLIGATION DESCRIBED IN PARAGRAPH A SHALL BE CONSIDERED A DEFAULT WITH RESPECT TO THE OBLIGATION DESCRIBED IN PARAGRAPH B.

      THE PROPERTY DESCRIBED IN PARAGRAPH B ABOVE SHALL STAND AS SECURITY AND SHALL COLLATERIZE THE OBLIGATION DESCRIBED IN PARAGRAPH A AS WELL AS THE OBLIGATION DESCRIBED IN PARAGRAPH B AND ANY DEFAULT WITH RESPECT TO THE PAYMENT OF THE OBLIGATION DESCRIBED IN PARAGRAPH B SHALL BE CONSIDERED A DEFAULT WITH RESPECT TO THE OBLIGATION DESCRIBED IN PARAGRAPH A.

      IN CASE OF DEFAULT UNDER THE TERMS OF THE LOAN DOCUMENTS WITH RESPECT TO EITHER THE OBLIGATION DESCRIBED IN PARAGRAPH A OR PARAGRAPH B ABOVE, LENDER SHALL HAVE THE OPTION TO ENFORCE ANY AND ALL LEGAL RIGHTS AGAINST EITHER OR BOTH PROPERTIES, AT ITS SOLE DISCRETION, INCLUDING PROCEEDINGS IN FORECLOSURE.

      AGREED TO BY PARTIES ON THE DATE FIRST ABOVE WRITTEN.

Witnesses:

Print Name

Print Name   Dolores Mendoza

**MORTGAGOR/BORROWER:**

**PZP INVESTMENTS, INC.**
a Florida corporation

By:
Oscar Zapata, President

Witnesses:

Print Name

Print Name   Dolores Mendoza

**GUARANTORS:**

MARIO PINO

OSCAR ZAPATA

Witnesses:

Print Name

Print Name   Dolores Mendoza

**MORTGAGEE:**

**INTERNATIONAL FINANCE BANK.**
a Florida banking corporation

By:
Manuel Alvarez, senior Vice President

STATE OF FLORIDA
COUNTY OF MIAMI-DADE

The foregoing instrument was acknowledged before me this ⌊7 day of June, 2010, by Oscar Zapata, as President of **PZP INVESTMENTS, INC.**, a Florida corporation.   The above named individual ___ is personally known to me or ✓has produced _____ as identification.

(Notary Seal)
NOTARY PUBLIC-STATE OF FLORIDA
Ibis M. Averhoff
Commission #DD818862
Expires:   AUG. 14, 2012
BONDED THRU ATLANTIC BONDING CO., INC.

Notary Public

Print Name

STATE OF FLORIDA
COUNTY OF MIAMI-DADE

The foregoing instrument was acknowledged before me this ⌊7 day of June, 2010, by Oscar Zapata, individually.  The above named individual ___ is personally known to me or ✓ has produced _____ as identification.

(Notary Seal)

NOTARY PUBLIC-STATE OF FLORIDA
Ibis M. Averhoff
Commission #DD818862
Expires:   AUG. 14, 2012
BONDED THRU ATLANTIC BONDING CO., INC.

Notary Public

Print Name

STATE OF FLORIDA
COUNTY OF MIAMI-DADE

The foregoing instrument was acknowledged before me this _17_ day of June, 2010, by Mario Pino, individually. The above named individual ___ is personally known to me or ___ has produced _____ as identification.

(Notary Seal)

NOTARY PUBLIC-STATE OF FLORIDA
Ibis M. Averhoff
Commission #DD814862
Expires: AUG. 14, 2012
BONDED THRU ATLANTIC BONDING CO., INC.

_____
Notary Public

_____
Print Name

STATE OF FLORIDA
COUNTY OF MIAMI-DADE

The foregoing instrument was acknowledged before me this _17_ day of June, 2010, by Manuel Alvarez, as Senior Vice President of **INTERNATIONAL FINANCE BANK**, a Florida banking corporation. The above named individual ___ is personally known to me or ___ has produced _____ as identification.

(Notary Seal)

NOTARY PUBLIC-STATE OF FLORIDA
Ibis M. Averhoff
Commission #DD814862
Expires: AUG. 14, 2012
BONDED THRU ATLANTIC BONDING CO., INC.

_____
Notary Public

_____
Print Name

### TERM LOAN PROMISSORY NOTE

US$900,000.00

January 12, 2007
Miami, Florida

      FOR VALUE RECEIVED, the undersigned, **PZP INVESTMENTS, INC.**, a Florida corporation (herein the "Borrower"), promises to pay to the order of **INTERNATIONAL FINANCE BANK**, a Florida banking corporation, its successors or assigns (herein the "Lender") at its offices at 801 Brickell Avenue, Miami, Florida 33131, or such other place as the holder hereof may from time to time designate in writing, the sum of NINE HUNDRED THOUSAND AND 00/100 DOLLARS ($900,000.00), together with interest thereon as herein set forth.

      1.    **Interest Rate.**  Interest on the principal amount of this Note from time to time outstanding shall be computed from the date hereof until the full amount of principal has been paid at a fixed rate of eight percent (8.00%) per annum (the "Interest Rate"). All computations of interest shall be based upon a 360-day year of twelve 30-day months, and in the case of any partial month, on the actual number of days elapsed in such month.

      2.    **Payment Terms.**  Beginning on the 4th day of February, 2007 and on the same day of each successive calendar month thereafter, Borrower shall pay to Lender combined monthly principal and interest payment installments of $ 7,579.04 based on a 20-year amortization. If not sooner paid, the balance of principal and accrued interest shall be due and payable on January 4, 2012 (the "Maturity Date").

      3.    **Collateral.**  This Note is made and delivered pursuant to the provisions of , and secured by:  (a) a Mortgage and Security Agreement executed by Borrower in favor of Lender of even date herewith to be recorded in the Public Records of Miami-Dade County, Florida (herein the "Mortgage") granting Lender a first lien and security interest in certain real property located in Miami-Dade County, Florida as more fully described therein (herein the "Mortgaged Property"); (b) an Assignment of Leases, Rents and Profits executed by Borrower in favor of Lender of even date herewith to be recorded in the Public Records of Miami-Dade County, Florida; (c) a Continuing and Unconditional Personal Guaranty executed by Mario V. Pino and Maria del Carmen Pino, and Oscar Zapata and Consuelo Zapata, of even date herewith, all in favor of Lender (herein collectively referred to as the "Guaranty"); and (d) certain other loan documents and instruments (hereinafter collectively called the "Loan Documents"). All of the foregoing are hereinafter referred to as the "Collateral".

