UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA

In Re:

PZP INVESTMENTS INC

CASE NO.  14-35132-AJC
Chapter 11

Debtor.
_____/

## DEBTOR'S RESPONSE TO MOTION FOR RELIEF FROM STAY
## FILED BY INTERNATIONAL FINANCE BANK

The Debtor, PZP INVESTMENTS INC, by and through its undersigned counsel

Files its Response to the Motion for Relief (DE 26) from Stay filed by Creditor,

International Finance Bank and states as follows:

1. Debtor maintains the position that the creditor,  International Finance Bank (IFB),

is now an unsecured creditor.

2. The Debtor does indeed list interests in two parcels of real property on Schedule A.

However, Debtor contends that IFB does not have a security interest or lien on either of the

interests claimed by the Debtor.

3. One parcel listed is the fee simple ownership interest in the property identified as folio

no. 30-6933-018-0051 with an estimated value of $500,000.00.  The other is a commercial

building which occupies a parcel of land (folio no. 306933-018-0040) owned by a third party.

4. The commercial building was listed in Schedule A under real property as the Debtor

owns or owned  a the brick and mortar but occupies the land (folio no. 30-6933-018-0040) by

virtue of a leasehold interest (hereinafter the 2014 lease) and not the leasehold (hereinafter the

Original Lease) in which IFB alleges to have a lien. The building also occupies a portion of the

fee simple property, folio no. 30-6933-018-0051.

1

5. As a notation, there was a third parcel in which Debtor had an interest, which is vacant land identified by folio no. 30-6933-018-0050.

6. The vacant land under folio no. 30-6933-018-0050 was transferred to IFB as part of the settlement referenced in its Motion.

7. The promissory notes identified in Plaintiff's motion were secured by liens on two real property interests of the Debtor, i.e. on the fee simple interest in the vacant land folio no. 30-6933-018-0050 and on the Original Lease pertaining to folio no. 30-6933-018-0040.

8. The fee simple land, folio no. 30-6933-018-0051, upon which a portion of the commercial building lies was not and is not now subject to the lien or security interest of the notes.

9. The legal descriptions of all of the parcels are metes and bounds descriptions which are extremely similar to each other. Thus when the amended judgments were entered, the undersigned had extensive discussions with counsel for IFB to make sure that folio no. 30-6933-018-0051 did not inadvertently get included in the judgments. When the amended judgments were entered, it was with the understanding that said folio was not part of the collateral. See Exhibit "A" attached and incorporated herein.

10. As such, IFB does not have a lien on said fee simple parcel and is not entitled to relief from stay to pursue any foreclosure against that parcel.

11. As to the alleged lien on the leasehold by which the building and Debtor occupy the third party owned land (folio no. 30-6933-018-0040), the leasehold interest which was the collateral for the promissory notes no longer exists. The Original Lease has been terminated by the landlord (third party property owner) due a default by Debtor, and thus there is no such leasehold interest.

2

12. The "collateral" in this regard was a right to occupy under the Original Lease, however, that right to occupy under the Original Lease no longer exists.

13. Certainly there is no dispute that the Original Lease was terminated as IFB's Motion for Relief states as much. Pursuant to that Original Lease, IFB could have had a right upon default and impending termination, to cure the defaults and in essence step into the Debtor's shoes. See Exhibit "B" attached and incorporated herein.

14. IFB contends that it still has some right to step in and cure the Debtor's defaults in order to preserve IFB's interest in the collateral, i.e. the leasehold interest. As its basis for that position, IFB asserts that it was not able to step in and cure the Debtor's defaults as it did not receive notice of the Debtor's defaults.

15. The assertion of lack of notice is not accurate in that the Debtor, through its officer, Consuelo Zapata, personally advised Elizabeth Rodriguez and Luis Gonzalez of IFB of the notice of default from the landlord. The default was for non-payment of the taxes, and the Debtor specifically requested that IFB pay the taxes on behalf of Debtor.

16. Further, the undersigned also notified IFB counsel that a letter of default had been received by the Debtor. See Exhibit "C" attached and incorporated herein.

17. As an side, the advancement of monies for back taxes was part of ongoing settlement/forbearance discussions between Debtor and IFB (and their attorneys) long before the notice of default was issued by the landlord. IFB knew (or should of known as it has a copy of the Original Lease) that non-payment of taxes was a default, thus IFB was on constructive notice that a default existed well before any official notice.

18. IFB knew of the non-payments of taxes for a long period of time and certainly knew the landlord was treating such as default as of September 18, 2014. To date, IFB has not cured

3

the default by paying the taxes. IFB had ample opportunity to exercise any option to preserve the Original Lease and thus its collateral lien against any leasehold interest, but failed to do so.

19. IFB has indicated that the two outstanding notes were both collateralized by the "leasehold interest" (Original Lease). The fact that there was more than one debt owed to IFB collateralized by the "leasehold interest" is an event in and of itself that voids any right that IFB may have had to cure defaults or otherwise step into the lessee's shoes regardless of any defaults and/or lack of notice thereof. See exhibit "B" attached and incorporated herein. As such, IFB's rights to take over occupancy/possession by virtue of the Original Lease were extinguished long before any defaults and/or notices thereof. Therefore, the notes are wholly unsecured at this time and IFB has no right to pursue any foreclosure on any rights to occupancy/possession.

20. Similarly, IFB has no right to conclude a foreclosure on the building that occupies the third party owned land as by virtue of the terminated leasehold (Original Lease), title to the building reverted to the landlord. Any rights that IFB may have had in the building were extinguished with the termination as IFB's security interest in the commercial building, if any, was subject and subordinate to the terms of the Original Lease.

21. The right to occupy/possess the building and the land thereunder is essential to effective reorganization of the Debtor. To that end, the Debtor made arrangements with the third party land owner to occupy/possess the building and land on a month-to-month basis (2014 Lease) in order to be able to work out its issues with its creditors, mainly IFB and Miami-Dade County Tax Collector. Upon a successful resolution whether through a bankruptcy plan or some other work-out, the 2014 Lease will automatically revert the building ownership to Debtor and convert the land possession/occupancy rights to a long-term leasehold interest.

22.  A value was not placed on the Original Lease in the schedules as said lease had been terminated. However, if IFB were to successfully argue that they still have some rights under that document, than a value must be ascertained for those occupancy rights as that value then directly relates to the assertion that there is no equity.

23. The only value given on the schedules was an estimated amount in a notation for the building only assuming the existence of any long-term leasehold rights (based on the terms of the 2014 Lease). Therefore, as the leasehold rights themselves are alleged to be part of the collateral, a value must be obtained and provided by IFB.

24.  IFB claims that there is no question that equity is lacking but fails to consider that the main "asset" in question,  the leasehold interest, (assuming IFB has any rights left in any leasehold) has not been assigned a value. So it is not conceivable how one can claim no equity without value being established.

25. In order to obtain relief from stay particularly where the creditor alleges there is no equity such in this instance, the movant must include a current/recent valuation report with its motion. IFB has not done so, and as such the creditor should not be permitted to move forward without providing such documentation.

26. As to adequate protection, prior to the bankruptcy the parties had extensive negotiations regarding forbearance agreements that involved monthly payments of at least $9,000.00 per month with a balloon payment in 3-5 years. In fact, the Debtor had agreed to such payments on more than one occasion only to have IFB withdraw from the negotiations at the last minute.

27. The Debtor would have no objection to a reasonable adequate protection monthly payment to be credited against the debt during the pendency of the bankruptcy. The building is

5

insured, and even though the Debtor now deems IFB to be unsecured, IFB remains as a loss

payee. The building is being properly maintained and Debtor's officers are regularly onsite.

There is no danger of a deterioration of any asset as the building is part of Debtor's ongoing

business.

28. As stated previously, the right to occupy/possess the building and land is absolutely

essential to an effective reorganization. Thus Debtor worked out an arrangement with the

landlord prior to filing bankruptcy which allows the Debtor to continue to occupy/possess the

building and land (folio no. 30-6933-018-0040) during the pendency of the bankruptcy as long as

rent remains current.

29. IFB claims that the fee simple parcel is vacant and therefore not necessary for an

effective reorganization. As mentioned above, this fee simple parcel (folio no. 30-6933-018-

0051) is not collateral for any debt owed IFB.  But even if it was, the land is not vacant. A

portion of the building as well the driveway/internal road is located on this lot. See Exhibit "B"

attached and incorporated herein. Thus the fee simple lot is necessary for an effective

reorganization.

30. IFB claims that there is no prospect of Debtor coming up with a viable plan.

However, as stated above, the parties were on the cusp of a forbearance agreement on more than

one occasion when IFB inexplicably withdrew from any such scenario.

31. Additionally, the Debtor has been negotiating with an investor that is interested in

buying the fee simple property from Debtor (folio no. 30-6933-018-0051), the land owned by the

third party  (folio no. 30-6933-018-0040) and the vacant land Debtor transferred to IFB (folio no.

30-6933-018-0050) as well as providing some working capital to satisfy IFB as a  package deal.

That investor would then lease all of the land to the Debtor. The undersigned has explored the

purchase option in general with the third party as to its land and it is willing to sell. The undersigned reached out to IFB counsel about this scenario on December 10, 2014. See Exhibit "D" attached and incorporated herein. There had been no response from IFB until this week, thus Debtor has been unable to move further in its negotiations until now.

32. Further, Debtor is in negotiations with an entity that would be a large anchor tenant at Debtor's flea market, and such tenant would greatly increase the monthly cash flow.

33. Specifically as to the *Picadilly* factors as referenced in IFB's Motion, these factors are inapplicable to this case. This is a very different case with a unique set of circumstances, assets and creditor categories.

34. IFB claims there are few unsecured creditors whose claims are small compared to the secured creditor. That statement depends greatly on whether IFB is indeed secured. While IFB may be the largest creditor, for the reasons outlined in this response, the Debtor's position is that the debt is unsecured.

35. There are only three employees, but that factor in and of itself does not warrant relief from stay. The three employees are in addition to the officer(s) of the company who is/are hands on in the day to day operations.

36. There is indeed a foreclosure pending, but that debt is disputed as to its status of being secured or unsecured and as to whether there is any currently existing collateral. Further, the debt is disputed as it seems by virtue of this Motion, IFB is claiming a security interest in a property that was not supposed to be part of the foreclosure as stated above. The other part of the foreclosure is not on real property, but on a leasehold interest, and IFB's rights thereunder are also disputed.

37. While the Debtor's problems may have arisen in great part due to its dispute with IFB,  there is still a dispute as to whether IFB is now a secured creditor.

38. The bankruptcy was not only filed to deal with the IFB loan(s) but to address the tax arrearages. Further, the filing was not intended to frustrate  a secured creditor as IFB is no longer in that position.

39. IFB is in essence trying to prevent Debtor from having an opportunity to come up with a viable plan.

40.  Further, the issue of the status of the IFB as either a secured or unsecured creditor should be established before any such relief from stay is addressed.

41. There appears to be a page(s) missing from the exhibits to IFB's Motion for Relief from Stay. Debtor reserves the right to amend this response upon receipt of such pages, if necessary.

WHEREFORE,  the Debtor  respectfully requests that the Court enter an Order denying the Motion for Relief from Stay (DE26).

I HEREBY CERTIFY that I am admitted to the Bar of the United States Bankruptcy Court for Southern District of Florida and I am in compliance with the additional qualification to practice in this Court set forth in Local Rule 2090-1(A).

I HEREBY CERTIFY that a true and correct copy of the foregoing was furnished to all parties on the annexed list by first class United States mail or electronic service as noted on January 28, 2015 or the date of entry on the docket (electronic service only).

/s/ Dolores K. Sanchez
_____
DOLORES K. SANCHEZ, ESQUIRE
Attorney for Debtor
4701 N. Federal Highway
Suite 316, Box B-1
Lighthouse Point, Fl 33064
Telephone (954) 785-8585
 Fax        (954) 785-6163
e-mail: dolores@bizhall.net
Florida Bar No. 0795976

8

## SERVICE LIST

**Electronic service:**

Office of the US Trustee       USTPRegion21.MM.ECF@usdoj.gov

Dolores K Sanchez            dolores@bizhall.net

Jonathan Heller, Esq.        jonathan@hellerlaw.com

**Service by US Mail:**

Benjamin Weinstock, Esq.
1425 RXR Plaza
East Tower, 15th Floor
Uniondale, NY 11556

International Finance Bank
c/o Jonathan A. Heller, Esq.
36 NE First Street, Suite 310
Miami, FL 33132

Lordhill Properties Corp
135 Jericho Turnpike
Old Westbury, NY 11568

PZP Investments, Inc
27455 South Dixie Highway
Miami, FL 33032

**EXHIBIT A**



**Gmail** by Google

Dolores Sanchez <doloresksanchez@gmail.com>

## RE: IFB v PZP
1 message

**Jonathan A. Heller** <jonathan@jhellerlaw.com>    Thu, Apr 17, 2014 at 8:39 AM
To: Dolores Sanchez <dolores@bizhall.net>
Cc: Susy Noal <snoal@jhellerlaw.com>

Dolores, I acknowledge receipt of your last evening's e-mail. I confirm that the purpose of the entry of the agreed corrective orders are solely to make sure that the legal descriptions are correct and the intention is to ensure that the judgments reflect foreclosure/conveyance of only the collateral upon which my client's lien pertains as reflected in the original loan and mortgage agreements. My client also has in its possession the same Mortgagee title policy which mirrors the fee owners policy purchased by PZP at the time of acquisition. Thank you for your cooperation in this regard.