      The Collateral shall further secure any other indebtedness or liability of the Borrower to the Lender direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising, including all future advances or loans by the Lender to the Borrower.

      4.    **Prepayments.**  The outstanding principal balance may be prepaid in whole or in part at any time without premium or penalty.

1





5.   Late Charge. Provided the Lender has not exercised its right to accelerate this Note as hereinbelow provided, in the event any required payment on this Note is not received by Lender within ten (10) days after said payment is due, Borrower shall pay to Lender a late charge equal to five percent (5%) of the payment not so received.   The foregoing provision shall not be construed to extend the due date for any amount required to be paid hereunder.   The parties agree that any such late charge is not a penalty, it being understood that said charge is fair and reasonable in order to compensate Lender for its damages and administrative expenses resulting from such late payment. Said late charge shall be immediately due and payable and shall be paid by the Borrower without notice or demand by the Lender. The failure by the Lender to collect or require payment of any late charge shall in no way prejudice the right of the Lender to collect or require payment of a late charge in connection with subsequent late payments.   Time is of the essence as to each and every of the Borrower's obligations hereunder.

6.   Application of Payments. All payments shall be applied first to the Lender's costs of collection as provided elsewhere herein, then to interest, and then to principal. All interest due hereunder shall be computed on the daily outstanding principal balance based on a 360-day year.

7.   Default. The occurrence of the following or any of the following shall constitute an "Event of Default" hereunder, and shall entitle Lender, at its option, to exercise any or all of its remedies hereunder:

(a)   the failure of the undersigned to pay principal, interest, or any other amount due under this Note;

(b)   any representation or warranty made by the undersigned or any other endorser hereof, or any guarantor or other party liable hereon (collectively, "Obligor"), under this Note, or any report, certificate, financial statement or other information provided by or on behalf of the undersigned to Lender in connection herewith is false or misleading in any material respect;

(c)   the failure of the undersigned or any other Obligor or any other person to fully perform when due any agreement under this Note;

(d)   the occurrence of a default or event of default under any other loan documents evidencing or securing this Loan;

(e)   the occurrence of a default or event of default under any present or future indebtedness of the undersigned to Lender not evidenced by this Note, or a default or event of default under any guaranty or security document executed by any person in connection therewith. A default under this Note shall constitute a default under any such indebtedness, guaranty or security documents;

(f)   the liquidation, dissolution or suspension of the business of the undersigned or any other Obligor, or the commencement by the undersigned or any other Obligor of a proceeding

2



in bankruptcy or insolvency; or the consent or acquiescence of the undersigned (or such other Obligor) to such proceeding; the application by the undersigned or any other Obligor for the appointment of a receiver for all or a substantial part of its properties or the consent or acquiescence of the undersigned or such other Obligor to such proceeding; the making by the undersigned or any other Obligor of an assignment for the benefit of creditors; or the inability of the undersigned or any other Obligor or the admission by the undersigned or any other Obligor in writing of its inability to pay its debts as they mature;

      (g)    the commencement of an involuntary proceeding in bankruptcy or insolvency against the undersigned or any other Obligor, the involuntary appointment of a receiver for all or a substantial part of the properties of the undersigned or any other Obligor; or there shall be issued an order for the issuance of a warrant of attachment, execution, distraint or similar process against all or a substantial part of the properties of the undersigned or any other Obligor, and the continuance of any of the foregoing for sixty (60) days without having been vacated, discharged, stayed, bonded or dismissed;

      (h)    the entry of a judgment against the undersigned or any other Obligor in an amount in excess of $75,000.00, if twenty (20) days have elapsed and the judgment has not been vacated, satisfied or dismissed, and the enforcement of the judgment has not been stayed pending appeal;

      (i)    the issuance of a writ of attachment or garnishment against, or the imposition of a lien by operation of law on, any property of the undersigned or any other Obligor, if the amount of the claim or value of the affected property is in excess of $75,000.00, if twenty (20) days have elapsed and the proceeding or lien has not been vacated, satisfied, dismissed or stayed pending appeal;

      (j)    the merger, consolidation or reorganization of the undersigned or any other Obligor, the termination or invalidation of the undersigned's or any other Obligor's corporate existence or rights, or the transfer or disposition of all or a substantial part of its property;

      (k)    the sale, conveyance or pledge of the Mortgaged Property or any interest of Mortgagor therein;

      (l)    the determination by Lender that a material adverse change has occurred in the financial condition of the undersigned or any other Obligor from that in existence on the date hereof, which determination shall be made reasonably and in good faith;

    The Lender shall have all of the rights and remedies of a creditor and, to the extent applicable, of a secured party under all applicable law. Without limiting the generality of the foregoing, upon the occurrence of any Event of Default hereunder, the entire amount of principal of this Note, and the entire amount then due under any instrument securing this Note, shall, at the

option of Lender, without notice, bear interest from such date at the maximum rate of interest permitted by law (the "Default Rate") and Lender may, at its option, declare the entire unpaid principal and accrued interest accelerated and due and payable at once, together with any and all other liabilities and other obligations and indebtedness of Obligor to Lender, whereupon all such obligations, with accrued interest thereon, whether contingent or direct, shall forthwith become due and payable, and shall bear interest at the Default Rate, without presentment, demand, protest, or other notice of any kind from Lender, all of which are hereby waived. In addition, Lender may immediately proceed to do all things as provided by law, in this Note, the Mortgage, or any other documents executed in connection herewith to enforce its rights hereunder and to collect all amounts owing to Lender.

Each of the undersigned and any other Obligor hereby grants to Lender, to secure all indebtedness of the undersigned and any other Obligor, or any of them, to Lender, whether under this Note or otherwise, a continuing lien upon and security interest in any and all monies, securities and other property of the respective party and the proceeds thereof, now or hereafter held or received by or in transit to, Lender from or for such party, and also upon any deposits (general or special) and credits of such party, if any at Lender, at any time existing. Upon the occurrence of any default, Lender is hereby authorized at any time and from time to time, without notice to the undersigned or any other Obligor, to setoff, appropriate, and apply any or all items hereinabove referred to against all indebtedness of the undersigned or any other Obligor owed to Lender, whether hereunder, under the other Loan Documents, or otherwise, whether now existing or hereafter arising. Lender shall be deemed to have exercised such right of setoff and to have made a charge against such items immediately upon the occurrence of such default although made or entered on its books subsequent thereto.