**From:** Dolores Sanchez [mailto:dolores@bizhall.net]
**Sent:** Wednesday, April 16, 2014 5:55 PM
**To:** Jonathan A. Heller
**Cc:** 'Consuelo Zapata'
**Subject:** IFB v PZP

Jonathan

As I said on the phone, sorry for the delay in getting back to you, but I needed my clients to look this over and they were out of town for a surgical procedure until Monday night. Thanks for taking the time to go over the legals in depth as well as review the property appraiser's maps with me.

To confirm our conversation, I am OK with the proposed amended/corrective judgments to fix the legal descriptions sent to me on April 7, 2014 as we are on the same page as to the intent of these documents and you have assured me that the title company has thoroughly investigated the legals to reflect our intent. To confirm our agreement, the new foreclosure judgment legals should be the property as shown on the map at the property appraiser's site for folio 30-6933-018-0040 (the leasehold part of the building and parking lot). The corrective conveyance judgment legal should be for the vacant land <u>only</u> (folio 30-6933-018-0050). The property appraiser's website incorrectly shows a corner of the building and part of the driveway/internal road as part of this legal but we agree that new legal should exclude it from the vacant land legal. The judgments DO NOT include any part of the fee simple lot (portion of the building and driveway) known as folio 30-6933-018-0051 (i.e. the lot as shown on the map plus the part removed from the vacant land legal as specified above such that this cutout should now be a rectangle) since that parcel was not a part of the mortgage transaction(s).

We also agreed that the sale date would be reset for a date no sooner than 45 days from the new judgment

date.

Please confirm your receipt of this e-mail. If the above outline is not your understanding of our conversation, please let me know. Otherwise, if you are in agreement, please submit the new judgments to the court tomorrow.

On another note, I have conveyed your sentiments to my clients for a speedy recovery from surgery. And as they are now in a position to focus on this matter, expect an offer next week so we may start really getting some substantive negotiations underway.

As always, thanks for your courtesy and professionalism.

Dolores
•••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••
Dolores K. Sanchez, Esq.

4701 N. Federal Highway

Suite 316, Box B-1

Lighthouse Point, FL 33064

Telephone: (954) 785-8585

Fax:     (954) 785-6163

e-mail:   dolores@bizhall.net

**EXHIBIT B**

~~OR.~~ ~~RLt.~~ 11922 ~~PG~~ 2766                    ~~Naranja: Pl~~
                                                      ~~9/21/83~~

~~LEASE~~

~~Lease made as of the 11th day of September, 2002~~ by and between LORDHILL

PROPERTIES CORP., a Delaware corporation having an office c/o Lawrence Kadish, 135

Jericho Turnpike, Old Westbury, New York, 11568 ("Landlord") and ~~LORDHILL NARANJA~~

P2P INVESTMENTS, INC.

~~LAKES LIMITED PARTNERSHIP~~, a Florida ~~limited partnership~~ having an address ~~c/o~~ At

CORPORATION

27455 South Dixie Highway, Homestead, FL 33032

~~Martin S. Major, 211 East 38th Street, New York, New York 10016~~ ("Tenant").

W I T N E S S E T H :

        Landlord hereby leases to Tenant and Tenant hereby
hires from Landlord the land in the County of Dade, State of
Florida, more particularty described in Exhibit A hereto annexed
(the "Land"), subject only to the matters set forth in Exhibit B
hereto annexed ("Permitted Exceptions");

        ~~TO HAVE AND TO HOLD said land unto Tenant, its~~
~~successors and assigns, for a term (hereinafter sometimes~~
~~referred to as the "Primary Term") commencing on the 2nd day~~
~~of October, 2008 and ending at midnight on the 1st day of~~
~~October, 2013, unless sooner terminated as hereinafter pro-~~
~~vided.~~

        It is mutually covenanted and agreed between Land-
lord and Tenant as follows:

ARTICLE I

Definitions

        1.01. As used herein, the following terms and
phrases shall have the meanings indicated:

н̈ 11922 ₨2767

(a)   Arbitration - as provided in Article XII.

(b)   Building - all buildings, structures
and improvements (and all fixtures, equipment and personalty
located therein and utilized in connection with the operation
thereof) now or at any time hereafter erected or located in,
at, on or under the Land, including without limitation, the
retail store complex containing approximately 68,337 square
feet, the parking facilities and the other improvements, roads,
walkways, terraces, truck loading and dockage facilities, and,
to the extent of Tenant's interest therein, fencing and
utility lines, erected or located at, on, or under the Land.

(c)   Event of Default - as defined in Article
XVIII.

(d)   Extended Term — as defined in Article XXXI.

(e)   Fair Market Value - as defined in Section
8.03.

(f)   Fixed Net Rent — as defined in Section
2.01.

(g)   Impositions — as defined in Section 4.01.

(h)   Institutional Lender ~ any bank, trust
company, insurance company or savings and loan association
whose investments are regulated by the laws of any State or
of the United States; any real estate investment trust;
any governmental agency or fund; any educational, religious
or charitable institution; any union or employees' welfare
or pension fund; any teacher's or public employees' retirement
fund; or any other financial or lending institution.

(i)   Premises - the Land, together with the
Building now or hereafter located thereon or thereunder; ~i̶t̶
̶b̶e̶i̶n̶g̶ ̶u̶n̶d̶e̶r̶s̶t̶o̶o̶d̶ ̶a̶n̶d̶ ̶a̶g̶r̶e̶e̶d̶ ̶t̶h̶a̶t̶ ̶t̶i̶t̶l̶e̶ ̶t̶o̶ ̶t̶h̶e̶ ̶B̶u̶i̶l̶d̶i̶n̶g̶ ̶s̶h̶a̶l̶l̶

-2-

㎝ 11922 ㎏2768

remain in Tenant, subject to the provisions of Article X
hereof.

(j) Leasehold Mortgage - any mortgage or
mortgages at any time or from time to time placed by Tenant
against its interest in the Premises, and any and all modifica-
tions, extensions, renewals, consolidations replacements and
refinancings thereof.

(k) Leasehold Mortgagee - the holder of
a Leasehold Mortgage.

(l) Occupancy Lease - any lease of a part of
the Premises to a tenant occupying such part for the conduct
of its business and not for the purpose of subleasing,
including, without limitation, all amendments, modifications,
extensions and renewals thereof. Occupancy Lease shall mean,
until the expiration or termination thereof, only the lease
from LORDBILL LIMITED PARTNERSHIP to K MART CORPORATION
("Original Occupancy Tenant") dated as of September 15, 1983
(the "Original Occupancy Lease").

(m) Occupancy Tenant - any tenant occupying
any part of the Premises under an Occupancy Lease, and, until
the expiration or termination of the Original Occupancy Lease,
Occupancy Tenant shall mean only the Original Occupancy Tenant
(or a Person validly claiming by, through or under the Original
Occupancy Tenant.

(o) Person - any individual, corporation,
partnership, joint venture, trust, unincorporated association
and any other entity, including, without limitation, any govern-
mental entity.

(p) Rental - as defined in Section 2.03.

-3-

OFF 11922 PG2769

(p)  Requirements — as defined in Section 5.01.

1.02  The words "herein," "hereof" and "hereunder" and words of similar import refer to this lease as a whole and not to any particular Section or subdivision.

1.03  The words "the term of this lease," "the term hereof" or words of similar import, shall be deemed to include the original term of this lease and any Extended Terms.

## ARTICLE II

### Rent

2.01  Tenant shall throughout the term of this lease pay a fixed net rent ("Fixed Net Rent") for the Land, without offset or demand, in equal quarter-annual installments of $15,307.20, in arrears on the 1st day of the applicable month, the first such installment being due on the 1st day of January, 1989.

2.02  Subject to the provisions of the next succeeding sentence, Tenant shall pay the Fixed Net Rent in lawful money of the United States,which shall be legal tender for the payment of all debts, at Landlord's office as set forth above or at such other place as Landlord may designate by notice.  The Fixed Net Rent shall be absolutely net to Landlord and all costs, expenses and obligations of every kind and nature relating to the Land and the Building shall be paid by Tenant.  The Fixed Net Rent and all other sums and charges required to be paid by Tenant under the terms of this lease are sometimes collectively referred to herein as "Rental."

2.03  All amounts which Tenant is required to pay pursuant to this lease (other than Fixed Net Rent and amounts

-4-

OFF. 11922 PG 2770

payable upon purchase of the Premises), together with every
fine, penalty, interest and cost, if any, which may be added
for non-payment or late payment thereof, shall constitute
additional rent (hereinafter sometimes referred to as "Addi-
tional Rent"). If Tenant shall fail to pay any Additional
Rent, Landlord shall have all rights, powers and remedies with
respect thereto as are provided herein or by law in the case
of non-payment of Fixed Net Rent.

    2.04  If any installment of Fixed Net Rent shall not
be paid within ten (10) days after its due date, Tenant shall
pay to Landlord, on demand, interest at the rate of 17-1/2%
per annum compounded monthly on the amount of such installment
from the due date thereof until paid. Tenant shall pay to
Landlord, on demand, interest at such rate on all overdue
Additonal Rent paid on behalf of or by Landlord on behalf of
Tenant from the date of payment on behalf of or by Landlord
until repaid by Tenant.  Tenant shall perform all its obliga-
tions under this lease at its sole cost and expense, and shall
pay all Fixed Net Rent and Additional Rent when due, without
notice or demand.

ARTICLE III

Net Lease

    3.01  (a)  Notwithstanding any other provision of
this lease, this lease is a net lease. Except as otherwise
expressly provided herein, any present or future law to the
contrary notwithstanding, this lease shall not terminate, nor
shall Tenant be entitled to any abatement, reduction, set-off,
counterclaim, defense or deduction with respect to any fixed
rent, additional rent or other sum payable hereunder, nor

-5-

rent, additional rent or other sum payable hereunder, nor
shall the obligations of Tenant hereunder be affected by
reason of: (i) any damage to or destruction of the Premises;
(ii) any taking of the Premises or any part thereof by condem-
nation or otherwise; (iii) any prohibition, limitation,
restriction or prevention of Tenant's use, occupancy or
enjoyment of the Premises, or any interference with such use,
occupancy or enjoyment by any person; (iv) any eviction by
paramount title or otherwise; (v) any default by Landlord
hereunder or under any other agreement; (vi) the impossibility
or illegality of performance by Landlord, Tenant or both;
(vii) any action of any governmental authority; or (viii) any
other cause whether similar or dissimilar to the foregoing.
The parties intend that the obligations of Tenant hereunder
shall be separate and independent covenants and agreements and
shall continue unaffected unless such obligations shall have
been modified or terminated pursuant to an express provision
of this lease.

(b)  Tenant shall remain obligated under
this lease in accordance with its terms and shall not take
any action to terminate, rescind or avoid this lease, notwith-
standing any bankruptcy, insolvency, reorganization, liquida-
tion, dissolution or other proceeding affecting Landlord or
any assignee of Landlord or any action with respect to this
lease which may be taken by any trustee, receiver or liquidator
or by any court.  Tenant waives all rights to terminate or
surrender this lease, or to any abatement or deferment of
Fixed Net Rent, additional rent or other sums payable here-
under.  Any dispute relating to Tenant's obligations, except
the obligation to pay rent, under this Section 3.01 shall be

-6-

OR 11922 PG 2772

settled by Arbitration; it being understood and agreed that in
the event of any such dispute settled by Arbitration, the
arbitrators in rendering their decision shall have no power to
modify any of the provisions of this Section 3.01, including,
without limitation, the first sentence of Section 3.01(a), and
their jurisdiction shall be limited accordingly.

ARTICLE IV

Taxes and Assessments

4.01  (a)  Tenant shall: (i) pay, or cause to be
paid, before any fine, penalty, interest or cost may be added
for non-payment, (A) all taxes (including, without limitation,
single business taxes), assessments, levies, fees, water and
sewer rents and charges, and all other governmental charges,
general and special, ordinary and extraordinary, foreseen and
unforeseen, which are, at any time prior to or during the term
hereof, imposed or levied upon or assessed against the Premises,
(B) all sales, use, value added and similar taxes at any time
levied, assessed or payable on account of the leasing or use
of the Premises and (C) all charges for utilities serving the
Premises, and (ii) reimburse Landlord, promptly upon receipt of
evidence of payment thereof for all Gross Receipts Taxes (as
hereinafter defined).  Tenant shall not be required to pay or
reimburse Landlord for the payment of any franchise, corporate,
estate, inheritance or transfer tax of Landlord or any income,
revenue or profits tax of Landlord based on its general income or
revenues (other than to the extent Tenant is required to reimburse
Landlord for the payment of such a tax pursuant to subparagraph
(ii) above), except to the extent, and only to the extent, such
tax is specifically stated in the legislation or otherwise

-7-

911 11922 2773

clearly demonstrated by the legislative history to be
imposed, levied or assessed in substitution for, or in
substitution for any increase to, any other tax, assessment,
charge or levy which Tenant is required to pay or reimburse
Landlord for the payment of pursuant to the preceding
sentence of this Section 4.01 (hereinafter "Substitute
Taxes"). Nothing in this Section 4.01 shall require Tenant
to pay or reimburse Landlord for the payment of (w) any
federal income tax, or (x) any tax imposed upon the sale of
all or a part of the Premises by Landlord, or (y) any tax,
assessment, charge or levy imposed or levied upon or assessed
against any property of Landlord other than the Premises or
any income to, or business activity of, Landlord not connected
with the Premises. Nothing in this Section 4.01(a) shall
require Tenant to pay or reimburse Landlord for the payment
of any tax if Tenant's payment of such tax or reimbursement
of Landlord for the payment of such tax would violate any
applicable law.