8.    **Usury.**    Nothing herein contained, nor in any instrument or transaction related hereto, shall be construed or so operate as to require Borrower, or any person liable for the payment of the indebtedness evidenced by this Note, to pay interest in an amount or at a rate greater than the highest rate of interest which may lawfully be charged by the holder hereof under applicable law. Should any interest or other charges paid by the Borrower, or any party liable under this Note, result in the computation or earning of interest in excess of the highest rate permitted under applicable law, then any and all such excess shall be and the same is hereby waived by the holder hereof, and all such excess shall be automatically credited against and in reduction of the principal balance, and any portion of said excess which exceeds the principal balance shall be paid by the holder hereof to Borrower and to any party liable under this Note, it being the intent that under no circumstances shall the Borrower, or any party liable for the payment of the loan made hereunder, be required to pay interest in excess of the highest rate permitted under applicable law.

9.    **Renewals and Extensions.**    The holder hereof may, without notice and without releasing the liability of any person liable under this Note, grant extensions or renewals hereof from time to time and for any term or terms, add or release one or more such persons to this security in whole or in part. The holder hereof shall not be liable for or prejudiced by failure to collect or for lack of diligence in bringing suit on this Note or any renewal or extension hereof.

4



10.   **Waivers.**   As to this Note, the Mortgage and any other Loan Documents, Borrower, any endorser, any guarantors, and any persons otherwise liable hereunder severally waive all applicable exemption rights, whether under the State Constitution, homestead laws, or otherwise, and also severally waive valuation and appraisement, presentment, protest and demand, notice of protest, demand and dishonor, and nonpayment of this Note, and expressly agree that the Maturity Date of this Note, or any payment hereunder, may be extended from time to time without in any way affecting the liability of Borrower, or any endorser hereof.

11.   **Remedies Cumulative.**   The remedies of Lender as provided herein, or in the Mortgage and any other Loan Documents, shall be cumulative and concurrent, and may be pursued singularly, successively or together, at Lender's sole discretion, and may be exercised as often as occasion therefor shall arise.

12.   **Successors and Assigns.**   This Note shall be binding upon Borrower and its successors and assigns. Lender has the right, at any time, to assign, endorse, transfer and set over to any person, or legal entity, in whole or in part, this Note, the Mortgage and any other Loan Documents and security documents evidencing and/or securing the loan of reference, for such consideration as Lender may deem advisable. Therefore, Borrower, upon Lender's request, made either personally or by mail, shall certify by a writing, duly acknowledged, to Lender, or to any proposed assignee of the Loan Documents, the amount of principal and interest then owing thereunder and whether or not any offsets or defenses exist against said indebtedness, within five (5) days in case the request is made personally, or within ten (10) days after the mailing of such request, in case the request is made by mail.

13.   **Attorney's Fees.**   In the event a default occurs as herein provided, this Note may be placed in the hands of an attorney for collection and, in such event, each Obligor hereby agrees to pay the holder hereof all attorneys' fees and costs incurred by Lender.

14.   **Sales and Use Taxes.**   Obligors agree that any sales and use tax imposed by any governmental authority upon any amounts due under this Note, the Mortgage or any other Loan Documents, shall be the responsibility of Obligors.

15.   **Governing Law and Venue.**   This Note was executed by Borrower and delivered to Lender in the State of Florida. This Note is to be construed and enforced in accordance with the laws of the State of Florida, United States of America, except that the interest to be paid on this Note shall not exceed the highest legal rate applicable in this transaction under Florida or Federal law, whichever is higher. The Borrower hereby waives any pleas of jurisdiction or venue as not being a resident of Miami-Dade County, Florida, and hereby specifically authorizes any action brought upon the enforcement of this Note to be commenced or suit filed in Miami-Dade County, Florida.

16.   **Waiver of Trial By Jury.**   LENDER AND BORROWER HEREBY KNOWINGLY, IRREVOCABLY, VOLUNTARILY AND INTENTIONALLY WAIVE ANY

5



RIGHT ANY OF THEM MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY ACTION, PROCEEDING OR COUNTERCLAIM BASED ON THIS TERM LOAN PROMISSORY NOTE, OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS TERM LOAN PROMISSORY NOTE, OR ANY LOAN DOCUMENTS, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS WHETHER VERBAL OR WRITTEN OR ACTIONS OF ANY PARTY HERETO OR TO ANY LOAN DOCUMENT. THIS PROVISION IS A MATERIAL INDUCEMENT FOR LENDER AND BORROWER ENTERING INTO THE SUBJECT LOAN TRANSACTION.

IN WITNESS WHEREOF, the undersigned has executed and delivered this Note as of the date and year first above written.

Borrower's Address:

1070 Hunting Lodge Drive
Miami Springs, Florida 33166

BORROWER:
PZP   INVESTMENTS,   INC.,   a Florida corporation

By: _____
Name: _____
Title: _____

6

IN THE CIRCUIT COURT OF THE 11TH
JUDICIAL CIRCUIT IN AND FOR MIAMI-
DADE COUNTY, FLORIDA

CASE NO.: 12-23576 CA 05

INTERNATIONAL FINANCE BANK,
a Florida Corporation,

    Plaintiff,

v.

PZP INVESTMENTS, INC., a Florida
Corporation, OSCAR ZAPATA, an
individual, CONSUELO ZAPATA, an
individual, MARIO V. PINO, an individual
and MARIA C. PINO, an individual

    Defendants.
_____/

### FINAL JUDGMENT CONVEYING
### AND TRANSFERRING REAL PROPERTY

This Cause came on before the Court upon Plaintiff, International Finance Bank's

Motion for Enforcement of Settlement Agreement, and for non-compliance with this Court's

Agreed Order of October 31, 2013, and the Court having reviewed the motion, the Settlement

Agreement, the Agreed Order and Plaintiff's Affidavit of Non-Compliance, and being

otherwise fully advised in the premises, the Court orders and adjudges: that

1.    Final Judgment directing the transfer and conveyance of the real property

legally described in Exhibit "A" is hereby ordered, vesting title in the Grantee,

    International Finance Bank, a Florida Banking Corporation.