The term "Gross Receipts Taxes" shall mean any State
Tax (as hereinafter defined), levied, assessed or imposed on
Landlord on account of Rental (including, without limitation,
any State Tax imposed on Landlord by reason of Tenant's
payment, or reimbursement of Landlord for payment, of any tax
under this Section 4.01(a)) and any State Tax, including,
without limitation, a value added tax, to the extent measured
by or based upon such rents (if in computing such taxes there
is not allowable as a deduction for the taxable year substan-
tially all of any interest deductions allowed for federal
income tax purposes for the taxable year), provided, however,
Tenant's obligation with respect to the aforesaid Gross

-8-

OR: 11922 PG2774

Receipts Taxes shall be limited to the amount thereof as computed at the rates that would be payable if the Premises were the only property of Landlord (provided, however, that to the extent Landlord has excess deductions or credits from other sources relating to the Premises that may be used to reduce such Gross Receipts Taxes, such deductions or credits shall be so used). The term "State Tax" means any tax or assessment of the state in which the Premises are located or any political subdivision thereof.

(b)  Tenant will furnish to Landlord, promptly after written demand therefor, proof of payment of all items referred to above which are payable by Tenant.  If any assessment may legally be paid in installments, Tenant may pay such assessment in installments; in such event, Tenant shall be liable only for installments which become due and payable prior to or during the term hereof.  To the extent Tenant is responsible to reimburse Landlord for the payment of any Gross Receipts Tax or Substitute Tax, Landlord shall prepare at Landlord's expense the required tax return and deliver a copy of same to Tenant for approval (which approval shall not be unreasonably withheld) at least thirty-five (35) days prior to the due date for the payment of such tax, provided, however, that pursuant to a written request of Landlord or its accountants not less than fifty-five (55) days prior to the date on which such tax is due, Tenant, not less than thirty-five (35) days prior to the date on which such tax is due, shall provide Landlord with any information which is in Tenant's possession or control and otherwise unavailable to Landlord which is required for completion of such tax return.  If Tenant does not notify Landlord of its approval or disapproval of such tax return at

--9--

OR 11922 PG 2775

least ten (10) days prior to the due date for payment of
such tax, such return shall be deemed approved hereunder. If
Tenant notifies Landlord of Tenant's disapproval of such return
[which disapproval shall contain an explanation of the reasons
therefor and a statement of the necessary changes and corrections
(hereinafter the "Corrections") to be made], such return shall
be revised accordingly and forthwith resubmitted to Tenant for
approval at least ten (10) days prior to the payment date.
Tenant shall, at least one (1) days prior to the payment date,
approve such revised return so long as it is consistent with the
Corrections requested by Tenant. If Tenant does not notify
Landlord of its approval or disapproval at least one (1) days
prior to the payment date, such return shall be deemed approved
hereunder. Following approval of such return hereunder, Tenant
shall prior to the payment date pay to Landlord the portion of
the tax for which Tenant is responsible hereunder in reimburse-
ment for Landlord's payment thereof. Alternatively, Tenant
may, at its option, pay such portion of the tax by delivery
to Landlord prior to the payment date of a check payable to
the appropriate taxing authority in such amount. If Tenant
shall fail to make such reimbursement payment to Landlord prior
to the payment date, Tenant shall be liable for all fines,
penalties, late charges, interest and costs which may be
added by such taxing authority for non-payment or late payment,
it being acknowledged by the parties that Tenant's reimburse-
ment payment is essential in order to enable Landlord to pay
such tax. In the event any tax return filed by Landlord in
connection with the foregoing is audited by the applicable
taxing authority, then, in that event (a) Landlord will afford
Tenant (at Tenant's expense) the opportunity to participate with

-10-

OR 11922 PG 2776

Landlord in any audit proceedings and Tenant shall pay to Landlord any additional amount determined to be owing by such taxing authority at least two (2) days prior to the due date for payment thereof.  Landlord will furnish to Tenant promptly upon request such information as may be required by Tenant to verify the accuracy of the tax return.  Landlord and Tenant otherwise agree to cooperate with one another in supplying information necessary to determine, and in determining, the responsibility for the payment of taxes hereunder.  Except to the extent that disclosure shall be required for any bona fide sale or mortgage of the Premises or for legal proceedings in any court, at law or in equity, Landlord shall hold in confidence information obtained from Tenant's records.  Tenant shall be entitled to the benefit of any credit or deduction which reduces any tax required hereunder to be paid or reimbursed by Tenant.  Landlord agrees that, to the extent permissible, it will assert all deductions and credits which will result in the greatest reduction in the amount of, and deferral of payment of, such taxes.

(c) Tenant may at its expense contest any tax, assessment, levy, fee, or other charge payable by Tenant under subparagraph (a) immediately above (herein collectively the "Impositions") in any manner permitted by law, in Tenant's name and, whenever necessary or required by law, in Landlord's name. Landlord shall cooperate with Tenant and shall at Tenant's expense execute any documents or pleadings required for such purpose.  Such contest may include appeals from any judgments, decrees or orders until a final determination is made by a court or governmental department or authority having final jurisdiction in the matter.  Notwithstanding such contest, Tenant shall pay the contested Imposition in the manner and on the dates provided

-11-

Vol 11922 PG 2777

~~for in this Article; provided, however, that if by reason of~~
such contest, payment of the contested Imposition may be deferred
as a matter of law, Tenant may defer payment of the contested
Imposition pending the determination of such contest, except
that if at any time Landlord's estate in the Premises or
any part thereof shall be in danger of being sold or forfeited
by reason of such non-payment, Tenant shall pay the deferred
Imposition within ten (10) days after demand by Landlord.
Upon final determination of any such contest, Tenant shall pay
the contested Imposition in the amount established by such
determination. Any dispute as to whether Landlord's estate is
in danger of being sold or forfeited by reason of such non-
payment shall be settled by Arbitration.

(d)  Any tax refund with respect to Impositions
~~paid by Tenant shall be the property of and retained by Tenant.~~

### ARTICLE V

### Compliance with Laws

5.01  Tenant shall at its expense duly comply, or
cause compliance, with all laws and ordinances and the orders,
rules, regulations and requirements of federal, state and
municipal governments and departments thereof, and the orders,
rules, regulations and requirements of the applicable Board of
Fire Underwriters, if any, or of any other Board now or
hereafter constituted exercising similar functions, as the
case may be, and the requirements of insurance companies that
have issued policies then in force covering the Premises,
ordinary and extraordinary, foreseen or unforeseen, and
whether or not such compliance shall require structural
repairs, additions, changes or alterations (all of the fore-
going being collectively referred to herein as "Requirements").

-12-

OFF. 11922 ₸2778

~~5.02  Notwithstanding anything to the contrary in~~
this lease contained, Tenant shall have the right at its
expense and in its name (or in Landlord's name whenever
necessary) to contest in any manner permitted by law the
validity or enforcement of any such Requirement and to defer
compliance therewith pending such contest, provided (a) such
non-compliance shall not subject Landlord to criminal prosecu-
tion, and (b) Landlord's estate in the Premises shall not be
subject to sale or forfeiture by reason of such non-compliance;
but in any event Tenant shall indemnify Landlord against all
costs, expenses, losses, fines and penalties resulting
therefrom.  Such contest may include appeals from any judg-
ments, decrees or orders until a final determination is made
by a court or governmental department or authority having
final jurisdiction in the matter.  Landlord, without expense
or liability to it, shall cooperate with Tenant and execute
any documents or pleadings required for such contest.

5.03  Any dispute as to the meaning, intent or
application of the provisions of this Article shall be settled
by Arbitration.

## ARTICLE VI

### Assignment and Subletting

6.01  Tenant shall have the right to assign this
lease or its interest hereunder, and at any time and from
time to time to sublet the Premises in whole or in part
to any subtenant or subtenants and to grant licenses and
concessions with respect to the Premises, provided, however,
that each sublease shall expressly be made subject to the
~~provisions hereof.~~

-13-

ᴄᴛ 11922 ᴘᴄ 2779

5.02  No assignment or sublease as herein provided
shall modify or limit any right or power of Landlord hereunder
or affect or reduce any obligation of Tenant hereunder, and
all such obligations shall continue in full effect as obliga-
tions of a principal and not of a guarantor or surety, as
though no assignment or subletting had been made.

ARTICLE VII

Mechanics Liens

7.01  If by reason of any act or omission of Tenant
or any party claiming by, through or under Tenant, any mechanic's
or other lien, charge or order for the payment of money shall
be filed against the fee of the Premises (but not including
the liens and encumbrances set forth in Exhibit B, or any
mortgage, charge, lien, security interest or encumbrance
created by Landlord without the consent of Tenant) Tenant
shall at its expense cause it to be cancelled or discharged of
record by bonding or otherwise within thirty (30) days after
written notice thereof.

7.02  Notwithstanding anything contained in Section
7.01, Tenant shall have the right to contest any such mechanic's
lien or other lien filed against the Premises and shall not be
required to pay or bond such lien if it diligently prosecutes
any such contest and foreclosure of any such lien is stayed by
reason of such contest; but in such event Tenant shall indemnify
Landlord against all costs, expenses, losses, fines and
penalties resulting therefrom.

ARTICLE VIII

Condemnation and Casualty

8.01  (a)  If (i) the use, occupancy or title of the
Premises or any part thereof is taken, requisitioned or sold

-14-

OFF. 11922 PG2780

in, by or on account of any actual or threatened eminent
domain proceeding or other action by any Person having the
power of eminent domain ("Condemnation") during the term
hereof; or (ii) there shall occur during the term hereof any
material damage to or destruction of the Building, then
Tenant may, not later than 180 days after such occurrence,
deliver to Landlord notice of its intention to terminate this
lease on the next date for payment of quarterly installments
of Fixed Net Rent pursuant to Section 2.01 (the "Termination
Date") which occurs not less than 90 days after the delivery
of such notice.  This lease shall terminate on the Termination
Date, except with respect to obligations and liabilities of
Tenant hereunder, actual or contingent, which have arisen on
or prior to the Termination Date, upon payment by Tenant of
all Fixed Net Rent, Additional Rent and other sums then due and
payable hereunder to and including the Termination Date.

(b)  In the event of any Condemnation pursuant
to which Tenant has no right to terminate this lease or elects
not to terminate this lease, as the case may be, the Fixed Net
Rent shall be reduced proportionately in relation to which the
area of the Land so taken bears to the area of the Land before
such taking.

(c)  However, so long as the Original Occupancy
Lease shall be in effect, Tenant may not exercise its right to
terminate this lease as aforesaid unless prior thereto the
Original Occupancy Tenant shall have given notice to Tenant
exercising its right to terminate the Original Occupancy Lease
and, in such event, Tenant, when exercising its right to
terminate, shall furnish Landlord with a copy of the Original
Occupancy Tenant's notice, and this lease shall terminate

-15-

OFF
REC 11022 PG 2781

~~simultaneously with the termination of the Original Occupancy~~
Lease.

(d) If this lease is terminated pursuant to
Section 8.01, the entire award or payment made in such proceed-
ings shall be paid to Landlord and Tenant in proportion to the
Fair Market Value of their respective estates in the Premises
immediately prior to such proceedings, except that there shall
be deducted from Tenant's share of any such award or payment,
and added to Landlord's share of any such award of payment, an
amount equal to the Fair Market Value of the portion of the Land
remaining after such taking, and the provisions of subsection
(b) of Section 8.02 with respect to payment of expenses, fees,
and mortgages shall be applicable.  Upon vesting of title in
any such condemnation proceeding, Landlord shall deed its
interest in the remaining Land to Tenant and title to the
Building shall not vest in Landlord.

8.02  Should Tenant not elect to give the notice
of termination described in Section 8.01, this lease shall be
deemed to continue as to the remaining portion of the Premises.
In such event, or, in the event of any taking in or by condemn-
ation or other eminent domain proceedings of any portion of
the Premises which shall not entitle Tenant to give notice of
its intention to terminate this lease as provided in Section
8.01, the total award or payment made in such proceedings
shall be paid and divided as follows:

(a)  If the Original Occupancy Lease is in
force and effect and Original Occupancy Tenant is not in default
thereunder, Original Occupancy Tenant shall be entitled to and
shall receive any award or payment made in such proceedings to
the extent it is entitled thereto under the Original Occupancy
~~Lease.~~

-16-

11922  2782

(b) If the Original Occupancy Lease is in
force and effect but all or a portion of such award or payment
is to be retained by the landlord under the Original Occupancy
Lease, or if the Original Occupancy Lease is not in force and
effect, any award or payment made in such proceedings and not
paid over to Original Occupancy Tenant shall be allocated
between Landlord and Tenant in proportion to the diminution
in Fair Market Value of their respective estates in the Premises,
provided however, that there shall first be charged to
and deducted from such award all appraisal fees, attorneys' fees
and other expenses actually incurred in connection with such
proceedings.