2.    Pursuant to Rule 1.570(d), Florida Rules of Civil Procedure, this Judgment for

conveyance shall be an absolute conveyance of title to the described property in lieu of

foreclosure by Grantee of that certain mortgage held by it and originally given by the Grantor

in favor of Grantee, which mortgage was executed recorded in Official Records Book 25347,

Page 709; as modified in Book 25347, Page 752; Book 27338, Page 4209, as affected by Partial

1



A TRUE COPY
CERTIFICATION ON LAST PAGE
HARVEY RUVIN, CLERK

Release recorded in Book 27338, Page 4185, Miami-Dade County, Florida, Public Records (collectively, the "Mortgage".) This conveyance shall not negate or waive any obligations except as more particularly set forth in paragraphs 2(II) (a-d) of the parties Settlement Agreement in the matter styled: International Finance Bank v. PZP Investments, Inc. etc. et.al., Case No.: 12-23576 CA 05, Miami-Dade County, Florida.

3.      The Court reserves jurisdiction of this cause to amend, reform or supplement this order as may become necessary.

DONE AND ORDERED in Chambers at the Miami-Dade County courthouse this _18_ day of November, 2013.

CIRCUIT COURT JUDGE

STATE OF FLORIDA, COUNTY OF DADE
HEREBY CERTIFY that the foregoing is a true and correct copy of the original on file in this office. _____ AD 20.__
HARVEY RUVIN, Clerk of Circuit and County Courts
Deputy Clerk _____

Marc Schumacher
Circuit Court Judge

Copies Furnished To:
Jonathan A. Heller, Esq., 36 N.E. First Street, Suite 310, Miami, Florida 33132 (jonathan@jhellerlaw.com)
James Doddo, Esq., 255 Alhambra Circle, Suite 700, Coral Gables, Florida 33134 (jdoddo@doddolaw.com)

2

## EXHIBIT A

## LEGAL DESCRIPTION

PARCEL I

Commence at the Southeast corner of Tract "A"; thence South 48 degrees 42 minutes 16 seconds East along the Northeast right-of-way line of Naranja Lakes Blvd., a distance of 513.24 feet to the POINT OF BEGINNING; thence North 41 degrees 17 minutes 44 seconds East, a distance of 120.00 feet; thence North 81 degrees 17 minutes 44 seconds East, a distance of 140.00 feet; thence North 41 degrees 17 minutes 44 seconds East, a distance of 347.69 feet; thence South 77 degrees 27 minutes 28 seconds East, a distance of 116.95 feet; thence South 12 degrees 32 minutes 32 seconds West, a distance of 690.00 feet to a point on a curve to the right having a radius of 1180.00 feet; thence from a radial bearing of South 28 degrees 04 minutes 35 seconds West, continue along the arc of said curve to the right, having a central angle of 13 degrees 13 minutes 09 seconds, a distance of 272.25 feet to the Point of Tangency; thence North 48 degrees 42 minutes 16 seconds West, a distance of 100.00 feet; thence North 46 degrees 51 minutes 07 seconds West, a distance of 154.68 feet to the POINT OF BEGINNING (the last three described courses being the Northeast right-of-way of Naranja Lakes Boulevard).



AFJUTTEXT    $2,116,618.16

5
AFJu

IN THE CIRCUIT COURT OF THE 11TH
JUDICIAL CIRCUIT IN AND FOR MIAMI-
DADE COUNTY, FLORIDA

CASE NO.: 12-23576 CA 05

INTERNATIONAL FINANCE BANK,
a Florida Corporation,

    Plaintiff,

v.

PZP INVESTMENTS, INC., a Florida
Corporation, OSCAR ZAPATA, an
individual, CONSUELO ZAPATA, an
individual, MARIO V. PINO, an individual
and MARIA C. PINO, an individual

    Defendants.

_____/

FINAL ORDERS AS TO ALL PARTIES
SRS DISPOSITION
NUMBER_____
THE COURT DISMISSES THIS CASE AGAINST
ANY PARTY NOT LISTED IN THIS FINAL ORDER
OR PREVIOUS ORDER(S). THIS CASE IS CLOSED
AS TO ALL PARTIES.
Judge's Initials ___ Circuit Court Judge

Mark Schumacher

6
2
14

## AGREED AMENDED FINAL JUDGMENT OF FORECLOSURE[1]

In accordance with the parties' Settlement Agreement recited to the Court on April 4, 2013 and the written Settlement Agreement and upon further Agreement of respective counsel, the Court hereby enters this Amended Final Judgment of Foreclosure as follows:

**IT IS ORDERED AND ADJUDGED** that:

1. The Agreed Amended Final Judgment of Mortgage Foreclosure is **GRANTED** in favor of Plaintiff, INTERNATIONAL FINANCE BANK, and against the real property described in Paragraph 4 herein. Service of process has been duly and regularly obtained over Defendants, PZP INVESTMENTS, INC., OSCAR ZAPATA, CONSUELO ZAPATA, MARIO V. PINO and MARIA C. PINO and any and all defenses have been duly waived.

---

[1] This Amended Judgment corrects the legal description only.


EXHIBIT

2.   **Amounts Due.**  There is due and owing to Plaintiff the following:

|  | | |
|---|---|---|
| A. | Principal due on note secured by mortgage foreclosed | $1,532,972.25 |
| B. | Accrued Interest through May 18, 2012 | $35,245.81 |
| C. | Default interest from May 18, 2012 | $229,314.54 |
| D. | Late fees | $2,182.83 |
| E. | Deficiency balance owed on Note 2 | $291,233.73 |

**Court Costs:**

|  | | |
|---|---|---|
| F. | Clerk's filing fee and Lis Pendens ($451.00 + 18) | $469.00 |
| G. | Service of process ($40.00 x 5) | $200.00 |
| **Agreed Attorney's Fees** | | $25,000.00 |

**TOTAL**   **$2,116,618.16**

3.   **Interest.**  The grand total amount referenced in Paragraph 2 shall bear interest from the date of the original Judgment, November 18, 2013 at the prevailing legal rate of interest.