8.03  For purposes of this Article VIII, Fair Market
Value shall mean the price at which Landlord's interest in the
Land(encumbered by this lease) and reversionary interest in
the Building, or the Tenant's interest in the Building and the
Tenant's interest in this lease, would be sold for cash by a
willing seller not compelled to sell, to a willing buyer not
compelled to buy, if the same were free and clear of all liens
and encumbrances securing the payment of money, but subject to
(a) the Occupancy Lease, if then in effect, and (b) all other
liens, encumbrances, restrictions, easements or agreements
created or approved by either party to the Original Occupancy
Lease with the consent of the other, all as determined pursuant
to the procedures set forth in Article IX hereof.

8.04  If as a result of any casualty, with conse-
quent damage to, or destruction of, the Building, the Original
Occupancy Tenant exercises its option to terminate the Original
Occupancy Lease, and if this lease is terminated by Tenant
pursuant to the terms of this Article, Tenant may retain any

-17-

~~OFF 11922 PG 2783~~

~~and all insurance proceeds recovered or recoverable as a~~
result of such damage or destruction and the Building or what
may remain thereof shall vest in Landlord upon the termination
of this lease as provided in Section 10.01 hereof, unless
Landlord requests Tenant in writing to raze the Building or
what may remain thereof on or before forty-five days prior to
the date of such termination, in which event Tenant shall raze
the Building or remaining portions thereof with reasonable
dispatch and level and clear the Land.

Except as provided for in this Article, Tenant shall
have no right to terminate this lease as a result of damage or
destruction of the Building, whether or not the Original
Occupancy Lease is then in effect.

8.05  Any dispute as to the meaning, intent or
application of the provisions of this Article shall be settled
by Arbitration.

## ARTICLE IX

### Appraisal

9.01  For purposes of Article VIII hereof, whenever a
determination of Fair Market Value is required and the parties
hereto cannot agree within fifteen (15) days upon the Fair
Market Value of the estate or estates in question (or the
diminution of such value), such question shall be submitted to a
board of appraisers, two in number, each of whom shall be a
qualified member of the American Institute of Real Estate
Appraisers, or any successor of such Institute, or if such
organization or successor shall no longer be in existence, a
recognized national association or institute of appraisers.
~~Landlord and Tenant shall each name a separate appraiser.~~

-18-

OFF 11922 PG2784

~~Before proceeding to determine the matter in dispute, the~~
appraisers so appointed shall subscribe and swear to an oath
fairly and impartially to determine such matter. Each appraiser
so appointed shall be instructed to determine independently the
Fair Market Value in accordance with the definition of such term
contained in Section 8.03 hereof and within thirty (30) days of
the making of such request. If only one appraiser shall have
been so appointed within fifteen (15) days of the giving of such
notice, or if two appraisers shall have been so appointed but
only one such appraiser shall have made such determination
within thirty (30) days of the giving of such notice, then the
determination of such appraiser shall be final and binding upon
the parties. If two appraisers shall have been appointed and
shall have made their determinations within the respective
requisite periods set forth above and if the difference between
the amounts so determined shall not exceed 10% of the lesser of
such amounts, then the Fair Market Value shall be an amount
equal to 50% of the sum of the amounts so determined. If the
difference between the amounts so determined shall exceed 10% of
the lesser of such amounts, then such two appraisers shall have
fifteen (15) days to appoint a third appraiser, but if such
appraisers fail to do so, then either party may request the
American Arbitration Association or any successor organization
thereto to appoint an appraiser within fifteen (15) days of such
request, and both parties shall be bound by an appointment so
made within such fifteen (15) day period. If no such appraiser
shall have been appointed within such fifteen (15) days or
within 90 days of the original request for a determination of
Fair Market Value, whichever is earlier, either party may apply
~~to any court having jurisdiction to make such appointment, and~~

-19-

RK 11922 762785

both parties shall be bound by any appointment made by such
court. Any appraiser appointed by the original appraisers, by
the American Arbitration Association or by any such court
shall be instructed to determine, within 30 days after its
appointment, the Fair Market Value of such interests as shall
not have been determined by the first two appraisers in accor-
dance herewith. If the third appraisal of such interests shall
exceed the higher of the first two appraisals, the Fair Market
Value of the interests so determined shall be the higher of the
first two appraisals; if the third appraisal shall be less than
the lower of such appraisals, the Fair Market Value shall be the
lesser of the first two appraisals. In all other cases, the
Fair Market Value of such interests shall be equal to the third
appraisal. This provision for determination by appraisal shall
be specifically enforceable to the extent such remedy is avail-
able under applicable law, and any such determination hereunder
of the Fair Market Value shall be final and binding upon the
parties as the Fair Market Value except as otherwise provided by
applicable law. All costs attributable to any such appraisal
shall be borne equally by Landlord and Tenant.

ARTICLE X

Building

10.01. By virtue of the conveyance from the Original
Occupancy Tenant to Tenant of the Building, Tenant holds legal
title to and possession of the Building, and it is the intention
of Tenant and Landlord that the separation of title to the
Land from title to the Building shall not change the character
of the Building as real property, but any personal property in-
cluded in the Building shall not lose its character as such

-20-

OR 11922 PG2786

personal property. Tenant and Landlord agree, subject, however, to the provisions of Article XVIII, that (i) the leasehold estate created hereby and the Building are and shall be separable; (ii) title to the Building may be effectively transferred without a transfer of this lease; (iii) this lease may be effectively transferred without a conveyance of the Building; and (iv) Tenant may at any time during the term of this lease, or any Extended Term, remove the Building or any portion thereof from the Land, but shall have no obligation to do so, except as otherwise expressly set forth herein and (v) subject further to the provisions of Article XX and Article VIII, upon the expiration or the early termination of this lease because of an Event of Default under Article XVIII, title to the Building, or such portion thereof as shall not have theretofore been removed by Tenant (such right of removal being herewith expressly retained by Tenant), shall automatically vest in Landlord and, at Landlord's request, Tenant shall, at no expense to Landlord, duly execute and deliver to Landlord a quit-claim deed and bill of sale in recordable form conveying and transferring to Land-lord all of Tenant's estate, right, title, interest, claim and demand in and to the Building, and Tenant hereby irrevocably appoints Landlord as its agent and attorney-in-fact, and it is hereby agreed that such agency and power is coupled with an interest, with full power and authority to execute and deliver such deed and bill of sale in its behalf and name; unless the Occupancy Lease has been terminated due to damage or destruc-tion of the Building and Tenant has received insurance proceeds in connection therewith, in which event Landlord may request Tenant in writing forty-five (45) days prior to the expiration of this lease to raze the Building or remaining portions there-

-21-

~~of, in either of which events Tenant shall raze the Building or~~
remaining portions thereof with reasonable dispatch and clear
the Land.

Any personal property owned by Tenant or any sub-
tenant or other occupant of the Premises which shall remain on
the Premises after the expiration or earlier termination
of this lease, may at the option of Landlord, be deemed to
have been abandoned, and may either be retained by Landlord as
its property or be disposed of at Tenant's expense without
accountability by Landlord, as Landlord may see fit.

### ARTICLE XI
#### Use

11.01.  Subject to the rights, if any, of the Original
Occupancy Tenant under the Original Occupancy Lease, Tenant
may use the Premises for any lawful purpose.

### ARTICLE XII
#### Arbitration

12.01.  Subject to the provisions of Article IX hereof,
arbitration of any matter or dispute which under this lease is
specifically to be settled or determined by Arbitration shall
proceed in the following manner:  either party shall notify the
other party of its desire to arbitrate the matter or dispute and
shall state in said notice the name and address of an impartial
person to act as arbitrator hereunder.  Within five (5) business
days after the receipt of such notice, the other party shall give
notice to the sender of the first-mentioned notice, stating the
name and address of an impartial person to act as arbitrator
hereunder.  The arbitrators so specified in such notices shall
~~be experienced in the field of the matter in dispute.  Before~~

-22-

OR: 11922 PG: 2788

~~proceeding to determine the matter in dispute, the arbitrators~~
so appointed shall subscribe and swear to an oath fairly and
impartially to determine such matter.  If within fifteen (15)
days following the appointment of the latter of said arbitra-
tors, said two (2) arbitrators shall be unable to agree in
respect of the matter in dispute, the said arbitrators, shall
appoint by instrument in writing, as third arbitrator, an
impartial person similarly experienced, who upon taking
similar oath, shall proceed with the two (2) arbitrators first
appointed to determine the matter in dispute.  The written
decision of any two (2) of the arbitrators so appointed shall
be binding and conclusive upon the parties hereto.  If after
notice of the appointment of an arbitrator the other party
shall fail within the above-specified period of five (5)
business days to appoint an arbitrator, such appointment of a
similarly experienced arbitrator may be made, upon application
without notice by the person who shall have been appointed an
arbitrator, by the American Arbitration Association or any
successor body or, if there is no successor body, any body
then exercising similar functions (the "Association").  If the
two (2) arbitrators aforesaid shall be unable to agree within
fifteen (15) days following the appointment of the later of
said arbitrators upon the matter in dispute and shall fail
promptly to appoint in writing a third arbitrator, the
third arbitrator shall be appointed by the Association.  If
any arbitrator appointed as aforesaid by either of the parties
or by said Association or by the other two (2) arbitrators so
appointed shall die, be disqualified or incapacitated or shall
fail or refuse to act before such matter shall have been deter-
~~mined, a substitute arbitrator shall promptly be appointed by~~

-23-

~~off 11922 ~c2789~~

~~the person or persons who appointed the arbitrator who shall~~ have died, become disqualified or incapacitated or who shall have failed or refused to act as aforesaid, and if a substitute arbitrator is not so named within five (5) business days after such death, disqualification, incapacity or failure or refusal to act, such substitute arbitrator shall be appointed by the Association.

12.02.   Landlord shall pay the fees of the arbitrator appointed by Landlord, and Tenant shall pay the fees of the arbitrator appointed by Tenant.  The fees of the third arbitrator (if any) shall be paid in equal shares by Landlord and Tenant.

12.03.   Landlord and Tenant shall each have the right to appear and be represented by counsel before said arbitrators and to submit such data and memoranda in support of their respective positions in the matter in dispute as they may deem necessary or appropriate in the circumstances.

12.04.   The award of the arbitrators shall be binding upon the parties and judgment may be entered thereon in any court of competent jurisdiction.  In rendering their decision and award the arbitrators shall have no power to modify any of the provisions of this lease, and the jurisdiction of the arbitrators is limited accordingly.

## ARTICLE XIII
### Notices and Certificates

13.01.   Any notice, statement, certificate, consent, approval, disapproval, request or demand required or permitted to be given in this lease shall be in writing and shall be sent by registered or certified mail, return receipt reques-~~ted, addressed as follows:~~

-24-

OFF. 11922 PG2790

(a)  To the Landlord:
     Lordhill Properties Corp.
     c/o Lawrence Kadish
     135 Jericho Turnpike
     Old Westbury, New York 11568

(b)  To the Tenant:
     Lordhill Naranja Lakes Limited Partnership
     c/o Martin S. Major
     211 East 38th Street
     New York, New York 10016

or to such other address as may be designated by either party
in a written notice given in accordance with the provisions of
this paragraph.

13.02.  Notices to a Leasehold Mortgagee shall be in
writing and shall be sent to such party by registered or
certified mail, return receipt requested, at such address
as may from time to time be designated by it in writing.  A
true copy of each notice sent by Landlord to Tenant pursuant
to Section 13.01 shall simultaneously be sent to the Leasehold
Mortgagee.

13.03.  Within fifteen (15) days after request
by Tenant, Landlord shall from time to time and without charge
deliver to Tenant or to any party specified by Tenant a duly
executed and acknowledged instrument (a) stating that this lease
is unmodified and in full force and effect or, if there have
been any modifications, identifying such modifications and
stating that this lease, as so modified, is in full force and
effect, (b) stating whether Landlord knows of any default by
Tenant in the performance by Tenant of the terms, covenants and
conditions of this lease, and specifying the nature of such
default or defaults, if any, and (c) stating the last date to
which the fixed Net Rent has been paid.

-25-

OFF. 11922 PG 2791

~~13.04.  Within fifteen (15) days after request by~~
Landlord, Tenant shall from time to time and without charge
deliver to Landlord or to any party specified by Landlord a
duly executed and acknowledged instrument (s) stating that
this lease is unmodified and in full force and effect or, if
there have been any modifications, identifying such modifica-
tions and stating that this lease, as so modified, is in full
force and effect, (b) stating whether or not, to Tenant's
knowledge, there are any existing set-offs or defenses by
Tenant to the enforcement by Landlord of the terms, covenants
and conditions of this lease and, if so, specifying them, and
(c) stating the last date to which the Fixed Net Rent has been
~~paid.~~

## ARTICLE XIV

### Waivers, Cumulative Remedies, Etc.

14.01.  The specified remedies to which Landlord
or Tenant may resort under the provisions of this lease are
cumulative and are not intended to be exclusive of any other
remedies or means of redress to which either of them may
be lawfully entitled in case of any breach or threatened
breach by the other of any of the terms, covenants and condi-
tions of this lease.  The failure of Landlord to insist upon
the strict performance of any of the terms, covenants and
conditions of this lease, or to exercise any right or remedy
herein contained, shall not be construed as a waiver or relin-
quishment for the future of such term, covenant or condition.
This lease may not be changed or terminated orally.  In addition
to the other remedies in this lease provided, Landlord and
Tenant shall be entitled to the restraint by injunction of the
violation or attempted or threatened violation of any of the

-26-

OR 11922 PG 2792

terms, covenants and conditions of this lease or to a decree in any court having jurisdiction in the matter compelling performance of any such terms, covenants and conditions.