4.   **Lien on Property.**  Plaintiff holds a fee simple mortgage and a leasehold mortgage for the grand total sum specified in Paragraph 2 herein. The lien of the Plaintiff is superior in dignity to any right, title, interest or claim of the Defendants and all persons, corporations, or other entities claiming by, through, or under the defendants or any of them and the property will be sold free and clear of all claims of the defendants, with the exception of any assessments that are superior pursuant to Florida Statues, Section 718.116. The Plaintiff's lien encumbers the subject property located in Miami-Dade County, Florida as described:

PARCEL 1

A portion of Tract "D" of "NARANJA LAKES SHOPPING PLAZA", according to the plat thereof as recorded in Plat Book 120, at Page 59, of the Public Records of Miami-Dade County, Florida, Being more particularly described as follows:

Commence at the Westerly corner of said Tract "D", which is a common corner with Tract "A", said common corner being on the Northeasterly Right-of-Way line of Naranja Lakes Boulevard, as shown on the aforementioned plat of "NARANJA LAKES SHOPPING PLAZA"; Thence S. 48° 42'16"E. Along said Northeasterly Right-of-Way line of Naranja Lakes Boulevard for 470.79 feet to a point; Thence run N. 41° 17' 44"E. for a distance of 56.59 feet to the Point of Beginning of the herein described parcel of land; Thence run S. 48°41'15"E. for a distance of 54.77 feet to a point of curvature of a circular curve, concave to the South and having for its elements a radius of 25.00 feet and a central angle of 90° 00'; Thence run Southerly, Easterly and Northerly, along the arc of said circular curve, for an arc distance of 39.27 feet to a point of tangency; Thence run N. 41° 18' 45"E. for a distance of 213.58 feet to a point; Thence run N. 48° 45' 31"W. for a distance of 79.84 feet to a point; Thence run S. 41° 17' 44' W. for a distance of 238.48 feet to the Point of Beginning. Said describes parcel of land containing 18,901.32 square feet, more or less.

PARCEL 2

A Portion of Tract "D" of Naranja Lakes Shopping Plaza according to the Plat as recorded in Plat Book 120, at Page 59 of the Public Records of Miami-Dade County, Florida, being more particularly described as follows:

Commence at the South 1/4 corner of Section 33, Township 56 South, Range 39 East; Thence North 00° 49'13" West, along the East line of the Southeast 1/4 of said Section 33,790.57 feet to the intersection with the centerline of U.S. Highway No. 1 (State Road No. 5); Thence, along said centerline of U.S. Highway No. 1 North 41° 17' 44" East, 1310.85 feet to the intersection with the centerline of Naranja Lakes Boulevard as it appears on the aforementioned plat of Naranja Lakes Shopping Plaza; Thence, South 48° 42' 16" East, along said centerline of Naranja Lakes Shopping Plaza, 58.00 feet; Thence along the Southeasterly right of way line of said U.S. Highway No. 1 and its Southwesterly projection, North 41° 17' 44" East, 250.00 feet. To the point of beginning of the following described parcel; Thence, continuing along said Southeasterly right of way line of U.S. 1, North 41° 17' 44" East, 154.00 Feet; Thence departing from said Southeasterly right of way line of U.S. Highway No. 1, South 48° 42' 16" East, a distance of 140.00 feet; Thence North 41° 17' 44" East, a distance of 106.00 feet; Thence North 48° 42' 16" West, a distance of 40.00 feet; Thence North 41° 17 '44" East, a distance of 180.00 feet; Thence South 48° 42' 16" East, a distance of 247.50 feet; Thence South 41° 17' 44" West, a distance of 30.69 feet; Thence South 48° 42' 16" East, a distance of 298.29 feet; Thence South 41° 17' 44" West, a distance of 609.33 feet; Thence North 48° 42' 16" West, a distance of 470.79 feet; Thence North 41° 17' 44" East, a distance of 200.00 feet; Thence North 48° 42' 16" West, a distance of 175.00 feet to the point of beginning; containing 7.721 acres more or less;

5.    **Sale of the property.** If the grand total amount with interest at the rate described in

Paragraph 3 and all costs accrued subsequent to this judgment are not paid, the Clerk of this Court shall

sell the property at public sale on _____ **JUN 0 9 2014** _____, 2014, to the highest bidder for cash

except as prescribed in Paragraph 6, at:

[ ] Room 908, 140 West Flagler Street, Miami, Florida at 11:00 a.m.

[X] www.miamidade.realforeclose.com, the Clerk's website for on-line auctions at 9:00 a.m.

after having first given notice as required by Section 45.031, Florida Statutes.

6.    **Costs.** Plaintiff shall advance all subsequent costs of this action and shall be reimbursed

for them by the Clerk if Plaintiff is not the purchaser of the property for sale. If Plaintiff is the purchaser,

the Clerk shall credit Plaintiff's bid with the total sum with interest and costs accruing subsequent to this judgment, or such part of it, as is necessary to pay the bid in full. The Clerk shall receive the service charge imposed in Section 45.031, Florida Statutes, for services in making recording and certifying the sale and title that shall be assessed as costs.

7. **Right of Redemption**. On filing the Certificate of Sale, Defendant's right of redemption as prescribed by Florida Statutes, Section 45.0315 shall be terminated.

8. **Distribution of Proceeds**. On filing the Certificate of Title, the Clerk shall distribute the proceeds of the sale, so far as they are sufficient, by paying: first, all of Plaintiff's costs; second, documentary stamps affixed to the Certificate; third, Plaintiff's attorneys' fees; fourth, the total sum due to Plaintiff less the items paid, plus interest at the rate prescribed in Paragraph 2 from this date to the date of the sale. During the sixty (60) days after the Clerk issues the certificate of disbursements, the Clerk shall hold the surplus pending further Order of this Court.

9. **Right of Possession.** Upon filing of the Certificate of Title, Defendants and all persons claiming under or against Defendant since the filing of the Notice of Lis Pendens shall be foreclosed of all estate or claim in the property, except as to claims or rights under chapter 718 or chapter 720, Florida Statutes, if any, and the purchaser at the sale shall be let into possession of the property, subject to the provisions of the "Protecting Tenant At Foreclosure Act of 2009".

10. **Attorney Fees.** Upon agreement of the parties, the Court awards Plaintiff $25,000.00 as a reasonable attorney's fee. The Court finds that there are no reduction or enhancement factors for consideration by the Court pursuant to *Florida Patient's Compensation Fund v. Rowe*, 472 So.2d 1145 (Fla. 1985).