14.02.  No receipt of monies by Landlord from Tenant before or after any re-entry or after the cancellation or termination of this lease in any lawful manner shall reinstate, continue or extend the term or affect any notice theretofore given to Tenant or operate as a waiver of the right of Landlord to enforce the terms of this lease or to recover possession of the Premises by proper action, proceeding or other remedy.

14.03.  No payment by Tenant or receipt by Landlord for a lesser amount than may be required to be paid hereunder shall be deemed to be other than on account of any such payment, and Landlord may accept such payment without prejudice to Landlord's right to recover the balance of such payment due.

14.04.  Landlord's rights and remedies hereunder shall in all events be subject to provisions of Article XXII hereof.

## ARTICLE XV
### Quiet Enjoyment

15.01.  ~~Subject to the rights of any Leasehold Mortgagee,~~ So long as no Event of Default has occurred and is continuing hereunder, Landlord covenants peaceful and quiet enjoyment of the Land by Tenant, subject to the terms and conditions of this lease.

## ARTICLE XVI
### Excavations on Adjoining Property

16.01.  If an excavation or other building operation shall be made upon any adjoining premises or streets, Tenant

-27-

OFF REC 11922 PG 2793

shall at its expense shore the foundations and walls of the
Building and do any other act or thing necessary for the
preservation of the Building and Landlord shall not be liable
for any inconvenience, annoyance, disturbance or loss of
business or other damage arising therefrom.  Landlord hereby
assigns to Tenant all rights it may have in and to, and Tenant
shall have the exclusive right to sue for and recover from any
adjoining owner or its agents or employees, any amounts expended
by Tenant under the provisions of this Article and any loss or
damage arising from such excavation or from any work performed
to preserve the Premises.

ARTICLE XVII

Indemnity and Insurance

17.01.  Subject to the provisions of Article XXII,
Tenant shall indemnify Landlord against and save it harmless
from any liability to and claims by or on behalf of any party
for death, personal injury or property damage arising from
the use by Tenant of the Premises, any adjoining sidewalk,
curb or vault, and any encroachments from the Premises upon
any adjoining property or street.  The foregoing indemnity
shall also cover all costs, reasonable counsel fees, expenses
and penalties reasonably incurred by Landlord in connection
with any such liability or claim.

17.02.  ~~If the Occupancy Lease is no longer in
affect,~~ Tenant shall maintain public liability insurance
covering all activities on or about the Land in amounts from
time to time comparable to those customarily maintained for
similar properties and naming Landlord as an insured thereunder.

-28-

11922  2794

## ARTICLE XVIII

### Conditional Limitations and Defaults

18.01. Each of the following shall be an "Event
of Default":

(i) if Tenant shall (1) fail to pay any Fixed Net
Rent, Additional Rent or other sum required to be paid by
Tenant hereunder and such failure shall continue for 10 days
after notice to Tenant of such failure, or (2) fail to observe
or perform any other provision hereof and such failure shall
continue for 35 days after notice to Tenant of such failure
(provided, that in the case of any such default which cannot
be cured by the payment of money and cannot with diligence be
cured within such 35-day period, if Tenant shall commence
promptly to cure the same and thereafter prosecute the curing
thereof with diligence the time within which such default may
be cured shall be extended for such period as is necessary to
complete the curing thereof with diligence); or (ii) if Tenant
shall file a petition in bankruptcy or for reorganization or
for an arrangement pursuant to any federal or state bankruptcy
law or any similar federal or state law, or shall be adjudi-
cated a bankrupt or become insolvent or shall make an assign-
ment for the benefit of creditors or shall admit in writing
its inability to pay its debts generally as they become due,
or if a petition or answer proposing the adjudication of
Tenant as a bankrupt or its reorganization pursuant to any
federal or state bankruptcy law or any similar federal or
state law shall be filed in any court and Tenant shall consent
to or acquiesce in the filing thereof or such petition or
answer shall not be discharged or denied within 60 days
after the filing thereof; or (iii) if a receiver, trustee or

-29-

OR 11922 PG2795

liquidator of Tenant or of all or substantially all of the
assets of Tenant, or of the Premises or Tenant's estate
therein shall be appointed in any proceeding brought by
Tenant, or if any such receiver, trustee or liquidator shall
be appointed in any proceeding brought against Tenant and
shall not be discharged within 60 days after such appointment,
or if Tenant shall consent to or acquiesce in such appoint-
ment; or (iv) if the Premises shall have been left unoccupied
and unattended for a period of 60 consecutive days; or (v) if
Tenant shall, in any manner, permit the divestiture of all or
substantially all of its assets (other than in connection with
a merger of Tenant into, or a sale of all or substantially all
of Tenant's assets to, another corporation provided that the
survivor of such merger or the purchaser of such assets shall
assume in writing all of Tenant's obligations under this
lease). The foregoing subparagraph (v) shall not be deemed to
prohibit any bona fide borrowing by Tenant or any of its
subsidiaries in connection with which Tenant grants a lien or
other security interest in its assets.

      18.02.  If an Event of Default pursuant to Section
18.01 (i)(2), (ii), (iii), (iv) or (v) shall occur, and so
long as the Occupancy Lease is then in effect, Landlord
at any time thereafter may at its option give written notice
to Tenant stating that this lease and the term hereby demised
shall expire and terminate on the date specified in such
notice (which shall be no earlier than ten (10) days after the
mailing of such notice) and, unless the Event of Default shall
have been cured by the date specified in such notice, this
lease and the term hereby demised and all rights of the Tenant
under this lease shall expire and terminate on such date as if

-30-

OR. 11922 PG 2706

that date were the date herein definitely fixed for the
termination of the term of this lease, and Tenant shall quit
and surrender the Premises.

18.03.  If this lease is terminated by operation
of law or by issuance of a dispossessory warrant or pursuant
to Section 18.02 or otherwise, Landlord may without notice
re-enter and repossess the Premises, using such force for that
purpose as may be necessary, without being liable to indict-
ment, prosecution or damages therefor.  If Landlord shall so
reenter Landlord may at its option repair and alter the
Premises in such manner as Landlord may deem necessary or
advisable, and/or let or relet the Premises or any parts
thereof for the whole or any part of the remainder of the term
hereof or for a longer period, in Landlord's name or as agent
for Tenant, and out of any rent collected or received as a
result of such letting or reletting Landlord shall first pay
to itself the cost and expense of retaking, repossessing,
repairing and/or altering the Premises and the cost and
expense of removing all persons and property therefrom and
securing any new tenants.  Any balance remaining shall be
applied toward Fixed Net Rent and other payments and charges
reserved herein and unpaid by Tenant for the remainder of the
term hereof.  Landlord shall in no way be responsible or
liable for any failure to relet the Premises or any part
thereof or for any failure to collect any rent due on any such
reletting.

18.04.  Tenant hereby expressly waives the service
of any notice of intention to re-enter provided for in any

-31-

OFF. 11922 PG 2797

statute or of the institution of legal proceedings to that end
and Tenant, for and on behalf of itself and all persons claiming
through or under Tenant, also waives any and all right of
redemption or re-entry or repossession or to restore the
operation of this lease in case Tenant shall be dispossessed by
a judgment or by warrant of any court or judge or in case of
re-entry or repossession by Landlord. The terms "enter",
"re-enter", "entry" and "re-entry", as used in this lease, are
not restricted to their technical legal meaning.

18.05. Each right and remedy of Landlord provided
for in this lease shall be cumulative and shall be in addition
to every other right and remedy provided for in this lease
or now or hereafter existing at law or in equity or by statute
or otherwise, and the exercise or beginning of the exercise
by Landlord of any one or more of the rights or remedies
provided for in this lease or now or hereafter existing at law
or in equity or by statute or otherwise shall not preclude the
simultaneous or later exercise by Landlord of any or all
other rights or remedies.

18.06. Landlord covenants and agrees that so long as
the Original Occupancy Lease remains in full force and effect,
the due and faithful performance of Occupancy Tenant thereunder
(including, without limitation, the exercise by the Occupancy
Tenant of its rights to contest pursuant to Paragraph 20(h) of
the Original Occupancy Lease) shall constitute full and satis-
factory performance of Tenant's obligations hereunder except
with respect to the payment of Fixed Net Rent. Landlord
further covenants and agrees, to the full extent of any
interest it has in the Premises or part thereof or interest
therein, not to sell or convey all or any part of the Premises

-32-

CPH 11922 PG 2798

~~or interest therein without first offering said Premises or~~
part thereof or interest therein to the Original Occupancy
Tenant in accordance with and pursuant to the provisions of
Section 34 (entitled 'Right of First Offer") of the Original
Occupancy Lease (and simultaneously with such offering by
Landlord as aforesaid, Landlord shall deliver to Tenant
written notice of such offering), and upon a rejection by the
Original Occupancy Tenant of said offer Landlord shall there-
upon notify Tenant in writing ("Tenant Notice") of such
rejection and offer said Premises or part thereof or interest
therein to the Tenant hereunder upon the same terms and
conditions as in the offer made to the Original Occupancy
Tenant pursuant to said Section 34, except that Tenant shall
have 10 days after receipt of the Tenant Notice to accept such
~~offer by giving written notice to Landlord.~~

    18.07  In the event of any expiration or termination
of the term of this lease or re-entry or repossession of the
Premises by reason of the occurrence of an event of default,
Tenant will pay to Landlord all Fixed Net Rent, Additional
Rent and other sums required to be paid by Tenant to and in-
cluding the date of such expiration, termination, re-entry or
repossession; and thereafter Tenant shall, until the end of
what would have been the term of this lease in the absence of
such expiration, termination, re-entry or repossession, and
whether or not the Premises shall have been relet, be liable
to Landlord for, and shall pay to Landlord, as liquidated and
agreed current damages:  (i) all Fixed Net Rent, Additional
Rent and other sums which would be payable under this lease by
Tenant in the absence of such expiration, termination, re-entry
or repossession, less (ii) the net proceeds, if any, of any

-33-

OR 11922 - 2799

reletting effected for the account of Tenant pursuant to
Section 18.03, after deducting from such proceeds all Land-
lord's expenses in connection with such reletting (including
all repossession costs, brokerage commissions, reasonable
attorneys' fees and expenses, employees' expenses, alteration
costs and expenses of preparation for such reletting). Tenant
will pay such current damages on the days on which Fixed Net
Rent would be payable under this lease in the absence of such
expiration, termination, re-entry or repossession, and Landlord
shall be entitled to recover the same from Tenant on each such
day.

        18.08  At any time after any such expiration or termi-
nation of the term of this lease or re-entry or repossession
of the Premises by reason of the occurrence of an event of
default, whether or not Landlord shall have collected any
current damages pursuant to Section 18.07, Landlord shall be
entitled to recover from Tenant, and Tenant will pay to Land-
lord on demand, as and for liquidated and agreed final damages
for Tenant's default and in lieu of all current damages beyond
the date of such demand (it being agreed that it would be
impracticable or extremely difficult to fix the actual damages),
an amount equal to the excess, if any, of (a) all Fixed Net
Rent, Additional Rent and other sums which would be payable
under this lease from the date of such demand (or, if it be
earlier, the date to which Tenant shall have satisfied in
full its obligations under Section 18.07 to pay current damages)
for what would be the then unexpired term of this lease in
the absence of such expiration, termination, re-entry or repos-
session, discounted at the rate of 4% per annum over (b) the
then fair rental value of the Land (determined by applying

-34-

11922 2800

a discount rate of 4% per annum) for the same period.  If any
law shall limit the amount of such liquidated final damages to
less than the amount above agreed upon, Landlord shall be
entitled to the maximum amount allowable under such law.

~~ARTICLE XIX~~

~~Fee Mortgages~~

~~19.01   During the term hereof, Landlord may not further encumber its interest in~~

the Premises without Tenant's prior written consent.

ARTICLE XX

Leasehold Mortgages

20.01.  Tenant shall have the right at any time and
from time to time without Landlord's prior consent to mortgage
its interest in this lease and any sublease(s) under one
Leasehold Mortgage without Landlord's prior written consent or
under two or more Leasehold Mortgages with Landlord's prior
written consent; and Tenant shall have the further right to
assign this lease and any sublease(s) as collateral security
for such Leasehold Mortgage(s).  If Tenant shall mortgage this
lease and if the Leasehold Mortgagee or Tenant shall send to
Landlord a true copy of the Leasehold Mortgage together with
written notice specifying the name and address of the Leasehold
Mortgagee, Landlord agrees that so long as any such Leasehold
Mortgage shall remain unsatisfied of record or until written
notice of satisfaction is given by the holder thereof to
Landlord, the following provisions shall apply:

-35-

OR 11922 PG 2801

(a)    There shall be no cancellation, surren-
der or modification of this lease by joint action of Landlord
and Tenant without the prior consent in writing of the Lease-
hold Mortgagee.