11. NOTICE PURSUANT TO AMENDMENT TO SECTION, 45.031, FLA. ST. (2006)

IF THIS PROPERTY IS SOLD AT PUBLIC AUCTION, THERE MAY BE ADDITIONAL MONEY FROM THE SALE AFTER PAYMENT OF PERSONS WHO ARE ENTITLED TO BE PAID FROM THE SALE PROCEEDS PURSUANT TO THE FINAL JUDGMENT.

IF YOU ARE A SUBBORDINATE LIENHOLDER CLAIMING A RIGHT TO FUNDS REMAINING AFTER THE SALE, YOU MUST FILE A CLAIM WITH THE CLERK NO LATER THAN SIXTY (60) DAYS AFTER THE SALE. IF YOU FAIL TO FILE A CLAIM, YOU WILL NOT BE ENTITLED TO ANY REMAINING FUNDS.

IF YOU ARE THE PROPERTY OWNER, YOU MAY CLAIM THESE FUNDS YOURSELF. YOU ARE NOT REQUIRED TO HAVE A LAWYER OR ANY OTHER REPRESENTATION AND YOU DO NOT HAVE TO ASSIGN YOUR RIGHTS TO ANYONE ELSE IN ORDER FOR YOU TO CLAIM ANY MONEY TO WHICH YOU ARE ENTITLED. PLEASE CHECK WITH THE CLERK OF THE COURT, 140 WEST FLAGLER STREET, ROOM 908, MIAMI, FLORIDA (TELEPHONE: (305) 375-5943), WITHIN (10) DAYS AFTER THE SALE TO SEE IF THERE IS ADDITIONAL MONEY FROM THE FORECLOSURE SALE THAT THE CLERK HAS IN THE REGISTRY OF THE COURT.

IF YOU DECIDE TO SELL YOUR HOME OR HIRE SOMEONE TO HELP YOU CLAIM THE ADDITIONAL MONEY, YOU SHOULD READ VERY CAREFULLY ALL PAPERS YOU ARE REQUIRED TO SIGN, ASK SOMEONE ELSE, PREFERABLY AN ATTORNEY WHO IS NOT RELATED TO THE PERSON OFFERING TO HELP YOU, TO MAKE SURE THAT YOU UNDERSTAND WHAT YOU ARE SIGNING AND THAT YOU ARE NOT TRANSFERRING YOUR PROPERTY OR THE EQUITY IN YOUR PROPERTY WITHOUT THE PROPER INFORMATION.

IF YOU CANNOT AFFORD TO PAY AN ATTORNEY, YOU MAY CONTACT THE LEGAL AID SOCIETY AT THE DADE COUNTY BAR ASSOCIATION, 123 N.W. 1ST AVENUE, SUITE 214, MIAMI, FLORIDA, (TELEPHONE: (305) 579-5733), TO SEE IF YOU QUALIFY FINANCIALLY FOR THEIR SERVICES. IF THEY CANNOT ASSIST YOU, THEY MAY BE ABLE TO REFER YOU TO A LOCAL BAR REFFERAL AGENCY OR SUGGEST OTHER OPTIONS. IF YOU CHOOSE TO CONTACT THE DADE COUNTY BAR ASSOCIATION LEGAL AID SOCIETY, YOU SHOULD DO SO AS SOON AS POSSIBLE AFTER RECEIPT OF THIS NOTICE.

12.     **Jurisdiction.** The Court retains jurisdiction of this action to enter further orders that are

proper, including, without limitations, writs of possession.

**DONE AND ORDERED** in Chambers in Miami-Dade County, Florida, this ___ 17 ___ day of

___ April ___, 2014.

_____
CIRCUIT JUDGE
Judge Marc Schumacher

Copies Furnished to all parties.

COPY HAND DELIVERED
TO PLTF'S ATTY
IN LIEU OF MAILING

CFN: 20140735212 BOOK 29361 PAGE 442
DATE:10/23/2014 08:54:04 AM
HARVEY RUVIN, CLERK OF COURT, MIA-DADE CTY

# AGREEMENT

**LORDHILL PROPERTIES CORP.**, a Delaware corporation having an office at 135 Jericho Turnpike, Old Westbury, NY 11568 (the "**Landlord**") and **PZP INVESTMENTS, INC.** a Florida corporation having an office at 27455 South Dixie Highway, Miami, Florida 33032 (the "**Tenant**") enter into this Agreement (this "**Agreement**") as of the 1st day of October, 2014 (the "**Effective Date**").

## WITNESSETH:

**WHEREAS**, the Landlord and the Tenant's predecessor-in-interest, Lordhill Naranja Lakes Limited Partnership entered into that certain Lease dated as of September 11, 2002 (the "**Original Lease**"), for the lease of the Land (as such term is defined in the Original Lease);

**WHEREAS**, Lordhill Naranja Lakes Limited Partnership assigned the Original Lease to GRS Naranja Lakes, LLC pursuant to that certain Assignment and Assumption Agreement recorded in Book 20874, Page 1983 in Dade County, Florida (and corrected by instrument recorded in Book 20947, Page 3146);

**WHEREAS**, the Original Lease was further assigned by GRS Naranja Lakes, LLC to Tenant pursuant to that certain Assignment and Assumption of Lease dated and of September 20, 2004 and recorded in Book 22720, Page 2662 on October 8, 2004 in Dade County, Florida;

**WHEREAS**, Tenant defaulted on its obligations under the Original Lease as set forth in the notice of default given to Tenant on August 22, 2014;

**WHEREAS**, Tenant failed to timely cure the default in accordance with the Original Lease;

**WHEREAS**, Landlord terminated the Original Lease as of October 3, 2014 by delivery of written notice to Tenant dated September 17, 2014 as extended on September 30, 2014;

**WHEREAS**, Tenant acknowledges that (i) the Original Lease has been terminated, (ii) Tenant's leasehold interest in the Land has been terminated, and (iii) any and all interest of Tenant in any buildings or other improvements erected on the Land including the Building (as defined in the Original Lease and as modified in Section 5 of this Agreement) have been terminated and title to the Building has vested in Landlord; and

**WHEREAS**, notwithstanding that the Original Lease has been terminated, Landlord, at Tenant's request, shall lease to Tenant the Premises (as defined in the Original Lease) to Tenant on the terms and conditions set forth in Exhibit A annexed hereto and made a part hereof, and in this Agreement (collectively, the "**Lease Agreement**").