(b)    Landlord shall, upon serving Tenant
with any notice of default or termination, simultaneously
serve a copy of such notice upon the Leasehold Mortgagee.
The Leasehold Mortgagee shall thereupon have the same period,
after service of such notice upon it, plus an additional 5
days in the case of a default under Section 18.01(a) and an
additional 20 days in the case of a default under Section
18.01 (b), to remedy or cause to be remedied the defaults
complained of, and the Landlord shall accept such performance
by or at the instigation of such Leasehold Mortgagee as if the
same had been done by Tenant.

20.02.    Notwithstanding anything to the contrary
herein contained, if any default shall occur which pursuant
to any provision of this lease entitles Landlord to terminate
this lease and if, before the expiration of twenty (20)
days from the date of service of a copy of the notice of
termination upon a Leasehold Mortgagee pursuant to Section
20.01(b), the Leasehold Mortgagee shall have notified Landlord
of its desire to nullify such notice (such notification from
the Leasehold Mortgagee being herein referred to as a "Cure
Notice"), then in such event Landlord shall not be entitled to
terminate this lease and any notice of termination theretofore
given shall be void and of no effect, provided that and for so
long as the Leasehold Mortgagee shall either have (a) within
thirty (30) days after service of the Cure Notice complied
or commenced the work of complying with any non-monetary

-36-

OFF. 11922 PG 2002

~~obligations then in default and diligently pursues the work of~~
complying with said non-monetary obligations then in default
~~to completion, or (b) within five (5) days after the service of~~
the Cure Notice complied with any monetary obligations then in
default, or (c) acquired or sold or commenced the process of
acquiring or selling Tenant's interest in this lease by
foreclosure of the Leasehold Mortgage or otherwise.

      20.03.  If Landlord's notice of termination shall
have been nullified pursuant to Section 20.02, Landlord shall
not have the right subsequently to terminate this lease so
long as the Leasehold Mortgagee or its nominee or successor
continues to pay the Rental due hereunder and either (a) the
Leasehold Mortgagee or its nominee proceeds with reasonable
diligence to complete or cause the completion of the work of
curing non-monetary defaults, or (b) the Leasehold Mortgagee
or its nominee proceeds with reasonable diligence to acquire
or sell Tenant's interest in this lease by foreclosure or
otherwise and following such acquisition or sale the Leasehold
Mortgagee or its nominee or any purchaser or assignee of
Tenant's interest in this lease proceeds with reasonable
diligence to complete or cause the completion of the work of
curing non-monetary defaults.

      20.04.  Landlord agrees that the name of the Lease-
hold Mortgagee(s) may be added to the "Loss Payable Endorse-
ment" of any and all insurance policies carried by Tenant in
connection with its use and occupancy of the Premises hereunder.

      20.05.  Landlord agrees that in the event of a
termination of this lease that is not nullified pursuant to
Section 20.02, Landlord shall upon request of any Leasehold
~~Mortgagee enter into a new lease of the Premises with the~~

-37-

OFF 11922 PAGE2803

~~Leasehold Mortgagee or its nominee for a term equal to~~
what would have been the remainder of the term of this Lease
if this lease had not been terminated, which new lease shall
be effective as of the date of such termination and shall
be at the same Rental and upon the same terms, provisions,
covenants and agreements (including renewal and extension
options) as are herein contained, subject to the conditions of
title existing on the date of the execution thereof, but not
subject to any liens or encumbrances created by Landlord
without Tenant's and Occupancy Tenant's consent, provided
that:

(a)   Said Leasehold Mortgagee or its nomi-
nee shall make written request upon Landlord for such new
lease within forty-five (45) days after service upon it of
a copy of the notice of termination;

(b)   Said Leasehold Mortgagee or its nomi-
nee shall pay to Landlord at the time of the execution and
delivery of said new lease the reasonable costs and expenses
of Landlord of lease preparation (including, without limita-
tion, reasonable attorney's fees), and any and all sums which
would at the time of the execution and delivery thereof be due
pursuant to this lease but for such termination, together with
any expenses, including reasonable attorney's fees, which
Landlord shall have incurred by reason of such default.

In the event that said new lease is executed and
delivered as aforesaid, the tenant under such new lease
shall have the same right, title and interest in and to the
Building as Tenant had therein and thereto under the termi-
nated lease prior to the termination thereof.

~~20.06.   Intentionally omitted.~~

-38-

OFF. 11922 PG2804

20.07.  The Leasehold Mortgagee shall be given
notice by Tenant of any Arbitration or appraisal proceedings
hereunder and shall have the right to intervene therein and be
made a party to such proceedings, and the parties hereto do
hereby consent to such intervention.

20.08.  Landlord shall upon Tenant's request execute,
acknowledge and deliver to Tenant and/or each Leasehold
Mortgagee an agreement prepared at the cost and expense of
Tenant and in form reasonably satisfactory to such Leasehold
Mortgagee and Landlord, confirming all or any of the provi-
sions of this Article.  Tenant shall reimburse Landlord for
Landlord's necessary, actual and reasonable counsel expenses
incurred in connection with the review of said agreement.

20.09.  If at any time two or more Leasehold Mort-
gagees request a new lease pursuant to Section 20.05 and/or
tender payment or performance of any obligation on the part of
the Tenant to be paid or performed hereunder, Landlord shall
enter into the new lease with, and shall accept payment or
performance from, the Leasehold Mortgagee then holding the
superior lien.

20.10.  Landlord shall send to the Leasehold Mort-
gagee a written acknowledgment of the receipt by Landlord of
any written notice sent by the Leasehold Mortgagee to Landlord
pursuant to this lease if the Leasehold Mortgagee's written
notice requests such acknowledgment.  If so requested, Land-
lord's acknowledgment shall be sent to the Leasehold Mortgagee
within a reasonably prompt period of time after receipt by
Landlord of the Leasehold Mortgagee's notice.

-39-

OR. 11922 PG 2005

ARTICLE XXI

Non-Disturbance for Successors to Original Occupancy Lease

21.01  If at any time during the term hereof the
Original Occupancy Lease shall be terminated but such termination
shall not have caused this lease to terminate, then, without
prejudice to Tenant's right to sublease the Premises subject
to the rights of Landlord hereunder, if (a) Tenant enters into
a sublease of the entire Premises with any new tenant approved
by Landlord, which approval shall not be unreasonably withheld
or delayed, and (b) such sublease is wholly to the landlord
thereunder, contains default provisions at least as onerous as
contained in the Original Occupancy Lease, and the other terms
of which (including, without limitation, length of term and
rent) not materially less favorable to Landlord (assuming
Landlord became the landlord thereunder by termination of this
lease) or to the landlord thereunder than those that would
have then been in effect under the Original Occupancy Lease,
then so long as such subtenant is not in default under its
sublease, its rights and privileges thereunder and to
possession of the Premises shall not be interfered with by
Landlord for the balance of the Primary Term and so many of
the Extended Terms as to which Tenant's election has been
exercised at the time of entering into the sublease.  Such
nondisturbance will be evidenced by documents in form and
substance reasonably satisfactory to Landlord.  If any such
successor sublease to the Original Occupancy Lease is entered
into, all references herein to Original Occupancy Tenant and
the Original Occupancy Lease (and provisions thereof)  shall
be deemed to refer to the successor subtenant and successor
sublease (and the corresponding sections thereof).

-40-

LIBER 11922 PAGE 2806

## ARTICLE XXII

### No Personal Liability of Landlord or Tenant

22.01  Notwithstanding any other provision hereof,
it is understood and agreed that neither Tenant nor Landlord
shall have any claim or right to proceed against the other or
against the estate, legal representatives, heirs, distributees,
executors, administrators, successors, assigns, partners,
officers, directors or employees of the other, for failure to
perform any covenant or obligation hereunder; provided, however,
nothing contained in this Article XXII shall (a) limit, impair,
restrict or otherwise modify Landlord's rights to terminate this
lease upon the occurrence of any Event of Default hereunder, (b)
limit, impair, restrict or otherwise modify the rights of
Landlord or Tenant to make claims against or to proceed against
the interest of the other in the Land and Building, the Original
Occupancy Lease and sums payable thereunder, or (c) limit,
impair, restrict or otherwise modify any claim or right of
Landlord and/or Tenant against or with respect to Original
Occupancy Tenant arising under or by reason of the Original
Occupancy Lease.

## ARTICLE XXIII

### Landlord May Cure Defaults

23.01  If Tenant shall be in default in the perform-
ance of any of its obligations under this lease and (a) if
such default is in the payment of a sum of money and shall
continue for a period of ten (10) days after written notice
from Landlord or (b) is such default is other than in the
payment of a sum of money and Tenant shall not have commenced
the curing thereof within thirty (30) days after written

-41-

OFF 11922 PG 2807

notice from Landlord or shall not thereafter proceed dili-
gently with the curing thereof, Landlord may do whatever is
necessary to cure such default for the account and at the
expense of Tenant; and the amount of any payment made or
expense incurred by Landlord for such purpose, with interest
thereon at the rate of seventeen and one-half (17 1/2%)
percent per annum, shall be deemed additional rent and shall
be paid by Tenant to Landlord on demand.

### ARTICLE XXIV

### Surrender of Land

24.01   Upon the expiration or sooner termination of
this lease, Tenant shall peaceably and quietly surrender the *Premises*
~~Land~~ to the Landlord, in good order and condition, reasonable
wear and tear and damage by casualty excepted.

### ~~ARTICLE XXV~~

### ~~Joinder in Easements, Etc.~~

~~25.01   Landlord agrees from time to time during the~~
term of this lease, at the request of Tenant, either (A) to the
extent the same has been requested by the Original Occupancy
Tenant or (B) subject to Landlord's approval not to be unrea-
sonably withheld or delayed (i) to grant access and utility
easements affecting the Land which are for the purpose of
providing services for the Building or any part thereof or any
adjoining property owned or leased by Tenant or those claiming
by, through or under Tenant, provided easements which service
adjoining property  shall be located along with the perimeter
of the Land (ii) to dedicate or convey, as required, portions
of the Land for road, highway and other public purposes to
~~provide access for the Building or for any adjoining property~~

-42-

owned or leased by Tenant or those claiming by, through or
under Tenant, (provided that such access for adjoining property
shall be located along the perimeter of the Land) or to permit
widening of existing roads or highways; (iii) to execute
petitions to have the Land or a portion or portions thereof
annexed to any municipality or included within any utility,
highway or other improvement or service district; but only
upon receipt by Landlord of (x) a certificate of an authorized
officer of Tenant stating (A) that such grant or release is
not detrimental to the proper conduct of the business of the
Occupancy Tenant on the Premises, and (B) that such grant or
release does not materially impair the effective use of the
property for its intended purposes or adversely affects its
value; (y) a duly authorized undertaking of Tenant, in form
and substance satisfactory to Landlord, to the effect that
Tenant will remain obligated hereunder to the same extent as
if such grant, conveyance, release, dedication or petition had
not been made; and (z) such other instruments, certificates
(including evidence of authority) and opinions as Landlord may
reasonably request. Landlord further agrees to join in the
execution of, and/or approve any document or instrument
required to be delivered by Tenant to the Original Occupancy
Tenant pursuant to Section 13 of the Original Occupancy Lease.

ARTICLE XXVI

Alterations

26.01  Tenant shall have the right from time to time
during the term hereof, and any extensions or renewals thereof,
to make, at its expense, Alterations (hereinafter defined) in,
on, at or of the Building, provided that no Event of Default

-43-

RK 11922 PG2809

~~than then occurred hereunder and exists beyond any applicable~~
grace period, and subject in all cases to the further provi-
sions of this Article XXVI and to all other applicable provi-
sions of this lease.

26.02  Subject to the rights of the Original Occupancy
Tenant under the Occupancy Lease, no Alteration shall be made
except in compliance with, and Tenant hereby covenants that it
will comply with, each of the following provisions:

(a)  All Alterations shall be made with reason-
able diligence and dispatch (subject to Unavoidable Delays) in
a first-class manner and with first-class materials and
workmanship and shall not materially adversely affect the
value of the Building.

(b)  Before any Alterations are begun, Tenant
shall procure, at its expense, all necessary licenses, permits,
approvals and authorizations from all federal, state and munici-
pal governments and departments thereof having justification in
the matter and deliver photocopies thereof to Landlord.  Upon
Tenant's request, Landlord shall join in the application for
such licenses, permits, approvals and authorizations whenever
such action is necessary, and Tenant covenants that Landlord
will not suffer, sustain or incur any cost, expense or liability
by reason thereof.

(c)  As soon as practicable after the completion
of any Alteration, Tenant shall procure, at Tenant's expense,
all such approvals by Governmental Authorities, if any, of the
completed Alteration as may be required by any applicable law
or ordinance or any applicable rule or regulation of federal,
state and municipal governments and departments thereof having
~~jurisdiction in the matter, and all such insurance organizations'~~

-44-

OR
REC 11922 PG 2010

approvals, if any, as may be required or customary in connection
therewith, and promptly deliver photocopies thereof to Landlord,
together with evidence satisfactory to Landlord that all bills
for labor and materials for the Alteration have been paid and
that the Premises are free and clear of any lien or encumbrance
arising out of such Alteration.