602922                                    1



CFN: 20140735212 BOOK 29361 PAGE 443

**NOW THEREFORE**, in consideration of the mutual undertakings of the parties hereto and other good and valuable consideration, it is agreed as follows:

1.      Definitions.   All initially-capitalized words and phrases, not defined in this Agreement, shall have the same meaning as set forth in the Lease Agreement.

2.      Term. (a) Landlord, in consideration of the Fixed Net Rent hereinafter reserved and of the terms, covenants, conditions and agreements herein contained on the part of Tenant to be paid, observed and fulfilled, does hereby demise and lease the Premises to Tenant and Tenant hereby hires the same from Landlord. The term ("**Term**") of the Lease Agreement shall commence on the Effective Date and shall expire on December 31, 2014 (the "**Expiration Date**"), unless the Lease Agreement shall sooner terminate pursuant to any of the terms, covenants, conditions or agreements of the Lease Agreement or pursuant to law.

(b)      If Tenant remains in possession of all or any part of the Premises after the Expiration Date or termination of the Lease Agreement, Tenant shall be deemed a Tenant on a month-to-month basis on the same terms and conditions as in effect during the Term. Either Landlord or Tenant may at any time terminate such month-to-month tenancy upon not less than thirty (30) days' prior written notice to the other, and upon the giving of such notice the Lease Agreement shall terminate and expire as fully and completely as though such date was the date originally fixed for the expiration of the Term.

3.      Fixed Net Rent. Tenant shall pay to Landlord, or to such other person as Landlord may from time to time designate, at the address specified in the Lease Agreement, Fixed Net Rent, in advance in equal monthly installments of $5,102.40. The first installment of such Fixed Net Rent for the Month of October 2014 is due upon the execution of this Agreement. Thereafter, the monthly installment for the month of November 2014 shall be due on November 1, 2014 and the monthly installment for the month of December 2014 shall be due on December 1, 2014. All such payments shall be without any set off or deduction whatsoever.

4.      Modification of the Lease Agreement. Notwithstanding anything to the contrary:

(a)      Any bills, statements, notices, demands, requests, consents or other communications given or required to be given under this Lease Agreement shall be effective only if rendered or given in writing and

(i) if to Tenant, then, sent by certified mail return receipt requested or by overnight courier addressed to Tenant's at the Premises, or (ii) delivered personally to Tenant. Landlord shall provide a courtesy copy of all notices to: Dolores K. Sanchez, 4701 N. Federal Highway, Suite 316, Box B-1, Lighthouse Point, FL 33064, or to such other address as Tenant may designate as its new address for such purpose by notice given to Landlord in accordance with the provisions of this Section.

602922

2

CFN: 20140735212 BOOK 29361 PAGE 444

(ii) If to Landlord, then sent by certified mail return receipt rqueted or by overnight courier addressed to Landlord at Landlord's address as set forth in this Agreement, with a courtesy copy thereof to: Ruskin Moscou Faltischek, P.C., 1425 RXR Plaza, East Tower, 15th Floor, Uniondale, New York 11556-1425, Attention: Benjamin Weinstock, Esq., or to such other address as Landlord may designate as its new address for such purpose by notice given to Tenant in accordance with the provisions of this Section.

(b)    If prior to the Expiration Date, the Premises or any part thereof shall be damaged by fire or other casualty, or if the Premises, or such part thereof as will render the remainder untenantable, shall be acquired or condemned for any public or quasi-public use or purpose, then Landlord may, at its option, terminate the Lease Agreement and the Term and estate hereby granted by giving Tenant not less than five (5) days written notice, and upon the giving of such notice the Lease Agreement shall terminate and expire as fully and completely as though such date was the date originally fixed for the expiration of the Term.

(c)    In the event of any acquisition or condemnation of all or part of the Premises for any public or quasi-public use or purpose, Landlord shall be entitled to receive the entire award for such acquisition or condemnation, Tenant shall have no claim against Landlord or the condemning authority for the value of any unexpired portion of the Term and Tenant hereby expressly assigns to Landlord all of its right, title and interest in and to any such award, and also agrees to execute any and all further documents that may be required in order to facilitate the collection thereof by Landlord.

5.    Building Encroachment.  Landlord and Tenant acknowledge that a portion of the building encroaches upon a parcel of land owned by Tenant (the **"Encroachment"**).  Neither Landlord nor Tenant shall be obligated to remove the Encroachment during the term of the Lease Agreement.  Following the termination of this Lease Agreement, either party may take such steps as such party desires to remove the Encroachment.

6.    New Lease.    (a)  Provided that Tenant fulfills the following conditions precedent no later than ninety (90) days following the Effective Date, Landlord and Tenant shall enter into a New Lease (hereinafter defined).

(i)    Tenant shall cause all liens and judgments, if any, now affecting the Original Lease and the Building to be satisfied and discharged of record.

(ii)    Tenant shall cause the Building to be released from all mortgage liens presently encumbering the Building, including, without limitation the mortgages made to International Finance Bank in 2004.

(iii)    Tenant shall pay Landlord all sums due under the Original Lease and this Lease Agreement and Tenant shall pay all sums heretofore due and payable under the terminated Original Lease, including without limitation all unpaid real estate taxes.



CFN: 20140735212 BOOK 29361 PAGE 445

(b)     The term "New Lease" shall mean a lease substantially in the same form as the Original Lease, with the following changes:

(i)     Articles XIX, XXXV, XXXVI and XXXVII of the Original Lease shall be deleted.

(ii)     All references to the "Original Occupancy Lease" and the "Original Occupancy Tenant" shall be deleted.

(iii)     The initial term of the New Lease shall commence on the date of full execution and delivery of the New Lease and shall end on October 1, 2018. References in Section 31.01 to "thirteen (13) successive five (5) year renewal periods" shall be amended to read: "twelve (12) successive five (5) year renewal periods." If all such renewal periods are duly exercised by Tenant, the last day of the term of the New Lease shall be October 1, 2068, unless sooner terminated in accordance with the New Lease.