(d)  No Alteration shall create any encroachment
upon any street or upon any adjacent premises, but nothing
herein contained shall be deemed to prohibit Tenant from
constructing any under-sidewalk or sub-surface vaults or from
affixing reasonable projections to the Building, provided
that the same are permitted by law.

(e)  Unless performed entirely within the
enclosure walls of any building then existing on the Land,
Tenant shall promptly deliver to Landlord a copy of a final
survey of the Premises showing the completed Alteration.

(f)  No Alteration shall be made which would
tie in or connect any building or structure on the Land with
any other building or structure located outside the boundary
lines of the Land without the consent of Landlord.

(g)  Nothing contained in this lease shall
constitute any consent or request by Landlord, express or
implied, for the performance of any labor or services or the
furnishing of any materials or other property in respect of
the Premises or any part thereof, nor as giving Tenant any
right, power or authority to contract for or permit the
performance of any labor or services or the furnishing of any
materials or other property in such fashion as would permit
the making of any claim against Landlord or the Premises in
respect thereof.

-45-

~~(h)   As herein used, the term Alterations shall~~
mean any and all construction, reconstruction, replacements,
repairs renewals, alterations, additions, improvements and
substitutions for the Building made from time to time by
Tenant.

~~26.03   Intentionally omitted.~~

## ARTICLE XXVII
### Invalidity of Particular Provisions

27.01   If any term, covenant or condition of this
lease or the application thereof to any person or circum-
stances shall to any extent be invalid or unenforceable, the
remainder of this lease or the application of such term,
covenant or condition to persons or circumstances other than
those as to which it is held invalid and unenforceable shall
not be affected thereby and each term, covenant and condition
of this lease shall be valid and enforceable to the fullest
extent permitted by law.

## ARTICLE XXVIII
### Governing Law

28.01   This lease shall be governed by and construed
in accordance with the laws of the State where the Land is
located.

## ARTICLE XXIX
### Intentionally Omitted

## ARTICLE XXX
### No Merger of Title

30.01   There shall be no merger of Tenant's interest
in this lease nor of the leasehold estate created by this

-46-

OFF. 11922 PG2012

lease with the fee estate in the Premises or any part thereof
by reason of the fact that the same person may acquire or own
or hold, directly or indirectly, (a) Tenant's interest in this
lease or the leasehold estate created by this lease or any
interest therein and (b) the fee estate in the Premises or any
part thereof or any interest therein, and no such merger shall
occur unless and until all persons, including the holder of
any mortgage loan on the Premises having an interest in the
ownership interests described in (a) and (b) above shall join in
a written instrument effecting such merger and shall duly record
the same.

ARTICLE XXXI

Extended Term

31.01  (a) If and for so long as no Event of Default
shall have occurred hereunder and be continuing beyond any
applicable grace or cure periods, if any, Tenant shall have
the right and option to renew this lease on the same terms and
conditions as are contained herein for thirteen (13) succes-
sive five (5) year renewal periods (each such renewal period
herein referred to as an "Extended Term") all such renewal
periods herein collectively referred to as the "Extended
Terms"), the first of which begins upon the termination of
the Primary Term, and the subsequent ones commencing upon
the expiration of the Extended Term immediately preceeding.
Tenant may exercise each such option to extend this lease by
giving written notice to Landlord at least eleven months but
not more than two years prior to the expiration of the then
current term.

        (b) Regardless of the exercise or non-exercise by
Tenant of any or all of the foregoing options in subsection

-47-

OR 11022 PG 2813

~~(a) immediately above Tenant shall have, unless this lease~~
shall be sooner terminated pursuant to the terms hereof or
unless the last day of the term hereof shall be January 31 of
any year, the option to extend (or further extend, as the case
may be) the term of this lease for such period of time (the
"Supplemental Term") as shall cause the last day of the term
of this lease to be January 31 next succeeding the date upon
which the term of this lease would expire but for the exercise
of this option. This option shall be exercised by notice to
Landlord given not less than eleven months but not more than
two (2) years prior to the expiration of the then term of this
lease. Tenant's rental during the Supplemental Term shall be
the same rental payable under this Lease at the time Tenant
notifies Landlord of its intention to exercise this option.

(c) In the case of any of the options set forth in
this Section 31.01, the giving of notice shall automatically
extend this lease for an Extended Term and no instrument of
renewal need be executed, provided that no Extended Term shall
take effect unless this lease is in full force and effect
immediately prior to the commencement thereof.

(d) Notwithstanding anything to the contrary herein
contained, the Tenant shall retain the right to so exercise
any of its aforesaid option to renew or extend after the
expiration of any of said time periods up to and including the
thirtieth (30th) day after receipt by Tenant of written notice
by Landlord stating that the applicable time period has
expired, which written notice Landlord hereby agrees to
promptly deliver to Tenant upon the expiration of such time
period. Any final cancellation or termination of this lease
~~shall terminate any right of renewal hereunder.~~

-48-

OR 11922 PG 2814

## ARTICLE XXXII

### Title and Condition

32.01  The *PREMISES* ~~Land~~ is leased to Tenant in its pre-
sent condition without representation or warranty, express
or implied, by Landlord and subject to (i) the rights of
parties in possession, (ii) Permitted Exceptions, and (iii)
all applicable zoning rules, restrictions, regulations,
resolutions and ordinances and building restrictions and
governmental regulations now or hereafter in effect.  Tenant
has examined the Land and title thereto and has found the
same satisfactory.  Tenant is renting the ~~Land~~ *PREMISES* "as is" in
its present condition and state of repair.  LANDLORD MAKES NO
REPRESENTATION OR WARRANTY WITH RESPECT TO THE CONDITION OF
THE ~~LAND~~ *PREMISES* OR ITS FITNESS OR AVAILABILITY FOR ANY PARTICULAR
USE AND LANDLORD SHALL NOT BE LIABLE FOR ANY LATENT OR PATENT
DEFECT THEREIN.

## ARTICLE XXXIII

### Additional Rights of Landlord

33.01  (a) No right or remedy hereunder shall be
exclusive of any other right or remedy, but shall be cumulative
and in additon to any other right or remedy hereunder or now
or hereafter existing.  Failure to insist upon the strict
performance of any provision hereof or to exercise any option,
right, power or remedy contained herein shall not constitute a
waiver or relinquishment thereof for the future.  Receipt by
Landlord of any Fixed Net Rent, Additional Rent or other sum
payable hereunder with knowledge of the breach of any provision
hereof shall not constitute a waiver of such breach, and no
waiver by Landlord of any provision hereof shall be deemed to

have been made unless made in writing. Landlord shall be
entitled to injunctive relief in case of the violation, or
attempted or threatened violation, of any of the provisions
hereof, or to a decree compelling performance of any of the
provisions hereof, or to any other remedy allowed to Landlord
by law.

(b) Tenant hereby waives and surrenders for itself
and all those claiming under it, including creditors of all
kinds, (i) any right and privilege which it or any of them may
have to redeem the Premises or to have a continuance of this
lease after termination of Tenant's right of occupancy by
order or judgment of any court or by any legal process or
writ, or under the terms of this lease, or after the termina-
tion of the term of this lease as herein provided, and (ii)
the benefits of any law which exempts property from liability
for debt or for distress for rent.

(c) If Tenant shall be in default in the performance
of any of its obligations hereunder, Tenant shall pay to
Landlord, on demand, all expenses incurred by Landlord as a
result thereof, including reasonable attorneys' fees and
expenses. If Landlord shall be made a party to any litigation
commenced against Tenant and Tenant, at its expense, shall
fail to provide Landlord with counsel reasonably approved by
Landlord, Tenant shall pay all necessary and actual costs and
reasonable attorneys' fees incurred by Landlord in connection
with such litigation.

ARTICLE XXXIV

Landlord's Right to Inspect

34.01  Tenant shall permit Landlord, the Mortgagee,
if any, and their respective authorized representatives to

-50-

OR 11922 PG 2816

inspect the Premises during usual business hours.

ARTICLE XXXV.

Option to Purchase at Fair Market Value

35.01    Landlord hereby grants to Tenant the option to
purchase (the "Purchase Option") the Land, as of the end
of the original term of this lease, or if and to the extent
Tenant exercises its options to extend the term of this lease,
as of the end of any current Extended Term (the "Purchase
Option Date") for a price equal to the fair market value of
the Land as unencumbered by this lease or any sublease as
hereinafter determined (the "Fair Market Value") plus in
either case all closing costs including without limitation any
applicable prepayment penalty.  Such option shall be exercised
by written notice from Tenant to Landlord, given not less than
one (1) year prior to the expiration of the original term of
this lease or such Extended Term, as the case may be, and in
each case accompanied by a statement of the Fair Market Value
determined in accordance with Article IX hereof.

To enable Tenant to make an informed judgment with
respect to the foregoing option, and to establish the Fair
Market Value as of the end of the original term of this lease
or any Extended Term, as the case may be, Tenant may notify
Landlord in writing not more than twenty-four (24) months
prior to the expiration of the term of the lease stating that
Tenant desires a determination of Fair Market Value of the
Premises as of the end of the term of the lease.  Thereafter,
Landlord and Tenant shall consult for the purpose of deter-
mining such Fair Market Value as of the end of the term of the
lease and any value agreed upon in writing shall constitute

-51-

RLL 11922 ₚₐ2817

~~such Fair Market Value for the purposes of this Section.  If~~
Landlord and Tenant fail to agree upon such Fair Market Value
prior to 16 months before the expiration of the term of this
lease, Tenant may request that such Fair Market Value be
determined by the appraisal procedure hereinafter described.
Tenant's request for a determination of such Fair Market Value
shall not obligate Tenant to exercise the option provided in
this Article but, if Tenant exercises such option, Tenant and
Landlord shall each pay the fees and disbursements of any
appraiser appointed by it and shall share equally the fees and
expenses of any third appraiser and any other costs and expenses
of any appraisal pursuant to this Section 35.01, while, if
Tenant does not exercise such option, Tenant shall pay all
costs and expenses of any appraisal pursuant to this Section
35.01.  If Tenant exercises the Purchase Option, Landlord shall
transfer and convey or cause the transfer and conveyance of
the Land to the Tenant in accordance with the provisions
of Article XXXIII on the Purchase Option Date, unless Landlord
by written notice to Tenant specifies a different date, which
date may be not more than thirty (30) days prior to or sixty
(60) days after the Purchase Option Date.

There shall be no closing adjustments, other than
for the rent payable by Tenant hereunder for the month in
which the Purchase Option Date occurs and other accrued
obligations of Tenant under the lease.

If Landlord shall be unable to give title or make
conveyance as stipulated, Landlord shall convey such title as
it then has if Tenant elects to accept the same.  The termina-
tion of this lease prior to exercise of the Purchase Option, or
~~prior to or after exercise of the Purchase Option if such~~

-52-

OFF 11922 PG 2810
REC

termination is pursuant to Article XVIII, shall terminate all
rights and obligations of Landlord and Tenant under this Sec-
tion.  If the Purchase Option has been exercised, then the
termination of this lease for any cause except pursuant to
Article XVIII shall not terminate the rights and obligations of
Tenant and Landlord under this Section.  The Purchase Option
shall not be assignable except as part of this lease.

In the event of Tenant's exercise of the Purchase
Option, this lease shall not terminate, except pursuant to
Article XVIII, until the Land shall have been conveyed to
Tenant and the purchase price therefor and all other sums due
under this lease shall have been paid.

### ARTICLE XXXVI
### Right of First Offer

36.01  Subject to Section 18.06 hereof, from and
after the date hereof, Landlord shall not sell or convey
(other than to Tenant as contemplated by this lease) all or
any part of the Land unless Landlord first notifies Tenant
of Landlord's intention so to convey and simultaneously offers
to sell the Land, or such part thereof, to Tenant or its
designee at the price and on such other terms as Landlord
would accept with respect to such a sale to any other person
or entity.  Within thirty (30) days after the giving of such
notice and offer, Tenant or its designee may accept such offer
by giving written notice to Landord.  Any such sale shall be
effected in the manner provided in Article XXXIII, with
conveyance of the Land, or such part thereof, to be made
within ninety (90) days after the acceptance of such offer.
If Tenant or its designee does not accept such offer, this

-53-

OFF. 11922 PG2019

~~lease shall continue in full force and effect and Landlord may~~
convey the Land or such part thereof to any third party,
but only at such price and upon such terms as are no more
favorable to such third party than those set forth in Land-
lord's offer to Tenant referred to above, and provided,
however, that Landlord shall have sold, or entered into a
contract to sell, the Land, or such part thereof, within
180 days after the giving of the aforesaid notice and offer.
It is expressly understood and agreed that Landlord's obliga-
tions under this Section 32.01 are recurring obligations that
shall also bind the successors and assigns of Landlord.

## ARTICLE XXXVII
### Procedure Upon Purchase

37.01  (a)  Title Conveyed.  If Tenant shall purchase
the Land pursuant to this lease Landlord need not convey
any better title thereto than existed on the date of the
commencement of the term hereof, and Tenant or its designee
shall accept such title, subject, however, to all charges,
liens, security interests and encumbrances on the Land
(including without limitation those created or caused to be
created by Tenant) and all applicable legal requirements, but
free of the lien of the Mortgage and charges, liens, security
interests and encumbrances created by or resulting from acts
of Landlord or any successor of Landlord without the written
consent of Tenant.