(iv)     Section 2.01 of the Original Lease shall be replaced with the following:

2.01     The Tenant shall throughout the term of this New Lease pay a fixed net rent ("Fixed Net Rent") for the Premises Rent shall be as set forth in the chart below, which shall be due and payable without notice or demand in equal monthly installments as se fort in the chart below, in advance on the first day of each month.

| Period Covered | Annual Fixed Net Rent | Monthly Installments |
|---|---|---|
| January 1, 2015 – December 31 2015 | $61,224.00 | $5,102.00 |
| January 1, 2016 – December 31 2016 | $73,440.00 | $6,120.00 |
| January 1, 2018 – December 31 2018 | $85,668.00 | $7,139.00 |
| January 1, 2019 – December 31 2019 | $97,896.00 | $8,158.00 |
| January 1, 2020 – December 31 2020 | $110,124.00 | $9,177.00 |
| January 1, 2021 – December 31 2021 | $122,334.00 | $10,194.50 |
| January 1, 2022 – End of Term | $122,334.00 | $10,194.50 |

(c)     All dates and time periods in the New Lease shall be TIME IS OF THE ESSENCE."

7.     Other Terms and Provisions. (a) Tenant hereby waives any and all rights it may have under the Lease Agreement or any applicable statute to extend the term of the Lease Agreement or remain in possession of the Premises. Tenant understands and agrees that

602922                                    4

CFN: 20140735212 BOOK 29361 PAGE 446

Landlord would not have entered into the Lease Agreement without the express acknowledgment by Tenant of the aforesaid.

(b)     Landlord and Tenant covenant, warrant and represent that no broker has been involved in the negotiation or consummation of this Agreement. Tenant and Landlord each agree to indemnify and hold the other harmless from and against all causes of action and liabilities arising out of a claim for a commission by any broker purporting to have acted on behalf of the indemnifying party.

(c)     The Lease Agreement and any exhibits attached hereto constitute the entire agreement between the parties hereto pertaining to the subject matter hereof and shall not be changed or added to except in writing signed by all parties hereto. All prior and contemporaneous agreements, representations and understandings of the parties, oral or written, pertaining to the subject matter hereof, are hereby superseded and merged herein.

(d)     Any individual executing this Agreement on behalf of or as representative for a corporation or other person, firm, company, partnership or entity represents and warrants that he or she is duly authorized to execute and deliver this Agreement and the Lease Agreement on behalf of said corporation, person, firm, company, partnership or other entity and that the Lease Agreement is binding upon said entity in accordance with its terms.

(e)     If any term, covenant, condition or provision of the Lease Agreement is held by a court of competent jurisdiction to be invalid, void or unenforceable, the remainder of the provisions hereof shall remain in full force and effect and shall in no way be affected, impaired or invalidated.

(f)     Each of the provisions of the Lease Agreement shall bind, extend to, and inure to the benefit of the respective heirs, legal representatives, and successors and assigns of both Landlord and Tenant.

(g)     Landlord and Tenant acknowledge and agree that the Lease Agreement has been reviewed and negotiated by both parties and their respective counsel, and that, in any dispute over the meaning, interpretation, validity or enforceability of the Lease Agreement or any of its terms or conditions, there shall be no presumption whatsoever against either party by virtue of that party having drafted the Lease Agreement or any portion thereof. If any words or phrases in the Lease Agreement (or in any prior draft thereof) shall have been stricken out or otherwise eliminated, whether or not any other words or phrases have been added, the Lease Agreement shall be construed as if the words or phrases so stricken out or otherwise eliminated were never included therein and no implication or inference shall be drawn from the fact that such words or phrases were so stricken out or otherwise eliminated.

(h)     If Landlord commences any proceedings for non-payment of Fixed Net Rent or Additional Rent, Tenant will not interpose any counterclaim of whatever nature or description in any such proceedings except if any such counterclaim is mandatory or compulsory.

CFN: 20140735212 BOOK 29361 PAGE 447

(i)     Landlord and Tenant hereby waive trial by jury in any action, proceeding or counterclaim brought by either against the other on any matter whatsoever arising out of or in any way connected with the Lease Agreement, the relationship of Landlord and Tenant, Tenant's use or occupancy of the Premises, including, without limitation, any claim of injury or damage, and any emergency and other statutory remedy with respect thereto.

(j)     Time is of the Essence with respect to the performance of the obligations of the Tenant and Landlord under the Lease Agreement and this Agreement.

(k)     Nothing contained in the Lease Agreement shall be deemed a release of waiver of any sum from Tenant under the Original Lease, including Tenant's failure to pay Rent, Real Estate Taxes, Gross Receipts Taxes or any State Taxes.

(l)     The Lease Agreement may be executed in one or more counterparts, each of which shall be deemed an original and all of which, when taken together, shall constitute one and the same instrument. The Lease Agreement may be signed by facsimile, electronic signature by email or by .pdf, and all of such signatures shall be deemed to be original signatures.

(m)     This Agreement is not an offer and shall not be binding upon or enforceable against either party unless and until it has been duly executed and delivered by all parties.

[Signatures on the Following Page]

602922

6



CFN: 20140735212 BOOK 29361 PAGE 448

[Signature Page to Lease Agreement]

IN WITNESS WHEREOF, the parties hereto have executed the Lease Agreement as of the day and year first above written.

LESSOR:

LORDHILL PROPERTIES CORP.

By: _____
Name: Charles Kadish
Title: Vice President

LESSEE:

PZP INVESTMENTS, INC.

By: _____
Name: CONSUELO  ZAPATA
Title: SECRETARY

CFN: 20140735212 BOOK 29361 PAGE 449

State of Florida
County of __Miami Dade__

The foregoing instrument was acknowledged before me this _3 RD_ day of October, 2014, by
_Consuelo Zapata_ , the _Secretary_ of PZP Investments, Inc.
a Florida corporation, on behalf of the corporation. He/she is personally known to me or has
produced a _____ as identification.

_Maria del C Pino_
FL Notary Public – Signature

> MARIA DEL C. PINO
> MY COMMISSION #FF020748
> EXPIRES: MAY 22, 2017
> Bonded through 1st State Insurance

_Maria del C. Pino_
FL Notary Public – Printed Name


State of New York    )
                     )  ss.:
County of Nassau     )

On the _1_ day of October in the year 2014, before me personally came Charles Kadish to
me known, who, being by me duly sworn, did depose and say that he resides in Nassau County;
that he is the Vice President of Lordhill Properties Corp, the corporation described in and which
executed the above instrument; and that he signed his name thereto on behalf of the corporation.

_Joanna Chiros_
notary

> JOANNA CHIROS
> NOTARY PUBLIC, STATE OF NEW YORK
> Registration No. 01CH6024343
> Qualified in Nassau County
> Commission Expires October 15, 2015

602922                                  8