37.02  Payment of Purchase Price; Costs.  Upon the
date fixed for any purchase of the Land hereunder, Tenant
shall pay to Landlord the purchase price therefor specified
~~herein together with all Basic Rent, Additional Rent and other~~

-54-

~~sums then due and payable hereunder to and including such date~~
of purchase, and Landlord shall deliver to Tenant an appropriate
deed to the Land with covenants against grantor's acts and
any other instruments necessary to assign any other property
then required to be assigned by Landlord pursuant hereto.
Tenant shall pay the purchase price in cash.  Tenant shall pay
all charges incident to such conveyance and assignment,
including counsel fees, escrow fees, recording fees, title
insurance premiums and all applicable taxes (other than any
net income taxes of Landlord) which may be imposed by reason
of such conveyance and assignment and the delivery of said
deed and other instruments.  Upon the completion of such
purchase, but not prior thereto (whether or not any delay or
failure in the completion of such purchase shall be the fault
of Landlord), this lease shall terminate, except with respect
to obligations and liabilities of Tenant hereunder, actual or
contingent, which have arisen on or prior to such date of
~~purchase.~~

ARTICLE XXXVIII

Miscellaneous

38.01 The captions of this lease are for con-
venience and reference only and in no way define, limit or
describe the scope and intent of this lease or in any way
affect this lease.

~~38.02  If Tenant is delayed in performing any obliga~~
tion on its part to be performed hereunder by reason of (a) the
enactment of any law or promulgation of any order or ruling
prohibiting or restricting the performance of such obligation
~~or rationing or restricting the use of labor or materials in~~

-55-

OFF 11922 PG2821

~~connection therewith, (b) strikes, lock-outs or inability to~~
obtain labor or materials, (c) enemy action, (d) civil commo-
~~tion, (e) fire or other casualty, (f) acts of God or (g) any~~
other cause whether similar or dissimilar to the foregoing
beyond Tenant's reasonable control (all of the foregoing
herein called "Unavoidable Delays"), the time within which
Tenant shall perform such obligation and the term hereof, if
necessary, shall be extended for the period of time during
~~which the performance of such obligations was so delayed.~~

38.03  Wherever Landlord's consent or approval is
required hereunder or wherever anything must be done to Land-
lord's satisfaction, Landlord's consent or approval shall
not be unreasonably withheld or delayed and Landlord's reason-
able satisfaction will suffice.

38.04  All sums payable hereunder as "additional
rent" shall be collectible and enforceable as such, subject to
the provisions of Article XXII.

38.05  All pronouns and variations thereof shall be
deemed to refer to the masculine, feminine or neuter, or the
singular or plural, as the indentity of the party or parties
may require.

38.06  This lease contains the entire agreement
between the parties and may be modified only by an agreement
in writing.

~~38.07  Landlord shall at Tenant's request execute,~~
acknowledge and deliver to Tenant a memorandum of this lease
in proper form for recording and memoranda of any modifications
of or amendments to this lease in proper form for recording.
Tenant shall have the right at Tenant's expense to record this
~~lease and/or any such memoranda.~~

-56-

~~OR 11022 PG2022~~

38.08  This agreement shall be binding upon and insure to the benefit of the parties hereto and their respective heirs, administrators, personal representatives, successors and assigns.

IN WITNESS WHEREOF, the parties have executed this agreement as of the day and year first above written.

Landlord:
LORDHILL PROPERTIES CORP.

By:
Name:
Title: V.P.

Tenant:
LORDHILL NARANJA LAKES LIMITED PARTNERSHIP

By: LORDHILL CONTINENTAL CORP.,
Its General Partner

By:
Name:  Arthur B. Malman
Title:  Executive Vice President

-57-

ACKNOWLEDGMENTS

<u>Lordhill Properties Corp.</u>

STATE OF FLORIDA        )
                                            : ss.:
COUNTY OF _____ )

    The foregoing instrument was acknowledged before me this _____ day of _____, 2002, by _____, the _____ of Lordhill Properties Corp., a Delaware corporation, on behalf of the corporation who personally appeared before me and personally known to me or produced a driver's license as identification and did not take an oath.

                                        Notary: _____

[Notarial Seal]                        Print Name: _____

                                         Notary Public, State of _____

                                         My commission expires: _____

<u>Lordhill Naranja Lakes:</u>

STATE OF NEW YORK        )
                                                : ss.:
COUNTY OF NEW YORK      )

    On the 17th day of September _____ in the year 2002 before me, the undersigned, a Notary Public in and for said State, personally appeared Arthur B. Malman, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is(are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

                        SUSAN M. HACKETT
                  Notary Public, State of New York
                     No. 41-4646036     _____
                  Qualified in Queens County      Notary Public
                Commission Expires June 30, 2003

58

## ACKNOWLEDGMENTS

Lordhill Properties Corp.

STATE OF New York )
                                    : ss.:
COUNTY OF Nassau )

    The foregoing instrument was acknowledged before me this 13th day of November, 2002, by Lawrence Kadish , the Vice President of Lordhill Properties Corp., a Delaware corporation, on behalf of the corporation who personally appeared before me and personally known to me or produced a driver's license as identification and did not take an oath.

Notary: Joanna Chiros

[Notarial Seal]

Print Name: Joanna Chiros

Notary Public, State of New York

My commission expires: May 10, 2003

**JOANNA CHIROS**
Notary Public State of New York
No. 01CH6024343
Qualified in Queens County
Commission Expires May 10 2003

OFF. 12401 PG 695

## EXHIBIT A

<u>PARCEL 1</u>

A portion of Tract "D" of Naranja Lakes Shopping Plaza according to the Plat thereof as recorded in Plat Book 120 Page 59 of the Public Records of Dade County, Florida being more particularly described as follows:

Commence at the South (1/4) one-quarter corner of Section 33, Township 56 S, Range 39 E; thence N 0° 49' 13" W 790.57 feet to a point on the centerline of U.S. Highway No. 1; thence N 41° 17' 44" E along said centerline 1310.85 feet to the point of intersection of said centerline with the centerline of Naranja Lakes Boulevard; thence S 48° 42' 16" E along the centerline of said Naranja Lakes Boulevard 58.00 feet; thence N 41° 17' 44" E along the southeasterly right-of-way line of said U.S. Highway No. 1 a distance of 250.00 feet to the POINT OF BEGINNING; thence N 41° 17' 44" E along said southeasterly right-of-way line 154.00 feet; thence S 48° 42' 16" E 140.00 feet; thence N 41° 17' 44" E 106.00 feet; thence N 48° 42' 16" W 40.00 feet; thence N 41° 17' 44" E 180.00 feet; thence S 48° 42' 16" E 247.50 feet; thence S 41° 17' 44" W 30.69 feet; thence S 48° 42' 16" E 298.29 feet; thence S 41° 17' 44" W 609.33 feet to a point on the northeasterly right-of-way line of said Naranja Lakes Boulevard; thence along said right-of-way line N 48° 42' 16" W 470.79 feet; thence N 41° 17' 44" E 200.00 feet; thence N 48° 42' 16" W 175.00 feet to the POINT OF BEGINNING.

<u>PARCEL II</u>

Together with all right, title and interest to a non-exclusive easement in common as set forth in Declaration of Reciprocal Easements dated as of September 15, 1983, recorded September 29, 1983 in Official Record Book 11922, Page 2630, Public Records of Dade County, Florida.

RECORDED IN OFFICIAL RECORDS BOOK
OF DADE COUNTY, FLORIDA
RECORD VERIFIED

RICHARD E. BRINKER
CLERK CIRCUIT COURT

~~REC 11922 PG2824~~

## EXHIBIT B

### PERMITTED ENCUMBERANCES

~~1.    Taxes for the year 1983, not due and payable.~~

2.   Restrictions shown on Plat recorded in Plat Book 91, Page 7, and in Plat Book 120, Page 59, Public Reccords of Dade County, Florida.

3.   Easements as shown on Plat recorded in Plat Book 120, Page 59, Public Records of Dade County, Florida.

4.   Covenant recorded in Official Records Book 9765, Page 191, Public Records of Dade County, Florida.

5.   Restrictions and Easements recorded in Official Records Book 11300, Page 850, Public Records of Dade County, Florida.

6.   Agreements recorded in Official Records Book 8824, Page 301 and Book 8824, Page 302, Public Records of Dade County, Florida.

7.   Encroachment of concrete wall upon 15 foot utility easement on the Southerly side of captioned land as disclosed by survey #83260, prepared by Carr Smith and Associates, Inc., dated August 17, 1983.  This policy insures against loss or damage sustained by the forceable removal of said encroachment.

8.   Terms and conditions of Declaration of Reciprocal Easements dated as of September 15, 1983, recorded ____83R273477__ in Official Record Book 11922, Page 2630 , Public Records of Dade County, Florida.

9.   Development Agreement dated May 20, 1982 between K mart Corporation and Rex Utilities, Inc.

RF 11922 PG 2825

EXHIBIT C

PERMITTED ENCUMBRANCES

~~1.   Taxes for the year 1983, not due and payable.~~

2.   Restrictions shown on Plat recorded in Plat Book 91, Page
     7, and in Plat Book 120, Page 59, Public Records of Dade
     County, Florida.

3.   Easements as shown on Plat recorded in Plat Book 120, Page
     59, Public Records of Dade County, Florida.

4.   Covenant recorded in Official Records Book 9765, Page 191,
     Public Records of Dade County, Florida.

5.   Restrictions and Easements recorded in Official Records
     Book 11300, Page 850, Public Records of Dade County, Florida.

6.   Agreements recorded in Official Records Book 8824, Page 301
     and Book 8824, Page 302, Public Records of Dade County,
     Florida.

7.   Encroachment of concrete wall upon 15 foot utility easement
     on the Southerly side of captioned land as disclosed by survey
     #83260, prepared by Carr Smith and Associates, Inc., dated
     August 17, 1983.  This policy insures against loss or damage
     sustained by the forceable removal of said encroachment.

8.   Terms and conditions of Declaration of Reciprocal Easements
     dated as of September 15, 1983, recorded _____ in
     Official Record Book _____, Page _____, Public Records of Dade
     County, Florida.

9.   Development Agreement dated May 20, 1982 between K mart
     Corporation and Rex Utilities, Inc.

10.  Lease from Naranja Lakes Joint Venture to Family Dollar
     Stores of Florida, Inc. recorded 7-19-01 as #01R382694
     in O.R. Book 19788 at Page 1595.

RICHARD P. BRINKER
CLERK CIRCUIT COURT

**EXHIBIT C**



**Dolores Sanchez <doloresksanchez@gmail.com>**

## FW: IFB--PZP

**Dolores Sanchez <dolores@bizhall.net>**           Wed, Jan 28, 2015 at 6:09 PM
To: doloresksanchez@gmail.com

---

**From:** Dolores Sanchez [mailto:dolores@bizhall.net]
**Sent:** Thursday, September 18, 2014 12:57 PM
**To:** 'Jonathan A. Heller'
**Cc:** 'Consuelo Zapata'
**Subject:** IFB--PZP

Jonathan

Following up on our conversation yesterday about the landlord attempting to terminate the land lease, I just wanted to let your know that the landlord sent my client an official termination letter. Certainly, I will try to get additonal time from the landord so our clients may finish negotiating a work-out. Let me know what the bank plans to do re the tax issue. Also, you had mentioned that you thought that my client did not have insurance. I think we sent you the dec page before when we sent the document package for the modification. I will look through my files and re-send it to you. If we did not, I will get the dec page from my client, and forward it to you. If memory serves me, I believe the hazard/windstorm is good through spring 2015 and the liability comes up for renewal in a month or two.

Dolores
*****************
Dolores K. Sanchez, Esq.
4701 N. Federal Highway
Suite 316, Box B-1
Lighthouse Point, FL 33064
Telephone: (954) 785-8585
Fax:      (954) 785-6163
e-mail:   dolores@bizhall.net

---

 **Termination.pdf**
97K

**EXHIBIT D**



**Dolores Sanchez <doloresksanchez@gmail.com>**

---

## PZP adv IFB
1 message

---

**Dolores Sanchez** <dolores@bizhall.net>             Wed, Dec 10, 2014 at 5:47 PM
To: "Jonathan A. Heller" <jonathan@jhellerlaw.com>
Cc: Consuelo Zapata <czapata1@bellsouth.net>

Jonathan

Per our conversation yesterday, my clients are working with an investor who is interested in buying the land that the building occupies (both the PZP lot and the Lordhill lot) as well as the vacant lot that IFB obtained from PZP. That investor would then allow PZP to occupy the property under an independant agreement. We have been in discussions with Lordhill, and they have advised us of what they would accept for their land. So I have several questions:

1. Is IFB interested in selling the parcel it obtained from PZP, and if so, what would be the asking price?
2. What is the bottom line figure that IFB would accept to settle the remaining debt.

Given the current status of this matter, this scenario would accomplish something for everyone without the expense of litigating a variety of issues including those surrounding the the terminated land lease.

I believe with some effort by all and some creativity, you and I can ressurrect a deal that works for all.

Thanks.

Dolores
*****************

Dolores K. Sanchez, Esq.
4701 N. Federal Highway
Suite 316, Box B-1
Lighthouse Point, FL 33064
Telephone: (954) 785-8585
Fax:    (954) 785-6163
e-mail:   dolores@bizhall.net